NOT FOR PUBLICATION (Docket No. 5)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

_____
                                           :
BRADLEY MANN, et al., on behalf of         :
themselves and all others similarly situated :
                                           :
         Plaintiffs,                       :     Civil No. 09-1062 (RBK/AMD)
                                           :
    v.                                     :     **OPINION**
                                           :
TD BANK, N.A., et al.,                     :
                                           :
         Defendants.                       :
_____        :

**KUGLER**, United States District Judge:

Plaintiffs Bradley Mann and Angelo Capizzi ("Plaintiffs") instituted this consumer class action against three banks and various corporate parent entities alleging a deceptive, misleading, and unlawful course of conduct and advertising in the State of New Jersey. Following voluntary dismissal of certain original defendants, Defendants TD Bank, N.A. and Commerce Bank, N.A. ("Defendants") remain. Defendants now move to dismiss all of Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

For the reasons expressed herein, Defendants' motion will be granted in part and denied in part.

1

I.      **BACKGROUND**[1]

Defendants are national banks based in New Jersey. In what has become big business, Defendants sell gift cards, ranging in value from $25 to $500, to consumers that are accepted for purchases at a wide variety of stores across the country. These gift cards closely resemble a plastic credit card. The face of the card states a "Good Thru" date and a value amount in large raised letters; a magnetic strip is superimposed on the back. The cards come in pre-packaged boxes, and forms that purport to disclose the existence of terms and conditions affecting the cards accompanies the cards inside the boxes. Inside the box, these forms are located in a "hidden pouch within a cardboard folding-envelope." (Compl. at ¶ 41.)

The Gift Cards are subject to certain fees and charges. One such fee, referred to as a "dormancy fee," is assessed monthly against a card that has not been utilized in a specified span of months from the card's date of issuance. In contrast to the conspicuously displayed "Good Thru" date, the exact issuance date is nowhere indicated on the card or accompanying materials and cannot be precisely determined through other available means. The continued assessment of this fee against a particular card can have the effect of completely sapping the card of value well in advance of the card's stated "Good Thru" date. In addition to dormancy fees, Defendants charge a $7.50 "replacement fee," which as the name suggests, is assessed against cards that have been lost and require re-issuance.

In most instances, customers, such as Plaintiffs, purchase Gift Cards from Defendants directly. At the time of purchase, customers are not informed of any material terms affecting the gift cards to include dormancy and replacement fees, nor do customers have the ability to inspect

---

[1]The facts in this section are drawn from the allegations in Plaintiffs' Complaint.

the cards and accompanying disclosures prior to purchase. Unsurprisingly, customers frequently purchase gift cards to present to friends and family as gifts. Such transfers are frequently accomplished by removing the gift card from its packaging and placing the gift card into a standard greeting card, or the like. Regardless of the method of transfer, it would be unusual for a customer to also give the recipient any accompanying statement disclosing terms and conditions.

Defendants market the gift cards through advertising campaigns which boast that "unlike other banks," Defendants' gift cards have "no fees" or are "free." (Compl. at 16.) Defendants also post signs in local bank branch offices and on storefront window billboards that contain similar representations. Despite claiming that its cards are "free" and have "no fees," none of Defendants' advertising discloses the existence of dormancy and replacement fees.

Plaintiffs filed a class action complaint in New Jersey Superior Court Camden County Civil Division against three banks based in either Canada or the United States as well as various corporate parents. The thrust of the Complaint is that the banks' deceptive and misleading sales and advertising conduct violates the New Jersey Consumer Fraud Act, N.J. STAT. ANN. 56:8-1, et seq ("NJCFA"). The Complaint also sounds in contract, alleging breach of the implied warranty of good faith and fair dealing, misrepresentation, and unconscionability. Finally, Plaintiffs' allege unjust enrichment and civil conspiracy.

On March 9, 2009, the original defendants removed to this Court. On March 16, 2009 the original defendants filed the instant Motion to Dismiss arguing that (1) the Court lacks jurisdiction over the Canadian bank defendant; (2) all of Plaintiffs' claims are preempted by the National Bank Act, 12 U.S.C. § 1, et seq., which does not provide for a private cause of action;

3

and (3) the corporate parent defendants cannot be held liable. Subsequently, and pursuant to notice of voluntary dismissal, the Court dismissed without prejudice Plaintiffs' claims against the Canadian bank and corporate parent defendants. Thus, the only issue before the Court is whether the NBA preempts Plaintiffs' claims.

## II. Motion to Dismiss Standard

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint or portions of a complaint may be dismissed for failure to state a claim on which relief can be granted. Fed. R. Civ. P. 12(b)(6). In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must first separate "the factual and legal elements of a claim . . . [accepting the] well-pleaded facts as true, but [disregarding] any legal conclusions." Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (citing Ashcroft v. Iqbal, -- U.S. -- , 129 S.Ct. 1937, 1949 (2009)). Second, the court must "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" Id. at 211 (quoting Iqbal, 129 S.Ct. At 1950). "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n] – 'that the pleader is entitled to relief.'" Iqbal, 129 S.Ct. At 1949 (quoting Fed. R. Civ. P. 8(a)(2)).

## III. DISCUSSION

Defendants argue that Plaintiffs' state law claims are preempted by the NBA and should be dismissed because the NBA does not provide for a private cause of action.[2] Plaintiffs

---

[2] Because Plaintiffs appear to concede that federal law does not provide them with a private cause of action, the Court will assume for purposes of the instant motion that it does not. See Orr v. J.P. Morgan Chase Bank, N.A., No. 08-3661, 2008 WL 5264128, at *4 (E.D. La.

disagree, arguing that their state law claims are not in conflict with the NBA.

### A. Preemption Principles

The Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2, preempts, by way of invalidation, state laws that "interfere with, or are contrary to, federal law." Fellner v. Tri-Union Seafoods, LLC, 539 F.3d 237, 242 (3d Cir. 2008) (quoting Hillsborough County v. Automated Med. Labs., 471 U.S. 707, 712 (1985)). Generally, preemption takes one of three forms, namely (1) express; (2) field; or (3) conflict. As the Third Circuit has explained,

> [t]he Supreme Court has identified three major situations where there is preemption . . . (1) "express" preemption, applicable when Congress expressly states its intent to preempt state law; (2) "field" preemption, applicable when "Congress' intent to pre-empt all state law in a particular area may be inferred [because] the scheme of federal regulation is sufficiently comprehensive" or "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject;" and (3) "conflict" preemption, applicable when "state law is nullified to the extent that it actually conflicts with federal law," even though Congress has not displaced all state law in a given area.

Id. at 242-43 (quoting Colacicco v. Apotex, Inc., 521 F.3d 253, 261 (3d Cir. 2008)).

Ordinarily, there is a presumption against preemption of state laws. In the context of national banks, however, the Supreme Court has a history of "interpreting grants of both enumerated and incidental 'powers' to national banks as grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law." Barnett Bank of Marion County, N.A. v. Nelson, 517 U.S. 25, 32 (1996). The pre-emptive scope of statutes and regulations granting a power to national banks is normally defined by reference to the proposition that "Congress would not want States to forbid, or to impair significantly, the exercise of a power that Congress

---

2008) (no private cause of action under NBA).

explicitly granted." Id. at 33. On the other hand, nationally chartered banks "are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or the general purposes of the NBA." Watters v. Wachovia Bank, N.A., 550 U.S. 1, 13 (2007) (citing Davis v. Elmira Savs. Bank, 161 U.S. 275, 290 (1896)).

B.   **National Banking Powers**

The NBA grants a list of enumerated powers to national banks. 12 U.S.C. § 24 (2006). It also authorizes national banks to "exercise all such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24 (Seventh). Incidental power is not limited to the power to conduct activities "essential to the exercise of enumerated powers," but rather includes the power to conduct activities that are "convenient or useful in connection with the performance" of bank activities. Bank of Am. v. San Francisco, 309 F.3d 551, 562 (9th Cir. 2002) (citation omitted). Such incidental power includes the power to negotiate promissory notes, receive deposits, and loan money. See 12 U.S.C. § 24 (Seventh).

Congress has charged the Office of the Comptroller of Currency ("OCC") with supervision of the NBA. Watters, 550 U.S. at 6. Pursuant to that authority, OCC has authorized national banks to use electronic means to furnish products and services by, for example, "offering electronic stored value systems." 12 C.F.R. 7.5002. Electronic stored value products are "retail payment products in which value is recorded on a personal electronic device or on a magnetic strip or computer chip in exchange for a predetermined balance of funds." Guidance on Electronic Financial Services & Consumer Compliance FFIEC Guidance, OCC 98-31, 1998 WL 460874, at *8 (July 30, 1998).

In connection with the provision of electronic stored value systems and otherwise, OCC

6

authorizes national banks to charge "non-interest charges and fees, including deposit account service charges." 12 C.F.R. § 7.4002. OCC clearly considers dormancy and replacement fees to fall within the ambit of authorized fees. See Gift Card Disclosures, OCC 2006-34, 2006 WL 2384741, at *2 (Aug. 14, 2006). OCC also grants considerable discretion to national banks in calculating the amount of such fees. See 12 C.F.R. § 7.4002(b)(2) (instructing that the calculation of such fees are "business decisions to be made by each bank, in its discretion, according to sound banking judgment and safe and sound banking principles").

    C.    **Application of Preemption Principles to Plaintiffs' Claims**

As an initial matter, Defendants argue that so much of Plaintiffs' claims predicated upon the calculation and assessment of dormancy and maintenance fees is conflict preempted by the NBA.

Conflict preemption comes in two forms, namely "(1) where 'it is impossible for a private party to comply with both state and federal requirements,' and (2) where 'state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Fellner, 539 F.3d at 251 (quoting English v. Gen. Elec. Co., 496 U.S. 72, 78-79 (1990)).

In SPGGC, LLC v. Ayotte, the First Circuit considered whether the NBA preempted a provision of the New Hampshire Consumer Protection Act prohibiting persons from selling gift certificates containing expiration dates and dormancy fees. 488 F.3d 525 (1st Cir. 2007). The court held that the NBA preempted the New Hampshire law by reasoning that the state's prohibition of an activity permitted by the NBA would "significantly interfere" with the bank's statutory power. Id. at 533; see SPGGC v. Blumenthal, 505 F.3d 183, 189 (2d Cir. 2007) (noting, in dicta, that a Connecticut law prohibiting the sale of gift certificates subject to

7

dormancy fees or an expiration date "would be preempted by the OCC's conflicting regulations regarding stored value systems").

To the extent that Plaintiffs' claims are predicated upon the issuance of cards subject to federally authorized fees, the Court agrees with Defendants that such claims are conflict preempted. Although a state prohibition of permissible federal conduct does not make compliance with both federal and state requirements "impossible," the state law clearly stands as an obstacle to federal objectives. This understanding of state laws that stand as an obstacle to federal goals is consistent with the standard conflict preemption case law. See Franklin Nat. Bank of Franklin Square v. People of New York, 347 U.S. 373 (1954) (state banking law forbidding use by national bank of advertisements using word "savings" significantly interferes with national banks' authorization to advertise); Bank of Am. v. City and County of San Francisco, 309 F.3d 551, 559 (9th Cir. 2002) (state law prohibiting charging of ATM fees significantly interferes with national bank's authorization to charge non-interest fees). Accordingly, because federal law clearly authorizes national banks to sell gift cards subject to dormancy and maintenance fees, calculated by national banks in their sound discretion, any application of the NJCFA that would penalize Defendants for doing so is clearly preempted.

Defendants' preemption argument goes further, however, arguing that Plaintiffs' state law claims predicated upon allegedly deceptive and misleading marketing are similarly conflict preempted.

Although there is no "yardstick" for measuring when a state law "significantly interferes with" a national bank's power, Am. Bankers Assoc. v. Lockyer, 239 F. Supp. 2d 1000, 1017 (E.D. Ca. 2002) (citations omitted), the Court is satisfied that the NJCFA, as applied to

Defendants alleged deceptive advertising and marketing, does not.  Unlike the preempted state laws in Ayotte, the state laws at issue in this case do not prohibit Defendants from conducting a discreet banking activity.  Rather, the state laws at issue prohibit Defendants from conducting a discreet banking activity in a certain manner.  The manner of prohibited conduct is not aimed at or specific to the banking industry.  To the contrary, the law simply require all actors to conform to a generally applicable code of conduct regardless of the nature of their business.  See Davis v. Chase Bank U.S.A., N.A., No. 06-4804, 2009 WL 2868817, at * 9 (C.D. Ca. Sept. 3, 2009) (observing that cases considering whether the NBA preempts unfair competition law claims "have tended to distinguish between those claims that arise from generally-applicable duties such as contractual obligations and the duty to refrain from deceptive acts and those that rest on alleged violations of statutes specifically aimed at NBA duties"); Poskin v. TD Banknorth, N.A., No. 06-463, 2009 WL 2981963, at *21 (W.D. Pa. Sept. 11, 2009) (holding that the NBA did not preempt application of a Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 PA. CONS. STAT. § 201-1, et seq., against national bank because the law was not "targeted directly at banking").

Further cutting against a finding of conflict preemption is the fact that the federal and state legal schemes at issue appear to endorse similar national bank conduct.  OCC guidelines clearly instruct banks to sell and market Gift Cards "in a manner in which both purchasers and recipients of gift cards are fully informed of the terms and conditions of the product."  Gift Card Disclosures Guidance on Disclosure and Marketing Issues, OCC 2006-34, 2006 WL 2384741, at *1 (Aug. 14, 2006).  Moreover, OCC is clear that it "expects national bank gift card issuers to take appropriate actions to ensure that critical information is provided in a form that is likely to

9

be readily available to recipients, as well as purchasers, of gift cards." Id. Specifically, OCC discourages "advertising gift cards as having no expiration date if monthly . . . dormancy fees . . . can consume the card balance . . . . Similarly, if such fees may consume the card balance before the stated expiration date . . . disclosures . . . should explain the possibility." Id. at *2. Thus, far from conflicting in the ordinary sense of the word, it appears that federal law discourages the same sort of conduct Plaintiff alleges violates New Jersey law.

Despite this apparent harmony of purpose, Defendants urge the Court to conclude that Plaintiffs' state law claims present an obstacle to the fulfillment of the NBA's purpose by arguing that allowing states' to develop and apply individual legal frameworks for combating unfair and deceptive conduct against national banks would potentially force national banks to conform their conduct to fifty different legal regimes.

Analyzing the state laws at issue from this perspective does give Defendants' argument a certain persuasive force. In Rose v. Chase Bank USA, N.A., for example, holders of credit cards issued by a national bank brought a class action suit against the issuing national bank due to the bank's practice of mailing "convenience checks" to its customers. 513 F.3d 1032 (9th Cir. 2008). When cashed, the convenience checks resulted in a charge against the user's credit card account and the accrual of various charges and fees. Id. at 1035. The credit card holders argued that this practice, in concert with the bank's failure to make adequate disclosures, violated California's Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200, et seq. Id.

The case presented the Ninth Circuit with the question of whether national banks' lending power preempted state laws governing the way in which such lending could be advertised and accomplished. In holding that the NBA preempted the state laws at issue, the court noted that

10

"[w]here, as here, Congress has explicitly granted a power to a national bank without any indication that Congress intended for that power to be subject to local restriction, Congress is presumed to have intended to preempt state laws" such as those at issue. Id. at 1037.

Defendants also refer the Court to a decision out of the Western District of Washington in the case of Fultz v. World Savings and Loan Association, No. C08-343, 2008 WL 4131512 (W.D. Wash. Aug. 18, 2008). In Fultz, plaintiff-mortgagors brought an action against two national banks for alleged misstatement of the true costs and terms of their mortgages as well as for failure to timely provide loan documentation pursuant to the Washington Consumer Protection Act. 2008 WL 4131512, at *1. The court held that the plaintiffs' state law claims were preempted by the NBA because the plaintiffs were using the state law claims "as a vehicle to impose limitations on the exercise of national banks' real estate lending power." Id. at *2. The court noted that OCC had issued specific regulations governing the preemptive force of national banks' lending powers and that these regulations specifically shielded a national bank's lending powers from state laws purporting to regulate a national banks's disclosure and advertising with respect to lending. Id. at *1-*2. Proliferation of state law, concluded the court, "would interfere with the uniform federal scheme." Id. at *2.

Despite the initial appeal of Defendants' arguments, Fultz and Rose do not control here. As noted, both of those cases addressed the preemptive force of national banks' authority to engage in lending. In the area of lending, OCC has interpreted the NBA as manifesting a broad preemptive force. See 12 C.F.R. § 34.4. In fact, in the lending context, OCC regulations specifically indicate that a national bank may make loans "without regard to state law limitations concerning: . . . [d]isclosure and advertising, including laws requiring statements, information, or

11

other content to be included in credit application forms . . . or other credit-related documents[.]" 12 C.F.R. §34.4(a)(9).  In contrast, OCC has not interpreted the NBA as manifesting the same degree of preemptive force in the area of a national bank's power to offer electronic stored value systems.  With respect to electronic stored value systems, OCC provides that:

> As a general rule, and except as provided by Federal law, State law is not applicable to a national bank's conduct of an authorized activity through electronic means or facilities if the State law, as applied to the activity, would be preempted <u>pursuant to traditional principles of Federal preemption</u> derived from the Supremacy Clause of the U.S. Constitution and applicable judicial precedent.  Accordingly, State laws that stand as an obstacle to the ability of national banks to exercise uniformly their Federally authorized powers through electronic means or facilities, are not applicable to national banks.

12 C.F.R. 7.5002 (emphasis added).  The Court also finds it significant that OCC appears to envision that certain state laws against unfair or deceptive practices will remain enforceable against national banks.  See <u>Augstine v. FIA Card Servs., N.A.</u>, 485 F. Supp. 2d 1172, 1175 (E.D. Ca. 2007) (citing Office of the Comptroller of the Currency, Advisory Letter 2002-03 at 3, n.2 (March 22, 2002) ("A number of state laws prohibit unfair or deceptive acts or practices, and such laws may be applicable to insured depository institutions.")).

Nonetheless, Defendants argue that the Supreme Court's recent decision in <u>Watters v. Wachovia Bank, N.A.</u> counsels this Court to liberally interpret the scope of state laws falling into the category of "obstacles" to the NBA.  In <u>Watters</u>, the Supreme Court considered the preemptive scope of the NBA's visitorial powers clause on state law purporting to require subsidiaries of national banks to submit to a state registration, licensing, and inspection regime.  In so doing, the Supreme Court offered a synthesis of judicial precedent on the issue of national

bank preemption, using language admittedly suggestive of a strong preemption preference. For example, the Court observed that "<u>diverse and duplicative</u> superintendence of national banks' engagement in the business of banking . . . is precisely what the NBA was designed to prevent." <u>Watters</u>, 550 U.S. at 13-14 (emphasis added). Indeed, according to the <u>Watters</u> court, the NBA envisions a federal system of banking free from state-created limitations and restrictions, which would naturally be as "'various and as numerous as the States'" themselves. <u>Id.</u> at 14 (quoting <u>Easton v. Iowa</u>, 188 U.S. 220, 229 (1903)).

  Although the Supreme Court styled the aforementioned preemption discussion in the form of a routine legal primer, the Court finds it significant that the specific issue before the Supreme Court in <u>Watters</u> involved the preemptive force of OCC's visitorial powers over national banks. Visitorial powers refer "to a sovereign's supervisory power over corporations. They include any form of administrative oversight that allows a sovereign to inspect books and records on demand . . . ." <u>Cuomo v. Clearing House Ass'n, LLC</u>, -- U.S. --, 129 S.Ct. 2710, 2721 (2009). As the Supreme Court recently explained, visitorial power is a much more encompassing and fundamental power than the mere power to enforce the law. <u>See id.</u> at 2717 ("'[G]eneral supervision and control' and 'oversight' are worlds apart from law enforcement."). Moreover, Congress has, by way of statute, expressly refused to allow states to exercise coordinate visitorial power. 12 U.S.C. § 484(a). Accordingly, in an area of law predominated by such a profound federal presence, the Court is not surprised by the Supreme Court's emphasis on the importance of avoiding duplicative state legal regimes.

  That the Supreme Court found diverse and duplicative state legal regimes anathema to the NBA's exclusive provision of visitorial power over national banks to the Federal government

13

does not, however, necessarily lead to the conclusion that the NJCPL is likewise preempted. Indeed, the Supreme Court has recently noted that "[n]o one denies that the [NBA] leaves in place some state substantive laws affecting banks," and has cited with approval the notion that the NBA envisions a "mixed state/federal regime[] in which the Federal Government exercises general oversight while leaving state substantive law in place." Cuomo, 129 S.Ct. at 2717-18. It may be true, as Defendants argue, that interpreting the NBA as allowing individual states to develop and enforce consumer protection statutes against national bank's advertising and marketing campaigns will significantly increase a national bank's legal compliance burden. In this case, however – where Plaintiffs seek to apply a generally applicable state law against national banks in an area where neither Congress nor OCC has expressly provided for preemption – increased compliance costs strike the Court as a price envisioned by Congress to be paid for the maintenance of our federal system.

## IV. CONCLUSION

For the foregoing reasons, Defendants motion to dismiss is GRANTED with respect to Plaintiffs' claims challenging the issuance of gift cards subject to dormancy and maintenance fees as well as Plaintiffs' claims challenging the amount of said fees. On the other hand, Defendants motion is DENIED with respect to Plaintiffs' claims challenging Defendants' alleged deceptive advertising and marketing. The accompanying Order shall issue today.


Dated: 11-12-2009                                     /s/ Robert B. Kugler
                                                      ROBERT B. KUGLER
                                                      United States District Judge