**EXHIBIT "A"**

1 (Pages 1 to 4)

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
- - -

BRADLEY MANN, et al., on   : Civil Class Action
behalf of himself and all  :
others similarly situated  :

                           :
          v.               :
                           :
TD BANK, NA, et al.     : 1:09-CV-01062-RBK-AMD

- - -
Thursday, March 18, 2010
- - -

Deposition of MATTHEW J. CHEVALIER, taken at
the law offices of Pepper Hamilton, LLP, Two Logan
Square, Suite 3000, Philadelphia, Pennsylvania 19103, on
the above date, beginning at 10:00 a.m., before Brad
Tratenberg, Court Reporter and Notary Public.

- - -

FRANCINE K. GUOKAS
COURT REPORTING
7 Galena Court
Erial, NJ 08081
(215)726-8855      (856)782-1640

---

**Page 2**

2   APPEARANCES:
3      MICHAEL P. LALLI, ESQ.
          -and-
4      LEONARD V. FODERA, ESQ.
       of SILVERMAN & FODERA
5        1835 Market Street, 26th Floor
         Philadelphia, Pennsylvania 19103
6        Counsel for Plaintiffs
7      STEPHEN G. HARVEY, ESQ.
       of PEPPER HAMILTON, LLP
8        Two Logan Square, Suite 3000
         Philadelphia, Pennsylvania 19103
9        Counsel for Defendants
10            - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

**Page 3**

1           (It is stipulated by and between
2      counsel for the respective parties that
3      sealing, certification and filing are waived;
4      and that all objections, except as to the form
5      of the question, are reserved until the time of
6      trial.)
7           - - -
8           ...MATTHEW J. CHEVALIER, having been
9      duly sworn, was examined and testified as
10     follows:
11 BY MR. LALLI:
12     Q     Mr. Chevalier, we just met previously. My name
13 is Michael Lalli and I represent some plaintiffs in a
14 class action that was brought against TD Bank. We're
15 here today to take your deposition. Have you ever been
16 deposed before?
17     A     I have not.
18     Q     Do you know what a deposition is generally?
19     A     Yes.
20     Q     I'm going to go over a few ground rules just to
21 make it simpler, more efficient. It's best if you wait
22 until I finish asking my question before you begin
23 answering the question. That way the court reporter can
24 take down one person speaking at a time instead of

---

**Page 4**

1  having to figure out two people speaking at a time.
2           If you don't understand a question I
3  ask, please let me know. I'm not the greatest wordsmith
4  in the world. So if I ask you a question that's poorly
5  worded and you don't quite understand it, let me know.
6  If you do answer the question, I'm going to assume that
7  you heard it and that you understood it. Is that fair
8  for me to assume?
9      A     Yes.
10     Q     If at any time you want to take a break, let me
11 know. The only caveat to that is, if there's a question
12 pending, I'm going to ask you to answer the question and
13 then you can take your break. Okay?
14     A     Okay.
15     Q     I'm going to ask you to respond to me verbally,
16 no nods of the head or shrugs of the shoulders or uh-uhs
17 or um-hms, because everything's being taken down and
18 it's much easier to take down a yes than it is to take
19 down an uh-huh. Okay?
20     A     Okay.
21     Q     And you understand that you were just put under
22 oath, so the testimony you give here today has the same
23 force and effect as if it were given in court?
24     A     I do.

Case 1:09-cv-01062-RBK-AMD Document 79-1 Filed 09/17/10 Page 3 of 34 PageID: 4192
HANNER et al. vs. TD BANK, N.A. et al.                    MATTHEW U. CHEVALIER
2 (Pages 5 to 8)

| Page 5 | Page 7 |
|---|---|
| 1   Q   Could you please state your name for the<br>2 record?<br>3   A   Matthew James Chevalier.<br>4   Q   And what's your current address?<br>5         MR. HARVEY: Can we just -- I don't<br>6 think we need to have the witness' home address<br>7 on the record.<br>8         MR. LALLI: A business address is fine.<br>9         THE WITNESS: 70 Gray Road in Falmouth,<br>10 Maine.<br>11 BY MR. LALLI:<br>12   Q   And do you understand that you've been brought<br>13 here to testify on behalf of TD Bank?<br>14   A   I do.<br>15   Q   And you understand you've been brought here to<br>16 testify about specific topics on behalf of TD Bank?<br>17   A   Yes.<br>18         MR. LALLI: I'm going to mark this as<br>19     Chevalier-1.<br>20         (Document marked for identification as<br>21     Chevalier exhibit 1.)<br>22 BY MR. LALLI:<br>23   Q   Mr. Chevalier, I've just passed you a<br>24 deposition notice. Have you ever seen this document | 1 testimony to offer on topics B, C, D, E, F, G,<br>2 H, L and M. And I clarified that M, when it<br>3 says takeover, it was a merger. In our<br>4 previous conversation, we verified that you<br>5 weren't interested in the corporate<br>6 transaction, you were interested in integration<br>7 of the Commerce Bank gift card program into TD<br>8 Bank, NA.<br>9         MR. LALLI: That's fair.<br>10 BY MR. LALLI:<br>11   Q   Mr. Chevalier, your counsel just identified<br>12 that you're knowledgeable regarding B through H and L<br>13 and M. Is that fair? Is that correct?<br>14   A   That's correct.<br>15   Q   Are you knowledgeable on any other of the<br>16 topics?<br>17         MR. HARVEY: I'm going to object. I've<br>18 already identified the topics on which he will<br>19 be providing corporate designee testimony.<br>20         MR. LALLI: Okay, I'm still going to<br>21 ask him if he's knowledgeable in certain areas.<br>22 I think it's fair for me to ask what his<br>23 knowledge is.<br>24         MR. HARVEY: He's here in his |

| Page 6 | Page 8 |
|---|---|
| 1 before or any parts of this document before? And you<br>2 can read through it.<br>3   A   Yes.<br>4   Q   You have seen it before?<br>5   A   I've seen these alphabetized pieces before,<br>6 yes.<br>7   Q   So you're talking about the underneath matters<br>8 upon which examination is requested? There's A through<br>9 M. You've seen that before?<br>10   A   Correct.<br>11         MR. HARVEY: Mike, can I ask a<br>12 clarification? This deposition notice has the<br>13 caption for the Pennsylvania action with it. I<br>14 believe there's a similar notice for the New<br>15 Jersey action that's identical. And Mr.<br>16 Chevalier is here today testifying pursuant to<br>17 both of those notices. Is that correct?<br>18         MR. LALLI: That's fine.<br>19         MR. HARVEY: And I will identify -- I<br>20 sent you an e-mail yesterday identifying the<br>21 topics on which this witness would be able to<br>22 offer testimony. He may not be the only<br>23 witness to offer testimony on these subjects.<br>24 But I told you that he would have some | 1 individual capacity. So you can ask questions<br>2 that go beyond the corporate designee scope.<br>3         MR. LALLI: We'll get to that when we<br>4 get to it, I guess.<br>5 BY MR. LALLI:<br>6   Q   Before today, before this deposition, what did<br>7 you do to prepare for the deposition?<br>8   A   I met with my lawyer, my legal counsel. And I<br>9 reviewed our training materials just to refresh myself<br>10 on what we had put out. And I reviewed or refreshed<br>11 myself on just some of the dates in terms of my own<br>12 personal career and on different key dates relative to<br>13 the gift card program.<br>14   Q   So you spoke with your lawyer. Did you speak<br>15 with anyone else?<br>16   A   We had --<br>17         MR. HARVEY: I'm going to object.<br>18 Well, the answer to that is a yes or no.<br>19         THE WITNESS: It's a yes.<br>20 BY MR. LALLI:<br>21   Q   Other than your lawyer, who did you speak with<br>22 to prepare for this deposition?<br>23   A   I spoke with the product manager.<br>24   Q   And who's the product manager? |

3 (Pages 9 to 12)

## Page 9

1  A   Pattie Gallant.
2  Q   Anyone else?
3  A   Operations, Jim Grimmer.
4  Q   Anyone else?
5  A   With counsel. Dan Kadelski.
6  Q   And what's Dan Kadelski's title?
7  A   I'm not sure of his actual title. He's
8  operations for debit.
9  Q   And anyone else?
10 A   No.
11 Q   When you spoke with Pattie, was it just you and
12 Pattie?
13 A   No, this group. Not so much Jim in the group.
14 But it was pretty much Pattie, Dan and our legal
15 counsel.
16 Q   Legal counsel that's here today?
17 A   Correct, Mr. Harvey.
18 Q   And you said not with Jim. You spoke with Jim
19 on your own accord?
20 A   No. I've spoken with Jim about gift card but
21 not in relation to this case.
22 Q   Not in relation to this deposition?
23 A   Correct.
24 Q   But you have spoken to him about gift cards?

## Page 10

1  A   Yes, because he's our operations manager.
2  Q   Just in the normal course of your --
3  A   Just in the normal course of business
4  operations.
5  Q   And you said you reviewed training materials?
6  A   Yes.
7  Q   Any other documents you reviewed?
8  A   Yes.
9  Q   And what were those?
10 A   So the training materials, just to refresh
11 myself market-wise, what we put out, and refreshed
12 myself on the policies and procedures.
13 Q   Anything else?
14 A   I read the deposition of Jim Grimmer. I read
15 the deposition of the plaintiff.
16 Q   Which plaintiff, if you can remember?
17 A   I'm trying to think. Her name escapes me. Her
18 name escapes me.
19 Q   Could it have been Fern Rutberg?
20 A   It was Rutberg. Thank you.
21 Q   Any other deposition transcripts besides Mr.
22 Grimmer's and Miss Rutberg's?
23 A   No. I also read the complaint.
24 Q   Any other documents?

## Page 11

1  A   No.
2  MR. HARVEY: Could we go off the record
3  for just a second?
4  MR. LALLI: Sure.
5  (Discussion off the record.)
6  BY MR. LALLI:
7  Q   Anyone else that you spoke to?
8  A   The individual -- I spoke to an individual
9  about the complaint today. Her name is Mamie Prout.
10 Q   Could you spell the last name for me?
11 A   I believe it's P-R-O-U-T.
12 Q   And her name is Mamie?
13 A   Yes, M-A-M-I-E, I believe.
14 Q   And she is a TD Bank employee or officer?
15 A   She runs our chairman service club or service
16 program.
17 Q   What's the chairman service program?
18 A   That program is if a complaint or --
19 Q   Let me interrupt you for one second. When you
20 say a complaint, you mean a customer complaint?
21 A   A customer complaint, yes. If a customer
22 complaint comes to the president, it will get referred
23 to the chairman service club or service program.
24 Q   And you spoke with her today?

## Page 12

1  A   Correct.
2  Q   And you spoke with her over the phone, in
3  person?
4  A   I spoke with her over the phone.
5  Q   And what did you guys talk about?
6  A   I wanted to get --
7  MR. HARVEY: I'm just going to clarify
8  for the record that this witness has done some
9  things to prepare for a deposition to testify
10 as a corporate designee. As to those, there's
11 no attorney-client privilege, or work product,
12 more importantly. So he can testify about
13 that. Other conversations that he may have had
14 with people in the bank that were not intended
15 to prepare him to testify, they were covered by
16 the work product privilege. They were done in
17 connection with preparation for this litigation
18 but not to prepare himself to testify. So
19 there's a distinction there. He can tell you
20 about the conversation with Mamie Prout.
21 THE WITNESS: Right. So my
22 conversation with Mamie Prout was to get an
23 understanding of the number of complaints that
24 we've had relative to the gift card program and

fc09d5f4-ac8c-47db-8077-89e4d375c9f3

Case 1:09-cv-01062-RBK-AMD   Document 79-1   Filed 09/17/10   Page 5 of 34 PageID: 4194
MANN et al vs. TD BANK, N.A. et al   3-18-10   MATTHEW J. CHEVALIER

4 (Pages 13 to 16)

## Page 13

1    how we've handled it.
2  BY MR. LALLI:
3    Q    Let's just jump right to that because we've
4  already brought it up, and we'll go back to other
5  things.  How do you handle a complaint about the gift
6  card program?  And by "you," I mean TD Bank.
7    A    Okay, yes, because I don't handle the
8  complaints.  When a complaint is made, usually it can be
9  made in the store or over the phone.  Depending on the
10  nature of the complaint, whoever is receiving that
11  complaint will try and resolve it any way they can.  In
12  the case of the chairman service department or office,
13  when those come in either through phone call or through
14  letter, they will be responded to with a phone call or
15  with a letter back to the customer, depending on how --
16  usually we'll respond to 100 percent of the letters that
17  we receive.
18    Q    And the people who respond to those complaints
19  are those that work in the chairman services program?
20    A    Yes, they're responsible, yes.  If they need
21  clarity, they'll come to product management.
22    Q    And who's product management?
23    A    That would be my group.
24    Q    And who is in your group other than yourself?

## Page 14

1    A    So I'm responsible for day-to-day product
2  management.  So I have a staff of five people.
3    Q    Who are they?
4    A    They all deal with the checking business.  So
5  her name is Shelly Photiades.  These folks don't have
6  anything to do with gift card.
7    Q    That's fine.
8    A    They're in the product management group.
9  Sherry Fotiatis, Chris Prew, Julie Johnson, Erin Wolf
10  and Lindsay Sacknoff.
11    Q    And at what locality does your group work?
12    A    They're in Falmouth.
13    Q    So getting back to the customer complaints, you
14  said you talked to Mamie about the number of complaints,
15  the type of complaints with the gift cards.  How many
16  complaints have you guys received over the years
17  regarding gift cards from customers?
18    A    So from 2007 to 2009, we've received 81
19  complaints from gift cards.
20    Q    And I'm sure you don't know the nature of each
21  one of those 81 complaints.  Could you give me a
22  breakdown or some more specific information about what
23  types of complaints were made?
24    A    So approximately 50 percent of the complaints

## Page 15

1  were in relation to fees.  The remainder would be,
2  whether it be a procedural problem of whether the card
3  wasn't loaded correctly or -- pretty much if the card
4  wasn't loaded correctly.  That's what Mamie had told me.
5    Q    And the 50 percent that regarded fees, any
6  specific type of fee?
7    A    She just said fees.
8    Q    Do you know how those complaints were handled?
9    A    So our goal always is to make the customer
10  whole.  So what she told me is, if there was a complaint
11  in regard to the fees, for the most part, they would be
12  reimbursed.
13    Q    When you say for the most part, could you give
14  me any more specific --
15    A    No.  She said we will always try to make the
16  customer whole, give them their fees back.
17    Q    So if a customer complained, for instance, that
18  a dormancy fee or a maintenance fee was assessed on
19  their card and they complained to the chairman services
20  program, odds are that fee would then be reimbursed to
21  the customer?
22    A    I would say that's speculation.  What she told
23  me was, if it was fee-related, they would try to make
24  the customer whole and give them their fees back.

## Page 16

1    Q    Now, these complaints were coming in through
2  phone, through letter?  Any e-mail complaints?
3    A    We didn't get in the details of how they came
4  in.  She just told me the number of the complaints.
5    Q    What type of, I guess, records are kept
6  regarding these customer complaints?
7    A    So I can answer relative to letters.  So if
8  it's a letter that's been written to the president, we
9  would keep a copy of the letter.
10    Q    And who's "we"?
11    A    Sorry.  "We" as in the bank, the chairman
12  services club would keep the letter.
13    Q    And is Mamie Prout the person to talk to if you
14  wanted to get those records?
15    A    If I wanted to get those records?
16    Q    Yes.
17    A    Yes.
18    Q    Besides Mamie -- now, does she run the chairman
19  services program?
20    A    Yes.
21    Q    Is there a committee that runs it or is it just
22  her?
23    A    I'm not sure.  She's responsible for it.  So
24  she has bosses above her but she's responsible for the

Case 1:09-cv-01062-RBK-AMD   Document 79-1   Filed 09/17/10   Page 6 of 34 PageID: 4195
HANNER et al. v. TD BANK, N.A. et al.    3:16 00    MATTHEW U. CHEVALIER
5 (Pages 17 to 20)

| Page 17 | Page 19 |
|---|---|

**Page 17**

1    chairman services program.
2    Q    She's the go-to person?
3    A    She's the go-to person.
4    Q    We may get back to complaints, but let's get
5    back to some more basic information.
6    A    Sure.
7    Q    Where did you go to college?
8    A    I went to the University of Western Ontario in
9    London, Ontario, Canada.
10    Q    Are you originally from Canada?
11    A    I am.
12    Q    When did you graduate?
13    A    1992.
14    Q    And what type of degree did you graduate with?
15    A    Bachelor of arts in political science.
16    Q    Did you have any formal education after
17    graduating in 1992?
18    A    No.
19    Q    What was your first job after graduating in
20    1992?
21    A    I've been with the bank since 1988.
22    Q    When you say the bank, you mean TD Bank or TD
23    Banknorth or --
24    A    Canada Trust.  It was Canada Trust in 1988.  It

**Page 18**

1    became TD Canada Trust in the year 2000.
2    Q    So you've been with the bank since 1988?
3    A    Correct.
4    Q    And I understand that you've had a number of
5    different roles in the bank since 1988?
6    A    Yes.
7    Q    I actually have your Linkedin profile.  So I
8    think this will make the deposition go quicker.
9        (Document marked for identification as
10    Chevalier exhibit 2.)
11    BY MR. LALLI:
12    Q    And before I ask questions about it, could you
13    just explain for the record what Linkedin is?
14    A    My understanding of Linkedin is it's a
15    centralized repository for people to, A, communicate;
16    and B, put up their resumes and credentials.  It's more
17    of a business networking, I would categorize it.
18    Q    And what's been marked as Chevalier-2, as far
19    as you know, is this your current Linkedin profile?
20    A    Yes, correct.
21        MR. HARVEY:  Could I just make a
22    clarification?  I haven't seen this document
23    before, but TD Bank, NA, did not exist until
24    May 31, 2008.  And so Mr. Chevalier's document

**Page 19**

1    here lists TD Bank, a job at TD Bank, June 2006
2    to May 2008.  I think that must have been TD
3    Banknorth, NA, which was a predecessor to TD
4    Bank, NA.
5        THE WITNESS:  That's correct.
6        MR. HARVEY:  I can't vouch for all the
7    other corporate information.
8        MR. LALLI:  Sure.
9        THE WITNESS:  So the same thing, if you
10    look, TD Canada Trust, it wasn't TD Canada
11    Trust until it became TD Canada Trust during
12    the integration.  It was Canada Trust prior to
13    that.  I put TD Canada Trust here just because
14    that's the common name of it today.
15    BY MR. LALLI:
16    Q    So there may be errors in the actual corporate
17    names?
18    A    The legal title, yes.
19    Q    But all in all, you've worked for TD since
20    1988?
21    A    Right, yes.
22    Q    And it has here that your first position was,
23    it just says various retail branch positions, TD Canada
24    Trust, January '88 to January '93.

**Page 20**

1    A    Yes.
2    Q    What were you doing?  What was your job?  What
3    was your position?
4    A    So I started in January 1988 as a teller.  I
5    didn't put all the details because it was 20 years ago.
6    Q    Sure.
7    A    It was teller.  Cage teller, which in Canada
8    means you have a centralized cage where the cash is kept
9    in the branch.  Proof teller.
10    Q    What's a proof teller?
11    A    Sorry.  A proof teller, in those days in
12    Canada, someone would encode a check.  So you did the
13    encoding of checks in the stores.  And then I went on to
14    customer service representative, which is along with
15    mortgages.  And that was within two different branches.
16    Q    And it looks like from this Linkedin profile,
17    you sort of just moved up the chain.
18    A    Correct.
19    Q    Is that fair?
20    A    Yes.
21    Q    And you moved up the chain since 1988 until
22    your present position, which is what?  What's your
23    present position there?
24    A    So right now I am the SVP of day-to-day banking

Case 1:09-cv-01062-RBK-AMD   Document 79-1   Filed 09/17/10   Page 7 of 34 PageID: 4196
MANN et al vs. TD BANK, N.A. et al      3/18/10      MATTHEW J. CHEVALIER

6 (Pages 21 to 24)

## Page 21

1    products.
2    Q    And when did you start at that position?
3    A    In its current form, in May of 2008. I should
4    clarify that I no longer have responsibility for debit
5    and gift card. That went to an another individual that
6    started in January.
7    Q    January of 2010?
8    A    Yes. So he's just started. So we're doing a
9    transition.
10   Q    And who is that person?
11   A    His name is Sunil Kirplani. And I'm
12   transitioning to a new role within the bank.
13   Q    And what would your new role be?
14   A    Retail sales and strategy.
15   Q    As senior vice president of day-to-day banking
16   products from May of '08 until sometime around now --
17   A    In the April time frame. It's not
18   officially -- we're shooting for April 12.
19   Q    What were your roles and responsibilities?
20   A    So I was accountable for the checking products
21   and the P and L on the checking products.
22   Q    P and L is profit and loss?
23   A    Profit and loss, yes. And responsible up until
24   January for debit card. Same thing, P and L. Those are

## Page 22

1    the two major accountabilities.
2    Q    And does debit card include gift cards?
3    A    It does.
4    Q    Any other major responsibilities?
5    A    That would be pretty all-encompassing. So no.
6    Q    Prior to becoming senior vice president of
7    day-to-day banking products, what was your position?
8    A    So it was senior vice president of money in.
9    The only difference between the two is that the prior
10   role had savings in addition to checking.
11   Q    So in your prior role as senior vice president
12   of money in, you still had control over the gift card
13   program?
14   A    From September 2007 on. So what happened was,
15   when I took over the role in June of 2006 --
16   Q    When you say the role, you mean the money in
17   role?
18   A    The money in role when I moved to the U.S. I
19   had checking and savings. In September 2007, I took
20   over debit.
21   Q    Which includes gift cards?
22   A    Which includes gift cards.
23   Q    So from September of 2007 until April 2010,
24   you're the head of gift cards, is that fair to say?

## Page 23

1    A    Yes.
2    Q    Prior to September 2007, did you have any roles
3    in the gift card program at TD at all?
4    A    No.
5    Q    No contact with it at all?
6    A    I wouldn't say no contact because gift card
7    comes out of a checking account. So just by the normal
8    course, we end up having some interactions. But not
9    really a big part of it. It was run by, for the most
10   part, our operations group.
11   Q    And prior to November 2007, who was the
12   operations group?
13   A    Prior to September 2007?
14   Q    You took over, September '07, you took over the
15   gift card, as I understand it?
16   A    Yes.
17   Q    Prior to that, who ran the show for gift cards?
18   A    It was operations.
19   Q    And who was in operations?
20   A    It was Deb Calello, Susan Coward.
21   Q    Susan who?
22   A    Coward. She's no longer with the bank.
23   Q    And Deb Calello, I understand, is still with
24   the bank?

## Page 24

1    A    She is. She's in operations.
2    Q    Do you know where Susan went?
3    A    No.
4    Q    Do you know when she left?
5    A    I don't recall. It was sometime in 2009.
6    Q    Do you know why she left?
7    A    No.
8    Q    Now, I'm inferring, and maybe incorrectly, that
9    you moved to the U.S. in September of 2007?
10   A    No, June 2006.
11   Q    And when you moved to the U.S., you immediately
12   became senior vice president of money in?
13   A    Correct. And just so we're clear, I actually
14   moved in August but I was commuting for a couple of
15   months.
16   Q    And prior to your position as senior vice
17   president of money in, what was your position?
18   A    Sorry. You're saying senior vice president of
19   money in. We really should call it deposit products.
20   Money in is sort of our internal nomenclature. So it's
21   deposit products.
22   Q    I'm sorry.
23   A    I'm sorry, can you repeat the question?
24   Q    Prior to becoming senior vice president of

| Page 25 | Page 27 |
|---|---|
| 1  deposit products or money in, what was your position? | 1  question, you can answer it. |
| 2  A   I was the district vice president of | 2        THE WITNESS:  I was accountable for the |
| 3  Scarborough South. | 3  product management of the gift card program. |
| 4  Q   And what's Scarborough South? | 4  BY MR. LALLI: |
| 5  A   Scarborough is a district within Toronto, | 5  Q   And what does that mean? |
| 6  Ontario. | 6  A   That means, once again, I'm accountable for the |
| 7  Q   What were your duties at that position? | 7  profit and loss of the program itself.  I have |
| 8  A   I had accountabilities for 20 branches.  It | 8  responsibility for the training materials that go out or |
| 9  varied. 20, sometimes it was 19.  We were closing | 9  signing off on the training materials that go out or |
| 10  branches and opening branches.  Anywhere from 16 to 20 | 10  signing off on the marketing materials that go out. |
| 11  branches. | 11  Q   So you review all the training materials before |
| 12  Q   Now, when did you start this position? | 12  they go out to the various branches or wherever they go |
| 13  A   Started that position in October 2003. | 13  to be seen by your employees? |
| 14  Q   And you finished it in June of '06? | 14  A   I sign off.  I make sure that my team has |
| 15  A   Yes. | 15  reviewed them.  Because they're the subject matter |
| 16  Q   When you say you oversaw 20 or so branches, did | 16  experts. |
| 17  you deal with customer complaints at all? | 17  Q   You don't personally go through them word by |
| 18  A   Sometimes. | 18  word?  Your team does that? |
| 19  Q   Any customer complaints related to gift cards | 19  A   So I actually do read them, yes.  And yes, I |
| 20  that you can remember? | 20  would go through them word by word. |
| 21  A   No.  Canada doesn't sell gift cards. | 21  Q   And you said you also sign off on the |
| 22  Q   So those branches didn't sell gift cards at all | 22  marketing.  The terms? |
| 23  when you were there? | 23  A   Yes. |
| 24  A   No.  The gift card product does not exist or | 24  Q   What about the packaging of the gift cards, do |

| Page 26 | Page 28 |
|---|---|
| 1  did not exist in Canada at the time. | 1  you sign off on that as well?  And when I say packaging, |
| 2  Q   So it's fair to say that the first time you had | 2  I mean the green box that the gift cards come in with |
| 3  any control over the gift card program at TD was | 3  the elasticized ribbon. |
| 4  beginning in September of '07? | 4  A   I'm one of the sign-offs. |
| 5  A   Yes. | 5  Q   And who else would be a sign-off besides you? |
| 6  Q   Do you know when TD started their gift card | 6  A   We'd have to make sure that operations signed |
| 7  program? | 7  off, both operations for card and retail operations, as |
| 8  A   And by TD, you mean TD Banknorth? | 8  well as compliance. |
| 9  Q   If there's a difference in timing, yes. | 9  Q   And who in compliance? |
| 10  A   I'm not totally sure.  I think it was a couple | 10        MR. HARVEY:  I'm going to object to the |
| 11  years before I got there.  I'm not sure. | 11        time frame.  You're asking today?  2007? |
| 12  Q   In September of 2007, when you took over the | 12  BY MR. LALLI: |
| 13  gift card program, what did you do?  What were your | 13  Q   We'll start off with when you started.  Who |
| 14  day-to-day roles, responsibilities, really anything you | 14  would have been in compliance? |
| 15  did regarding the gift card program, on a day-to-day | 15  A   It would be Nina Caulkins. |
| 16  basis? | 16  Q   Can you spell the last name? |
| 17        MR. HARVEY:  Object to the form of the | 17  A   I'm going to guess.  C-A-U-L-K-I-N-S, I |
| 18        question. | 18  believe. |
| 19  BY MR. LALLI: | 19  Q   And is she still the person in compliance? |
| 20  Q   Do you understand my question? | 20  A   Yes. |
| 21  A   Yes. | 21  Q   And when you started in September of 2007, who |
| 22  Q   You can answer it. | 22  at operations would have been the person who signed off? |
| 23        MR. HARVEY:  I've objected to the form | 23  A   It would have been Susan Coward or Deb Calello. |
| 24        of the question.  If you understand the | 24  Q   And has that changed at all? |

Case 1:09-cv-01062-RBK-AMD Document 79-1 Filed 09/17/10 Page 9 of 34 PageID: 4198

MANN, et al vs. TD BANK, N.A. et al     J-18-10     MATTHEW G. CHEVALIER

8  (Pages 29 to 32)

| Page 29 | Page 31 |
|---|---|
| 1 A Yes, Stan Kadelski and Deb Calello. Deb works<br>2 for Stan, and Stan works for Sunil.<br>3 Q Did you also sign off on the gift cards<br>4 themselves, the artwork on the gift cards, the writing<br>5 on the gift cards?<br>6 A Can I get clarity on timing again?<br>7 Q Yes. When you started.<br>8 A So when I started in September 2007, it was<br>9 already in place.<br>10 Q At some point, did a new form of the card come<br>11 up for review?<br>12 A Whenever we made a change to the card, I would<br>13 sign off, yes.<br>14 Q When was the first time that happened after you<br>15 started?<br>16 A We always have a new design every holiday<br>17 season. So every year prior to the holidays, usually<br>18 around the October time frame, there's new art that we<br>19 produce.<br>20 Q Did you have to approve new art in October of<br>21 2007?<br>22 A I don't recall if I approved art in October<br>23 2007 or not. It might have been already approved. I<br>24 don't recall. | 1 card, there's obviously some text on the back of the<br>2 card. Is that your understanding?<br>3 A Yes.<br>4 Q Do you also sign off on that?<br>5 A I would, yes.<br>6 Q Anyone else?<br>7 A Pretty much the same people that would be<br>8 involved from the work we would sign off on the back of the<br>9 card. Not so much marketing but certainly compliance.<br>10 Q So that's Nina?<br>11 A Yes, operations, retail operations.<br>12 Q Who actually drafts the disclosures on the back<br>13 of the card?<br>14 A Can you clarify your question?<br>15 Q Who writes the words that are on the back of<br>16 the card?<br>17 A The words are already written. So who<br>18 originally wrote them, I have no idea. That would have<br>19 been done long before I got there.<br>20 Q As far as you know, did the disclosures on the<br>21 back of the card change while you've been there?<br>22 A They did change. I mean, they've changed in<br>23 terms of phone numbers. There was a change made, to my<br>24 understanding, to enhance the disclosures with regard to |

| Page 30 | Page 32 |
|---|---|
| 1 Q But you approved art in October of 2008?<br>2 A I would have approved art from that point<br>3 forward, yes.<br>4 Q So once a year, sometime in the fall?<br>5 A That's typically when we do it. I mean, we<br>6 changed the art at integration because we had to change<br>7 branding. So there were other times where we changed<br>8 art as well.<br>9 Q Now, you're the person who's signing off on it.<br>10 Does anybody else sign off on the art other than maybe<br>11 Nina and Stan or Deb or Susan?<br>12 A So the actual artwork itself, the images on the<br>13 front, they would have been signed off by marketing as<br>14 well.<br>15 Q And when you began, who at marketing would have<br>16 signed off?<br>17 A Probably Tom Dick, I believe.<br>18 Q And did that change at all?<br>19 A Yes. Tom has gone back to Canada. John<br>20 Cunningham heads up our marketing group now. And there<br>21 would be a number of people. Lise Moncilovich is<br>22 another one that's involved today in the changing of the<br>23 art.<br>24 Q Now, apart from the artwork on the front of the | 1 the fees. I believe that change was made by the time I<br>2 got there in 2007, though.<br>3 Q Since you've been there, has there been a<br>4 change to the disclosures?<br>5 A I don't believe so. There would have been<br>6 updates relative to the TD Bank name. But I don't<br>7 believe -- I'm not sure. We would have done tweaks here<br>8 and there, changes here and there. But I wouldn't be<br>9 able to give you specifics in terms of the disclosures.<br>10 Q And when you say we would have done tweaks here<br>11 and there, who are the "we" who are actually making the<br>12 changes?<br>13 A So it depends on where the change originates<br>14 from. If it's from compliance, if it's something that<br>15 we think we want to change, or even within the product<br>16 group, things we want to clarify or enhance. So it<br>17 could come from either of the two groups.<br>18 Q What types of things, what types of changes<br>19 would come from compliance?<br>20 A If there were things that were mandated to be<br>21 on the card. So if there were specific pieces of<br>22 information to be on the card, where the signature goes,<br>23 all those types of things. Anything that is required in<br>24 order to make sure we're compliant would come from |

fc09d5f4-ac8c-47db-8077-89e4d375c9f3

9 (Pages 33 to 36)

| Page 33 | Page 35 |
|---|---|

**Page 33**

1  compliance.
2  Q     And required by whom or what?
3  A     By the regulators.  And oftentimes our
4  compliance folks will make sure that it's more than
5  just -- that we're not just following the letter.  We're
6  a pretty conservative compliance group.
7  Q     Do you also sign off on the -- we've used the
8  word "tri-fold" in previous depositions.  I have a copy
9  of it just to give you.  When you open the gift box,
10  there's a tri-fold, "for you," and there's a message you
11  can write and a to and a from.  Do you also sign off on
12  this?
13  A     Yes.
14  Q     Do you sign off on the terms and conditions
15  that are held within the middle pouch of the tri-fold?
16  A     Yes.
17  Q     And who else would sign off on these?  When you
18  started.
19  A     Same groups, compliance.
20  Q     And that's Nina?
21  A     That's Nina.
22  Q     Who else?
23  A     I'm not entirely sure.  I believe that retail
24  operations would have to sign off as well, Jim Grimmer.

**Page 35**

1  A     Yes.
2  Q     Is he still the head of the -- I forget what
3  you called it.  But the legal department who would work
4  on gift cards.
5  A     No.
6  Q     Who was that or who did that change to?
7  A     I believe Catherine Gilmour is pretty much the
8  main legal for gift card.
9  Q     And is Catherine Gilmour currently the main
10  legal for gift card?
11  A     I believe so.
12  Q     Now, how would any of these topics -- we talked
13  about the actual gift cards themselves, the packaging of
14  the gift cards.  We talked about the training materials,
15  the disclosure on the gift cards, the terms and
16  conditions.  How would they come to you for approval?
17  A     In various forms.
18  Q     Let's go through them.
19  A     Mostly it's e-mail is pretty much how I would
20  see it.  Or it would be presented to me, like if it's
21  talking about artwork, it would be presented to me by
22  marketing and we would say yes, we like it or can we
23  change this?
24  Q     When you say presented, do you mean an

**Page 34**

1  And operations, Deb and Stan.
2  Q     Anyone else?
3  A     Marketing once again.  They're the ones that
4  actually do the printing and all those types of things,
5  the manufacturing.
6  Q     Is there a legal department that looks at this
7  stuff?
8  A     Yes.  So compliance usually works pretty
9  closely with legal.
10  Q     Is it your understanding that any changes that
11  legal wanted would come to you through compliance?
12  A     Yes.
13  Q     And who was the head of the legal department
14  when you began?  When I say began, I mean September
15  2007.
16  A     Can you clarify head of?  Are you talking
17  specifics for the gift card program itself?
18  Q     Sure, if there is a position.
19  A     There isn't specifically as to gift card.  For
20  product in TD Banknorth when I started, it was Einar
21  Anderson.
22  Q     Can you spell that?
23  A     E-I-N-A-R, A-N-D-E-R-S-O-N.
24  Q     And is it Mr. Anderson?

**Page 36**

1  in-person presentation of the artwork?
2  A     Yes.  So story boards, here's what the
3  marketing materials look like.
4  Q     And is it fair to say that the terms and the
5  conditions, the disclosures on the card, the training
6  materials, all that stuff would generally be done via
7  e-mail?
8  A     Yes.
9  Q     And they would come from whatever source they
10  came from, from different people?
11  A     Yes.
12  Q     And would you then e-mail responses back or how
13  did you deal with any concerns or changes you wanted to
14  make or questions you had or any type of feedback?
15  A     It depends on how it was presented.  So if it
16  was a story board, I would give my feedback right there
17  verbally.  If it was through e-mail, I would give my
18  feedback through e-mail.
19  Q     And I'm talking from September of 2007 to
20  present.  Is that the way it's been done?
21  A     Well, not to present because Sunil is doing it
22  now.  But up until Sunil came, yes.
23  Q     Can you guess how many e-mails you've sent and
24  received regarding gift cards?

fc09d5f4-ac8c-47db-8077-89e4d375c9f3

| Page 37 |
|---|
| 1      MR. HARVEY: Object to the form of the |
| 2 question. |
| 3      THE WITNESS: No. |
| 4 BY MR. LALLI: |
| 5 Q     Is it more than 50? |
| 6 A     Can you clarify what type of e-mails you're |
| 7 talking about? |
| 8 Q     Any e-mails regarding changes to any of the |
| 9 topics we spoke about. |
| 10      MR. HARVEY: I'm going to object again |
| 11      because he's asking him to guess. |
| 12 BY MR. LALLI: |
| 13 Q     Is it more than 50? |
| 14 A     Yes, probably. |
| 15 Q     Maybe more than a hundred? |
| 16      MR. HARVEY: Same objection. |
| 17      THE WITNESS: It would be around. |
| 18 BY MR. LALLI: |
| 19 Q     Around a hundred, okay. Do you still have |
| 20 these e-mails? |
| 21 A     Any e-mails that I would have relative to gift |
| 22 card that would be directly -- I keep them in a file |
| 23 folder that we have submitted. |
| 24 Q     I didn't quite hear what you said. Did you say |

| Page 38 |
|---|
| 1 that you have a special file folder for e-mails relative |
| 2 to the gift cards? Is that true? |
| 3 A     Yes. |
| 4 Q     And you produced that to your attorney? |
| 5 A     Yes. |
| 6      MR. HARVEY: And we produced that to |
| 7      you. |
| 8 BY MR. LALLI: |
| 9 Q     Do you know how many e-mails? You said around |
| 10 a hundred. Would you have produced about a hundred |
| 11 e-mails to your attorney? |
| 12 A     I'm not sure of the total amount. I think it |
| 13 was more than that, but I'm not sure of the total |
| 14 amount. |
| 15      MR. HARVEY: Michael, just to be clear, |
| 16      as we indicated in our objections to the |
| 17      discovery responses, we didn't mention Mr. |
| 18      Chevalier, but documents created after the |
| 19      filing of this litigation that concerned this |
| 20      litigation, we didn't consider those |
| 21      responsive. We considered those outside the |
| 22      scope of your request. But things in the |
| 23      ordinary course of business that he |
| 24      communicated back and forth about gift cards, |

| Page 39 |
|---|
| 1 we considered all that within the request. |
| 2      MR. LALLI: And were produced. |
| 3      MR. HARVEY: Were produced, yes. |
| 4 Subject to the privilege, which I'm in the |
| 5 process of reviewing. I don't know if the |
| 6 subject of any of his e-mails were not |
| 7 produced. But I'll let you know in the next |
| 8 few days. |
| 9 BY MR. LALLI: |
| 10 Q     From the time you started in September of '07, |
| 11 did you express any concerns regarding -- and when I say |
| 12 express concerns, I mean either through e-mails or |
| 13 in-person meetings -- regarding any of the training |
| 14 materials that you reviewed? |
| 15 A     No. |
| 16 Q     Did you express any concerns regarding any of |
| 17 the gift packaging itself? When I say gift packaging, I |
| 18 mean the box and the ribbon. |
| 19 A     Can you clarify concerns? |
| 20 Q     As I understand it, that model would have been |
| 21 presented to you. |
| 22 A     Yes. |
| 23 Q     What type of feedback, if at all, would you |
| 24 have given regarding the gift card packaging? |

| Page 40 |
|---|
| 1 A     Pretty much relative to the packaging, that's |
| 2 more of a marketing piece. So I have to make sure it |
| 3 looks nice and marketing gives it to me. So I wouldn't |
| 4 have concerns with the color of the box, the bow, the |
| 5 ribbon, all those things. Because that's more of a |
| 6 marketing piece than anything else. |
| 7 Q     I guess a better question to ask is, have you |
| 8 ever made any changes to the gift card packaging? |
| 9      MR. HARVEY: He himself? |
| 10      MR. LALLI: Yes. |
| 11      MR. FODERA: Or recommended changes. |
| 12      MR. LALLI: That's what I'm getting at. |
| 13      THE WITNESS: No. |
| 14 BY MR. LALLI: |
| 15 Q     Have you ever made or recommended any changes |
| 16 to the training materials that you saw? |
| 17 A     I don't recall. I mean, I may have given some |
| 18 small feedback here and there. I don't recall what the |
| 19 specifics were. Change this, do this formatting. |
| 20 Q     That would have been done via e-mail? |
| 21 A     That would have been done via e-mail had I had |
| 22 comments to it. I'm not sure if I had comments to the |
| 23 training pieces or not. |
| 24 Q     Where do the training materials come from? |

| Page 41 | Page 43 |
|---|---|
| 1   A    The training materials come from a combination | 1  the actual policy itself? |
| 2  of products, my former team, and with the help of | 2   A    To the extent that I believe we keep most |
| 3  learning and development. But for the most part, it's | 3  pieces, most major pieces of customer information for |
| 4  products and operations, to make sure that the | 4  seven years. But other than that, I can't give you |
| 5  operations pieces are correct. | 5  specifics. |
| 6   Q    And learning and development, what's that? | 6   Q    You don't know how long customer complaints are |
| 7   A    That's training, the training group. But | 7  kept? |
| 8  they're more -- we don't deal with learning and | 8   A    No. |
| 9  development relative that much to gift card.  Training | 9       MR. HARVEY:  Just to be clear, I was |
| 10  materials, the training guides that go out, come from, | 10  identifying him more for, I believe that he has |
| 11  really, they're designed by products and operations. | 11  some knowledge regarding some of the other |
| 12   Q    Have you ever made any or recommended any | 12  things in that same section, B.  I assume |
| 13  changes regarding the gift card artwork? | 13  you'll move into that. |
| 14   A    In terms of enhancements, changes in colors, | 14       MR. LALLI:  Yes. |
| 15  things like that? | 15  BY MR. LALLI: |
| 16   Q    Any changes at all to the actual artwork on the | 16   Q    How did you find out about this litigation? |
| 17  gift card. | 17   A    If I recall, through our internal lawyer, Leo |
| 18   A    No. | 18  Doyle, I believe was who informed me. |
| 19   Q    Have you made any or recommended any changes to | 19   Q    And did you receive any instructions to |
| 20  the disclosures that are on the back of the card? | 20  preserve documents? |
| 21   A    I don't believe so. | 21   A    Yes. |
| 22   Q    So everything regarding the disclosures on the | 22   Q    What were those instructions? |
| 23  back of the card that you saw was good enough, was | 23   A    To preserve documents, to preserve any and all |
| 24  approved by you? | 24  documents that would be in relation to gift card. |

| Page 42 | Page 44 |
|---|---|
| 1   A    Yes. By the time it gets to me, it's been | 1   Q    And how did you go about doing that? |
| 2  through a number of different people. So yes. | 2   A    I didn't destroy any of the documents that |
| 3   Q    Now, when we started, your attorney said that | 3  relate to gift card. |
| 4  you may have information regarding the document | 4   Q    You didn't destroy any of the documents under |
| 5  retention and destruction policies of TD Bank. Is that | 5  your control? |
| 6  correct? | 6   A    Correct. |
| 7       MR. HARVEY:  Just to be clear, it's a | 7   Q    Did you pass along that instruction to anyone |
| 8  longer phrase.  I didn't specifically identify | 8  else? |
| 9  that. | 9   A    Yes. |
| 10  BY MR. LALLI: | 10   Q    To whom? |
| 11   Q    Do you have knowledge regarding TD Bank's | 11   A    We determined who would be the people who would |
| 12  document destruction or retention policies? | 12  have relevant information.  And we asked or we passed on |
| 13   A    Yes. | 13  the requirement to hold documents to all of those |
| 14   Q    What are they? | 14  people. |
| 15   A    I can't give you the specifics. I know we have | 15   Q    Do you know who they are? |
| 16  a document retention policy and I know it's governed by | 16   A    I don't know if I could give you the exhaustive |
| 17  our compliance group. | 17  list, but it was pretty much everyone that we've talked |
| 18   Q    And that's Nina? | 18  about.  So Jim Grimmer, Deb Callelo, Stan Kadelski. We |
| 19   A    Correct. | 19  put a list of folks together, which we've already |
| 20   Q    So for questions specific to the document | 20  produced. |
| 21  retention and/or destruction policy, Nina would be the | 21   Q    So there was a list of people who may have had |
| 22  person to speak to? | 22  relevant documents created by someone? |
| 23   A    Yes. | 23   A    Yes. |
| 24   Q    Do you have any specific knowledge regarding | 24   Q    And who created that document? |

Case 1:09-cv-01062-RBK-AMD Document 79-1 Filed 09/17/10 Page 13 of 34 PageID: 4202

MANN et al vs. TD BANK, N.A. et al                    ED 90    MATTHEW J. CHADDER

12 (Pages 45 to 48)

| Page 45 | Page 47 |
|---|---|

**Page 45**

1  A    Who created the document? We met as a group to
2  say let's understand who would be on that list. Who
3  actually created the e-mail, I don't recall if it was me
4  or Leo or who it was.
5  Q    When you say "we" met, who's "we"?
6  A    So it would have been the same, so myself,
7  Pattie, our counsel, Leo Doyle. And I believe that was
8  it for that meeting.
9  Q    And was that list of people turned over to your
10  counsel?
11  A    Yes.
12  Q    Was your IT department brought in for this at
13  all?
14  A    Yes.
15  Q    Who's the head of the IT department?
16  A    Can you clarify the question? Are you talking
17  all of IT?
18  Q    I guess who at IT was consulted for this
19  litigation?
20        MR. HARVEY: You mean for purpose of
21  the litigation?
22        THE WITNESS: I'm not sure. I would
23  have dealt with Kevin Rogue, who was my IT
24  contact. But I'm not sure who we put on the

**Page 47**

1  him not to answer that. If you have something
2  specific that you're getting at that's not work
3  product, I'd be happy to discuss and explore
4  this with you. But I think, in general, this
5  is someone who's been communicating with
6  counsel in preparation for this litigation, and
7  that's work product.
8        (Discussion off the record.)
9        MR. FODERA: The steps that he took are
10  not covered by the work product document
11  doctrine. In other words, I went to this, I
12  went to here, I went to here. What he put
13  together from that is part of the work product.
14        MR. HARVEY: No, I think the steps he
15  took would be protected by the work product
16  doctrine as well.
17  BY MR. LALLI:
18  Q    Your counsel has instructed you not to answer
19  what steps you took to identify potentially relevant
20  documents for this litigation. Do you understand that?
21  A    Yes.
22  Q    Are you going to listen to him or are you going
23  to answer the question?
24  A    I'm going to listen to him.

| Page 46 | Page 48 |
|---|---|

**Page 46**

1      list.
2  BY MR. LALLI:
3  Q    And where does Kevin work?
4  A    In Falmouth, Maine.
5  Q    Were you involved in the identification of
6  potentially relevant information?
7        MR. HARVEY: Object to the form of the
8  question. I think that goes to the
9  attorney-client privilege and work product
10  document. I'm going to instruct him not to
11  answer.
12        MR. LALLI: All I want to know is, he
13  took steps to identify what documents were
14  relevant to this litigation. I don't think
15  that's privileged. I don't see how
16  attorney-client privilege would even apply to
17  that.
18        MR. HARVEY: It would be work product
19  if it was done in preparation for this
20  litigation and particularly but not necessarily
21  if it was done at the direction of counsel. So
22  his effort to identify any documents for
23  purposes of this litigation would be, I
24  believe, work product and I'm going to instruct

**Page 48**

1        MR. HARVEY: Now, just to be clear, if
2  you're talking about in terms of preservation,
3  what efforts were made to identify documents
4  just solely for purposes of preservation, if he
5  did anything, he can tell you about that
6  subject. But if you're speaking more broadly
7  than that -- that's my point here -- I'm
8  willing to work with you to get you the
9  information you need, but I think it's
10  protected.
11        MR. LALLI: We will go to there then.
12  BY MR. LALLI:
13  Q    What steps did you take to identify documents
14  that would be preserved?
15  A    So personally all I did was make sure, I always
16  kept a gift card file folder in my e-mail. And I just
17  didn't delete anything out of that. So that's all I
18  did.
19  Q    Did you instruct anyone else regarding what
20  steps should be taken to preserve certain documents?
21  A    Once again, we produced an e-mail to all the
22  people that we identified, making sure that they knew
23  that they were not to destroy or eliminate any
24  documents.

Case 1:09-cv-01062-RBK -AMD Document 79-1 Filed 09/17/10 Page 14 of 34 PageID: 4203

MANN et al vs. TD BANK, N.A. et al      3-18-10      MATTHEW J. CHRUSCIEL

13 (Pages 49 to 52)

| Page 49 | Page 51 |
|---|---|

**Page 49**

1  Q    Getting back to the gift card program, I'm
2  going to ask you a few names and if you know these
3  people and what their titles and roles were, just
4  because they came up in some of the documents that were
5  produced by counsel. Who's Dan Goldman?
6  A    Dan Goldman ran the gift card program before I
7  got to the bank.
8  Q    Do you know when he started?
9  A    I do not.
10 Q    Who's Dennis DeFlorio?
11 A    Dennis DeFlorio was a senior executive. I
12 don't know what his exact title is or was. During the
13 time of our acquisition of Commerce Bank.
14 Q    Is he no longer with the bank?
15 A    Correct.
16 Q    He is no longer with the bank?
17 A    He is no longer with the bank.
18 Q    Who's Kevin Barry?
19 A    Kevin Barry worked in marketing. Commerce
20 didn't really have product management. Kevin left after
21 I was appointed to the role.
22 Q    Now, you mentioned Pattie Gallant?
23 A    Gallant, yes.
24 Q    What's her title?

**Page 51**

1  I'm not sure.
2  Q    Do you know why TD Bank sells gift cards?
3  A    Yes. It's a convenience for our customer and
4  it's a great way to get our brand in the hands of many,
5  many customers. It's a great customer convenience
6  factor for us.
7  Q    Do you also sell them to make money?
8  A    The gift card is not a big money-making
9  program. It's more a brand program. It's about getting
10 all those little billboards out, making sure customers
11 have them. And it's, once again, about convenience.
12 We're all about convenience. And so it's a chance for
13 our customers to come in and do their banking and do
14 their shopping all at the same time.
15 Q    You do make money from gift cards, though, is
16 that correct?
17 A    Yes.
18 Q    Do you know how much money yearly?
19 A    No, I don't know the exact number. It's a
20 small piece of what I worry about. It's a small part of
21 the business from a revenue perspective. Big for brand
22 but small for revenue.
23 Q    Who would know how much money TD Bank makes
24 from the sale of gift cards?

**Page 50**

1  A    She's product manager, debit card.
2  Q    And she reports to you?
3  A    She did. She reports to Sunil Kirplani now.
4  Q    Who's Beth Hogan?
5  A    Beth Hogan is marketing and planning. She
6  works in marketing. She was the planner at the time for
7  gift card.
8  Q    And what type of responsibility did she have
9  with gift card?
10 A    So marketing and planning is responsible for
11 planning all the marketing activities around the
12 product.
13 Q    Who's Karen Mayo?
14 A    Karen works for Pattie in product management.
15 Q    Robert Harpool?
16 A    I know the name. I don't know exactly what he
17 does.
18 Q    Who's Kevin Cane?
19 A    Kevin Cane also works in marketing. He's the
20 graphics guy. He's the guy that comes up with the
21 artwork.
22 Q    And there's a name I don't know how to
23 pronounce. It's K-A-I-A and the last name is Vaenis.
24 A    I don't know. I think she's in marketing but

**Page 52**

1  A    We'd have to find out from our finance guys.
2  Q    And if you wanted to know, say, today, who
3  would you ask?
4  A    I would ask, well, today I'd ask Sunil or his
5  finance representatives.
6  Q    And what about when you started, who would you
7  have asked?
8  A    What about when who started?
9  Q    I'm sorry, in September of 2007.
10 A    If I wanted to know what the revenue was for
11 gift card?
12 Q    Yes.
13 A    Finance.
14 Q    And who was the head of finance back then?
15 A    Elysha Owens was the debit finance person but I
16 don't believe she was the finance person when I first
17 started. I don't recall who was doing it when I first
18 got there.
19 Q    And do you understand the records regarding the
20 sale of gift cards are kept by TD?
21 A    Can you clarify the question?
22 Q    Do you know if records are kept regarding
23 revenue created by the sale of gift cards, if records
24 regarding that are kept by TD?

14 (Pages 53 to 56)

| Page 53 | Page 55 |
|---|---|
| 1   A    Records are kept, yes. | 1   Q    And you understand that fees are assessed on TD |
| 2   Q    And are they kept by finance? | 2  Bank gift cards? |
| 3   A    Yes.  I mean, finance keeps GL entries and all | 3   A    Yes. |
| 4  those types of things, yes. | 4   Q    Are fees assessed on cash? |
| 5   Q    Do you know what the cost of maintaining the | 5   A    No. |
| 6  gift cards is that the bank incurs? | 6       MR. HARVEY:  Object to the form of the |
| 7   A    No, not specifically, no. | 7  question. |
| 8   Q    Do you know generally? | 8       THE WITNESS:  I don't understand what |
| 9   A    No.  I know there is a cost but I don't know | 9  you mean. |
| 10 exactly what it is because, once again, I would look at | 10 BY MR. LALLI: |
| 11 one line on this product line and it would be sort of a | 11   Q    What I'm getting at, I just want to know, you |
| 12 net number.  And that cost, it wouldn't even include | 12 talked about the benefit to the purchaser of the card, |
| 13 what it costs to keep our branches running and the | 13 the giver of the card.  It's a gift.  It's in a box. |
| 14 person's wage to sell the card. | 14 What benefit does the recipient receive? |
| 15   Q    Do you know who would know what the cost of | 15   A    I still don't understand the question.  I mean, |
| 16 maintaining the cards is? | 16 they get a card.  They get a card that they can use |
| 17   A    Operations can tell you the cost of the | 17 anywhere. |
| 18 plastic, the cost of the box.  They can tell you | 18   Q    And you don't know what the numbers are in |
| 19 specifically.  I don't think there would be anyone that | 19 terms of how many gift cards you've sold?  Or do you? |
| 20 could say when you say all things relative to wages and | 20   A    Not specifically, no. |
| 21 all that stuff.  I mean, it would be way more than just | 21   Q    Generally? |
| 22 the cost of the plastic and the cost of the box.  But | 22   A    Generally we sell most of our gift cards before |
| 23 operations would be the ones to give you the specific | 23 the holidays.  And so I think it's, collectively, it's |
| 24 costs. | 24 around a million cards a year, with the majority of them |

| Page 54 | Page 56 |
|---|---|
| 1   Q    But it's your understanding that you bring more | 1  being sold around the holidays. |
| 2  in, more money in than you pay out in costs in the gift | 2   Q    And that's a million cards a year for how many |
| 3  card program? | 3  years? |
| 4   A    Yes. | 4   A    That would be, I can tell you, since we |
| 5   Q    What benefit to the consumer would gift cards | 5  combined our organizations.  So that would be this year |
| 6  have over, say, any retail store gift card? | 6  and last year. |
| 7   A    The benefit to the consumer? | 7   Q    And what are you basing that million cards on? |
| 8   Q    Yes. | 8   A    What am I basing it on? |
| 9   A    They can use that card anywhere they want.  So | 9   Q    Yes.  What are you basing -- I guess it's an |
| 10 anywhere that Visa is accepted is where they can use | 10 estimation? |
| 11 that card.  In a closed loop or, as you refer to it, in | 11   A    Yes. |
| 12 a merchant, you can typically only use that card with | 12   Q    What are you basing it on? |
| 13 that merchant.  If that merchant goes out of business, | 13   A    So, I mean, we know how many gift cards we sell |
| 14 you're out.  So the Visa gift card is a great | 14 during the holidays.  We track that daily, how many gift |
| 15 convenience for anywhere you want to go. | 15 cards we sell during the holidays.  And then we sell a |
| 16   Q    What benefit does the consumer get from a TD | 16 very small amount for the year.  So once again, call it |
| 17 Bank gift card over getting cash? | 17 850,000 this past holiday season and we know we sell a |
| 18   A    Well, that's speculative.  But I'd say, as a TD | 18 little bit of gift cards -- not a little bit but 150,000 |
| 19 customer, I'd rather give a gift card, for me | 19 or so -- and that's just a ballpark -- during the summer |
| 20 personally, I'd rather give a gift card than give | 20 months, like with moms, dads and grads, as we call it. |
| 21 someone cash.  The gift card comes in the box.  It's a | 21   Q    And who would know specifically how many cards |
| 22 present.  Whereas cash is just sort of in an envelope | 22 are sold? |
| 23 and there you go.  So it's much more aesthetic.  It's a | 23   A    Operations would be probably the best one. |
| 24 gift. | 24 Sunil would as well. |

15 (Pages 57 to 60)

| Page 57 | Page 59 |
|---|---|

**Page 57**

1  Q  Have you ever purchased a TD Bank gift card?
2  A  I have not because all of my family is in
3  Canada and gift cards aren't a big thing in Canada. So
4  I haven't.
5          MR. LALLI: Do you want to take a
6  break?
7          MR. HARVEY: Sure.
8          (Brief recess.)
9             - - -
10 BY MR. LALLI:
11 Q  Just to clear up a few things that we've spoken
12 about, in your conversation with Mamie about the
13 complaints, you testified that if it was about fees, we
14 generally make the customer whole. Do you remember
15 that?
16 A  Yes.
17 Q  What does that mean?
18 A  So we will reimburse the customer their fees.
19 That's really what it means.
20 Q  Now, these people who were complaining, do you
21 know if they were recipients of the gift cards or
22 purchasers of the gift cards?
23 A  I don't know.
24 Q  You don't have any specifics?

**Page 58**

1  A  No.
2  Q  You said your new position is retail sales and
3  strategy?
4  A  Retail sales and strategy.
5  Q  What does that mean?
6  A  In my new role, I'm going to be accountable for
7  the sales metrics that we use to measure the success of
8  sales at the employee and store level, the campaigns
9  that we run internally, to make sure that we're selling
10 products and getting the employees really engaged, how
11 we measure and track both the stores, the regions, the
12 individuals, all of that whole piece. That's pretty
13 much the crux of it.
14 Q  And the gift card sales will be a part of that,
15 that you'll be tracking?
16 A  Yes. It's hard to say because it won't be a
17 big part of my new role. Most of the gift card
18 tracking, the sales tracking, comes from operations and
19 products. And the only time we ever really track it is
20 during the holidays when we really are counting how many
21 we're selling because that's the big time of year.
22         MR. HARVEY: Mike, you've asked the
23         witness several questions that relate to
24         internal business processes at TD Bank. I

**Page 59**

1  assume you're going to ask many more. I'm
2  going to invoke the terms of our
3  confidentiality agreement with respect to this
4  deposition as with respect to the deposition of
5  Jim Grimmer.
6          MR. LALLI: Okay.
7          MR. HARVEY: Thank you.
8  BY MR. LALLI:
9  Q  I was asking you about any changes you may have
10 made to the disclosures on the back of the card. And I
11 think your answer was something to the effect of by the
12 time it gets to me, it's already gone through a whole
13 bunch of pieces, or something to that effect.
14 A  Yes.
15 Q  What would it have gone through, what specific
16 departments would they have come through before it got
17 to you?
18         MR. HARVEY: I'm going to object to the
19         form of the question. I'm not sure that it's
20         been established there were any changes made to
21         the gift cards during his time.
22         MR. LALLI: That's not my question.
23         MR. HARVEY: I just object to the form
24         of the question.

**Page 60**

1  BY MR. LALLI:
2  Q  Do you understand what I'm asking you?
3  A  I think you need to clarify what type of
4  changes you're talking about.
5  Q  I'm not talking about changes. What I'm saying
6  is, when the disclosures reach you for you to sign off
7  on them, you testified that they've already gone through
8  a number of different departments or they've already
9  been seen by a number of different groups or something
10 to that effect. Do you remember testifying to that?
11 A  Yes.
12         MR. FODERA: By time it gets back to
13         me, it has been through a number of pieces is
14         what you said.
15         THE WITNESS: Yes.
16 BY MR. LALLI:
17 Q  What are those pieces, as you said it?
18         MR. HARVEY: And I'm just going to
19         object to the form, and I'll tell you the
20         basis. And that is, I think, I don't know if
21         he said this, but I think it only comes to him
22         when there are changes made to it. In other
23         words, it doesn't just come to him and they say
24         here it is, approve it, every year. I think he

16 (Pages 61 to 64)

## Page 61

1    said when there is a change, it comes his way.
2        You can explore that but I just wanted the
3    record to be clear.
4    BY MR. LALLI:
5    Q    Do you understand my question?
6    A    Can you rephrase it or repeat it?
7    Q    You testified that before it gets to you, it
8    goes through a number of different pieces. I understood
9    that to mean a number of different departments looking
10   at it.
11   A    I understand that.
12   Q    Is my assumption correct?
13   A    Correct.
14   Q    And who are those departments?
15   A    I think we had identified them, which was
16   compliance, operations, marketing would be the three
17   main ones.
18   Q    And prior to the disclosures going to
19   compliance, is it your understanding they would have
20   gone through legal or come from legal?
21   A    Yes.
22   Q    And going on what your counsel just said, do
23   you only approve changes to the disclosures or do you
24   approve them each year when the new marketing push comes

## Page 62

1    for the holidays?
2    A    Just when it's changed.
3    Q    And how many times would you say you've
4    reviewed a change in the disclosures on the card?
5    A    I couldn't answer that. Not many.
6    Q    Less than 20?
7    A    Yes.
8    Q    Less than 10?
9    A    Yes.
10   Q    Less than five?
11   A    I'm not sure.
12   Q    Do you remember any of the changes that were
13   made?
14   A    To what?
15   Q    To the disclosures.
16   A    So pretty much as we were making changes, we
17   made changes to the fees themselves. Those were pretty
18   much the main changes that we made between Banknorth and
19   Commerce. And then we had the legal entity changes we
20   had to make as well after the legal date of the TD Bank
21   acquisition of Commerce.
22   Q    Any other changes other than the -- now, when
23   you say the fees, do you mean the amounts of fees?
24   A    Yes. Dollar amount and frequency.

## Page 63

1    Q    So other than the change of the dollar amount
2    and the frequency of the fees and the legal entity name
3    change, any other changes on the disclosures?
4    A    Not that I recall.
5    Q    And you may have answered this, but who's Leo
6    Doyle?
7    A    He's an internal lawyer to TD Bank.
8    Q    You testified that the customer complaint
9    letters are kept?
10   A    Yes.
11   Q    Where are they kept?
12   A    So in the chairman -- I keep changing the name.
13   I apologize. In Mamie's group, the chairman service
14   center.
15   Q    So Mamie has access to them?
16   A    Yes.
17   Q    Where is she located?
18   A    In Mt. Laurel, New Jersey, I believe.
19   Q    Why are there fees on your gift cards?
20   A    Because the program costs to run.
21   Q    And what fees -- I guess we'll start in
22   September of '07 when you took over the gift card
23   program. What fees were being assessed in September of
24   '07?

## Page 64

1    A    So in TD Banknorth, is that what you're --
2    Q    Sure.
3    A    In TD Banknorth, we charged a $3.50 fee to
4    purchase the card. And then we waived that fee for six
5    months. And then at the end of six months, the $3.50
6    would kick in every month subsequent while there was a
7    balance on the card.
8    Q    So it was $3.50 to purchase the card?
9    A    Yes.
10   Q    Up front?
11   A    Yes. So we would say $3.50 a month. You pay
12   for it in the first month and then we'll waive it for
13   six months.
14   Q    After six months, the $3.50 would be assessed
15   on a monthly basis until the balance of the card ran
16   out, is that correct?
17   A    That's correct.
18   Q    And those fees would start being assessed prior
19   to the good-through date that's on the front of the
20   card, isn't that true?
21   A    They could, yes.
22   Q    Do you know generally how far ahead from when a
23   card is made, how far ahead the expiration date is
24   placed?

17 (Pages 65 to 68)

| Page 65 | Page 67 |
|---|---|
| 1  A     The good-through date is that what you're<br>2 asking about?<br>3  Q     Yes.<br>4  A     Typically two years.<br>5  Q     So when you say the fees could start being<br>6 assessed prior to the good-through date, isn't it true<br>7 that they're always going to be assessed, if they're<br>8 going to be assessed, prior to the good-through date?<br>9  A     If they're going to be assessed. So if you use<br>10 the entire balance of that card, you're not going to be<br>11 assessed any fees.<br>12  Q     Sure. But if there's any balance left after<br>13 that six months, fees will be assessed onto it until the<br>14 card balance is run out either through other purchases<br>15 or through fees?<br>16  A     Yes.<br>17  Q     Did those fees at all change?<br>18  A     Yes.<br>19  Q     When and how?<br>20  A     So we did a couple of things. In the summer of<br>21 2008, for the moms, dads and grads campaign, as we call<br>22 it, we eliminated the $3.50 up-front fee just for that<br>23 period. I believe it was June to maybe the end of July,<br>24 maybe May to July. I'm not sure of the exact dates. | 1 reason for that is Commerce was a spectacular brand<br>2 bank. They opened more accounts than any other bank<br>3 pretty much in the United States. And they had more<br>4 customers than Banknorth did. So for those reasons, it<br>5 was quite an obvious decision for us to say let's go<br>6 with the Commerce pricing and product set.<br>7  Q     And who made that decision?<br>8  A     It was made by a collection of people. I mean,<br>9 ultimately it was made by the executives of the bank,<br>10 the very top of the house, from the president. It was<br>11 presented and decided on by a number of people.<br>12  Q     Did you have any say?<br>13  A     Yes.<br>14  Q     And were you in favor or against going to the<br>15 Commerce fee structure?<br>16  A     I was in favor.<br>17  Q     For the reasons you've outlined?<br>18  A     Correct.<br>19  Q     Can you tell me, I guess, the step-by-step<br>20 process when a customer walks into a bank looking to<br>21 purchase a gift card, how they go about doing it and<br>22 what happens?<br>23  A     No, I can't tell you the steps that they take.<br>24 I mean, that's more of a retail operations question. I |

| Page 66 | Page 68 |
|---|---|
| 1 But we eliminated that fee in the Banknorth environment<br>2 for the moms, dads and grads campaign, the up-front fee.<br>3  Q     Any other changes?<br>4  A     Yes. In September of 2008, we eliminated the<br>5 fee altogether.<br>6  Q     The up-front fee?<br>7  A     The up-front fee. And we moved the $3.50 to<br>8 $2.50 after one year. And we did that to align with the<br>9 legacy Commerce fee structure.<br>10  Q     Was there any reason the up-front fee was<br>11 waived during that moms, dads and grads? Was it just a<br>12 promotion?<br>13  A     Yes.<br>14  Q     And when the Commerce, I guess, merger took<br>15 place, it's my understanding that TD Bank, you sort of<br>16 changed, you adopted Commerce's legacy, Commerce's fee<br>17 structure? Is that your understanding?<br>18  A     That was correct.<br>19  Q     Why?<br>20  A     For a couple reasons. When you're doing an<br>21 integration, you pick one product set, one fee<br>22 structure, and you go with it. You never create a<br>23 hybrid. So with that as the guiding principle, we<br>24 picked the Commerce legacy set and fee structure. The | 1 know a customer walks into a store, asks for a card, and<br>2 they walk out with a card. And I also can reference<br>3 certainly what we mention in the training.<br>4  Q     That's what I'm getting at. You said you okay<br>5 training materials.<br>6  A     Yes, okay.<br>7  Q     So what do you train your customer service<br>8 representatives or tellers to do? What steps do they<br>9 take?<br>10  A     Sure. So when the customer asks for a gift<br>11 card, the store staff acquire the gift card. I think<br>12 they get it out of the vault. They put the gift card<br>13 onto the system. They put the gift card into the box<br>14 and into the sleeve that goes in the box. They give the<br>15 gift card to the customer. They are instructed to tell<br>16 the customer or show the customer the terms and<br>17 conditions. And we also instruct them to tell the<br>18 customer to tell the recipient of the card of the terms<br>19 and conditions, to share the terms and conditions with<br>20 them as well. And we've even gone so far as to say tell<br>21 them about the fee.<br>22  Q     When you say the fee, what do you mean by that?<br>23  A     The fee that's associated with the card.<br>24  Q     Any other instructions you give your employees? |

Case 1:09-cv-01062-RBK-AMD Document 79-1 Filed 09/17/10 Page 19 of 34 PageID: 4208

MANN et al vs. TD BANK, N.A. et al    3-19-10    MATTHEW C. CHRODER

18 (Pages 69 to 72)

| Page 69 | Page 71 |
|---|---|

**Page 69**

1   A   There's a number of different instructions in
2 the training. I can't give you the specific ones.
3   Q   Any other instructions relative to fees and
4 informing the purchaser about the fees?
5   A   We tell them to inform the purchaser about the
6 fees. We also ask them to -- we encourage everyone to
7 register the card online. We encourage them -- it's
8 right on the card, too -- register the card online. We
9 tell them about the 1-800 number. So all of those
10 things are instructed.
11   Q   Do you know how the gift cards are presented to
12 the card purchaser?
13   A   I don't understand the question.
14   Q   Do you know what is given to the purchaser of
15 the gift card by the teller, how it's presented?
16   A   Not specifically. I mean, the training pretty
17 much says, with the customer, you have the box, you put
18 the card in the sleeve, the sleeve in the box, and you
19 give it to the customer, all with the customer there.
20   Q   So it's your understanding that you at least
21 train your employees to give the purchasers of gift
22 cards the gift card that's already wrapped or enclosed
23 in the box?
24   A   No. I mean, they do it right then and there

**Page 70**

1 with the customer. The customer walks out, if they
2 choose to, with it done as a gift.
3   Q   When you say it done, you mean the card in the
4 box already?
5   A   Correct.
6   Q   And do you understand there's an elasticized
7 ribbon that closes the box?
8   A   Yes.
9   Q   Are the terms and conditions explained to the
10 purchaser?
11   A   Do they actually read them to them? Is that
12 your question?
13   Q   Okay, that's a start. Do they read the terms
14 and conditions?
15   A   No.
16   Q   Do they summarize the terms and conditions?
17   A   They would tell the customer, they would show
18 the customer this is the terms and conditions. They're
19 instructed to show the customer the terms and
20 conditions.
21   Q   So you train your employees to inform the
22 customer that terms and conditions exist?
23   A   Correct.
24   Q   And the representative will show and physically

**Page 71**

1 say, here, look, here's the piece of paper with the
2 terms and conditions?
3   A   I can't say what the individual will do. Some
4 might.
5   Q   What are they trained to do?
6   A   They're trained to tell the customer of the
7 terms and conditions. How they choose to do that, I
8 don't think we give specific actions they should take.
9   Q   Is it important that purchasers are fully
10 informed of the terms and conditions of the card?
11   A   Yes.
12   Q   And why so?
13   A   Because those are the terms and conditions.
14 That gives you everything you want to know about the
15 card, how to replace the card, the cost of the card and
16 all those things.
17   Q   Is it important that the recipient is fully
18 informed of the terms and conditions of the card?
19   A   Yes.
20   Q   And for the same reasons or different reasons?
21   A   Same reasons.
22   Q   Do you think that information about when or how
23 to use the card should be affixed to the card itself,
24 either on a sticker or with tape?

**Page 72**

1       MR. HARVEY: Object to the form of the
2 question.
3       THE WITNESS: I need clarity. I don't
4 understand what you mean.
5 BY MR. LALLI:
6   Q   What I'm getting at is, when does this -- let's
7 call it a monthly maintenance fee. Is that fair?
8   A   Yes.
9   Q   Is there another name for it?
10   A   It's a monthly fee. We call it all kinds of
11 things. Breakage.
12   Q   Breakage fee?
13   A   That's an internal thing. We don't call it
14 breakage with the customer. It's all the same thing.
15   Q   My understanding is the breakage fee kicks in
16 after 13 months.
17   A   First day of the first month after the 365th
18 day after the card is issued.
19   Q   And the date the card is issued, what does that
20 mean?
21   A   It's the date that the customer comes in, the
22 purchaser comes in and loads the card.
23   Q   That issue date is not included on the card?
24   A   No.

Case 1:09-cv-01062-RBK -AMD   Document 79-1   Filed 09/17/10   Page 20 of 34 PageID: 4209

MANN et al vs. TD BANK, N.A. et al                      MATTHEW W. CHAGARES

19 (Pages 73 to 76)

## Page 73

1  Q    Does it say the issue date?
2  A    No.
3  Q    Are there any terms that are packaged with the
4  card that are designed to reach the recipient that state
5  the issue date?
6  A    No. There are materials that are designed to
7  allow the customer to find out the balance on the card,
8  the issue date of the card. And that is through the
9  1-800 phone number.
10  Q    That's what I'm getting at. Do you think
11  information about when to use the card, the issue date,
12  do you think the issue date should be affixed on a
13  sticker on the card?
14        MR. HARVEY: Object to the form of the
15  question.
16  BY MR. LALLI:
17  Q    Do you understand my question?
18  A    Yes. So my answer is no.
19  Q    And why not?
20        MR. HARVEY: Same objection.
21        THE WITNESS: Am I answering?
22        MR. HARVEY: Yes.
23        THE WITNESS: So, first of all, putting
24  it on a sticker adds an extra step, which is --

## Page 74

1  it just adds an extra step. It makes the
2  process more complex. It may not even look
3  that good. If you're going to have somebody
4  put a sticker on, write a date on, it's not
5  going to make the card look good. It takes
6  away from the gift.
7        The third thing is some customers may
8  not want that on their card. Some customers
9  may not want to know when they purchased the
10  card. If I know I've got four gifts coming up
11  in the next month, I personally would not want
12  that on my card. I would want to tell the
13  customer, you could go online. But I don't
14  think I'd want it on the card.
15  BY MR. LALLI:
16  Q    Don't you think it's more convenient for the
17  recipient to have the issue date on the card?
18        MR. HARVEY: Object to the form of the
19  question.
20        THE WITNESS: No, because, once again,
21  they have lots of means of finding out what
22  that issue date is, what the balance is, all of
23  those things.
24  BY MR. LALLI:

## Page 75

1  Q    So it's your testimony that it's more
2  convenient for them, if they want to know the issue date
3  of the card, to call the number than it would be to have
4  a little sticker on the card with the issue date?
5        MR. HARVEY: Object to the form of the
6  question.
7        THE WITNESS: Am I answering?
8        MR. HARVEY: Go ahead, you can answer.
9        THE WITNESS: What's more convenient is
10  having the customer register that card. That's
11  the ultimate convenience for the customer. We
12  want them to go online and register the card.
13  We want them to do that for all kinds of
14  reasons, lost, stolen, replaced. So what's
15  more convenient for the customer is have them
16  go on and register that card. It's better for
17  them. So I think putting the sticker on the
18  card is not going to support what is the
19  ultimate convenience and that is registering
20  that card.
21  BY MR. LALLI:
22  Q    Isn't it easier for the customer, if they want
23  to know the issue date, wouldn't it be easier for them
24  to just look on the card than go online or call a phone

## Page 76

1  number?
2        MR. HARVEY: Object to the form of the
3  question.
4        THE WITNESS: That's speculation to me.
5  I mean, is it easier for them? What's easier
6  for them is registering that card. If they're
7  going to go out and purchase right away, it
8  doesn't matter to them at all what the issue
9  date of the card is.
10  BY MR. LALLI:
11  Q    So it's your testimony that it's not easier for
12  them to have the issue date directly on the card? It's
13  easier for them to look on the back, see what the number
14  is or Web site is, go to their computer, type in the Web
15  site address, type in their card number, type in the
16  three-digit number on the back, whatever other
17  registration information is needed, and then find out
18  the issue date?
19        MR. HARVEY: Object to the form of the
20  question.
21        THE WITNESS: It's my testimony that it
22  is more convenient for the customer to register
23  their card.
24  BY MR. LALLI:

20 (Pages 77 to 80)

| Page 77 | Page 79 |
|---|---|
| 1   Q   Would it be easier, if I wanted to provide you<br>2 some information on this sheet of paper right now, would<br>3 it be easier for me to write the information down and<br>4 hand it to you or would it be easier for you if I wrote<br>5 down that you can go to some Web site address to get the<br>6 information? What would be easier for you?<br>7       MR. HARVEY: Object to the form of the<br>8 question. You can answer.<br>9       THE WITNESS: Once again, it depends on<br>10 the function of that piece of paper. If that's<br>11 a valuable piece of paper that I'm worried<br>12 about losing, then I would want to do the Web<br>13 thing. If it is just a piece of paper, yes.<br>14 But we're not talking about a piece of paper,<br>15 we're talking about a gift card. I want the<br>16 customer to register that gift card. I want<br>17 the customer to understand the terms and<br>18 conditions of that gift card.<br>19 BY MR. LALLI:<br>20   Q   If you want them to understand the terms and<br>21 conditions of the gift card, and I'm going to go back to<br>22 it, wouldn't it be easier if they were given the issue<br>23 date either on the card itself -- and I keep going to<br>24 the sticker, but it can be done in a number of ways. It | 1   Q   Sure, like we've been talking about.<br>2   A   No, it's the issue date, correct.<br>3   Q   Are you aware of what your competitors do<br>4 regarding gift cards?<br>5   A   We have few competitors. Most banks aren't<br>6 even selling gift cards anymore. No, I don't spend a<br>7 lot of time looking at what other people are doing,<br>8 certainly not in the closed loop space, either.<br>9   Q   What about American Express? Do you know how<br>10 their gift card program works?<br>11   A   I don't personally, no.<br>12   Q   I brought an American Express gift card<br>13 packaging. What I have here is a golden envelope. It<br>14 says American Express, the American Express gift card on<br>15 the front. And you open it up, there's no card in here<br>16 anymore, but if you open it up, it's got the terms and<br>17 conditions of the card. It's got some heavy stock paper<br>18 with some more information about how to use the card.<br>19 And then I'm going to represent to you that I have this<br>20 carbon copy sheet that the card that used to exist here,<br>21 you can see gift card here and it has sticky, gummy<br>22 stuff. And on the back of it, it's a document entitled<br>23 purchase record. And right there, the teller writes in<br>24 the month, day and year of the date of purchase. Do you |

| Page 78 | Page 80 |
|---|---|
| 1 can be done with a receipt along with the packaging,<br>2 something to that effect, so that the issue date is<br>3 provided to the recipient?<br>4       MR. HARVEY: Object to the form of the<br>5 question.<br>6       THE WITNESS: Once again, I want the<br>7 customer to be able to register that card. So<br>8 that's what's more convenient for the customer.<br>9 If that customer loses their card or they want<br>10 to find out information about that card, if I<br>11 lose my card and then I go and I haven't<br>12 registered it, it's much easier for me had I<br>13 registered it. That's what's easier for me.<br>14 BY MR. LALLI:<br>15   Q   Is it your understanding that all customers<br>16 will register the card?<br>17   A   No. We encourage them to do so, but not<br>18 everyone does.<br>19   Q   And the fees kick in, the clock starts for the<br>20 fees at the issue date?<br>21   A   Correct.<br>22   Q   Not the date the card is registered?<br>23   A   Sorry. What do you mean by registered?<br>24 Online? | 1 see that?<br>2   A   Yes.<br>3   Q   I'm going to represent to you that American<br>4 Express has, at this point in time, had a fee that<br>5 kicked in after a certain amount of time after the<br>6 purchase date. Do you think this is convenient for the<br>7 customer, for the recipient --<br>8       MR. HARVEY: Object to the form of the<br>9 question.<br>10 BY MR. LALLI:<br>11   Q   -- to have the purchase date in the packaging<br>12 designed to reach the recipient?<br>13   A   Once again, I'd say that's speculation. What I<br>14 think, because I've already explained, I can't speak to<br>15 American Express and how they handle their customers in<br>16 the event of lost, stolen. I don't know if they're<br>17 asking them to register or any of that. So it's hard to<br>18 say. It's going to depend. I'd say what's more<br>19 convenient to the customer is having a card that's<br>20 completely protected and that they can look up and see<br>21 the balance on.<br>22   Q   Did it ever cross your mind to have the issue<br>23 date on the card or within its packaging materials?<br>24   A   It's never been presented to me as an option |

Case 1:09-cv-01062-RBK-AMD Document 79-1 Filed 09/17/10 Page 22 of 34 PageID: 4211
MANN, et al. vs. TD BANK, N.A. et al.    3/18/10    MATTHEW J. CHEVALIER

21 (Pages 81 to 84)

| Page 81 | Page 83 |
|---|---|

**Page 81**

1  that we would want to put on the card.
2  Q    And you've never personally even thought of it
3  as an option?
4  A    No.
5  Q    So they can go on a Web site and they can learn
6  the date of issue?
7  A    Yes.
8  Q    And they can call the number and learn the date
9  of issue, is that correct?
10  A    That's my understanding, yes.
11  Q    Have you ever called the number on the back of
12  the gift card?
13  A    I have not.
14  Q    Would it surprise you if I told you that I
15  tried to call the number on the back of the gift card
16  and I couldn't get the issue date?
17  A    Yes.
18  Q    It would surprise you?
19  A    Yes.
20  Q    You described your training materials that you
21  spoke about. Does that encompass all of TD Bank's
22  branches or is that specific to we're going to send
23  these training materials to Maine and different training
24  materials go to Florida?

**Page 82**

1  A    No, we have one gift card guide that goes to
2  Maine and to Florida.
3  Q    So the gift card transaction is, from the
4  company's perspective, standardized at every branch?
5  A    Correct.
6  Q    Do you think it's important not to have
7  advertisements that may mislead a customer about the
8  terms and conditions?
9  A    Yes.
10  Q    Why do you think that?
11  A    Because you don't want to mislead them about
12  the terms and conditions. Now, that said, you can't
13  have advertisements that include all the terms and
14  conditions.
15  Q    What type of advertisements were used in TD
16  Bank at the time you started in '07 regarding gift
17  cards?
18      MR. HARVEY: Can I -- hold the
19  question, but you're obviously returning to the
20  subject. I told you earlier we have some
21  additional documents that were some marketing
22  materials used by TD Bank in 2008. They state
23  TD Banknorth. That's when they were using that
24  as a trade name in 2008. I've just given you a

**Page 83**

1  copy. I'll produce these with Bates numbers on
2  them separately. They're similar to documents
3  that have already been produced in this
4  litigation. But that came to my attention
5  yesterday and I wanted you to have those.
6      (Discussion off the record.)
7      ---
8      (Recess.)
9      ---
10  BY MR. LALLI:
11  Q    I want to cover a few things we talked about
12  prior to lunch. The first was the issue date being on
13  the card and whether there are any thoughts of doing
14  that. I think you testified that was never a thought.
15  A    Correct.
16  Q    Were there any discussions that you know of
17  between anyone about having the issue date either on the
18  card, on a sticker, or contained in the materials that
19  were designed to reach the recipient?
20  A    No conversations that I've had.
21  Q    What about conversations that you've heard of?
22  A    No.
23  Q    Now, at some point, TD Bank took on Commerce's
24  gift card fee structure, is that correct?

**Page 84**

1  A    Yes.
2  Q    After the merger or acquisition?
3  A    Yes.
4  Q    At one point, Commerce wasn't charging any
5  fees. I think it was in 2005. They were charging zero
6  fees for their gift cards, no purchase fees, no
7  maintenance fees, nothing. Are you aware of that?
8  A    That's my understanding. I wasn't there at the
9  time, but yes, that's my understanding.
10  Q    At the time of the acquisition, moving the gift
11  card programs together, was there any discussion about
12  not having any fees or about having no fees?
13  A    No.
14  Q    Any discussion, any thoughts of it that you
15  had?
16  A    No.
17  Q    Was that even an option?
18  A    No.
19  Q    Do you know why?
20  A    Yes. As I said, the first rule of integration
21  is pick a product set. You never create a hybrid. So
22  we picked a product set and that's what we picked. We
23  picked the Commerce product set. We didn't want to
24  create a third product set because it's confusing to

Case 1:09-cv-01062-RBK -AMD  Document 79-1   Filed 09/17/10   Page 23 of 34 PageID: 4212
MANN et al vs. TD BANK, N.A. et al                              MATHEW O. CHEVALIER

22  (Pages 85 to 88)

## Page 85

1  customers, confusing to employees.  You just don't want
2  to do it.
3  Q     Would it have been more or less confusion to
4  customers if there were no fees?
5          MR. HARVEY:  Object to the form of the
6  question.
7          THE WITNESS:  I don't know.  I mean, I
8  don't know.
9  BY MR. LALLI:
10  Q     There's a good-through date on the front of the
11  card, right?
12  A     Yes.
13  Q     And what's the purpose of the good-through
14  date?
15  A     The good-through date, it's not like an expired
16  date on a credit card.  It's really Visa makes us put
17  that on there.  So my understanding of what it's for is
18  the card is only good until that date and then a new
19  card would be issued if there's still a balance on it.
20  Not unlike why is there an expire date on your credit
21  card?  Same sort of thing.
22  Q     And you testified before that if fees were
23  going to be assessed, they would be assessed prior to
24  the good-through date?

## Page 86

1  A     I think I said they could be assessed.  The
2  good-through date and fees are two totally different --
3  they have nothing to do with each other at all.
4  Q     Do you think that at all could be confusing to
5  a customer?
6          MR. HARVEY:  Object to the form of the
7  question.
8          THE WITNESS:  Speculation.  I have no
9  idea.
10  BY MR. LALLI:
11  Q     You don't know?
12  A     I don't know.
13  Q     I want to go one more time back to Mamie Prout
14  and these complaints with the fees.  You testified that
15  the customers would be made whole, right, if they
16  complained about fees?  Is that true?
17  A     Yes.
18  Q     And you said that making whole meant you would
19  reimburse the fees to the customers.  Is that correct?
20  A     Yes, that's correct.  That's what Mamie had
21  told me, yes, in those cases.
22  Q     Was that the policy, to reimburse fees whenever
23  a customer complained about them regarding the gift
24  cards?

## Page 87

1  A     No.  There is no policy that says reimburse
2  fees if a customer complains about gift cards, no.
3  Q     Then why were you doing it?
4  A     I mean, that would be a question for Mamie.  I
5  wasn't part of the decision process to reimburse the
6  fees.
7  Q     Was Mamie the sole person who decided to
8  reimburse the fees?
9  A     I don't know.
10  Q     Who else may have?
11  A     It could have been Mamie.  It could have been
12  her boss.
13  Q     Who is that?
14  A     Her boss right now, her boss was Elaine
15  Olmhousen.  She just changed and her name escaped me.
16  She reports in to Linda Verba ultimately.
17  Q     Now, you read Mr. Grimmer's deposition?
18  A     Yes.
19  Q     We had him draw sort of a corporate structure
20  for us just so we can get a sense of who the players are
21  and where you sit in the corporate structure, below the
22  president, above whoever else.  Do you mind doing that
23  for us?  Start with when you began in September of '07.
24  Or I guess it would be June of '06, right?

## Page 88

1  A     Yes, I came in June of '06.  So we can start
2  with me.  I would be product management for deposit
3  products, as we talked about.  I reported in to a
4  gentleman by the name of Tom Dick, who at the time had
5  products and marketing.  And Tom reported to Bill Ryan,
6  who was the president and CEO of TD Banknorth.
7  Q     And at the time, who was below you?
8  A     Who was below me?
9  Q     Yes.  Who reported to you?
10  A     When I first started, there was Krista
11  Abbotoni, who had checking.  There was Anna O'Connor,
12  who had savings.  Michelle Murphy, who was more like a
13  project, policy and procedure type person.  And that was
14  it for direct reports.  I had an assistant, too.
15  Q     Who was your assistant?
16  A     Francesca Cormier.  So Anna had a direct
17  report.  And that was it.
18  Q     And then how did this change over time?
19  A     So over time, what happened was --
20          MR. FODERA:  Why don't you just date
21      that and do it again.
22          THE WITNESS:  This would be June 2006.
23      So then in May of 2008, a couple things
24      happened.  So you've now got Bharat Masrani,

## Page 89

1   who is president of TD Bank. You've got Tom
2   Dick, who now just has money in, deposit
3   products. You've got Matt Chevalier, who's got
4   checking. And now I have debit. Tom's got
5   savings. Checking reports in to me. He's got
6   data analysis. Now marketing is no longer with
7   products. Marketing and products are two
8   different groups. And that's John Cunningham.
9   And then, so under Bharat, you've got retail
10  distribution, which would be Fred Graziano,
11  which is where Linda Verba comes in. Do you
12  want me to draw that?
13  BY MR. LALLI:
14  Q    Show me where Linda Verba would be.
15  A    For retail, you've got Fred -- I'll call it
16  retail distribution. So you've got Fred Graziano, who
17  runs retail distribution. Fred's got Linda Verba. He's
18  got commercial, too, but I'm not as familiar with the
19  commercial setup. And Suzanne Poole. Linda is
20  responsible for retail service. Suzanne is responsible
21  for retail sales. So Jim works for Linda, as does
22  Mamie. And, as we mentioned at the very start, I now
23  work for, or I will sometime in the beginning of April,
24  I think April 12, I'll be working for Suzanne Poole.

## Page 90

1   Q    And this time period is May 2008 until when?
2   A    There was a layer put in between Tom and
3   Bharat, a gentleman by the name of Paul Vessey. And
4   that was sometime in 2009 or late 2008 -- I'm not
5   completely sure -- that changed. As we talked about,
6   debit moved on its own. And there's Sunil in January
7   2010. Those would be the major changes.
8   Q    And who reported to you?
9   A    In May?
10  Q    Yes.
11  A    So in May --
12  Q    This is May of '08?
13  A    May of '08. So Krista went through the
14  integration. May of '08, I still had Pattie because I
15  still had debit.
16  Q    That's Pattie Gallant?
17  A    Pattie Gallant. Who else did I have in May?
18  Krista Abbotoni was still helping but I hired -- I
19  believe Michelle Murphy was still with me as well.
20  Between May and September '09, for checking, I had
21  Shelly Photiades. I still had Pattie, debit. I have
22  another guy by the name of Kevin Fitzgerald, but he's
23  not responsible for a product. He's responsible for a
24  project. It's called project 49. That would be the

## Page 91

1   team in September of '09.
2   Q    And were there any changes since September '09?
3   A    So since September '09 --
4   Q    Wait.
5   A    So now let's go up to January. So we've got
6   Bharat. That has not changed. I've got Paul Vessey.
7   Paul is responsible for all product management, money in
8   and money out. So money in is what we call deposits.
9   Money out is lending.
10      MR. FODERA: On retail, not commercial?
11      THE WITNESS: From a retail
12  perspective, that's right, because there's
13  another gentleman on the commercial side called
14  Walter Owens, which I have very little to do
15  with and don't understand the structure. So
16  Tom's now back in Canada. And Mandita Bhakshi,
17  B-H-A-K-S-H-I -- I hope that's right. If it's
18  wrong, I'm in trouble. We have Mandita
19  Bhakshi, who's now replaced Tom. And that
20  happened around the April to August, September
21  time frame. There was a couple-month overlap.
22  BY MR. LALLI:
23  Q    Of '09?
24  A    Of '09, yes. And Mandita's world is debit,

## Page 92

1   which is Sunil; day-to-day, which is me; savings, which
2   is Tami Farrow. Pardon my handwriting. And data
3   analysis. And the other changes from my time, I still
4   have Shelly. I still have Kevin. And I've just hired
5   someone new called Lindsay Sacknoff, who we talked about
6   earlier.
7   Q    So Pattie is no longer on your team?
8   A    No. Pattie works for Sunil.
9   Q    And is that accurate up to before you make your
10  change in April?
11  A    That is accurate up to before I make my change
12  in April, yes.
13      (Documents marked for identification as
14      Chevalier exhibits 3A through 3C.)
15  BY MR. LALLI:
16  Q    Do you have to go back to Canada at some point
17  based on your visa?
18  A    Yes.
19  Q    When's that going to happen?
20  A    So I just signed up for it in July of 2009. I
21  extended my L1A, which is my work visa in the United
22  States, for three more years. So that will get us up to
23  January 2012. And then I can renew for one more year
24  after that for a total of seven years I'll have been in

| Page 93 |
|---|
| 1    the country.  And then I'm either going to go back to |
| 2    Canada or I'm going to go through the green card |
| 3    process. |
| 4    Q      And you're not sure what you're going to do |
| 5    yet? |
| 6    A      I'm not sure what I'm going to do yet. |
| 7    Whatever the bank wants me to do. |
| 8    Q      Before we broke for lunch, we just, I think, |
| 9    started talking about advertisements.  Are you aware of |
| 10   any advertisements that contained information about the |
| 11   monthly maintenance fee? |
| 12   A      About the monthly maintenance fee? |
| 13   Q      Yes. |
| 14   A      Most of our advertisements only talk about the |
| 15   purchase fee. |
| 16   Q      So is the answer no? |
| 17   A      No, that's right. |
| 18          MR. LALLI:  This will be Chevalier-4. |
| 19          (Document marked for identification as |
| 20   Chevalier exhibit 4.) |
| 21   BY MR. LALLI: |
| 22   Q      I'll represent this has been produced by your |
| 23   counsel in document production pursuant to discovery |
| 24   requests.  Have you ever seen this before? |

| Page 95 |
|---|
| 1    couple years ago.  It looks like it's in that 2008 time |
| 2    frame. |
| 3          MR. FODERA:  I'm sorry for |
| 4    interrupting, Mr. Chevalier.  The court |
| 5    reporter can't take down what you're pointing |
| 6    to. |
| 7          THE WITNESS:  Oh, I'm sorry. |
| 8          MR. FODERA:  So if you just say in |
| 9    words what you're pointing to, the difference |
| 10   in style.  You just pointed to the word "gift" |
| 11   or maybe to something else. |
| 12         THE WITNESS:  "The perfect gift" or |
| 13   "gift card," the font on that is not a recently |
| 14   used font. |
| 15         MR. HARVEY:  Can I offer something? |
| 16   There is a date in the lower left-hand corner. |
| 17         THE WITNESS:  Yes, 2008. |
| 18   BY MR. LALLI: |
| 19   Q      Is this an advertisement that you would have |
| 20   okayed?  Or signed off on, I think was the word you |
| 21   used. |
| 22   A      Possibly. |
| 23   Q      What form did this -- this is a copy.  So what |
| 24   form did it take?  Was it a poster?  What was it? |

| Page 94 |
|---|
| 1    A      I believe so. |
| 2    Q      Have you seen this form of the advertisement or |
| 3    have you seen the actual advertisement? |
| 4    A      I don't understand your question. |
| 5    Q      This is a copy of an advertisement, right? |
| 6    A      Yes. |
| 7    Q      Have you seen the actual advertisement? |
| 8    A      I believe so. |
| 9    Q      Do you know when this was in use? |
| 10   A      No.  I mean, it looks like it might have been |
| 11   2008, right after the rebranding of legacy Commerce to |
| 12   TD Bank. |
| 13   Q      Do you know where it would have been in use? |
| 14   A      Without knowing the date, it's hard to say. |
| 15   Q      If it was, like you said, late 2008, if it was |
| 16   at that point in time, where would it have been in use? |
| 17   A      If it was in late 2008, it would have been in |
| 18   the legacy Commerce, the legacy Commerce that we have |
| 19   branded to TD Bank. |
| 20   Q      Why do you think it's late 2008? |
| 21   A      Only because it's labeled TD Bank because we |
| 22   weren't TD Banknorth in the north until November of -- |
| 23   let's see.  We rebranded in the north in September of |
| 24   2009.  This looks like a little bit of an older piece, a |

| Page 96 |
|---|
| 1    A      I'm not totally sure. |
| 2    Q      Is it your understanding it would have been |
| 3    larger than what you have in front of you? |
| 4    A      It depends on the application in the store. |
| 5    But in our stores, we will put marketing.  It depends. |
| 6    But it would be a poster or smaller, eight and a half by |
| 7    11 card. |
| 8    Q      I see at the top, right there's a word.  I |
| 9    don't know if it's highlighted or just has a background |
| 10   behind it.  But it says "free," exclamation point.  And |
| 11   it is all capitals.  Do you see that? |
| 12   A      Yes. |
| 13   Q      What does that mean? |
| 14   A      So it means that there is no cost to purchase |
| 15   the card. |
| 16   Q      Any thinking on whether or not that may confuse |
| 17   a customer into thinking that there are no fees |
| 18   associated with the card at all? |
| 19         MR. HARVEY:  Object to the form of the |
| 20   question. |
| 21         THE WITNESS:  That would be |
| 22   speculation.  I can't say what customers are |
| 23   going to think by seeing that. |
| 24   BY MR. LALLI: |

25 (Pages 97 to 100)

| Page 97 | Page 99 |
|---|---|

**Page 97**

1   Q   Well, what does the word "free" mean to you?
2   A   So free for this, it means I can acquire a gift
3   card for free. Most or a lot of people will charge to
4   acquire a gift card. We do not.
5   Q   Is there anything about a purchase fee on this?
6   A   I see on the bottom right-hand corner, it says
7   no purchase fee.
8   Q   And what you're pointing, to I'm going to
9   circle it on the original. It's down here, correct?
10  A   Yes, bottom right-hand corner.
11  Q   Now, can you tell me what size font that is in?
12  A   No.
13  Q   Is it a relatively small font?
14  A   Yes.
15  Q   Is it the smallest font on this advertisement?
16  A   I assume so.
17  Q   Well, I mean, you can look at the other fonts
18  that are used.
19  A   It's hard to say. Is it smaller than the word
20  "Visa"? I don't know. But it's probably the smallest
21  font on the form, yes.
22  Q   And would you characterize the "no purchase
23  fee" as being prominently displayed on this
24  advertisement?

**Page 99**

1   BY MR. LALLI:
2   Q   So where would this have been in use?
3   A   In the store.
4   Q   In what stores?
5   A   I'm sorry. Geographically? It would be in the
6   north. So anywhere where we were TD Banknorth branded.
7   Q   What states does that encompass?
8   A   That encompasses Maine, Massachusetts,
9   Connecticut, Vermont. I think I got them all. Yes,
10  that's pretty much it. Because where we have
11  overlapping states, we rebranded the outside of the
12  store. So where we rebranded Commerce to TD Bank, we
13  also rebranded TD Banknorth to TD Bank so we didn't
14  confuse our customers with having two green logos with
15  two different names. In the north we were still TD
16  Banknorth until September 2009, when we rebranded to TD
17  Bank.
18  Q   Now, if you look at the exhibit number 5 that
19  I've given you, in the bottom right-hand corner is
20  another all capital "free." Do you see that?
21  A   Yes.
22  Q   And it's in relatively large font. Beneath
23  that, there's an all capital "no purchase fee." Do
24  see that?

**Page 98**

1   A   No.
2   Q   And it's your feeling that this isn't confusing
3   at all to a customer?
4   A   I can't say if it's confusing or not to a
5   customer.
6   Q   Now, we were just given some additional
7   advertisements that were in use. And it looks like the
8   form changed somewhat.
9       MR. LALLI: This will be Chevalier-5.
10      (Document marked for identification as
11  Chevalier exhibit 5.)
12      THE WITNESS: This is the holiday card
13  from 2008.
14      MR. FODERA: I just want clarification.
15  You're looking at one sheet, Mr. Chevalier. We
16  were handed a packet. Are they all from 2008?
17      THE WITNESS: I need to see what else
18  is in the packet.
19      MR. HARVEY: I can represent to you
20  that it's my understanding these were used in
21  2008.
22      MR. FODERA: That's fine.
23      MR. HARVEY: That's what I was
24  informed.

**Page 100**

1   A   Yes.
2   Q   And the "no purchase fee" is in smaller font
3   than the "free." Would you agree with me there?
4   A   Yes.
5   Q   Is this another advertisement that you would
6   have signed off on?
7   A   Yes.
8   Q   I guess my first question is, why is "no
9   purchase fee" not like it is on the previous exhibit in
10  a completely different place on the advertisement?
11  A   Sorry. Why is it not in the same place?
12  Q   On the first exhibit, number 4 that we talked
13  about, you have "free" at the very top of the
14  advertisement in big, bold letters. Then at the very
15  bottom, there's the "no purchase fee" message. Do you
16  agree with that?
17  A   Yes.
18  Q   It changed, right?
19  A   Yes.
20  Q   Here it has "free" and "no purchase fee" right
21  next to each other. Do you agree with me? Or beneath
22  each other?
23  A   Yes.
24  Q   Why was that change made?

Case 1:09-cv-01062-RBK-AMD  Document 79-1  Filed 09/17/10  Page 27 of 34 PageID: 4216
MANN et al vs. TD BANK, N.A. et al  5-18-10  MATTHEW J. CHEVALIER
26 (Pages 101 to 104)

| Page 101 | Page 103 |
|---|---|
| 1    A    I mean, this "free", "no purchase fee" is what<br>2 we put on all our marketing material now. If you look<br>3 at "free" here, free to us has always meant free to<br>4 purchase. When the gift card is sold, as we talked<br>5 about earlier, we always give the terms and conditions.<br>6 That's always clear, what the fees are in the terms and<br>7 conditions. As I said, our training tells our employees<br>8 to tell the customer about the terms and conditions. It<br>9 also tells the customer to provide the recipient, tell<br>10 them the terms and conditions and tells them about the<br>11 fee. All this does is reinforces what the terms and<br>12 conditions and the policies and procedures are. It's a<br>13 further reinforcement to make sure there's no confusion<br>14 to the fact that free to us means no purchase fee.<br>15    Q    So you want to make sure there's no confusion,<br>16 that free doesn't mean free, no fees at all, but free<br>17 means no purchase fee only?<br>18    A    Correct.<br>19    Q    And would you characterize this card, exhibit<br>20 number 5, or this advertisement, as more or less<br>21 confusing on that point than exhibit number 4?<br>22       MR. HARVEY: Object to the form of the<br>23 question.<br>24       THE WITNESS: These are not the only | 1    A    Correct.<br>2    Q    I just want to be clear for the record we're<br>3 talking about an exhibit. When I said it's in a<br>4 completely different place, I meant that the "free" is<br>5 at the top of the card in bold, large font, and the "no<br>6 purchase fee" is way at the bottom of the card in<br>7 smaller font. You would agree with me?<br>8    A    Yes.<br>9    Q    Now, you just spoke about what your employees<br>10 do in terms of telling people the terms and conditions.<br>11 Whose responsibility is it to train your employees? And<br>12 when I say train your employees, obviously that can mean<br>13 a lot. I'm specifically talking about the gift card<br>14 transaction.<br>15    A    Can you be specific about what type of<br>16 employees? New employees? Existing employees?<br>17    Q    Let's start with new employees.<br>18    A    The new employees go through new employee<br>19 training. And that would be learning and development<br>20 and our retail distribution folks that do that training.<br>21    Q    And do you know what that training encompasses<br>22 in terms of the gift card transaction?<br>23    A    I'm not specifically sure, no.<br>24    Q    Do you know if gift card transactions are |

| Page 102 | Page 104 |
|---|---|
| 1 things, the only tools used to sell the gift<br>2 cards. So when the gift card is sold, whether<br>3 I'm in this advertisement, number 5, or this<br>4 advertisement, number 4, this is not the only<br>5 thing that's used. What still happens is the<br>6 employee is still giving the terms and<br>7 conditions. They're still making sure it's<br>8 absolutely clear.<br>9 BY MR. LALLI:<br>10    Q    Taking all that aside and only looking at these<br>11 two exhibits, these two advertisements, is 5 more or<br>12 less confusing on the point that free means no purchase<br>13 fee than 4?<br>14       MR. HARVEY: Object to the form of the<br>15 question.<br>16       THE WITNESS: It's speculative because<br>17 they both have the same content. They both<br>18 have "free." They both have "no purchase fee."<br>19 BY MR. LALLI:<br>20    Q    But you would agree with me --<br>21    A    I would agree "no purchase fee" is smaller.<br>22 It's still on both.<br>23    Q    And it's in a completely different place,<br>24 correct? | 1 brought up in that training?<br>2    A    I believe so but I'm not totally sure. I've<br>3 not done the new hire training myself.<br>4    Q    So there's new hire training and there's also<br>5 current employee training?<br>6    A    Yes.<br>7    Q    Who takes care of the current employee<br>8 training?<br>9    A    Relative to gift card?<br>10    Q    Yes.<br>11    A    So that would be our annual sort of training<br>12 guide that goes out every year. And that's put out, as<br>13 we discussed earlier, from the product team with help<br>14 from operations and retail operations.<br>15    Q    Does the training guide have a name?<br>16    A    Yes, I think it's called the gift card guide.<br>17 And there's one every year.<br>18    Q    Apart from that material -- is that material<br>19 sent to each branch individually?<br>20    A    I'm not sure if we actually send it out in hard<br>21 copy or send it out electronically. I'm not sure which<br>22 one.<br>23    Q    But it is delivered either electronically or<br>24 through regular mail to each branch? |

fc09d5f4-ac8c-47db-8077-89e4d375c9f3

## Page 105

1   A    Yes.
2   Q    Is there any in-store training that takes
3   place?
4   A    Yes.
5   Q    Relative to gift card transactions?
6   A    Yes.
7   Q    And how is that conducted? How frequent is it?
8   A    My understanding would be anything that
9   changes, the store staff would communicate that. I
10  don't know if they do it through a huddle or how they do
11  it. Jim Grimmer could tell you how those things are
12  distributed. But there's refresher training, as I said,
13  that happens every year.
14  Q    And the refresher training, is that done by the
15  product team in operations?
16  A    No, we create it. We manufacture the training
17  and then it's pushed out to the stores. And so I
18  believe it's the store manager. Once again, the retail
19  operations folks, Jim Grimmer would be able to say how
20  it actually gets disseminated in the stores themselves.
21  That's not a product role.
22  Q    What are the goals of in-store training
23  relative to gift cards?
24  A    Just to make sure they understand what the

## Page 106

1   process is to sell the card and why we sell the card,
2   what the purpose of the card is.
3   Q    Is one of the goals to ensure that the gift
4   card transaction is uniform throughout the branches?
5   A    It's uniform training, absolutely, yes.
6   Q    The training is uniform?
7   A    Yes. We do the same training, as we discussed
8   earlier, it's only one guide that goes everywhere.
9        MR. FODERA: One guy or guide?
10       THE WITNESS: Guide. It's not one
11  individual. It's one guide. I apologize.
12       (Document marked for identification as
13  Chevalier exhibit 6.)
14  BY MR. LALLI:
15  Q    Have you ever seen this?
16  A    I'm not entirely sure.
17  Q    Do you know what it is?
18  A    It looks like we're trying to clarify here
19  because we had different bin numbers in different
20  markets. So this looks more like -- well, it says tips.
21  I wouldn't have been directly involved in this one.
22  Q    Would you have not okayed this or signed off on
23  this before it went out?
24  A    Yes. This is a tips sheet. So I probably

## Page 107

1   wouldn't have signed off on this one.
2   Q    You're characterizing that as a tips sheet?
3   A    I'm sorry, it's simply clarifying a process
4   that we have.
5   Q    Who would have created this?
6   A    I don't know.
7   Q    If you look midway down the first page, it's
8   got in bold lettering, "Quick hints to keep the lines
9   moving." Do you see that?
10  A    I do.
11  Q    Any idea what that means?
12       MR. HARVEY: Object to the form of the
13  question.
14       THE WITNESS: I would simply speculate
15  that it's just how to make sure the store
16  staffs don't get tripped up in terms of so
17  they're not fumbling around for information,
18  that they know what to do.
19  BY MR. LALLI:
20  Q    Is it your understanding that it's better for
21  TD Bank if the transactions are completed quickly, the
22  gift card transactions are completed quickly?
23  A    Yes.
24  Q    It is better or it is not better?

## Page 108

1   A    It's better for the bank and better for the
2   customer.
3   Q    And would a transaction be faster or not
4   faster, I guess with all things being equal, a
5   transaction where a customer service representative
6   fully explains the terms and conditions versus a
7   transaction where the customer service representative
8   skimps on that?
9        MR. HARVEY: Object to the form of the
10  question.
11       THE WITNESS: I don't understand the
12  question.
13  BY MR. LALLI:
14  Q    All I'm asking is, what's faster, what would be
15  faster, if a customer -- all things being equal, which
16  transaction would be faster, one in which a customer
17  service representative fully explains the terms and
18  conditions to the purchaser of a card or one in which
19  the customer service representative does not fully
20  explain the terms and conditions of the card to the
21  purchaser, with all other things being equal?
22  A    Any transaction where you do less things than
23  more things is going to go faster if you do less things.
24  Once again, though, our training and our procedures do

| Page 109 | Page 111 |
|---|---|

**Page 109**

1   not instruct the employees to not -- at no point do we
2   say, hey, if you want to make it fast, skimp out on
3   these or whatever word you used, or skip these steps.
4   No, that's not the policy of the training.
5       Q      Now, is it your understanding that the customer
6   service representatives are trained to inform the
7   purchaser about the maintenance fee without any
8   questioning, that they affirmatively take that step?
9              MR. HARVEY: I'm sorry, could I get
10      that question read back?
11             (Pending question read back.)
12             THE WITNESS: Can you rephrase it so
13      that I understand?
14  BY MR. LALLI:
15      Q      Sure. Do you train your employees to
16  affirmatively inform the purchasers of gift cards about
17  the monthly maintenance fee?
18      A      Yes.
19      Q      And are they instructed to affirmatively inform
20  the customers, the purchasers, about the maintenance fee
21  in response to questioning or just as part of the
22  transaction?
23      A      That is part of the transaction. We tell them
24  in the training to give the terms and conditions. We

**Page 111**

1       A      Yes.
2       Q      Is a whole other step to say, hey, customer,
3   there's also this monthly maintenance fee that kicks in
4   after X date? Is that a fair representation?
5       A      No, I would say that the terms and conditions,
6   the step is that's where everything they need to know
7   about the fees, the card, how the card operates, it's
8   all in the terms and conditions. So we say give the
9   terms and conditions. In the training, we say tell them
10  about the fee. Tell them to tell whoever they gave the
11  gift to about the fee. If you want to call that a
12  different step, it's not like we have numbered steps.
13  It's certainly in the training. But the key part for us
14  is you've got to give them the terms and conditions.
15      Q      Is there any mechanism to ensure that the
16  employees are following the training?
17      A      No.
18      Q      Is there any secret shopper type policy you
19  guys have?
20      A      Do you mean like mystery shoppers that come
21  into the store?
22      Q      Sure.
23      A      We have mystery shoppers that come into the
24  stores and we call it a customer WOW index. Those

**Page 110**

1   tell them to tell the customer about the fee. And we
2   tell them to tell who they give the card to about the
3   fee.
4       Q      When we talked about this before, I think I
5   understand that you just instruct your employees to make
6   the purchaser aware of the terms and conditions.
7       A      Um-hm.
8       Q      That's correct, right?
9       A      That's correct.
10      Q      Now, in doing that, is that where you're
11  thinking the monthly maintenance fee is advised of or is
12  it a completely different step?
13      A      Well, if you look at the training we did in
14  2009, it says specifically. The market-wise that goes
15  with the training, it says it specifically, yes.
16      Q      So it's a different step?
17             MR. HARVEY: Object to the form of the
18      question.
19             THE WITNESS: Ask the question again.
20  BY MR. LALLI:
21      Q      If I'm an employee, I see this training guide
22  and I have a checklist of things to do. One of them is
23  to show the terms and conditions to the purchaser,
24  right?

**Page 112**

1   aren't specific to gift card, though. This is about
2   what was your experience today? How did you feel about
3   your experience?
4       Q      I just want to understand this. So you don't
5   have people going to the bank, mystery shoppers going to
6   the bank to purchase a gift card to determine whether or
7   not the training guides on selling gift cards are being
8   followed?
9       A      Not to my knowledge.
10             (Document marked for identification as
11      Chevalier exhibit 7.)
12  BY MR. LALLI:
13      Q      Again, Mr. Chevalier, this is something that
14  was produced by your counsel. Do you know what this
15  document is?
16             MR. HARVEY: The witness has just been
17      handed it. You might want to give him a chance
18      to review the whole document.
19             MR. LALLI: Sure.
20             THE WITNESS: Okay.
21  BY MR. LALLI:
22      Q      Have you had a chance to review the document?
23      A      Yes.
24      Q      Have you ever seen it before?

29 (Pages 113 to 116)

| Page 113 | Page 115 |
|---|---|

**Page 113**

1  A   Yes.
2  Q   What is this?
3  A   This is a marketing kick-off document.
4  Q   And who creates this?
5  A   This would have been created by marketing.
6  Q   Is this something that you would sign off on?
7  A   No.
8  Q   What's the purpose of this marketing kick-off?
9  A   This is to get ready for the campaign that's
10 coming for the holiday season.
11 Q   You said it's created by marketing. Who is it
12 provided to?
13 A   Whenever we do a marketing campaign, it would
14 be provided to anybody who's in attendance at the
15 marketing kick-off meeting, which would be very similar
16 to those people we've talked about, retail operations,
17 debit card operations, product, Kevin Cane. That would
18 be those people. I can't say who was actually at this
19 meeting.
20 Q   Were you not at this meeting?
21 A   I'm not sure if I was at this one or not. I
22 don't recall if I was at the meeting.
23 Q   But you may have been?
24 A   I may have been.

**Page 114**

1  Q   Do you generally attend these type of meetings?
2  A   It's hit and miss. Sometimes I'll attend a
3  kick-off meeting, sometimes I won't. It depends if my
4  schedule will support it.
5  Q   You said these kick-off -- what did you call
6  it?
7  A   It's a kick-off meeting.
8  Q   And the purpose of this document, is it an
9  agenda?
10 A   It's not an agenda. It's saying, okay, what's
11 changed in the program? What are the goals of the
12 program? Who's the target? What are our key messages?
13 And how are we going to display those messages? Like
14 what zones? Zones just means how prominent is it going
15 to be in the store?
16 Q   If you turn to page 2, you have campaign
17 details, sales and marketing objectives. Do you see
18 that?
19 A   I do.
20 Q   And underneath that, it says goals. The third
21 goal says highlight the "free," in quotation marks,
22 message of TDBN. Do you see that?
23 A   I do.
24 Q   And TDBN is TD Banknorth?

**Page 115**

1  A   Yes.
2  Q   What does that mean, highlight the "free"
3  message?
4  A   Banknorth used to charge a purchase fee. The
5  "free" message meaning there's no longer a purchase fee.
6  Q   What I'm getting at is, highlight the "free"
7  message, who is doing the highlighting?
8  A   As we say earlier in the document, second
9  paragraph, we'll be aligning our pricing with the
10 Commerce Bank gift card, no up-front purchase fee. It's
11 a 13-month breakage fee rather than six months. This is
12 a good news message, holiday gift card campaign. So
13 that's what we mean. We're going to highlight the
14 "free" message because it is now free to purchase.
15 Q   You're going to highlight the "free" message to
16 customers?
17 A   Yes. This is new. This was new at the time.
18     And then below that, there's target market,
19 strategies and then message/offer. Do you see that?
20 A   Yes.
21 Q   And then below that is merchandising. And the
22 first segment is primary messages across merchandising
23 zone A. What's merchandising zone A?
24 A   Merchandising zone A just means it's going to

**Page 116**

1  be the most prominent in the store.
2  Q   And then the first subpart beneath is TDBN,
3  "It's free," in all capital letters with an exclamation
4  point. Do you see that?
5  A   Yes.
6  Q   And what does that mean?
7  A   As I just said, it means that it's free to
8  purchase.
9  Q   Am I reading this correctly that your
10 merchandising in the most prominent section is going to
11 read "it's free" or something to that effect?
12 A   It's going to say, as it did, that it's free to
13 purchase. So we were highlighting fact that it is free
14 to acquire this card.
15 Q   And the fourth one down says zone B supporting
16 points. What does that mean?
17 A   So I'm not the one to explain what the
18 difference is between zone A and zone B.
19 Q   Let me interrupt you real quick. Who would be?
20 A   Marketing. So Beth Hogan would have been our
21 planner at the time for this.
22 Q   I'm sorry, I didn't mean to interrupt you.
23 A   No problem. Lise Moncilovich is another one
24 who can certainly explain the differences between zone A

Case 1:09-cv-01062-RBK -AMD   Document 79-1   Filed 09/17/10   Page 31 of 34 PageID: 4220
MANN et al v. TD BANK, N.A. et al                                              MATTHEW J. CHEVALIER

30 (Pages 117 to 120)

| Page 117 | Page 119 |
|---|---|

**Page 117**

1  and zone B. This is a campaign where we are going to
2  take it to both zones, and zone B is going to support
3  that message.
4  Q    And that message being that the card is free?
5  A    That it's free to purchase, that's correct.
6        MR. HARVEY: Mike, I think you know but
7  just to be clear, TD Banknorth, that was a
8  d/b/a or doing business as after the date of
9  May 31, 2008. And before that date, it was the
10 official name of the company.
11       MR. LALLI: Sure.
12 BY MR. LALLI:
13 Q    Mr. Chevalier, did you okay or sign off on
14 press releases as well?
15 A    No.
16 Q    Who did?
17 A    I don't know. You'd have to tell me what press
18 releases. I typically don't sign off -- well, let's see
19 which ones you're talking about.
20       (Document marked for identification as
21       Chevalier exhibit 8.)
22 BY MR. LALLI:
23 Q    Have you had a chance to read this?
24 A    Yes.

**Page 118**

1  Q    I guess, in a general sense, where do these
2  press releases come from within TD Bank?
3  A    From our public and corporate affairs
4  department.
5  Q    And at the time, November of 2008, who was the
6  person that you would speak to in corporate and public
7  affairs? Who was the head?
8  A    The head would have been Neal Parmener.
9  Q    Do you know who drafted the press releases?
10 A    I'm not sure. It might have been Rebecca
11 Saveto. But she took on a new job. I'm not sure if she
12 had it at this point or not.
13 Q    And you said you're not sure if you signed off
14 on this, it depends. Would you have signed off on this?
15 A    Just so we're clear, I don't sign off on press
16 releases. It would have gone by my desk to say do you
17 have any comments, but I don't sign off on these.
18 Q    Would this one have gone by your desk?
19 A    I believe this one would have.
20 Q    Do you remember reading it before it went out?
21 A    This one in particular, I believe I did. I
22 mean, I have a few, a number of press releases that go
23 by my desk. But I believe I did.
24 Q    What's the purpose of a press release?

**Page 119**

1  A    To create excitement. It's to increase the
2  excitement to the external marketplace, quite frankly.
3  Q    So it's TD Bank's intention that these press
4  releases will be read by potential customers, new
5  customers?
6  A    Yes.
7  Q    I'm going to focus in on the second paragraph
8  that says, "TD Bank, America's most convenient bank,
9  offers holiday shoppers the TD Bank or TD Banknorth gift
10 card, the only free Visa gift cards that are gift-boxed
11 and ready to give." Do you see that?
12 A    I do.
13 Q    And again, I'm going to assume that that word
14 "free" means no purchase fee to you?
15 A    As indicated in the final sentence of the
16 paragraph, yes.
17 Q    Do you have any inkling as to whether or not
18 that may or may not confuse a customer?
19 A    Once again, I can't comment on what's going to
20 confuse or not confuse a customer. I think if you read
21 the whole paragraph, there would be no confusion.
22 Q    I believe what you're saying or what you're
23 focusing on is the last sentence of that paragraph ends
24 with, "And best of all, there is no purchase fee"?

**Page 120**

1  A    Yes.
2  Q    Is that correct?
3  A    Yes.
4  Q    So there's no chance that a customer would read
5  this paragraph and think, oh, it's free, free meaning no
6  fees at all?
7  A    I'm not going to speculate on what the customer
8  is going to think.
9  Q    If free means no purchase fee, why even have
10 the last sentence specify no purchase fee?
11       MR. HARVEY: Object to the form of the
12       question.
13       THE WITNESS: Once again, it's
14       consistent through all of this, adding
15       additional clarity.
16 BY MR. LALLI:
17 Q    So no purchase fee adds additional clarity to
18 the word "free"?
19       MR. HARVEY: Object to the form of the
20       question.
21 BY MR. LALLI:
22 Q    Is that your testimony?
23 A    So my testimony is we want to be, yes, we were
24 trying to be clear through all of these communications.

| Page 121 | Page 123 |
|---|---|

**Page 121**

1  Q     So "no purchase fee" clarifies the meaning of
2  "free"?
3             MR. HARVEY: Object to the form of the
4  question.
5             THE WITNESS: Yes.
6  BY MR. LALLI:
7  Q     I want you to take a look at this. I just have
8  a question about it.
9             MR. LALLI: This will be 9.
10            (Document marked for identification as
11  Chevalier exhibit 9.)
12            THE WITNESS: Okay.
13  BY MR. LALLI:
14  Q     Have you had a chance to read the document
15  that's now been marked Chevalier-9?
16  A     I've scanned the document, the terms and
17  conditions.
18  Q     And, like you said, it's entitled terms and
19  conditions and important information concerning the gift
20  card, effective September 2009. And it's a three or
21  four-page document with all the terms and conditions of
22  the card, is that correct?
23            MR. HARVEY: Object to the form of the
24  question. It's obviously a mark-up. It's not

**Page 122**

1  the actual terms and conditions.
2             MR. LALLI: I'm getting to that.
3             THE WITNESS: Yes.
4  BY MR. LALLI:
5  Q     And there are a lot of changes and scribbles
6  and it's been edited by someone. Is that correct?
7  A     That's what it would appear to be, yes.
8  Q     Do you know whose mark-ups these are?
9  A     No.
10  Q     Would you have ever done this to any terms and
11  conditions?
12  A     Clarify "done this."
13  Q     Would you have ever been the one to make these
14  kinds of mark-ups on terms and conditions?
15  A     No, not in this level of detail, no.
16  Q     Not at all?
17  A     Is your question relative to handwritten
18  mark-ups?
19  Q     Any changes to the terms and conditions.
20  A     Possibly. But no, I don't go into the details
21  of the terms and conditions.
22  Q     And if you did make changes to the terms and
23  conditions, those would have been via e-mail?
24  A     Most likely, yes.

**Page 123**

1  Q     And those e-mails were then produced to your
2  counsel?
3  A     Yes.
4             MR. LALLI: Could we take 10 minutes?
5             MR. HARVEY: Sure.
6             (Brief recess.)
7                    - - -
8  BY MR. LALLI:
9  Q     Just to clarify one point, I think you
10  testified that the training informs your employees to
11  make it absolutely clear to customers that free means no
12  purchase fee. Do you remember testifying to that?
13  A     So, I mean, the training doesn't use the words
14  "absolutely clear." I mean, I couldn't quote you word
15  for word what the training says. But the training says
16  that they are to inform the customer, yes.
17  Q     And how so?
18  A     How so?
19  Q     How are the employees instructed to inform the
20  customers that free really means no purchase fee?
21  A     So we say inform the customer. We don't say,
22  say these words or pass them this. What we tell them
23  is, as I said, share the terms and conditions and inform
24  the customer. And that's what we tell them.

**Page 124**

1  Q     So it's up to the customer service
2  representative or the teller to take that instruction,
3  read it, understand it and then execute it?
4  A     It's training. Yes.
5  Q     And I think you testified there's nothing, no
6  policies in effect to ensure that the training regarding
7  gift card transactions is being followed?
8             MR. HARVEY: Object to the form of the
9  question. He said there was no mechanism.
10            THE WITNESS: No process.
11  BY MR. LALLI:
12  Q     Is there something out there that is checking
13  up on the employees to ensure that they're following the
14  training regarding gift card transactions?
15  A     I still don't understand the question. I've
16  already answered that there's no mechanism, there's no
17  process to say relative to gift card, are they doing
18  each step of the training, no, there's not. There's
19  customer satisfaction and customer advocacy measurements
20  but not specific to gift card.
21  Q     So there's nothing -- I am not even going to
22  use the word "policy" or "mechanism" or anything --
23  nothing done to ensure that the TD Bank training
24  regarding gift card transactions is being followed by

Case 1:09-cv-01062-RBK-AMD Document 79-1 Filed 09/17/10 Page 33 of 34 PageID: 4222
MANN, et al. v. TD BANK, N.A., et al.                                    MATTHEW J. CHEVALIER

32 (Pages 125 to 128)

| Page 125 | Page 127 |
|---|---|

**Page 125**

1 the employees?
2 A    No, there's policy and procedure, and there's
3 training.
4          MR. LALLI:  That's all I have for you.
5 BY MR. HARVEY:
6 Q    I have a follow-up question.  In the branches,
7 there is a management structure, isn't there?
8 A    Yes.
9 Q    What are the names of people in the branches
10 who are in the management structure?
11 A    There's branch manager.  There is, I think
12 there's an assistant branch manager.  I'm not exactly
13 sure what the titles are.  And we also have market
14 managers.  There are regional market managers which
15 provide support to the branches.
16 Q    Does the management structure in the branches
17 have any responsibility for ensuring the training and
18 policies and procedures are followed?
19 A    Yes.
20          MR. HARVEY:  I have no further
21     questions.
22 BY MR. LALLI:
23 Q    Just one follow-up.  How --
24 A    So, I mean, they would use any number of

**Page 127**

1              I N D E X
2 WITNESS                          PAGE
3 MATTHEW J. CHEVALIER
4     By Mr. Lalli ---------------------- 3, 125
5     By Mr. Harvey --------------------- 125
6              - - -
7 CHEVALIER EXHIBITS                MARKED
8 1    Notice of deposition ----------------    5
9 2    Resume ----------------------------   18
10 3A-C  Organizational charts ---------------   92
11 4    Advertisement -----------------------   93
12 5    Advertisement -----------------------   98
13 6    Gift card selling tips --------------  106
14 7    Kick-off document -------------------  112
15 8    Press release ----------------------  117
16 9    Terms and conditions ----------------  121
17              - - -

**Page 126**

1 methods.  So they would observe customer interactions,
2 whether it's gift card or anything.  They would
3 potentially do role play.  Any number of those types of
4 things.  I'm not in the branch, nor am I a branch
5 manager.  So that would be really speculation on my
6 part.  But any good manager, that's what they would do.
7 Q    Do you know if any records are kept regarding
8 that oversight of the gift card transaction?
9 A    I do not know.
10          MR. LALLI:  That's all I have.
11     (Deposition concluded at 1:55 p.m.)
12              - - -

**Page 128**

1          I have read the foregoing transcript of
2 my deposition, given on March 18, 2010, and find it to
3 be accurate and complete, to the best of my knowledge
4 and recollection, except for the changes, if any, noted
5 on a separate sheet herewith.

8          _____

          MATTHEW J. CHEVALIER

Case 1:09-cv-01062-RBK -AMD Document 79-1 Filed 09/17/10 Page 34 of 34 PageID: 4223
MATTHEW J. CHEVALIER vs. TD BANK, N.A., et al., vs. MATTHEW J. CHEVALIER

33 (Pages 129 to 130)

## Page 129

1    ERRATA SHEET
     MATTHEW J. CHEVALIER - MARCH 18, 2010

2

3    PAGE  LINE        CHANGE AND REASON THEREFOR

4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____

## Page 130

1    CERTIFICATION

2

3         I HEREBY CERTIFY that the foregoing is
4    a true and correct transcript of the proceedings held in
5    this matter, as transcribed from the stenographic notes
6    taken by me on March 18, 2010.

7

8

9    _____

         BRAD TRATENBERG
10       Court Reporter - Notary Public

11

12

13       (This certification does not apply to
14   any reproduction of this transcript, unless under the
15   direct supervision of the certifying reporter.)

16

17

18

19

20

21

22

23

24

fc09d5f4-ac8c-47db-8077-89e4d375c9f3