EXHIBIT "B"

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHAWEZI MWANTEMBE, et al   :   CIVIL ACTION
                           :
         vs.               :
                           :
TD BANK, N.A., et al       :   2:09-cv-00135-TJS

- - -

Tuesday, March 9, 2010

- - -

        Oral Deposition of JAMES C. GRIMMER,
pursuant to Notice, taken in the offices of Pepper
Hamilton, 3000 Two Logan Square, 18th and Arch
Streets, Philadelphia, Pennsylvania, commencing at
11:15 a.m., before Francine K. Guokas, R.P.R.,
Notary Public.

- - -

---------------------------------------------------
            FRANCINE K. GUOKAS
            COURT REPORTING
            7 Galena Court
            Erial, NJ  08081

    (215) 726-8855          (856) 782-1640

5a189ffe-5282-43a5-be73-771a52af4ae7

## Page 2

APPEARANCES:

    SILVERMAN & FODERA
    BY: LEONARD V. FODERA, ESQ.
        MICHAEL P. LALLI, ESQ.
        26th Floor
        11 Penn Center Plaza
        1835 Market Street
        Philadelphia, Pennsylvania 19103

    Counsel For Plaintiffs


    PEPPER HAMILTON
    BY: STEPHEN G. HARVEY, ESQ.
        3000 Two Logan Square
        18th and Arch Streets
        Philadelphia, Pennsylvania 19103

    Counsel For Defendants

## Page 4

DOCUMENT REQUEST

Page  Line

107   13
186   18

## Page 3

INDEX

WITNESS                        PAGE
JAMES C. GRIMMER
    By Mr. Fodera          5, 230
    By Mr. Lalli           --
    By Mr. Harvey          228


EXHIBITS

NO.    DESCRIPTION        PAGE
Plaintiffs' Exhibit Grimmer-1      22
Handdrawn Chart, consisting of 2 pages

Plaintiffs' Exhibit Grimmer-2      107

Document Bates-stamped number TD001391, consisting
of 1 page

Plaintiffs' Exhibit Grimmer-3      155

Notice of Deposition to TD Bank, N.A., consisting
of 4 pages

Plaintiffs' Exhibit Grimmer-4      211

Document Bates-stamped number TD000969 through
TD000978, consisting of 10 pages

## Page 5

            (It was agreed by and among
    counsel that all objections, except as to
    the form of the question, are reserved
    until the time of trial.)
            - - -
            JAMES C. GRIMMER, having been
    duly sworn, was examined and testified as
    follows:
BY MR. FODERA:
    Q.   My name is Len Fodera.  This is my
associate Mike Lalli.  We've instituted an action
against TD Bank.  I'm going to ask you some
questions today.  TD Bank has put you up as a
witness for certain areas of inquiry that we have.
            And before I start to ask you
questions, let me give you some instructions.  I
assume that you've met -- are you represented here
today?
    A.   Yes.
    Q.   And have you met with your attorney
in preparation for this?
    A.   I have.
    Q.   And maybe he's given you
instructions; maybe he hasn't.  Have you been

5a189ffe-5282-43a5-be73-771a52af4ae7

3 (Pages 6 to 9)

| Page 6 | Page 8 |
|---|---|

**Page 6**

1  deposed before?
2      A.   Once.
3      Q.   How long ago?
4      A.   I'm guessing, 1982.
5      Q.   What did that concern?
6      A.   It was a grand jury case for Mellon
7  Bank.
8      Q.   Were you a witness before the grand
9  jury?
10     A.   No.
11     Q.   What capacity were you deposed?
12     A.   It was for the bank.  I honestly
13  can't recall exactly what it was about.
14     Q.   A deposition is a question and answer
15  period for me to ask you questions and for you to
16  respond.  Everything that you say is taken down by
17  the court reporter.  It has the same full force
18  and effect as if you're testifying in court.
19          Are you on any medications
20  today that would prevent you from understanding
21  and answering my questions fully, completely, and
22  honestly?
23     A.   No.
24     Q.   If I ask you a question and you

**Page 7**

1  respond to the question, I'm going to assume
2  several things: I'm going to assume you heard the
3  question, you understood the question, and you're
4  responding fully and completely.  Would those be
5  fair assumptions for me to make?
6      A.   Yes.
7      Q.   If at any time during the deposition
8  you realize a subsequent answer -- an answer you
9  gave me in the past was incorrect or incomplete,
10  just stop me, tell me, we'll go back and you can
11  supplement that answer.
12     A.   Okay.
13     Q.   Okay?  If you want to take a break at
14  any time, that's fine.  Under the Federal rules,
15  though, in the Eastern District of Pennsylvania,
16  you really can't confer with your counsel while a
17  question is pending.  Okay?  You have to respond
18  to the question, and then we'll take whatever
19  break you need.
20     A.   Okay.
21     Q.   Before we begin this deposition, do
22  you have any questions of me?
23     A.   No.
24     Q.   Can you tell me what you reviewed in

**Page 8**

1  preparation for this deposition, if anything?
2      A.   Documents relative to the bank's
3  training materials, emails, policies, manuals.
4      Q.   What type of volume of material?  I'm
5  looking at about 8 inches here.  More than
6  8 inches' worth of volume?
7      A.   No.
8      Q.   Less than 8 inches' worth of volume?
9      A.   I'd say yeah.
10     Q.   Less than 4 inches worth' of volume?
11     A.   Between.
12     Q.   Did you bring anything with you here
13  today?  Any materials?
14     A.   In the building?
15     Q.   With you to this deposition.
16     A.   No.
17     Q.   Did you bring any materials into the
18  building today?
19     A.   Yeah.  I brought my laptop with me.
20     Q.   Do you have an understanding of why
21  you have been designated by TD Bank as a person
22  most knowledgeable?
23     A.   Yes.
24     Q.   What is your understanding?

**Page 9**

1      A.   Is that I have experience with the
2  TD Bank policies, procedures, training materials,
3  execution of sales of gift cards for TD Bank.
4      Q.   Why don't you tell me your
5  background.  I can infer that you worked at Mellon
6  Bank --
7      A.   Yeah.
8      Q.   -- but where did you go to
9  high school, where did you graduate from high
10  school, did you go to college?  Just walk me
11  through your educational and work history.
12     A.   Sure.  I went to high school in
13  Philadelphia, Catholic Boys High School in
14  Northeast Philadelphia, Archbishop Ryan
15  High School.
16     Q.   Are you from Melrose Park or
17  Parkwood?
18     A.   I'm from -- no, more Knights Road.  I
19  don't even know what they call it.  It's like a
20  section in that area, but not either one of those.
21     Q.   Okay.
22     A.   Worked at -- went right from high
23  school, worked for a bank, PSFS, as a teller in
24  1980.  Part-time school at night at Holy Family

## Page 10

1 College and U of P and Wharton for a period of
2 time. Never finished my graduate, though, never
3 got my degree. Worked there for eight years until
4 1988.
5     Q.   Worked at PSFS?
6     A.   PSFS. Went to a small bank in Bucks
7 County, Pennsylvania, Horizon Financial, for a
8 two-year period in their retirement planning
9 division. Then I came and worked for Mellon when
10 they acquired the former PSFS or the first half of
11 former PSFS, running their operations department.
12         I stayed there for ten years,
13 until 2000, and then I joined Commerce in 2000 and
14 worked in back room operations, what we called
15 deposit operations. And then in, I want to say
16 2005 in my current as the director of store
17 operations.
18     Q.   Were you a teller throughout your
19 tenure at PSFS?
20     A.   No, I was only a teller for about a
21 year. I wasn't a very good teller.
22     Q.   What did you do after that?
23     A.   I was a CSR, customer service
24 representative where you sold products on the

## Page 11

1 platform, and I worked in their retirement
2 planning for the rest -- remainder of time, six
3 years.
4     Q.   Were you on the retail side?
5     A.   Yes, always retail.
6     Q.   When I say the retail side, what's
7 your understanding of that?
8     A.   The retail banking, consumer banking
9 branches.
10     Q.   Okay. And at Horizon Financial, what
11 did you do there?
12     A.   Retirement planning there, too.
13     Q.   That's on the retail side?
14     A.   Yes.
15     Q.   What were you doing in retirement
16 planning?
17     A.   I managed the IRA department for
18 them.
19     Q.   Okay. And then after that, you went
20 to Mellon again?
21     A.   Uh-huh.
22     Q.   What did you do at Mellon?
23     A.   I worked on the acquisition and the
24 merger of PSFS for the first two years, worked on

## Page 12

1 mergers and acquisitions of other banks that they
2 bought in the Pennsylvania and New Jersey area for
3 another two years, and then I actually ran what we
4 call deposit operations, which would be
5 reconcilement; customer account information on the
6 system, CIF, it's called; retirement plans, as
7 well; call center; a variety of back support areas
8 to the retail front end.
9     Q.   When you did the -- when you worked
10 on the acquisition, did you work out of Pittsburgh
11 or Philadelphia?
12     A.   Philadelphia.
13     Q.   Have you ever worked out of
14 Pittsburgh for the bank?
15     A.   No.
16     Q.   On an ongoing basis.
17     A.   No.
18     Q.   So why did you make the move from
19 Mellon to TD, I guess, or Commerce?
20     A.   Commerce at the time.
21         So Mellon Bank was selling off
22 a lot of their retail divisions, they started with
23 the credit card, I can't remember a date, and the
24 writing was on the wall that probably the retail

## Page 13

1 bank was next to go, and a former colleague of
2 mine at the bank called me and said, "Do you want
3 to come work at Commerce." So I did.
4     Q.   And when you went into Commerce Bank,
5 what was your position on hiring?
6     A.   I was vice president of deposit
7 operations.
8     Q.   What was the responsibilities of
9 vice president of deposit operations? And this
10 was in 2005, correct?
11     A.   No, 2000.
12     Q.   2000.
13     A.   Uh-huh. So I ran the support areas
14 for the retail bank, every support area you could
15 think of: Electronic banking, debit/ATM card,
16 wire transfer, CIF, again, which is customer
17 information files, didn't have an IRA department
18 then, but at a period of time, loss prevention.
19 Pretty much that was it.
20     Q.   And you were in that position from
21 when to when?
22     A.   Started in April 2000 and I probably
23 ran till about 2004.
24     Q.   And in that position were you -- did

5a189ffe-5282-43a5-be73-771a52af4ae7

5 (Pages 14 to 17)

| Page 14 | Page 16 |
|---|---|
| 1 you consider that a policy making position?<br>2    A.  Yeah.  I would say yes.<br>3    Q.  And what types of policy decisions<br>4 were you involved in in that position?<br>5    A.  How products would be set up on the<br>6 system, how we would manage the policies and<br>7 procedures of the system.  I don't know if that<br>8 answers your question.<br>9    Q.  When you say how projects would be<br>10 set up on the system and how you would manage, I<br>11 guess, those products --<br>12    A.  Uh-huh.<br>13        MR. HARVEY:  Objection.<br>14        THE WITNESS:  Projects.<br>15 BY MR. FODERA:<br>16    Q.  Projects.  I'm sorry.  Can you tell<br>17 me, is that -- were those policy decisions that<br>18 were unique to your position or was it a<br>19 position -- decisions by committee?  Just explain<br>20 the overall structure of the way decisions were<br>21 made with regard to policy that you were involved<br>22 in from 2000 to 2004.<br>23    A.  So typically it would be, you know, a<br>24 group of people, it wasn't one independent person | 1 that depending upon the nature of the particular<br>2 project, the committee members may change?<br>3        MR. HARVEY:  Same objection.<br>4 BY MR. FODERA:<br>5    Q.  In one particular project you may<br>6 have four committee members from four different<br>7 areas of the bank, and in another project you may<br>8 have four committee members from four other --<br>9 from other parts of the bank.<br>10        MR. HARVEY:  Let me just seek a<br>11    clarification.  When you refer to<br>12    committee, he didn't testify about formal<br>13    committees; he just testified about people<br>14    being involved.<br>15        MR. FODERA:  Fair enough.  Fair<br>16    enough.<br>17 BY MR. FODERA:<br>18    Q.  Let me back up.  When you utilized<br>19 the term committee, what were you referring to?<br>20    A.  Project teams.<br>21    Q.  Okay.  And is that nomenclature that<br>22 was used at TD Bank at the time, project teams, or<br>23 is that an informal designation that you're giving<br>24 it? |
| **Page 15** | **Page 17** |
| 1 making the decision, that's for sure, and we would<br>2 come up with a recommendation relative to the<br>3 product or the process or the service that was<br>4 being implemented or changed.<br>5    Q.  Okay.<br>6    A.  That could be relative to many<br>7 things, it could be customer experience, it could<br>8 be regulatory, it could be compliance issues.<br>9    Q.  Sure.<br>10    A.  It could be AML/BSA.  I mean there's<br>11 millions of things.  And then we would have a<br>12 committee of people that would work on the<br>13 project, and then we would bump it up through our<br>14 executive team for approval.<br>15    Q.  Would it be fair to say that<br>16 depending upon the nature of the product, the<br>17 committee members would change?<br>18        MR. HARVEY:  I'm going to<br>19    object to the form of that question.<br>20        MR. FODERA:  You can answer the<br>21    question.<br>22        THE WITNESS:  I'm sorry?<br>23 BY MR. FODERA:<br>24    Q.  Would it be a fair characterization | 1    A.  I'm sorry.  I don't understand the<br>2 question.<br>3    Q.  I'm not trying to confuse you.  I<br>4 just want to know what you guys called these<br>5 committees back then.<br>6    A.  Oh, project teams would be a<br>7 committee that was -- it could be called<br>8 committee, it could be project teams.<br>9    Q.  Okay.<br>10    A.  It could be informal, it could be a<br>11 group of people sitting in a room.  I mean<br>12 Commerce wasn't as formal relative to project<br>13 management like I am today with TD Bank, their<br>14 project teams.<br>15    Q.  Even though Commerce wasn't as formal<br>16 with regard to project teams or committees, there<br>17 were committees that were organized committees at<br>18 Commerce, correct?  And if you wanted to, if you<br>19 had an assignment to come up with a new product,<br>20 there would be people assigned to that committee<br>21 to come up with a new product or to address a new<br>22 product; is that correct?<br>23    A.  True.<br>24    Q.  And those people would come together, |

5a189ffe-5282-43a5-be73-771a52af4ae7

| Page 18 | Page 20 |
|---|---|
| 1  have several meetings, together or apart, come up<br>2  with recommendations, generally; is that correct?<br>3      A.  True.<br>4      Q.  And those recommendations would be<br>5  placed with someone or some other committee,<br>6  correct?  I just want to understand the structure<br>7  here.<br>8      A.  Yeah.  I mean we weren't very<br>9  committee driven.  Let me just put that out there.<br>10      Q.  All right.<br>11      A.  So there was a small group of people,<br>12  basically, so we would get together, outline what<br>13  we thought the product, the service, the system<br>14  should look like, and then that would be referred<br>15  into executive management for review.<br>16      Q.  And at the time that you were<br>17  involved in these policy decisions from 2000 to<br>18  2004, who comprised the executive committee?<br>19           MR. HARVEY:  Objection.  He<br>20  didn't say executive committee; I think he<br>21  said executive management.<br>22           MR. FODERA:  Well, he said<br>23  committee, but whatever the nomenclature<br>24  would be. | 1      Q.  Could you just do me a favor and just<br>2  draw the tree out for me, at the top.<br>3      A.  Starting with me?<br>4      Q.  Starting with -- yeah, you could<br>5  start with you and go up or start at the top and<br>6  go down.<br>7      A.  That's the best I can recall.<br>8      Q.  Okay.  And this is --<br>9      A.  There's probably others here on the<br>10  commercial side of the bank.  I don't know them as<br>11  well.<br>12      Q.  This is TD Bank 2004?<br>13      A.  Commerce Bank.<br>14      Q.  I'm sorry, Commerce Bank.  And can<br>15  you put some timeframe on it?<br>16      A.  2000 to -- I'd say 2000 to 2004.<br>17      Q.  2000 to 2004?<br>18      A.  Uh-huh.<br>19      Q.  And that's an approximation.<br>20      A.  Yeah.<br>21      Q.  And what was Vernon Hill?<br>22      A.  He was the chairman, president.<br>23      Q.  Chairman of Commerce.  And then who<br>24  was... |

| Page 19 | Page 21 |
|---|---|
| 1           THE WITNESS:  Management would<br>2  be a better term.<br>3           MR. FODERA:  Okay.<br>4           THE WITNESS:  My boss?  You<br>5  want --<br>6  BY MR. FODERA:<br>7      Q.  Okay, that's a good start.<br>8      A.  Carlo DiToro was the head of all<br>9  operations at the bank.<br>10      Q.  And that's all banking operations?<br>11      A.  Yes.  Retail.  Not loans.<br>12      Q.  All retail banking operations.<br>13      A.  Not lending.<br>14      Q.  All right.  What is under all retail<br>15  banking operations?<br>16      A.  Everything that I had in addition to<br>17  we also had what we call item processing, which is<br>18  check processing.<br>19      Q.  On this tree, now, Carlos (sic) is<br>20  here and you're down here.  How many people are on<br>21  par with you at that time?<br>22      A.  Just one other at the time.<br>23      Q.  And then who's above Carlos?<br>24      A.  Dennis DiFlorio. | 1      A.  My writing is horrible.<br>2      Q.  -- Dennis...<br>3      A.  DiFlorio.<br>4      Q.  -- DiFlorio?<br>5      A.  Right.<br>6      Q.  What was his position?<br>7      A.  He was executive vice president then<br>8  of retail banking.<br>9      Q.  Of retail banking.  And John<br>10  Cunningham was --<br>11      A.  Marketing.<br>12      Q.  And then there's a part of the tree<br>13  that's not on this diagram that would have been<br>14  the --<br>15      A.  Commercial bank.<br>16      Q.  -- commercial banking.  Fine.  And<br>17  Carlos reported to Dennis?<br>18      A.  Yes.<br>19      Q.  What's Carlos' last name?<br>20      A.  DiToro.<br>21      Q.  And then you reported to Carlos?<br>22      A.  Yes.<br>23      Q.  And then underneath you, let's put<br>24  you at the top of this tree. |

5a189ffe-5282-43a5-be73-771a52af4ae7

## Page 22

1    A.   Taxing here on names.
2    Q.   If you just want to put positions,
3  that's okay, too.
4    A.   These are the three main ones at the
5  time that I can recall.
6         MR. FODERA:  We'll just mark
7  this two-page document as Exhibit Number-1.
8  BY MR. FODERA:
9    Q.   And what was Barbara Evans' position?
10        MR. HARVEY:  Do you want to
11  call that Plaintiffs' Exhibit-1?
12        MR. FODERA:  Plaintiffs'
13  Exhibit-1 is fine.  Or we'll call it
14  actually Grimmer-1.
15        (Document received and marked
16  for identification Plaintiffs' Exhibit
17  Grimmer-1, Handdrawn Chart, consisting of
18  2 pages.)
19  BY MR. FODERA:
20    Q.   Barbara Evans?
21    A.   She was savings and time deposit
22  department.
23    Q.   And Bob?
24    A.   I don't know Bob's -- I can't

## Page 23

1  remember his last name.
2    Q.   Okay, that's fine.  He's --
3    A.   Electronic banking.
4    Q.   And?
5    A.   Mamie Prout.
6    Q.   What was --
7    A.   She was CIF.
8    Q.   What is CIF?
9    A.   Customer information files.
10    Q.   Let me go back just a little bit.
11  You had said earlier that you took courses up at
12  Holy Family and some courses over at Penn and
13  never got a bachelor's degree.
14    A.   True.
15    Q.   How about additional formal education
16  aside from any seminars in banking besides Penn
17  and Holy Family, any certificate education?
18    A.   I was a licensed broker Series 7,
19  Series 6.
20    Q.   Do you still maintain that license?
21    A.   No.
22    Q.   Approximately when did you get it,
23  approximately when did it lapse?
24    A.   Approximately?

## Page 24

1    Q.   Yes.
2    A.   1986, I got it, and probably lapsed
3  in '88 when I left PSFS.
4    Q.   Any other formal certificates or
5  formal training?
6    A.   No.
7    Q.   How about now, maybe it's voluminous,
8  maybe it's not, but can you give me an idea of
9  bank training?
10    A.   Oh, lots of bank training.
11    Q.   Generally would that be a range from
12  a day to a couple-of-day seminar on a given topic
13  or would it take some other form?
14    A.   Over thirty years it could be a day,
15  it could be a couple days, it could be a week.
16    Q.   You said a bit earlier that TD Bank,
17  and I'm going to paraphrase you, was a little bit
18  more formal with regard to committees than
19  Commerce Bank, or words to that effect.  Do you
20  recall that testimony?
21    A.   Yes.
22    Q.   What did you mean by that?
23    A.   They have a very distinguished
24  project management philosophy at TD Bank.

## Page 25

1    Q.   What does that mean?
2    A.   In other words, there's templates and
3  you have to document every step of the way when
4  you do a project, and there are certain
5  departments that are strictly project management
6  departments.
7    Q.   What actually is the date that TD
8  took over Commerce?
9    A.   The formal date would have been May
10  2008.
11    Q.   And at what point in time, if at all,
12  did you begin working on the -- on transition from
13  Commerce to TD?
14    A.   December 2007.
15    Q.   And what were your responsibilities
16  with regard to transition?  What were your
17  positions with regard -- what were your
18  responsibilities with regard to the transition?
19    A.   I worked on the retail integration
20  team.
21    Q.   We'll get back to that.  After 2004,
22  your position at Commerce changed.
23    A.   Yes.
24    Q.   What did it change to?

8 (Pages 26 to 29)

| Page 26 | Page 28 |
|---|---|

**Page 26**

1    A.   In 2004, I went and worked under what
2  was called the complimentary delivery channel
3  division.
4    Q.   Tell me what that is.
5    A.   So it's online banking, phone
6  banking, call center.  So for that year -- and ATM
7  and debit card were in there, as well, so I was
8  running the operations of the ATM/debit card
9  group.
10    Q.   What does that mean?
11    A.   Just the interaction with Visa, the
12  plastic inventory, the controls, that kind of
13  stuff.
14    Q.   So was it a 9 to 5 desk job or did it
15  put you out in branches or both?
16    A.   No, it was more back office.  Never 9
17  to 5, but back office.
18    Q.   At what point in time did Commerce
19  Bank institute a gift card program?
20    A.   The formal program?
21    Q.   Well, if there's an informal program,
22  tell me about that, too.
23    A.   There was a pilot, employee pilot in
24  2003.

**Page 28**

1    A.   I ran the program.
2    Q.   Tell me about before the program was
3  instituted, were you involved in the planning of
4  the program.
5    A.   Yes.
6    Q.   In what respect?
7    A.   So I laid out how we were going to
8  sell them, the system, how we were going to
9  interface with the system, planned the actual
10  pilot events.
11    Q.   When you say sell them, what does
12  that mean?
13    A.   In other words, what was the process
14  going to be when we issued them to the employees
15  at the time.
16    Q.   What was that process that you all
17  determined you were going to do?
18    A.   So we would get the plastic, which is
19  the card, we would have a disclosure that went
20  with it, and at an employee event, not done in the
21  retail store environment, two weekends --
22  I'm sorry, not "two weekends," my apologies, two
23  events prior to the holiday, the Christmas holiday
24  of 2003, we would have employee events and we

**Page 27**

1    Q.   Tell me about the employee pilot
2  program.
3        MR. HARVEY:  Object to the form
4  of the question.  What do you want to know?
5        MR. FODERA:  I want to know
6  what he knows.
7        MR. HARVEY:  Object to the form
8  of the question.
9        MR. FODERA:  You can answer.
10        THE WITNESS:  Okay.  It was a
11  pilot to see exactly how the gift card
12  program would be received externally and
13  the usage and the merchant process, did
14  they know what to do with it, meaning the
15  merchants out there, so if I went and
16  bought a card and I went out and sold it --
17  used it as a recipient, would I have a good
18  experience.
19  BY MR. FODERA:
20    Q.   Were you involved in that pilot
21  program?
22    A.   Yes.
23    Q.   How were you involved in that pilot
24  program?

**Page 29**

1  would actually issue the cards to them.
2    Q.   Did the employees pay for the cards
3  or --
4    A.   Yes.
5    Q.   And "issue the employee the card."
6  Were they in specific denominations or did that
7  matter or they just --
8    A.   They had to be between 25 and 500 in
9  the denomination.
10        (Discussion held off the
11  record.)
12  BY MR. FODERA:
13    Q.   More about this pilot program.  So
14  you had this event or two events --
15    A.   Two events.
16    Q.   -- where the employees knew that they
17  were going to be able or have the ability to
18  purchase this new product.
19    A.   Yes.
20    Q.   And were you, at this point, writing
21  script for the sales of this product?
22    A.   It wasn't that formal at the time.
23    Q.   What was the -- what was given to the
24  employees?  You said --

9 (Pages 30 to 33)

| Page 30 | Page 32 |
|---|---|
| 1      A.   So there was a greeting card with the<br>2 disclosure and the card.<br>3      Q.   The box?<br>4      A.   The box wasn't introduced until the<br>5 next year.<br>6      Q.   That's fine. And at this point in<br>7 time were there any fees associated with<br>8 activating the card?<br>9      A.   No.<br>10      Q.   Were there any fees associated with<br>11 dormancy?<br>12          MR. HARVEY: I'm going to<br>13      object to the form of the question. You<br>14      might want to just clarify that.<br>15 BY MR. FODERA:<br>16      Q.   Were there any fees at all? Any fees<br>17 at all?<br>18      A.   There's a maintenance fee.<br>19      Q.   Was the maintenance fee waived for<br>20 any period of time?<br>21      A.   Not for the pilot.<br>22      Q.   So you get a $25 card and the next<br>23 month there's a $2.50 charge?<br>24      A.   Oh, I apologize. I thought you meant | 1      Q.   What's that recollection generally?<br>2      A.   That it was too new.<br>3      Q.   What do you mean?<br>4      A.   That merchants weren't really sure<br>5 what to do with it.<br>6      Q.   Was it a Visa endorsed card?<br>7      A.   Yes, it was.<br>8      Q.   Did you have any understanding at the<br>9 time as to whether or not if a person presented a<br>10 card for a purchase that was more than the value<br>11 of the card, whether that card would be outright<br>12 rejected or whether that card would be accepted up<br>13 to the point of the value of the card?<br>14          MR. HARVEY: You're asking for<br>15      his understanding at the time?<br>16          MR. FODERA: Exactly.<br>17          THE WITNESS: I'm sorry.<br>18      Repeat the question.<br>19 BY MR. FODERA:<br>20      Q.   What I want to know, were you getting<br>21 feedback that, "I got this $25 card and I went to<br>22 the merchant and bought a $50 item, and they said,<br>23 'It's declined,' or did they say, 'You have $25 on<br>24 this card?'" |

| Page 31 | Page 33 |
|---|---|
| 1 waived in general. It was a year after. It was<br>2 good for a year, and then the maintenance fee<br>3 would kick in after the year.<br>4      Q.   On the flip side of that, I think you<br>5 mentioned that you wanted to see how the card<br>6 would be received by retailers.<br>7      A.   Yes.<br>8      Q.   Tell me about those efforts and what<br>9 you did with regard to that.<br>10      A.   We did -- after we did the pilot with<br>11 the employees, we asked them to provide us<br>12 feedback on the experience of the recipients on<br>13 how they did when they went to a merchant: Did<br>14 they know what to do with it, did it work.<br>15      Q.   What, if anything, did you learn --<br>16 first of all, is there material, formal material<br>17 that you know of that you've seen with regard to<br>18 that feedback from the employees in that pilot<br>19 program?<br>20      A.   I don't recall. It's a long time<br>21 ago.<br>22      Q.   Do you have a recollection of what<br>23 the feedback was generally?<br>24      A.   General. | 1      A.   I don't remember exactly what the<br>2 feedback we got was. From what I can remember, I<br>3 mean there was cases where they got turned down,<br>4 the card didn't work. That's what we would get<br>5 back.<br>6      Q.   The card didn't work is what they're<br>7 telling you?<br>8      A.   Yes. That's what the recipients were<br>9 telling us: "I went there, the card didn't work."<br>10      Q.   In this employee pilot program was<br>11 it, to your knowledge, generally the employee who<br>12 was using the card or were they giving the cards<br>13 away as gifts?<br>14      A.   I can't tell you what the employee<br>15 did with the cards after we sold them to them.<br>16      Q.   But you're getting feedback from them<br>17 with regard to the use of the card?<br>18      A.   Right. I can't remember exactly what<br>19 the feedback was. It was a long time ago.<br>20      Q.   Is there any documentation with<br>21 regard to that at all?<br>22      A.   I don't know.<br>23      Q.   If I wanted to -- if you wanted to<br>24 find out if there was documentation with regard to |

| Page 34 | Page 36 |
|---|---|
| 1 that, where would you look? | 1     A.   Sorry. Unless I haven't deleted it, |
| 2     A.   No clue at this point. | 2 I can see it. |
| 3     Q.   What was the formal name of this | 3     Q.   Do you have emails that go back to |
| 4 program, if they had one? | 4 2004? |
| 5     A.   Employee pilot gift card. | 5     A.   Yes. |
| 6     Q.   Do you use Outlook mail? | 6     Q.   Do you have emails with regard to the |
| 7     A.   No. | 7 pilot program that go back to 2004? |
| 8     Q.   What's your mail system? | 8     A.   I don't know what I have exactly from |
| 9     A.   Lotus Notes. | 9 2004. |
| 10     Q.   How long have you used Lotus Notes? | 10     Q.   Do you keep folders for emails? |
| 11     A.   Ever since I worked for Commerce | 11     A.   I do sometimes, yes. |
| 12 Bank. | 12     Q.   Did you in 2004? |
| 13     Q.   Are those Lotus Notes deleted at any | 13     MR. HARVEY: Objection. The |
| 14 given time? | 14 pilot program was in 2003. |
| 15     Do you have the ability to | 15     MR. FODERA: I'm sorry. 2003. |
| 16 delete your own emails? | 16     THE WITNESS: Holiday season |
| 17     A.   Yes. | 17 2003. |
| 18     Q.   Do you delete your own emails? | 18 BY MR. FODERA: |
| 19     A.   Yes. | 19     Q.   But the feedback would have come in |
| 20     Q.   How often do you delete your emails? | 20 the beginning of 2004, I would imagine, is that |
| 21     A.   Every day. | 21 correct? |
| 22     Q.   Now, they go into a trash folder? | 22     A.   But it started in 2003 if that person |
| 23     A.   Yes. | 23 used the card. |
| 24     Q.   Or a deleted file folder? | 24     Q.   Did you keep folders back then, |

| Page 35 | Page 37 |
|---|---|
| 1     A.   Trash. | 1 electronic folders? |
| 2     Q.   Can you recover that trash folder? | 2     A.   I'm not really good in my email. I |
| 3     A.   Clarify your question for me. | 3 mean I have folders. How well I use them... I |
| 4     Q.   Well, in some programs you can delete | 4 usually leave everything in the inbox. |
| 5 an email and it will go into a deleted file or a | 5     Q.   Did you designate an employee or a |
| 6 trash file, and if you go into that folder, you | 6 representative of Commerce Bank to work with this |
| 7 can click on that and you can see what's been | 7 pilot program? |
| 8 deleted, and then if you want to get rid of that, | 8     A.   Did I personally designate anybody? |
| 9 you have to go through an additional step. | 9     Q.   Or was one designated other than you? |
| 10     A.   Yes. | 10 You told me you ran the program. |
| 11     Q.   So my question to you now, in that | 11     A.   Right, I ran the program. |
| 12 deleted file or in the trash or where it goes | 12     Q.   Did you have someone who reported to |
| 13 after you deleted it file, do you delete that | 13 you who was coordinating all of the responses? |
| 14 file. | 14     A.   No. |
| 15     A.   No. I don't, personally. | 15     Q.   Were you talking individually to the |
| 16     Q.   Do you have an understanding as to | 16 people who purchased the cards? |
| 17 whether or not that file is deleted at any given | 17     A.   No. |
| 18 time? | 18     Q.   Who was? |
| 19     A.   I don't know. | 19     A.   The clerks that sold the cards. |
| 20     Q.   If you wanted to see an email that | 20     Q.   How were they communicating what |
| 21 you wrote in 2004, do you have the ability to do | 21 people were telling them? |
| 22 that? | 22     A.   No, no, no. So somebody sold the |
| 23     A.   No. | 23 card. That was an event. So we sat there and |
| 24     Q.   Go ahead. | 24 they used the little machine and little cards and |

5a189ffe-5282-43a5-be73-771a52af4ae7

| Page 38 | Page 40 |
|---|---|
| 1   they sold the cards.<br>2   Q.  Right.<br>3   A.  Employee feedback was obtained by<br>4  marketing.<br>5   Q.  Okay.<br>6   A.  I'm sorry, pilot feedback was<br>7  obtained from marketing.<br>8   Q.  Who in marketing was designated to<br>9  get that feedback, if you know?<br>10   A.  I can't specifically give you the<br>11  name.<br>12   Q.  What position in marketing was<br>13  designated to get that feedback, if you know?<br>14   A.  It would have been on the product<br>15  team.<br>16   Q.  Who comprised the product team in the<br>17  end of 2003, beginning of 2004?<br>18   A.  Kevin Barry.<br>19   Q.  Kevin Barry? B-A-R-R-Y?<br>20   A.  Yes.<br>21   Q.  Is Kevin still employed at TD Bank?<br>22   A.  No, he's not.<br>23   Q.  When did he leave TD Bank?<br>24   A.  I don't recall. | 1   Q.  So, to your knowledge, did product<br>2  generate reports to senior management with regard<br>3  to this program, this pilot program?<br>4   A.  Not to my knowledge. I never saw a<br>5  report.<br>6   Q.  Did you come to the understanding<br>7  that there was feedback in the form of reports to<br>8  senior management on the pilot gift card program?<br>9   A.  Say it one more time.<br>10   Q.  Did you come to the understanding<br>11  that there were reports generated to senior<br>12  management with regard to the outcome of the pilot<br>13  gift card program and what they learned about it<br>14  and how it was received and all of those marketing<br>15  issues? And when I say management, I mean<br>16  executive management.<br>17   A.  I never saw a report.<br>18   Q.  Okay.<br>19   A.  But typically in a pilot program in<br>20  banking you're going to provide feedback in a<br>21  report.<br>22   Q.  Sure. So it wouldn't be -- you would<br>23  expect that there was --<br>24   A.  Right. |
| **Page 39** | **Page 41** |
| 1   Q.  Did he leave Commerce or TD?<br>2   A.  I can't say for sure.<br>3   Q.  Can you approximate for me?<br>4  Approximation's fine.<br>5     MR. HARVEY: If you can do it,<br>6  if you have a reasonable basis for<br>7  approximating.<br>8     MR. FODERA: Sure, absolutely.<br>9     THE WITNESS: I can tell you it<br>10  was after the announcement of TD Bank<br>11  merger of Commerce.<br>12  BY MR. FODERA:<br>13   Q.  Okay. Were there ever any reports<br>14  generated by you or designated to be generated by<br>15  you with regard to this pilot program for the<br>16  benefit of more senior executives?<br>17   A.  Not by me.<br>18   Q.  By anybody designated by you?<br>19   A.  No.<br>20   Q.  You ran the program.<br>21   A.  No.<br>22   Q.  So how did the senior management know<br>23  whether the program was a success or not?<br>24   A.  That would be product. | 1   Q.  -- some written feedback, some formal<br>2  written feedback to senior management with regard<br>3  to this program?<br>4   A.  I don't know how formal, but there<br>5  would have been written report feedback.<br>6   Q.  With regard to your responsibility<br>7  running that pilot program, other than the<br>8  implementation of that pilot program, did you have<br>9  any ongoing responsibilities with regard to the<br>10  pilot program?<br>11   A.  No, because the pilot stopped and we<br>12  moved on to the next thing.<br>13   Q.  Sure. And that was right after the<br>14  Christmas season 2003?<br>15   A.  2003.<br>16   Q.  Did you have a team that you utilized<br>17  for this pilot program?<br>18   A.  Yes.<br>19   Q.  Who comprised that team?<br>20   A.  The only name I can recall was Dan<br>21  Behr.<br>22   Q.  Dan Bear like bear in the woods?<br>23   A.  Like Behr in paint, B-E-H-R.<br>24   Q.  Is Dan Behr still employed at |

5a189ffe-5282-43a5-be73-771a52af4ae7

12  (Pages 42 to 45)

| Page 42 | Page 44 |
|---------|---------|
| 1  TD Bank? | 1  you that contact information if you want to |
| 2  A.  No, he's not. | 2  depose that person as a former employee of |
| 3  Q.  When did -- did he leave TD or | 3  our client, we can actually help you |
| 4  Commerce? | 4  facilitate that.  I don't think he needs to |
| 5  A.  I don't recall. | 5  pull out his phone and be providing |
| 6  Q.  Can you approximate for me? | 6  information from his phone on former |
| 7  A.  I think it was after the acquisition | 7  employees of the bank, particularly their |
| 8  of TD. | 8  home numbers or whatever he may have. |
| 9  Q.  Do you know where Dan went? | 9  BY MR. FODERA: |
| 10  A.  No. | 10  Q.  Do you have his email number in your |
| 11  Q.  Did you provide a recommendation for | 11  phone, his email address? |
| 12  Dan? | 12  A.  No. |
| 13  A.  No, I did not. | 13  Q.  Do you have a phone or a PDA? |
| 14  Q.  Do you know if he's still in banking? | 14  A.  I have a PDA. |
| 15  A.  No, I do not. | 15  Q.  Even though you were not involved -- |
| 16  Q.  Do you know where he lived? | 16  or at least you've testified -- I want to make |
| 17  A.  Yes, I do. | 17  sure I'm clear here.  After this pilot program was |
| 18  Q.  Where? | 18  implemented, you were no longer involved in the |
| 19  A.  Langhorne, Pennsylvania. | 19  pilot program, it was done, over, and you weren't |
| 20  Q.  Can you approximate his age for me? | 20  involved? |
| 21  A.  42. | 21  A.  The pilot stopped. |
| 22  Q.  Do you know his email? | 22  Q.  Is that a fair characterization? |
| 23  A.  No. | 23  A.  Yes. |
| 24  Q.  Do you know his phone number? | 24  Q.  Even though you weren't involved -- |

| Page 43 | Page 45 |
|---------|---------|
| 1  A.  No. | 1  even though the pilot had stopped, did you at some |
| 2  Um... | 2  point come to the knowledge that the pilot program |
| 3  Q.  Is it in your phone? | 3  had been successful? |
| 4  A.  Yes. | 4  A.  Validate what you mean by successful |
| 5  Q.  Would you pull out your phone and | 5  for me. |
| 6  tell it to me? | 6  Q.  Fair enough.  Did you come to the |
| 7  MR. HARVEY:  I'm going to | 7  knowledge that Commerce Bank wanted to institute a |
| 8  object to the form of the question. | 8  gift card program for the benefit of the general |
| 9  And you can put a request in | 9  depositing public at TD Bank? |
| 10  for that and we'll look at that. | 10  A.  So clarify, based on the pilot? |
| 11  MR. FODERA:  Why? | 11  Q.  Okay, good clarification. |
| 12  MR. HARVEY:  Because I'm not | 12  A.  Is that what you're asking me, based |
| 13  going to have him pulling out his phone and | 13  on the pilot? |
| 14  providing information right now, especially | 14  Q.  Well, let me withdraw that question |
| 15  a home number or that may be of a personal | 15  and say: To your understanding, what were the |
| 16  nature.  We will take a request for that | 16  reasons that TD Bank decided to institute the |
| 17  and we will look at that and we'll respond. | 17  gift card program to their depositors? |
| 18  You're here to take oral testimony from | 18  A.  A competitive edge and it met our |
| 19  this witness. | 19  model. |
| 20  MR. FODERA:  I'm here to get | 20  Q.  What do you mean by competitive edge? |
| 21  what this witness knows.  One of the things | 21  A.  Other banks, particularly American |
| 22  he knows and has available to him is | 22  Express, was launching a gift card program that |
| 23  contact information for this person. | 23  year, that year being 2004, and it was part of our |
| 24  MR. HARVEY:  And I can provide | 24  convenience model. |

## Page 46

1    Q.   And the convenience model being what?
2    A.   That I can come in and buy a
3 gift card at a branch, it's very convenient.
4    Q.   Were you involved, after the pilot
5 program, in the organization of the gift card, the
6 ongoing gift card program?
7    A.   Yes.
8    Q.   And did you run the ongoing gift card
9 program?
10   A.   From an operational standpoint, yes.
11   Q.   Explain to me what you mean and
12 everything that's entailed in the operational
13 standpoint of the running of the gift card
14 program.
15   A.   So at the time it would be more
16 relative to assuring that we had the inventory:
17 The plastic, the box, the ribbon, the
18 greeting card, and the terms and conditions.
19   Q.   Anything else?
20   A.   I was involved in reviewing training
21 materials, our WOW Answer Guide, which is the
22 policy and procedure manual that is used by the
23 stores.
24   Q.   Anything else?

## Page 47

1    A.   And then daily reporting on sales.
2    Q.   Let's back up to -- at what point in
3 time did -- after the, and maybe it was before the
4 pilot program, at what point in time did you come
5 to the understanding that this was going to be
6 launched as a full-time program?
7    A.   Fall of 2004.
8    Q.   So a good eight, nine months after
9 the other program closed?
10   A.   Yes.
11   Q.   And from, say, January of 2004 until
12 the fall of 2004, had you been involved in any
13 organizational meetings with regard to the
14 gift card program?
15       MR. HARVEY:  January to what
16   month, please?
17       MR. FODERA:  Fall is what he
18   said.
19       THE WITNESS:  Specifically, I
20   can't recall.
21 BY MR. FODERA:
22   Q.   Okay.  And then in the fall of 2004,
23 you found out that they were going to launch this
24 as a full-time program?

## Page 48

1    A.   Correct.
2    Q.   How did you find that out?
3    A.   From my boss at the time.
4    Q.   And what did your boss say?
5    A.   I apologize.  Let me clarify.
6    Q.   Go ahead.
7    A.   From an executive but wasn't my boss
8 at the time.
9    Q.   Okay.
10   A.   She called me and said, "Can we do
11 gift cards this year."
12   Q.   And walk me through what occurs next.
13   A.   Next it's to get the look and feel of
14 the card, order the card, review the procedures
15 with the -- I'm sorry, review the training
16 material with our training -- formal training
17 department, order other supplies, the greeting
18 card, the terms and conditions, the boxes, the
19 ribbons, assure that they're all being delivered
20 and then sent out to all the locations.
21   Q.   Were you involved before the launch
22 of the gift card program in organizational
23 meetings with regard to disclosures on the
24 gift card?

## Page 49

1    A.   No.
2    Q.   How is it that you were informed of
3 the disclosures that would be on the gift card?
4 If you were.
5    A.   I mean... You have to clarify the
6 question.  I'm not sure what you mean.
7    Q.   Well, we can both agree that there
8 are terms and conditions attached to the
9 gift card, right?  That's not in dispute.
10   A.   Not at all.
11   Q.   And those terms and conditions
12 originated somewhere.
13   A.   Right.
14   Q.   I'm trying to find out from you if
15 you know how and where they originated.
16   A.   It would come from product.
17   Q.   What do you mean, "It would come from
18 product?"
19   A.   The product gentleman at the time, I
20 gave you his name, would work with Visa to create
21 the disclosures, their regulations that applied to
22 disclosures.
23   Q.   And who was that person?
24   A.   Kevin Barry.

Page 50

1    Q.   Kevin Barrity?
2    A.   Barry, B-A-R-R-Y.
3    Q.   Is Kevin Barry still at TD Bank?
4    A.   No.
5    Q.   Did we already go through this name?
6         MR. LALLI:  Yes.
7         MR. FODERA:  Okay.
8    BY MR. FODERA:
9    Q.   Was there anyone else responsible for
10   disclosure that you know of?
11        MR. HARVEY:  Timeframe?
12        MR. FODERA:  Before the launch
13   of the product.
14        MR. HARVEY:  In 2004?
15   BY MR. FODERA:
16   Q.   I understand there's going to be
17   changes in the disclosure. Maybe you don't know,
18   but I think there's some changes in the
19   disclosures over time. I'm talking about
20   originally, before the product is actually
21   launched. Other than Mr. Barry, was there anyone
22   else, to your knowledge, involved in the drafting
23   or implementing of the disclosures?
24   A.   For gift card?

Page 51

1    Q.   Yes.
2    A.   Yes.
3    Q.   Who?
4    A.   Dan Goldman.
5    Q.   And who is Dan Goldman?
6    A.   He was a gentleman that worked for
7    Kevin, started that year in the gift card product.
8    Q.   Is he still with the bank?
9    A.   No.
10   Q.   Do you know when he left the bank?
11   A.   Post acquisition of TD Bank.
12   Q.   Did a lot of people leave Commerce
13   post acquisition?
14   A.   (Indicating.)
15   Q.   You have to answer verbally.
16   A.   People left.
17   Q.   Other than Goldman and Barry, anyone
18   else that would have been involved in the
19   disclosures during the origination of the card
20   program?
21   A.   I don't recall anyone else.
22   Q.   Would it be fair to say that you were
23   not personally involved in drafting or anything
24   having to do with the actual disclosure writing?

Page 52

1    A.   Sure.
2    Q.   Would it be fair to say that your
3    involvement was the nuts and bolts of putting the
4    cards together and getting them to the branches
5    and training the branches?
6    A.   Nuts and bolts of putting them
7    together, yes. Training was with our training
8    department.
9    Q.   That's where I'm going next. There's
10   training materials that I've looked at and we can
11   go over, we'll probably get to them this
12   afternoon, there's WOW material, there's a Big
13   Red...
14   A.   America's Got Red.
15   Q.   -- America's Got Red program.
16   A.   Yes.
17   Q.   Who put these training materials
18   together?
19   A.   Various people, I would say, in the
20   training department.
21   Q.   Inartfully phrased. What department
22   put them together?
23   A.   Commerce University.
24   Q.   What is Commerce University?

Page 53

1    A.   Our formal training department.
2    Q.   And at the time, can you tell me who
3    was involved in the gift card program training
4    from the training university? In other words, who
5    put the training program together, if you know?
6    A.   So what I know is from what I recall
7    reading recently. If I had to go back --
8    Q.   Okay.
9    A.   I know Maureen Farmer was the name.
10   And Jen Cornish. I don't know if she was that far
11   back, though.
12   Q.   Who are Maureen Farmer and Jen
13   Cornish? Who are they?
14   A.   They worked in the training
15   department.
16   Q.   Do you know if they had a hand in
17   putting the materials together or were they
18   trainers?
19   A.   They had a hand in putting the
20   materials together.
21   Q.   Do you know what their positions are
22   or were?
23   A.   Formal names, no.
24   Q.   Are either or both of them still

5a189ffe-5282-43a5-be73-771a52af4ae7

## Page 54

1 employed at TD Bank?
2     A. Maureen, no. I believe Jen is.
3     Q. When did Maureen leave, if you know?
4     A. No idea.
5     Q. Were both of them employed at
6 Commerce Bank?
7     A. Yes.
8     Q. Would you be involved in training
9 sessions with the personnel -- and we're talking
10 about the launch program here now. Was the launch
11 program a WOW program or American's Got Red,
12 either one of them?
13     A. No. WOW is a program that's ongoing.
14 It's a staple program of the bank. WOW is a
15 customer philosophy; it's not a program.
16     Q. It's not just for gift cards?
17     A. WOW?
18     Q. WOW, yes.
19     A. No. We have a WOW program at the
20 bank.
21     Q. Why don't you explain the WOW program
22 for me in the nutshell?
23     A. It's just a philosophy; wow your
24 customer. That's the nutshell.

## Page 55

1     Q. Does W-O-W mean anything?
2     A. Wow.
3     Q. Wow.
4     A. It doesn't stand for anything.
5     Q. All right. Were you involved in
6 training either branch heads or tellers or branch
7 personnel in the gift card launch program?
8     A. No.
9     Q. Did you have any oversight
10 responsibility with regard to the training of the
11 employees at Commerce Bank in the gift card launch
12 program?
13     A. No.
14     Q. Do you know who had the overall
15 responsibility for training employees in the
16 gift card launch program?
17     A. Just the university. Specific name,
18 I can't give you.
19     Q. Is it correct for me to refer to this
20 as the gift card launch program in the fall of
21 2004 or was there some other name?
22     A. No.
23     Q. No, it's correct, or, no, it's not
24 correct?

## Page 56

1     A. No, I think that's a good
2 description.
3     Q. At the time were you given and did
4 you review the gift card launch training
5 materials?
6     A. Yes.
7     Q. Did you have any input, whatsoever,
8 in the gift card launch training materials?
9     A. Yes.
10     Q. What input did you have?
11     A. I can't recall exactly what I --
12     Q. Okay. Tell me generally.
13     A. I would review it to make sure it
14 made sense.
15     Q. Would you make comments?
16     A. I'm sure I did.
17     Q. Would that be via email or hard copy
18 or don't you know?
19     A. I don't recall.
20     Q. What was your custom and practice at
21 the time in 2004, were you regularly using your
22 emails and red lining on emails or would you take
23 a hard copy or what?
24     A. My personal practice?

## Page 57

1     Q. Yes.
2     A. Email.
3     Q. Who were you reporting to or working
4 with in marketing during the launch?
5     A. I didn't report to anyone in
6 marketing.
7     Q. Or in Commerce U?
8     A. In Commerce University? Deb
9 Jacovelli.
10     Q. Deb Jacovelli?
11     A. Jacovelli.
12     Q. You got to spell that for the court
13 reporter.
14     (Discussion held off the
15     record.)
16     THE WITNESS: Deb, D-E-B;
17 Jacovelli, J-A-C-O-V-E-L-L-I, I want to
18 say.
19 BY MR. FODERA:
20     Q. To your knowledge, was there any time
21 at all in either Commerce or TD Bank where there
22 were no fees charged at any time, no maintenance
23 fees charged at any time for cards?
24     A. 2005.

5a189ffe-5282-43a5-be73-771a52af4ae7

## Page 58

1    Q.   Tell me about when that came into
2  being and your understanding of why it came into
3  being.
4    A.   Best recollection, January 2005. End
5  date, fall of 2005 I want to say or -- I'm sorry,
6  I can't confirm the exact end date.
7    Q.   That's fine.
8    A.   It was 2005.
9    Q.   In 2005. Now, those cards that were
10  sold at the launch date of fall of 2004, did they
11  have fees, maintenance fees attached to them?
12    A.   It was disclosed with maintenance
13  fees, yes.
14    Q.   So when you say in 2005, this was
15  post holiday 2004 season?
16    A.   Yes.
17    Q.   Cards were introduced that had no
18  fees, whatsoever?
19    A.   Right.
20    Q.   No maintenance fee?
21    A.   No maintenance fee.
22    Q.   Okay. Can you address in any way the
23  change in that policy?
24    A.   Other than the fact that it came from

## Page 59

1  Vernon Hill.
2    Q.   Okay. And how do you know it came
3  from Vernon Hill?
4    A.   Linda Verba told me.
5    Q.   Who is Linda Verba?
6    A.   She's my current boss.
7    Q.   Was she your current boss then?
8    A.   No.
9    Q.   What was her position then?
10    A.   She was head of retail banking.
11    Q.   What did she tell you?
12    A.   That we were getting -- doing away
13  with the maintenance fee based on Vernon's
14  direction.
15    Q.   Did you have an understanding of the
16  basis for Vernon's direction that in 2005 the
17  maintenance fee would be done away with?
18    A.   No idea.
19    Q.   Did you see any documentation, emails
20  or otherwise in regard to this or was it just
21  oral?
22    A.   Yeah. No, I didn't see anything
23  formal.
24    Q.   Was this a situation where the cards

## Page 60

1  had had maintenance fees attached to them and
2  those maintenance fees were suspended forever or
3  was there a batch of cards printed up where on the
4  back it said there is no maintenance fee? If you
5  know.
6        MR. HARVEY:  Object to the form
7    of the question.
8        THE WITNESS:  I'm sorry, you'll
9    have to...
10  BY MR. FODERA:
11    Q.   Well, my understanding is you were
12  the guy who was responsible for the nuts and bolts
13  of printing, getting the cards printed and getting
14  the boxes and getting the disclosure; is that
15  right?
16    A.   Getting them to the stores, right.
17    Q.   Getting them to the stores.
18    A.   Yes.
19    Q.   And were you also responsible for any
20  changes, of course with directions from others,
21  that would go on to the card?
22    A.   Just that we would supply -- I was
23  responsible to make sure that the store had the
24  new supply.

## Page 61

1    Q.   Okay. Who was responsible for what
2  would go on the back of the card or go on the
3  front of the card?
4    A.   Product, marketing.
5    Q.   Can you tell me if in 2005 on the
6  back of the card the portion that refers to a
7  maintenance fee, if that was contained on the back
8  of the card or not?
9    A.   To my recollection, it was not.
10    Q.   Okay. Were you ever involved in any
11  meetings with any personnel with regard to this
12  change in policy where there would be no
13  maintenance fees?
14    A.   No.
15    Q.   How often would you get changes from
16  product on what would be contained on the card,
17  itself?
18    A.   I don't recall ever getting changes
19  from product what's on the card.
20    Q.   Well, who's placing the order with
21  the company that's manufacturing the cards?
22    A.   What year?
23    Q.   All right. We'll go in 2005, or we
24  can go last year, whatever you're comfortable

5a189ffe-5282-43a5-be73-771a52af4ae7

## Page 62

1  with, unless it's changed.
2        MR. HARVEY: Just to clarify
3  one thing that I think the witness can
4  clarify is he only ran this in 2004, I
5  believe.
6        THE WITNESS: Till Dan came.
7        MR. HARVEY: So he didn't have
8  the same position in 2005.
9  BY MR. FODERA:
10     Q.   Let me go into that. Okay? You ran
11  the pilot program.
12     A.   Correct.
13     Q.   And then you ran the first year of
14  the roll out of the new gift card program?
15     A.   From an execution standpoint, yes.
16     Q.   Which is making sure the cards got to
17  the banks, making sure the boxes were there, the
18  ribbons were there, all of that, is that what you
19  mean?
20     A.   Yes.
21     Q.   You weren't involved in the policy of
22  disclosure and what would be on a disclosure.
23     A.   No.
24     Q.   But you were aware at some points of

## Page 63

1  what those disclosures -- at least what some of
2  them were?
3     A.   Yes.
4     Q.   And then at the end of 2004, that
5  Christmas season 2004, when there are still fees,
6  at what point did you change positions?
7     A.   I don't remember the exact month, but
8  it was definitely 2005.
9     Q.   Okay. Was it after the institution
10  of the no fee --
11     A.   Yes.
12     Q.   -- policy?
13        Okay. So at least during part
14  of that, at least during the institution of the no
15  fee policy, you were still running the gift card
16  program.
17     A.   Yes. From an operational standpoint.
18     Q.   Correct. Can you tell me who else
19  was running the gift card program from other than
20  an operational standpoint?
21     A.   Dan Goldman.
22     Q.   So the two of you had 360 degrees of
23  the gift card program between you?
24     A.   There was other people involved like

## Page 64

1  training. Dan didn't manage training.
2     Q.   Okay.
3     A.   So training would be involved.
4     Q.   Okay.
5     A.   There's other pieces of marketing
6  that would be involved.
7     Q.   Okay.
8     A.   Like design team.
9     Q.   What about legal, anybody from legal
10  on your team?
11     A.   Not on my team.
12     Q.   Anyone from legal involved in the
13  overall responsibility of the gift card program
14  that you recall?
15     A.   I didn't interact with legal.
16     Q.   Okay. Do you know if Dan Goldman
17  interacted with legal on the gift card program?
18     A.   I don't know. I wasn't there when he
19  interacted with legal.
20     Q.   But do you have an understanding one
21  way or another?
22     A.   The standard would be to interact
23  with legal, yes.
24     Q.   The standard? What standard?

## Page 65

1     A.   The bank standard when we launch
2  anything.
3     Q.   So one of the two of you would have
4  interacted with legal and it wasn't you?
5     A.   It wasn't me.
6     Q.   And it's either you or Dan, correct?
7  I mean I just want to understand the players.
8     A.   From a product perspective?
9     Q.   Uh-huh.
10     A.   That would fall under a product
11  design piece of responsibility, yes.
12     Q.   So you can infer that Dan would have
13  interacted with legal because you didn't and you
14  were the two product guys?
15     A.   I wasn't a product guy; I was the
16  operations guy.
17     Q.   Okay.
18     A.   He was the product guy.
19     Q.   So the answer to my question is you
20  believe Dan would have interacted with legal,
21  correct?
22        MR. HARVEY: I object to the
23  form of the question.
24        MR. FODERA: You can answer it.

5a189ffe-5282-43a5-be73-771a52af4ae7

18 (Pages 66 to 69)

| Page 66 | Page 68 |
|---|---|

**Page 66**

1  THE WITNESS: I would assume
2 Dan interacted with legal.
3  MR. FODERA: Fair enough.
4 Okay. Let's take five minutes.
5  (Discussion held off the
6 record.)
7  (At this time, a lunch recess
8 was taken.)
9 BY MR. FODERA:
10  Q.  Mr. Grimmer, let me clean up a couple
11 of details on what we've discussed so far. Going
12 back to that pilot program that we were talking
13 about earlier today, do you know if during the
14 pilot program there were disclosures made with
15 regard to the gift cards?
16  A.  I can't recall what they looked like,
17 but yes, we always had to have disclosures.
18  Q.  During the pilot program, was there a
19 trifold used like there is today?
20  A.  I can't recall exactly.
21  Q.  Was there a terms and conditions
22 attached in some way to the gift card during the
23 pilot program?
24  A.  Yes, every product that we institute

**Page 68**

1 event called Red Friday celebrating our culture
2 and our color, so we would have various events
3 during the year, you know, some were for community
4 events, stuff like that. So Dr. WOW is our
5 internal communication guy. It's not a person;
6 it's just a name. He would just send out a mass
7 email to everyone advising that there was going to
8 be a pilot gift card sales for the holiday season.
9  Q.  "To everyone," that would have been
10 everyone in Marlton or in the Marlton area or --
11  A.  Mt. Laurel area.
12  Q.  In Mt. Laurel?
13  A.  Mt. Laurel.
14  Q.  Okay. And what was the Mt. Laurel
15 area? I mean does it extend to Cinnaminson and
16 down to Haddonfield --
17  A.  No.
18  Q.  -- or is it just Mt. Laurel?
19  A.  Mt. Laurel, in the campus.
20  Q.  What do you mean the campus?
21  A.  The Mt. Laurel campus is where most
22 of the support functions for Commerce Bank sat.
23  Q.  Okay. And what was the address of
24 that?

| Page 67 | Page 69 |
|---|---|

**Page 67**

1 has to have a terms and conditions.
2  Q.  Are you saying yes because it's your
3 understanding the practice and procedure is that
4 every program or are you saying yes from actual
5 knowledge of the terms and conditions attached to
6 the card in the pilot program?
7  A.  I can't recall whether -- I'm doing
8 yes from practice and policy.
9  Q.  Okay.
10  A.  I can't recall exactly what the
11 layout of the terms and conditions for the pilot
12 was.
13  Q.  Fair enough. How did the employees
14 become aware -- you said there were two events.
15 How did they become aware of these events? How
16 did they become aware of the pilot program?
17  A.  Through our internal communication.
18  Q.  What does that mean?
19  A.  So we have -- any time we have an
20 employee event, and when I -- let me clarify
21 employee event. This would have been for the main
22 campus, so it would be like in the Mt. Laurel
23 area. We didn't do it in every store.
24  So we would do a Friday WOW

**Page 69**

1  A.  There was a couple: 9000 Atrium Way.
2 11000 Atrium Way. 17000 Horizon Way.
3  Q.  Where is that?
4  A.  Right off of 73.
5  Q.  And?
6  A.  Atrium.
7  Q.  Down by Greentree?
8  A.  Excuse me?
9  Q.  Down by Greentree?
10  A.  No. Further west. Closer west,
11 closer to the City than that. Do you know where
12 Church Road is or Springdale?
13  Q.  Sure. Right in there --
14  A.  In that vicinity.
15  Q.  I may have asked some questions with
16 regard to this, but are you aware of any
17 documents, whatsoever, that exist with regard to
18 the pilot program?
19  A.  Can you clarify "documents?"
20  Q.  Any kind of documents with regard to
21 the gift card pilot program, any correspondence,
22 any communications, any documents, whatsoever, any
23 sales figures, anything.
24  A.  I mean there could be emails about

## Page 70

1  it. Is that what you mean?
2      Q.   Anything.
3      A.   I don't have any formal reports on
4  it, no.
5      Q.   We've covered that, I understand
6  that, but now I've just opened it up to all sorts
7  of documents, anything. Are you aware of anything
8  existing?
9      A.   Yeah, I mean I have emails from back
10 in 2003 relative to gift card.
11     Q.   Okay. And have you produced those
12 emails to your attorney?
13     A.   Yes.
14     Q.   We talked about feedback to the
15 executive management earlier with regard to the
16 pilot program. Do you recall those questions?
17 Can you tell me -- and I think you said that
18 marketing might have created that feedback, it
19 wasn't operations or it wasn't your end, but can
20 you tell me who in executive management would have
21 received that feedback?
22     A.   I can't give you specific names of
23 who --
24     Q.   Can you give me positions?

## Page 71

1      A.   No.
2      Q.   When you were using the term
3  executive management, what group of officers were
4  you including in that?
5      A.   The retail bank executive team.
6      Q.   Which would be?
7      A.   Dennis DiFlorio.
8      Q.   Dennis DiFlorio. John...
9      A.   Cunningham.
10     Q.   -- Cunningham.
11             And Vernon Hill? Not that
12 high?
13     A.   That's pretty high.
14     Q.   Okay. Who else?
15     A.   Well, Kevin would have been part --
16     Q.   Kevin Barry.
17     A.   -- producing it. Possibly Linda
18 Verba.
19     Q.   Okay.
20     A.   She's not on there, but...
21     Q.   You mentioned her before and you said
22 that she's the one who told you, but I wanted to
23 know what is her position now.
24     A.   She's in charge of operation --

## Page 72

1  retail operations and customer experience.
2      Q.   Okay. You were in charge of the
3  program at its launch?
4      A.   Operational.
5      Q.   From an operations standpoint.
6      A.   Yes.
7      Q.   But did you have any input into the
8  advertisements or announcements at the launch?
9      A.   No.
10     Q.   Let's talk a moment about Card Genie.
11 You're familiar with that system?
12     A.   Yes.
13     Q.   Explain that system, briefly.
14     A.   It's a system that records the cards,
15 both debit, gift card; at one point credit card,
16 as well.
17     Q.   So it's not just for the gift card
18 program?
19     A.   No.
20     Q.   All right. But within the Card Genie
21 system would it be fair to say that you could pull
22 out reports with regard to the gift card program
23 only as opposed to debit cards or credit cards?
24     A.   I can't answer that question. That's

## Page 73

1  a technology question.
2      Q.   Okay. The Card Genie program, when
3  was it created?
4      A.   Best recollection?
5      Q.   Yes.
6      A.   September 2001.
7      Q.   So would the Card Genie program have
8  been utilized to -- strike that question.
9             Do you utilize the Card Genie
10 program to create a gift card or authorize a
11 gift card?
12     A.   It funds the gift card, loads the
13 balance.
14     Q.   Loads it. That's the term I was
15 looking for. And did it load -- did you use the
16 Card Genie program during the pilot program for
17 the gift card?
18     A.   Yes.
19     Q.   Did you use it during the roll out?
20     A.   Yes.
21     Q.   And does the Card Genie program have
22 the ability to tell a person who looks in it how
23 much is left on an individual card?
24     A.   No.

| Page 74 | Page 76 |
|---|---|
| 1     Q.  Other than loading the card, what | 1  meetings? |
| 2 other function does it have, if you know? | 2     A.  Huddle, store huddles. |
| 3     A.  I don't know. | 3     Q.  Store huddles. |
| 4     Q.  Back in 2004, one of your other | 4     A.  Uh-huh. |
| 5 responsibilities had to do with ATM and debit | 5     Q.  And are store huddles training |
| 6 cards. | 6 sessions? |
| 7     A.  Yes. | 7     A.  Yes. And meetings, combination. |
| 8     Q.  Do you recall that line of | 8 Training as well as just staff meetings per se. |
| 9 questioning? | 9     Q.  Fair enough. So would it be fair to |
| 10     A.  Yes. | 10 say that this video is used or was used as a |
| 11     Q.  Were you involved in disclosures with | 11 training tool? |
| 12 ATM and debit cards? | 12     A.  Yes. |
| 13     A.  No. | 13     Q.  And where would this have been used |
| 14     Q.  This was a very interesting video. | 14 as a training tool? Just in Mt. Laurel or -- |
| 15     A.  It's a little embarrassing. | 15     A.  No. |
| 16     Q.  It was a very interesting video. | 16     Q.  -- Florida, New York? Where? |
| 17 You're the man in black. | 17     A.  New York, Florida, wherever we had |
| 18     A.  That's me. | 18 branches. |
| 19     Q.  Like Johnny Car' -- Cash. | 19     Q.  Would this have been shown in every |
| 20     Who was the video meant for? | 20 branch at one time or another? |
| 21     A.  The retail store employees. | 21     A.  Yes. |
| 22     Q.  So it's not something that was shown | 22     Q.  Any question about that? |
| 23 on ABC? | 23     A.  Am I questioning -- |
| 24     A.  No, it's internal. Thank god. | 24     Q.  Any question about that? Are you |

| Page 75 | Page 77 |
|---|---|
| 1     Q.  Where would it be shown and -- | 1 sure it would have been shown in every branch at |
| 2     A.  At a store team huddle meeting. | 2 one time or another? |
| 3     Q.  And how often would they occur? | 3     A.  I wasn't there, so I can't confirm -- |
| 4     A.  Team huddle meetings? | 4     Q.  Yeah, I realize that. |
| 5     Q.  Uh-huh. | 5     A.  That was the practice was to show the |
| 6     A.  Not standard but typically weekly. | 6 video at every store. |
| 7     Q.  Would this be something -- do you | 7     Q.  Okay. In the video, itself -- if you |
| 8 know when this video was made? Can you | 8 want to put it on -- |
| 9 approximate? | 9     A.  No. |
| 10     A.  2006. | 10     Q.  -- I'd be happy to show it to you |
| 11     Q.  Okay. | 11 again. |
| 12     A.  Actually, August 2006 is when it was | 12     A.  I'm somewhat familiar. |
| 13 produced. | 13     Q.  But it seems to be broken down into a |
| 14     Q.  How do you know that? | 14 couple things. One I'll refer to as the rah-rah |
| 15     A.  Because when I went to get the video, | 15 session. And then there's interaction, I don't |
| 16 I asked them to go back in the archive and my | 16 know if that's a real customer and a real bank |
| 17 colleague said, "Oh, the one from August 2006." | 17 employee or if they're bank employees or they're |
| 18     Q.  Okay. Any other videos like this | 18 all actors, but it seems to be a mock sale. So |
| 19 that you haven't gotten? | 19 you got a rah-rah session and a mock sale. Then |
| 20     A.  Not for gift card. | 20 you've got the happy recipient opening up his |
| 21     Q.  Okay. This is the only gift card | 21 gifts, his disappointing gifts and then seeing the |
| 22 in-house video? | 22 gift card. Those are the three sorts of segments. |
| 23     A.  That I recall, yes. | 23 Is that what you recall? |
| 24     Q.  That would have been used at hall | 24     A.  Yes. |

Case 1:09-cv-01062-RBK-AMD Document 79-2 Filed 09/17/10 Page 22 of 50 PageID: 4245

MWANTEMBE et al vs. TD BANK, N.A., et al                                    3-3-10 JAMES C. GOEHMER

21 (Pages 78 to 81)

## Page 78

1    Q.   And that middle segment where you
2  have the -- first of all, are they bank employees
3  or are they actors, if you know?
4    A.   Combination.
5    Q.   What's the combination?
6    A.   Some are bank employees, some are
7  actors.
8    Q.   No, I'm talking about specifically
9  the middle section where you've got the bank
10  employee showing and selling the card to the
11  perspective customer.
12    A.   I don't know, I can't be one hundred
13  percent sure whether or not they're actors or all
14  bank employees.  Some, I know, are bank employees.
15  The recipient, I know --
16    Q.   Some of them really didn't look like
17  actors --
18    A.   Right.
19    Q.   -- some of them did.
20    A.   Exactly.  Two ladies to my -- either
21  side are actors.  I could tell you that.
22    Q.   Oh, really?
23    A.   Yes.
24    Q.   They weren't CSR from New York and

## Page 79

1  Florida?
2    A.   No.  They played that part, but they
3  were actors.
4    Q.   I just assumed that they weren't.  I
5  was completely wrong.
6          The middle part, the whole
7  sales segment, was that sort of meant to be a
8  training in how to sell the product, or at least
9  in part?
10    A.   In part, yes.
11    Q.   Was that an exemplar of the types of
12  things that the branch person selling the card
13  should say to the purchaser of the card, things
14  they should go over?
15    A.   I don't recall a hundred percent.
16  Yeah, in general it's showing them how to sell the
17  card.
18    Q.   Sure.  Do you ever sell -- do you
19  ever buy cards to give as gifts?
20    A.   All the time.
21    Q.   Have you?
22    A.   Yes.
23    Q.   Since this has been instituted?
24    A.   I think I probably was the first

## Page 80

1  person who bought a card.
2    Q.   When you've given cards to people --
3  do you then turn around and give them to people?
4    A.   Yes.
5    Q.   When you give them to the recipient,
6  do you tell the recipient, your own personal
7  practice, the issue date of the card?
8    A.   No.
9    Q.   Why not?
10    A.   Why do they need to know?
11    Q.   Because twelve months after the issue
12  date of the card, fees start to accrue.  Do you
13  think that's information the recipient should
14  know?
15    A.   Yes, but it's in the disclosure.  I
16  mean I don't sit there and tell them every -- "Hi,
17  here's your gift, and by the way, you're going to
18  get charged a fee."
19    Q.   How would they know when the card was
20  issued unless they hear it from you?
21    A.   There's all the information relative
22  to where to contact people, like for the
23  recipients.  So I would tell them, You should go
24  on line --

## Page 81

1    Q.   Right.
2    A.   -- register your card --
3    Q.   Okay.
4    A.   -- which would provide the issue
5  date, you can call into this phone number as well
6  as a live customer service person relative to your
7  card.
8    Q.   Would it be fair to say that in none
9  of the training materials or videos since the
10  inception of the program through Commerce and
11  through today were store salespeople who were
12  selling the cards ever advised to tell the
13  purchaser to tell the recipient what the issue
14  date was?  Is that a fair statement?
15    A.   Yes.
16    Q.   So right after this roll out of the
17  program, you become the director of store
18  operations?
19    A.   Correct.
20    Q.   First of all, is that a promotion?
21    A.   Yes.
22    Q.   And what was her name, Linda Verba
23  had been the director of store operations?
24    A.   No, she was the head of retail

5a189ffe-5282-43a5-be73-771a52af4ae7

Case 1:09-cv-01062-RBK-AMD   Document 79-2   Filed 09/17/10   Page 23 of 50 PageID: 4246

MWANTEMBE, et al. vs. TD BANK, N.A., et al.                                    JONES, GENE/MAR

22 (Pages 82 to 85)

| Page 82 |
|---|

1  banking and still was when I became the director
2  of store operations.
3      Q.   Oh, okay.  So in the prior position
4  were you reporting to Linda?
5      A.   No.
6      Q.   But in the new position you were
7  reporting to Linda?
8      A.   Correct.
9      Q.   And you reported to her continuously
10 since then?
11     A.   Correct.
12     Q.   She didn't leave after the
13 transition?
14     A.   No, she did not.
15     Q.   So what were your responsibilities as
16 the director of store operations -- well, let me
17 ask it this way:  Since 2005, since you took that
18 position, have your responsibilities changed?
19     A.   The only way they've changed is with
20 the integration, it expanded into the former
21 legacy Banknorth footprint.
22     Q.   So you're in charge of --
23     A.   Same job with more locations.
24     Q.   -- more banks?

| Page 83 |
|---|

1      A.   Right.
2      Q.   Okay.  But what does the director of
3  store operations -- what do you do?
4      A.   So I overall run the stores from a
5  staffing service delivery perspective.
6      Q.   Okay.  What does that mean?
7      A.   So the model of the staff, in other
8  words, how many tellers you need, how many CSRs
9  you need, your hours of operation, what computer
10 equipment you need to have in your store,
11 supplies.  I have a group of regional operational
12 officers that work for me that have clusters of
13 stores.  So I do more the strategic pieces of the
14 banking and the operations of the banking, and
15 then --
16     Q.   So in each branch -- I'm cutting you
17 off here because I just want to be clear here.  In
18 each branch you have a combination of tellers and
19 customer service representatives, and then there's
20 a branch manager.
21     A.   Correct.
22     Q.   And then there's groups of branches
23 that have a regional manager?
24     A.   Yes.

| Page 84 |
|---|

1      Q.   Is there a step in between those two,
2  branch manager and regional manager?
3      A.   There's actually two regional
4  managers.
5      Q.   Okay.
6      A.   So no, there's no step in between,
7  but there's two regional managers.
8      Q.   Okay, that's fine.  There's two
9  regions.
10     A.   Yeah -- no.
11     Q.   No?
12     A.   Two regional managers.
13     Q.   All right.
14     A.   One's sales and one's operations.
15     Q.   Okay.  All right.  And customer
16 service representatives report to which regional
17 manager?
18     A.   Customer service representatives
19 report to the store manager.
20     Q.   Okay.
21     A.   Which is branch when you say store.
22     Q.   Store manager/branch manager.
23     A.   Right.
24     Q.   I grew up in a different era.

| Page 85 |
|---|

1      A.   Right.
2      Q.   And then the regional managers report
3  to you?
4      A.   The operational regional managers do
5  report to me, but not directly.  There's a senior,
6  which is a market, regional manager.
7      Q.   Okay.
8      A.   So there's twelve that report to me.
9      Q.   So under Commerce how many regional
10 managers did you have and then --
11     A.   Seven.
12     Q.   -- under TD how many do you have?
13     A.   I'm sorry.  Eight under Commerce,
14 twelve under, combined.
15     Q.   And branches, how many branches under
16 Commerce, how many branches under TD?
17     A.   Commerce, approximately five hundred.
18 TD combined with Commerce 1,039.
19     Q.   And you're the director of operations
20 from Florida to Maine?
21     A.   Yes, I am.
22     Q.   Do you get to go to Florida and
23 Maine?
24     A.   Yes, I do.

## Page 86

1  Q. How much of your time is spent on the
2  road?
3  A. 50 percent.
4  Q. What do you do on the road?
5  A. Meet with regional operations
6  officers, visit stores, meet with facilities, real
7  estate.
8  Q. Do you have any, inartfully termed
9  but I'm going to term it as secret shopper
10 programs?
11 A. We have WOW shoppers, mystery
12 shoppers.
13 Q. Okay. Mystery shoppers, very good.
14 WOW shoppers.
15 A. Yes.
16 Q. And do you have WOW shoppers that go
17 into stores for gift cards?
18 A. Yeah, they would.
19 Q. And in the WOW shopper or mystery
20 shopper program do they have to generate reports
21 with regard to their findings when they go into a
22 branch?
23 A. Yes.
24 Q. And would it be fair to say that

## Page 87

1  their entire time in the branch they are not to
2  tell anybody their true identity?
3  A. True.
4  Q. And they walk out and they write up
5  their findings?
6  A. Correct.
7  Q. And they submit them to who?
8  A. The WOW department.
9  Q. And where is the WOW department
10 relative to you?
11 A. It's a different vertical under Linda
12 Verba.
13 Q. So do you get comments from the
14 mystery shoppers from the WOW department or from
15 Linda Verba?
16 A. I get the scoring. I don't get the
17 individual comments.
18 Q. Okay. What do you mean the scoring,
19 what does that mean?
20 A. So it's broken down into segments, so
21 it's the greeting, the process of the transaction,
22 the closing, the overall experience, scoring.
23 Q. Do you get them with regard to
24 specific transactions or if I wanted to know what

## Page 88

1  your mystery shoppers at the bank found with
2  regard to gift card program, could I get that
3  information?
4  A. I don't know if you can get it down
5  to specific product. You can get it down to
6  teller, CSR, Penny Arcade, phone.
7  Q. You lost me there. Penny Arcade and
8  phone?
9  A. Yeah. So you want them, too?
10 Q. Well, go from the beginning.
11 A. Teller, so that would be a teller
12 experience.
13 Q. Right.
14 A. CSR, that would be a platform
15 experience.
16 Q. CSR is customer service
17 representative?
18 A. Right.
19    Penny Arcade would be the coin
20 counting experience. Telephone would be that they
21 called into the store and asked a question.
22 Q. Okay. But in the TD Banks, and we're
23 talking about TD now, maybe it is different in
24 Commerce, you tell me, am I correct that only the

## Page 89

1  CSRs sold gift cards?
2  A. In Commerce Bank, you are correct.
3  Q. And TD Bank, that's not correct?
4  A. It's available at teller, as well.
5  Q. When a purchaser comes into TD Bank,
6  or Commerce Bank before it, to purchase a
7  gift card, as part of the information, the oral
8  information that is given to them in the sales
9  pitch, for lack of a better term -- do you
10 understand? Do you have an understanding what I
11 mean when I say sales pitch?
12 A. What they talk about the product?
13 Q. Yes.
14 A. Uh-huh.
15 Q. We'll use that as the definition of
16 sales pitch.
17    -- would you agree with me
18 that in the sales pitch for the gift card, the
19 bank's representative never tells the purchaser
20 that after a certain amount of time there will be
21 a $2.50 per month charge on the card?
22    MR. HARVEY: Object to the form
23 of the question.
24    MR. FODERA: You can answer it.

5a189ffe-5282-43a5-be73-771a52af4ae7

24 (Pages 90 to 93)

## Page 90

1         THE WITNESS: I'm sorry, repeat
2    the question.
3    BY MR. FODERA:
4         Q.   I just want to be clear, that in the
5    formal training and in all of the training
6    materials, if a TD or Commerce Bank employee is
7    following all of the right steps, when they're
8    selling a card to a depositor, nowhere in their
9    sales pitch are they telling the depositor that
10   after X amount of months there will be a $2.50
11   per month charge on the card; is that correct?
12        A.   No.
13        Q.   At what point and what materials can
14   you point to where they're told to tell the
15   purchaser that there is a $2.50 per month charge
16   after X amount of months?
17        A.   In all our documentation, even our
18   training or online procedure manual it tells you
19   that you have a $2.50 fee, the WAG, WOW Answer
20   Guide.
21        Q.   The WOW Answer Guide tells the person
22   who's selling the card to tell the purchaser that
23   there is a $2.50 per month fee after a certain
24   amount of time?

## Page 91

1         A.   It doesn't specifically say tell the
2    customer this.
3         Q.   That's what I'm asking.
4         A.   I'm sorry.
5         Q.   That's where I'm at right now.
6    There's no dispute that your materials, some of
7    your materials disclose that. That's not in
8    dispute. What I'm talking about now is the retail
9    experience, the customers going into the store,
10   they've got -- at times would you agree with me
11   you have signs outside the store that say, free
12   gift card, things of that nature? Is that fair?
13        A.   That's true.
14        Q.   And a person comes in and says, "I'd
15   like to get a gift card."
16        A.   Right.
17        Q.   At no time during that transaction is
18   the bank employee directed to tell the purchaser,
19   to tell the purchaser that a $2.50 per month
20   charge can begin accruing after a certain amount
21   of months; is that correct?
22        A.   Not that I can recall.
23        Q.   Well, you would be the person who
24   would know that information; isn't that right?

## Page 92

1         A.   I should, yeah.
2         Q.   So the answer to the question is --
3    isn't the answer no, they're not directed to tell
4    the person that there's a $2.50 per month fee
5    after a certain amount of time?
6         A.   Specific in those terms --
7         Q.   Uh-huh.
8         A.   -- I can't recall whether or not
9    specifically they were told to say there's a $2.50
10   fee.
11        Q.   Is there any -- because I haven't
12   seen -- I've looked through all of the materials,
13   and you in preparation for this told me you looked
14   through some sales materials.
15        A.   Uh-huh.
16        Q.   Have you seen any sales materials at
17   all from TD or Commerce Bank for the bank
18   employees where they are told to tell the
19   purchaser that there is a $2.50 per month fee
20   after a certain amount of time?
21        A.   The only place that would have told
22   them is in a Q and A environment which is standard
23   in training which would have said: "Is there a
24   fee associated with this card?" "There is a two

## Page 93

1    fifty -- $250 maintenance -- I'm sorry, $2.50
2    maintenance fee that applies after -- I think on
3    the first day after the twelfth month of the card
4    I think is how it's stated.
5         Q.   Okay. So if there is such a thing,
6    it may appear in a Q and A sheet?
7         A.   Right.
8         Q.   And when you talk about a sheet --
9         A.   Q and A training document.
10        Q.   I'm sorry. Q and A training
11   document.
12        A.   Yes.
13        Q.   Okay. As the director of store
14   operations in 2005 and subsequently, are you
15   responsible for the ongoing gift card program?
16        A.   No.
17        Q.   When you changed positions in the
18   beginning of 2005, who then became responsible for
19   the overall gift card program on the operational
20   side?
21        A.   I don't know.
22        Q.   You don't know?
23        A.   No.
24        Q.   Who's responsible for it now?

## Page 94

1    A.   Deb Calulo.
2    Q.   Can you spell that?
3    A.   No.
4    Q.   With a C or a K?
5    A.   I have no idea.  She's from former
6  Banknorth.  I just don't know how to spell her
7  name.
8    Q.   And how long has she had that job --
9    A.   I have no idea.
10    Q.   -- can you approximate for me?
11    A.   No.
12    Q.   Has there been anybody with that job
13  between you and her?
14    A.   Yes.
15    Q.   Has there been more than one person
16  with that job between you and her?
17    A.   I don't know for sure.
18    Q.   Can you estimate for me the number of
19  people who have had that job between you and her?
20    A.   No.
21    Q.   And you said that there were two, I
22  think Goldman was the other --
23    A.   Dan Goldman.
24    Q.   -- Dan Goldman was the other side of

## Page 95

1  the gift card?
2    A.   Yes.
3    Q.   Does Dan Goldman still have that
4  position?
5    A.   No.
6    Q.   Who has that position now?
7    A.   Suneal, it begins with a K.  I don't
8  know his last name.
9    Q.   Before Suneal K. and after Goldman,
10  who had that position?
11    A.   Matt Chevalier.
12    Q.   Okay.  And before Matt Chevalier and
13  after Goldman, did anyone have that position?
14    A.   No, actually -- no.
15    Q.   What does Matt Chevalier do at the
16  bank now?
17    A.   Right now?
18    Q.   Uh-huh.
19    A.   Within the last week he's now in
20  charge of sales.
21    Q.   What does that mean?
22    A.   Retail sales.  He's a retail sales
23  manager.  He designs campaigns and product --
24  doesn't design product, excuse me, the sales piece

## Page 96

1  of products for the retail bank.
2    Q.   Did you ever work with Matt Chevalier
3  with regard to the gift card program?
4    A.   Conversations during the integration
5  process, just two different platforms, what are we
6  going to, but not -- not in the operational
7  standpoint like I was back in 2004.
8    Q.   Was he a TD person or a Commerce
9  person?
10    A.   TD person.
11    Q.   Was he with TD before the merger?
12    A.   Yes.
13    Q.   You said earlier on that you were
14  responsible for ordering cards -- the cards,
15  themselves, and the operational standpoint.  Did
16  you have any responsibility with regard to daily
17  sales figures?
18    A.   Reporting daily sales figures?
19    Q.   Yes.
20    A.   I would get daily sales figures, yes.
21    Q.   Was that in your last position or do
22  you get those figures also as director of --
23    A.   I still get them.
24    Q.   And how -- obviously you get them

## Page 97

1  daily.
2    A.   Well, let me clarify.  We don't
3  typically get them daily during the down period of
4  gift card; it's usually holiday season.  So the
5  last one I got was December 2009.  Are we 2010?
6  Yeah.
7    Q.   Is there more than one holiday
8  season?
9    A.   That's a...
10    Q.   I mean Christmas, the November to
11  January is -- would you agree that the majority of
12  your cards are sold in that season?
13    A.   Absolutely.
14    Q.   And then are there any other peaks?
15    A.   Yes.
16    Q.   When are those?
17    A.   Grads and dads.
18    Q.   Grads and dads.  So June, May?
19    A.   May, June.
20    Q.   Okay.  Any other peaks?
21    A.   That's the only ones I can recall.
22    Q.   Now, I've seen materials, and maybe
23  we'll get to them and maybe we won't, with regard
24  to percentage increases in sales.  "We want to, we

Case 1:09-cv-01062-RBK-AMD  Document 79-2  Filed 09/17/10  Page 27 of 50 PageID: 4250

MWANTEMBE et al vs. TD BANK, N.A., et al                    3-9-10      JAMES C. BACHMEIER

26 (Pages 98 to 101)

| Page 98 | Page 100 |
|---|---|
| 1 at TD or we at Commerce want to increase our | 1 A. No. I don't know the P and L from |
| 2 percentages by 200 percent over last year or | 2 gift card. |
| 3 300 percent," and I'm just picking those numbers | 3 Q. Okay. What about with regard to |
| 4 at random. But can you put a little flesh on | 4 maintenance or other fees that are accruing to the |
| 5 those bones with regard to the percentage increase | 5 bank because the card has gone more than six |
| 6 over year one to year two, year two to year three | 6 months or twelve months? |
| 7 in gift card sales? Like year one you had your | 7 A. I don't understand the question. |
| 8 pilot program in 2004 and then you rolled it | 8 Q. Well, after -- except for the year |
| 9 out -- | 9 2005, we agree that after twelve months from the |
| 10 A. No, we had the pilot program in 2003. | 10 date of purchase of the card, a $2.50 per month |
| 11 Q. 2003. You rolled it out in 2004. | 11 fee begins to accrue and is taken off the card. |
| 12 A. 2004. | 12 We agree with that, right? There's no dispute |
| 13 Q. So use 2005. Did your sales go | 13 there. |
| 14 100 percent over 2004 or 500 percent over, as best | 14 A. Yes. That would be legacy Commerce, |
| 15 you can? | 15 yes. |
| 16 A. I don't know the exact percentage, | 16 Q. I don't understand what you mean. |
| 17 but they were higher the year -- second year. | 17 A. I can speak to legacy Commerce card, |
| 18 Q. Would it be fair to say every year | 18 gift card. |
| 19 has seen an increase in gift card sales? | 19 Q. Okay. |
| 20 A. No. | 20 A. Not as much TD Banknorth gift card. |
| 21 Q. What years have not seen an increase? | 21 Q. Do you have an understanding as the |
| 22 A. I don't think last year was an | 22 director of store operations that after twelve |
| 23 increase to the prior year. | 23 months after the sale of a TD North gift card, |
| 24 Q. Up until Christmas season of 2009, | 24 $2.50 per month comes off that card? |

| Page 99 | Page 101 |
|---|---|
| 1 had each year been an increase over the prior | 1 A. Well, there is more TD Banknorth, |
| 2 year? | 2 so, no, I don't have -- |
| 3 A. I'm not a hundred percent sure. | 3 Q. Well, TD Bank. This card here. |
| 4 Q. Who would have that information, the | 4 A. TD Bank, yes. |
| 5 sales information for gift cards? | 5 Q. This card here. |
| 6 A. Product. | 6 A. The current card. |
| 7 Q. Who in product would have that | 7 Q. This current card. |
| 8 information? | 8 A. Yes. |
| 9 A. I'm guessing. | 9 Q. Right. That somebody gave me for |
| 10 Q. Well, I don't want you to guess, but | 10 Christmas. |
| 11 if you have an understanding of which position | 11 A. Lovely. |
| 12 would most likely be responsible for getting that | 12 Q. Okay? That if I don't use this in |
| 13 information, I want to know who that is. | 13 twelve months, the thirteenth month, your |
| 14 A. The product manager for gift card. | 14 understanding is $2.50 a month is going to come |
| 15 Q. And who is the product manager for | 15 off this card until there is no more value on the |
| 16 gift card now? | 16 card. |
| 17 A. Suneal, I don't know his last name. | 17 A. Or you use it. |
| 18 Q. And what about with regard to fees | 18 Q. Or I use it. |
| 19 assessed against cards, are you and have you at | 19 A. Uh-huh. |
| 20 any time been involved with knowing what fees are | 20 Q. Right. Okay? So can you tell me who |
| 21 assessed with regards to the gift cards? And I | 21 would be responsible for knowing how much in fees |
| 22 don't mean $2.50 after twelve months; I mean with | 22 have been generated from that? |
| 23 regard to fees generated to the bank from | 23 A. The product manager. |
| 24 gift cards. | 24 Q. Suneal? |

5a189ffe-5282-43a5-be73-771a52af4ae7

Case 1:09-cv-01062-RBK-AMD   Document 79-2   Filed 09/17/10   Page 28 of 50 PageID: 4251
MWANTEMBE et al vs. TD BANK, N.A., et al                                              8-5-10   JAMES C. SKIMMER

27 (Pages 102 to 105)

| Page 102 | Page 104 |
|---|---|

**Page 102**

1    A.   Currently.
2    Q.   Can you tell me if the bank keeps
3 records with regards to -- historical records with
4 regard to the fees they've earned in that area?
5    A.   I can't answer that question.
6    Q.   Is that something you would expect
7 the bank to be keeping historical information on,
8 how much money they got from a particular area of
9 operations?
10    A.   Yes.
11    Q.   I might have asked this question ten
12 minutes ago, but I'm not certain.  Do you have any
13 responsibilities at all with regard to the
14 gift card program as the vice president of store
15 operations?
16    A.   Clarify what you mean
17 "responsibilities."
18    Q.   I asked it wide open because I want
19 to know if there's anything that you have to do
20 with that program since 2005.
21    A.   I have knowledge of the program.  My
22 stores sell the cards.
23    Q.   Fair.
24    A.   So yes.

**Page 104**

1 don't know the year.
2    Q.   Well, you said it was right after you
3 got your teeth done, so when did you get your
4 teeth done?
5    A.   I can't tell you that either.
6    Q.   Okay.
7    A.   A couple years ago.
8    Q.   Like '08?
9    A.   I think before that.  '07?  I don't
10 know.
11    Q.   I'm trying to put -- I'm trying to
12 figure out --
13    A.   Yeah, I don't know exactly when I
14 became senior, but it was the same job just with a
15 different corporate title.
16    Q.   Okay.
17       MR. HARVEY:  He told you the
18    date of that video.
19       THE WITNESS:  August 2006, that
20    was.  Whether or not I was in the job of
21    director of store operations, whether I was
22    a vice president or senior vice president,
23    that's questionable.
24 BY MR. FODERA:

**Page 103**

1    Q.   And other than your general knowledge
2 of the program, do you have specific knowledge,
3 are you involved in the day-to-day aspects of
4 the --
5    A.   No.
6    Q.   -- program at all?
7    A.   No.
8    Q.   And other than knowing that your
9 stores sell the program and that periodically
10 there are sales efforts to educate your employees,
11 other than that aspect, are you involved in any
12 other aspect of the gift card program?
13    A.   No.
14    Q.   When I saw your smiling face on the
15 TV, were you the vice president of store
16 operations?
17    A.   Yes.  I was the senior vice president
18 of store operations, I believe.
19    Q.   Is there some form of junior
20 vice president --
21    A.   I was vice president at one point.
22    Q.   Okay.
23    A.   I got promoted to senior
24 vice president.  I don't know if it was then.  I

**Page 105**

1    Q.   Okay.  Do you have any oversight
2 responsibilities with regard to the gift card
3 program?
4    A.   Not today.
5    Q.   Have you had any since you became the
6 director of store operations?
7    A.   I would say no.
8    Q.   Okay.
9    A.   Not in that capacity I was pre this
10 job.  I wasn't running the daily operations of
11 gift card --
12    Q.   All right.
13    A.   -- after that time.
14    Q.   Right around the time that you moved
15 into vice president of store operations was when
16 Vernon Hill decided to cut out the fees --
17    A.   Correct.
18    Q.   -- for that year period.
19       Do you have any information
20 with regard to that at all except that it came
21 from on high I think is what you said earlier?
22    A.   It came from Vernon.
23    Q.   Do you have any other information?
24    A.   No, I don't.

5a189ffe-5282-43a5-be73-771a52af4ae7

| Page 106 |
| --- |

1     Q.   Do you have any understanding as to
2   why he made this determination?
3     A.   No.
4     Q.   Do you have any understanding if he
5   was advised to make this determination?
6     A.   No.
7     Q.   Do you have any understanding that
8   the competition was doing this?
9     A.   No.
10     Q.   Okay.  At some point in time, fees
11   were reinstituted.
12     A.   Yes.
13     Q.   Do you have any understanding as to
14   why fees were reinstituted?
15     A.   Speculating?
16     Q.   Well, no, I don't want speculation,
17   but I'm entitled to your best understanding.
18     A.   Best understanding was that it was a
19   standard practice in the industry to charge a
20   maintenance fee for gift cards.  If you don't
21   charge a maintenance fee, the cards just sit there
22   with these balances forever.  That would be my
23   best recollection.
24     Q.   Did you have any input into the $2.50

| Page 107 |
| --- |

1   number?
2     A.   No.
3           MR. FODERA:  I don't know where
4   that email is, Mike.  Can you pull that
5   out?
6           MR. LALLI:  Sure.
7           MR. FODERA:  Let's mark this as
8   Grimmer Exhibit-2.
9           (Document received and marked
10   for identification Plaintiffs' Exhibit
11   Grimmer-2, Document Bates-stamped number
12   TD001391, consisting of 1 page.)
13           MR. FODERA:  Let me put an
14   objection on the record and a clarification
15   on the record.  And what's produced to us
16   TD001391 appears to be the end of an email
17   string with regard to a $2.50 fee.  I'm
18   going to send a follow-up to counsel that
19   he produce the entire mail string for this
20   email, and if it contains additional emails
21   from Mr. Grimmer in this string, I'm going
22   to reserve the right to recall him or at
23   least ask him in some form with regard to
24   what would be contained in this email.

| Page 108 |
| --- |

1           MR. HARVEY:  Let me just begin
2   by saying I don't believe there was
3   anything more that we have other than this
4   email and that nothing was withheld on
5   that.  If you send me the email letter you
6   promised to, I will take that as my
7   reminder to double check, but I believe
8   that to be the case.
9   BY MR. FODERA:
10     Q.   You have in front of you Grimmer-3.
11     A.   Yes.  2.
12     Q.   2, I mean.  Sorry.  First of all, can
13   you identify what that is?
14     A.   It's an email.
15     Q.   Is that an email that at least on
16   this page in front of us begins with an email from
17   Kevin Barry?
18     A.   No, it begins with an email from
19   Dennis DiFlorio.
20     Q.   It begins with an email from Dennis
21   DiFlorio.  Okay.  To Kevin Barry.
22     A.   Correct.
23     Q.   And it says, "Okay to go with the
24   2.50 fee."

| Page 109 |
| --- |

1     A.   Correct.
2     Q.   And this is in October of 2005.  In
3   October 2005, had you moved to director of --
4     A.   Store operations.
5     Q.   -- store operations?
6     A.   Yes.
7     Q.   Okay.  And this is an email to Kevin
8   Barry.  And Kevin Barry the -- was who again?
9     A.   Product manager in marketing.
10     Q.   All right.  And you're copied on this
11   particular email along with Dan Goldman, who've
12   you've identified.  The second person, Lise...
13     A.   Moncilovich.
14     Q.   -- Moncilovich, you haven't
15   identified.  Who is she?
16     A.   She works in marketing.  I don't have
17   her title.  Works in marketing.
18     Q.   Is she at an officer level in
19   marketing?
20     A.   I believe so.
21     Q.   Is she still with TD?
22     A.   She is.
23     Q.   Chas Hermann, who is that?
24     A.   Marketing, as well.  He ran our field

5a189ffe-5282-43a5-be73-771a52af4ae7

| Page 110 | Page 112 |
|---|---|

**Page 110**

1  marketing program.
2      Q.   What is a field marketing program?
3      A.   Marketing reps out into the various
4  markets that we serve.
5      Q.   What do marketing reps do?
6      A.   They run local marketing campaigns
7  for the retail network, grand openings, stuff like
8  that.
9      Q.   And you're cc'd on this.
10     A.   Correct.
11     Q.   The only thing that we see here is
12 the Dennis DiFlorio to Kevin Barry, "Okay to go
13 with the 2.50 fee," and that's sent from
14 apparently Dennis DiFlorio's BlackBerry wireless.
15 Can you shed any light on this email?
16     A.   Other than I'm on it, no.
17     Q.   Does this email refer to the $2.50
18 maintenance fee?
19     A.   It doesn't say that.
20     Q.   I know that.  That's why I'm asking
21 you.
22     A.   I don't know what other fee it could
23 be.
24     Q.   Well, that's my follow-up question.

**Page 111**

1  Is there any other $2.50 fee that these people
2  would be involved with?
3      A.   Not that I can think of.
4      Q.   So would it be a fair
5  characterization -- would it be a fair assumption
6  on our part to assume that this $2.50 fee has to
7  do with the fee on the gift card?  Maintenance fee
8  on the gift card.
9      A.   Are you asking me whether I think you
10 should assume that?
11     Q.   Whether it's a fair assumption given
12 who this is going to.
13     A.   It makes sense.
14     Q.   How about with regard to the timing?
15 We know that in the beginning of 2005, Vernon Hill
16 said no more fees, and we know that sometime
17 subsequently the fees were reinstituted, right?
18     A.   Yes.
19     Q.   Would that sometime subsequently be
20 around October or November of 2005?
21     A.   The holiday season in 2005, correct.
22     Q.   So this would dovetail nicely into
23 that, this email?
24     A.   That's correct.

**Page 112**

1      Q.   So this email seems to -- at least
2  you're cc'd on this email with, "Okay to go with
3  the $2.50 fee," correct?
4      A.   Correct.
5      Q.   So does this -- did you review this
6  email in preparing for this deposition?
7      A.   I've seen this email, yes.
8      Q.   Did you review this email in
9  preparing for this deposition?
10     A.   Yes.
11     Q.   I mean you've obviously seen it
12 because you saw it in 2005.
13     A.   Yes.  Oh, no.  Yes, I've seen it
14 recently.
15     Q.   Okay.  So can you tell me now having
16 seen this does this refresh your recollection in
17 any way with regard to whether or not you were
18 involved in additional conversations or emails
19 with regard to this $2.50 fee being reinstituted
20 in the holiday season of 2005?
21     A.   I can't recall.
22     Q.   Would you have any additional emails
23 or documentation or notations having to do with
24 October, November 2005 and the reinstitution of

**Page 113**

1  the fee?
2      A.   Not that I'm aware of.
3      Q.   Have you personally checked your
4  computer emails for any such emails in 2005?
5      A.   Clarify the question.
6      Q.   Have you personally checked your
7  computer emails to see if you have any outstanding
8  emails that you have not produced to counsel from
9  2005 when this fee was reinstituted?
10     A.   So I've checked my emails for every
11 email relative to gift card for counsel.  Did I
12 read them all?  No.  If it had gift card on it, I
13 sent it to him.
14     Q.   But this email doesn't have gift card
15 anywhere on it, does it?
16     A.   No, it doesn't.
17     Q.   Is this an email that you produced to
18 counsel?
19     A.   No, I don't believe I did.
20     Q.   Okay.  So is it possible that you
21 didn't capture all of the materials on your email
22 with regard to gift cards because you just did a
23 search for gift cards?
24     A.   Any card -- any email relative to

| Page 114 | Page 116 |
|---|---|

**Page 114**

1  gift card I provided to counsel.
2  Q.  But you didn't provide this one.
3  A.  Who says I have it?
4  Q.  I don't know whether you did or you
5  didn't.  I'm going a little bit to the side of an
6  issue.
7  A.  Okay.
8  Q.  When you did your search and provided
9  the emails to counsel, did you do a search?
10  A.  I didn't personally do a search.
11  Q.  Did you direct a search be done?
12  A.  Yes.
13  Q.  And when you directed a search be
14  done, who did you direct that to?
15  A.  To technology.
16  Q.  And did you say, "Give me every email
17  on my computer that relates to --"
18  A.  "-- gift card."
19  Q.  And if gift card wasn't in the
20  subject matter, would that email come up?
21  A.  I believe if gift card wasn't
22  anywhere in the content of the email --
23  Q.  Okay.
24  A.  -- it would not have come up.

**Page 115**

1          Did I answer that right?
2  Q.  The converse, your understanding,
3  correct me if I'm wrong, your understanding is if
4  the words gift card appeared anywhere on the
5  gift card, it would be captured?
6  A.  Correct.
7  Q.  All right.  And did you come up with
8  emails?
9  A.  Yes.
10  Q.  How many?
11  A.  I don't know.
12  Q.  Can you approximate?  A thousand?
13  A.  No.
14  Q.  Ten?
15  A.  I can't approximate.
16  Q.  A hundred?
17  A.  I didn't count them.
18  Q.  I understand that.  Was it a stack of
19  papers?  Was it two pieces of paper?
20  A.  No, it's more than two pieces of
21  paper.
22  Q.  Was it fifty pieces of paper?  Was it
23  a ream?
24          MR. HARVEY:  I think you can

**Page 116**

1  ask the witness if he can approximate.
2          MR. FODERA:  Yeah, I am, that's
3  what I'm doing.
4          THE WITNESS:  I would say less
5  than twenty-five emails they came up with.
6  BY MR. FODERA:
7  Q.  Were some of them multiple-page
8  emails or were they all one-page emails?
9  A.  Typically they're one page.
10  Q.  Okay.
11  A.  Some had attachments.
12  Q.  Okay.  Now, we talked about this
13  particular email.  Now let me ask you about the
14  substance of it.  Do you have any recollection of
15  any conversations, whatsoever, on or about October
16  or November of 2005 with Kevin Barry with regard
17  to a $2.50 fee?
18  A.  I don't recall.
19  Q.  Do you have any recollections with
20  regard to Dennis DiFlorio in 2005 with regard to a
21  $2.50 fee?
22  A.  I don't recall.
23  Q.  Now, Dennis, at least by my looking
24  at this Grimmer-1, was between you and Vernon

**Page 117**

1  Hill, right?  He's two up from you?
2  A.  True.
3  Q.  At that time.  Did this hold true in
4  October -- and "this" I mean Grimmer-1, was this
5  the structure in October of 2005?  You had changed
6  positions, but I don't know if you changed levels.
7          MR. HARVEY:  I don't know that
8  he did testify that he -- he said he didn't
9  know when in 2005 he changed positions, I
10  believe.
11          MR. FODERA:  No, he's testified
12  that as of October of 2005, he was already
13  the director of retail operations.
14          MR. HARVEY:  Maybe I'm wrong.
15  BY MR. FODERA:
16  Q.  Didn't you say that?
17  A.  I believe I said that, yes.
18          MR. HARVEY:  My mistake.
19  BY MR. FODERA:
20  Q.  So my question is I want to know
21  where are you relative to Dennis DiFlorio after
22  you changed positions when this email was
23  generated.
24  A.  This would be replaced with Linda

5a189ffe-5282-43a5-be73-771a52af4ae7

| Page 118 |
|---|

1  Verba. So Linda Verba is on this vertical, and
2  I'm still here, Dennis is still here, Vernon's
3  still there.
4      Q.   All right. So you're at the same
5  level?
6      A.   Basically, yes.
7      Q.   So you're two steps away from Dennis
8  DiFlorio?
9      A.   One step away from Dennis DiFlorio.
10     Q.   Correct. Okay. Can you, as you sit
11  here today, give me any reason, whatsoever, as to
12  why you would have been included in this email
13  that says, "Okay to go with the 2.50 fee," in
14  2005?
15     A.   It's an FYI, I'm cc'd on it.
16     Q.   I understand you're cc'd on it. It's
17  an FYI?
18     A.   It's an FYI to me because I'm only
19  cc'd on it. It's not directed to me.
20     Q.   Do you read this email, since it's
21  from Dennis DiFlorio, as a pronouncement that now
22  the fee will be $2.50 or is it still something
23  that's up for debate, or maybe you have no
24  position at all?

| Page 119 |
|---|

1      A.   It's okay to go with it.
2      Q.   So Dennis is saying the $2.50 fee is
3  back in?
4      A.   Okay to go with it.
5      Q.   I'm trying to find out what, "Okay to
6  go with it," means to you, coming from Dennis
7  DiFlorio. Understanding that if it was coming
8  from the janitor, it would have a different
9  meaning entirely, or it may have.
10     A.   Yes.
11     Q.   So what's the answer to the question?
12     A.   Yes, it's okay to go with the 2.50
13  fee.
14     Q.   Okay. Is there anyone in this email
15  string from legal?
16     A.   There is not.
17     Q.   You said, when I asked you about why
18  it was reinstituted, at least your understanding
19  as to why the fee was reinstituted, you said
20  possibly, among other things, that other
21  retailers, other banks were having a fee. Can you
22  tell me your understanding from the time what
23  other banks had gift cards and had a fee other
24  than American Express? You did mention them.

| Page 120 |
|---|

1      A.   Yeah, I can't recall exactly who had
2  a gift card.
3      Q.   Were you involved in any discussions
4  where -- and these discussions may or may not have
5  occurred at all, where revenue generated from
6  maintenance fees were discussed in terms of being
7  a profit center for the bank?
8      A.   No.
9      Q.   At any time with anyone? Did you
10  ever hear or know of such discussions?
11     A.   Discussions on -- repeat the
12  question, I'm sorry.
13     Q.   Whether maintenance fees, fees such
14  as the $2.50 per month fee after twelve months
15  were discussed as a profit center for the bank.
16     A.   No.
17     Q.   Do you have an understanding of what
18  a profit center is?
19     A.   Yes.
20     Q.   What is your understanding what a
21  profit center is?
22     A.   It's profit from the product that you
23  sell.
24     Q.   Okay. Do you have any information or

| Page 121 |
|---|

1  understanding at all with regard to the cost of
2  Commerce or TD Bank cards?
3      A.   There is cost to the card.
4      Q.   I would assume that. But do you have
5  any understanding as to what that cost was at any
6  time?
7      A.   Not specific costs, no.
8      Q.   What about during the pilot program,
9  were you involved in the cost --
10     A.   No.
11     Q.   -- costing out the materials and
12  things of that nature?
13     A.   No.
14     Q.   Is the TD Bank -- to your
15  understanding, is the TD Bank -- was the Commerce
16  Bank card a profit center?
17     A.   I'm sure we made a profit on it.
18     Q.   And to your understanding, is a
19  TD Bank card a profit center?
20     A.   I would assume it is.
21     Q.   As the senior vice president of store
22  operations, do you have to in the course of your
23  responsibilities -- strike that.
24          As the senior vice president of

Case 1:09-cv-01062-RBK-AMD  Document 79-2  Filed 09/17/10  Page 33 of 50 PageID: 4256
MWANTEMBE et al vs. TD BANK, N.A., et al                    8-3-10        JAMES C. SCHEIMER

32 (Pages 122 to 125)

## Page 122

1  store operations, are you looking at what parts of
2  your branches are profitable and what parts are
3  not?
4      A.  No.
5      Q.  Do you have anything, any
6  responsibility at all with regard to the
7  profitability of any aspect of banking operations?
8      A.  No.
9      Q.  Who does have the responsibility for
10  the -- to know the profitability of the various
11  aspects of store operations?
12      A.  That's a different question.
13      Q.  I know.
14      A.  Who has the responsibility of --
15  well, we're not a profit center, store operations,
16  so that's pretty difficult to have a profit run
17  expense center.
18      Q.  Okay.
19      A.  We don't bring in income.  We don't
20  book income.
21      Q.  The flip side of that is who does.
22  Who knows?  If I wanted to ask somebody at TD Bank
23  how profitable is this aspect of your store
24  operations or this aspect or gift cards, who would

## Page 123

1  that person be that I would be asking?
2      A.  Finance.
3      Q.  Who in finance?
4      A.  The retail finance guy.
5      Q.  Who is that?
6      A.  Paul Masterson.
7      Q.  How long has Paul Masterson been
8  there, if you know?
9      A.  Less than a year.  Excuse me.  Let me
10  clarify.
11      Q.  Go ahead.
12      A.  He's been with TD Bank U.S.A. or
13  America's Most Convenient Bank for less than a
14  year.  He is a TD Bank legacy person from Canada.
15      Q.  All right.  So he's come down from
16  TD?
17      A.  Yes.
18      Q.  Toronto-Dominion?
19      A.  Yes.
20          MR. HARVEY:  Just to clarify,
21      Toronto-Dominion, the Toronto-Dominion Bank
22      is something altogether separate from what
23      was called TD Bank, N.A., just so you're
24      clear on that.

## Page 124

1  BY MR. FODERA:
2      Q.  Where did he come from?
3      A.  He came from TD CT, TD Bank -- TD --
4      Q.  Canada.
5      A.  -- Canada Trust.
6      Q.  Okay.  The person who had the job
7  before him, is he still there?
8      A.  I would say no.
9      Q.  Who is that person?
10      A.  I'm thinking it would be Joe Manion.
11      Q.  Do you know where Joe Manion went?
12      A.  No, I don't.
13      Q.  How old was Joe Manion?  In his 50s,
14  in his 60s?
15      A.  Younger.
16      Q.  Younger.  Okay.
17      A.  Late 30s, maybe.
18      Q.  Do you know if any of the gift cards
19  that you have ever purchased personally and given
20  to friends and family have had fees assessed?
21      A.  I don't know personally.
22      Q.  Has anybody ever come back to you --
23      A.  Never.
24      Q.  -- and said, "Yo?"

## Page 125

1      A.  No.
2      Q.  Is it your understanding -- and I get
3  this from your materials, your sales materials.
4  Is it your understanding that with the TD Bank
5  card you have to tell the retailer a specific
6  amount to charge and it's either accepted or
7  declined?
8      A.  No.
9      Q.  I say that because in your
10  gift cards -- in your materials, and I could pull
11  it out, they use the example of going to get gas,
12  and gas could be $75 to fill up your tank, and if
13  you put a $25 gift card into the gas machine, it's
14  going to be rejected because it's not $75.  Do you
15  recall that --
16      A.  Yes.
17      Q.  -- from your own materials?
18          So what is your understanding
19  of what happened, if any, maybe you don't have an
20  understanding, when you take that gift card and
21  you go to a retailer and you say, "Okay, I want to
22  get gas," and you put it in there, is it just
23  rejected, is it accepted to a certain point, will
24  it tell you how much is on the card, or do you

## Page 126

1    have to call a number to find out what's on the
2    card?
3        A.   It doesn't tell you how much is on
4    the card.
5        Q.   Okay.
6        A.   You call the number, you sign online.
7    I think actually in our training material it tells
8    people that they should tell them they should know
9    the balance or validate the balance before you use
10   the card.
11       Q.   And your materials do say that --
12       A.   Yes.
13       Q.   -- that they should -- you know,
14   people can call and register the card --
15       A.   Register.
16       Q.   -- call and get a balance for the
17   card. But --
18       A.   You don't have to register to get a
19   balance, but you can call and register the card.
20       Q.   For a person walking into a retailer
21   and if they say, "Okay, I want to buy this cup,"
22   and this cup is $23, and I have a $25 card that
23   I've had in my pocket for the last year and a
24   half, and I give them that card, and it's $23, but

## Page 127

1    now this card's worth 22.50, is it your
2    understanding this card is just rejected or will
3    the retailer say, "Well, you have 22.50, you got
4    to come up with .50 in cash?"
5        A.   Depending on what processor you're
6    on, I think some will -- I think, not from
7    experience, I think some will accept it and tell
8    you the difference; others will say declined.
9        Q.   Okay. You see on the front of this
10   card, which hasn't been activated yet, there's a
11   sticker.
12       A.   Uh-huh.
13       Q.   And I don't know -- how long, to your
14   understanding, how long have there been stickers
15   on TD Bank cards?
16       A.   TD Bank legacy, I don't know.
17       Q.   How about since they came over and
18   bought off Commerce?
19       A.   This is the first year that I
20   remember a sticker.
21       Q.   And what about with regard to
22   Commerce, was there ever a sticker on it?
23       A.   Not on the gift card.
24       Q.   Can you tell me is there any reason

## Page 128

1    that you can think of that there was never a
2    sticker put on the front of the card that the
3    customer service representative could just put in
4    the date that the card was issued or activated?
5            MR. HARVEY:  Can I have that
6        question read back, please.
7            (The court reporter read back a
8        preceding portion of the proceedings as
9        directed:
10           "Q.   Can you tell me is there
11       any reason that you can think of that there
12       was never a sticker put on the front of the
13       card that the customer service
14       representative could just put in the date
15       that the card was issued or activated?")
16   BY MR. FODERA:
17       Q.   Do you understand the question?
18       A.   Yeah. Well, we didn't have a
19   sticker.
20       Q.   My question is is there any reason
21   that you could think of why a sticker could not be
22   utilized in the Commerce program where the sticker
23   says activation date, and then the person fills in
24   the date of activation and that's right on the

## Page 129

1    card?
2        A.   Any reason why?
3        Q.   Or issue date. Yes. Issue date,
4    yeah.
5        A.   I don't understand the purpose.
6        Q.   Well, twelve months later there's a
7    fee attached.
8        A.   Right, but that's disclosed there's a
9    fee attached to it.
10       Q.   But the person who receives the card
11   has no idea when the card was purchased.  It's
12   twelve months from the date of purchase. Isn't
13   that your understanding?
14       A.   Yes. Well, it's the first day
15   following the twelfth month.
16       Q.   But if I'm like my sister and I do my
17   Christmas shopping in October or September, or
18   sometimes even July, and I buy Christmas card --
19   gift cards, the person I'm giving that card to in
20   January, they have no way of knowing when that
21   card was issued; isn't that correct?
22       A.   Not from the card, no.
23       Q.   And wouldn't it be convenient if
24   there was a sticker on that card saying, issue

Case 1:09-cv-01062-RBK-AMD   Document 79-2   Filed 09/17/10   Page 35 of 50 PageID: 4258
MWANTEMBE et al vs. TD BANK, N.A., et al                                    JAMES C. Zickler

34 (Pages 130 to 133)

| Page 130 | Page 132 |
|---|---|
| 1 date? Wouldn't you agree with that? | 1 the gift card program. I know that you were in |
| 2     A. I don't -- I don't see the need for | 2 charge of the gift card program, but somebody put |
| 3 it. That's just my perspective. | 3 that plan together. Who was that? |
| 4     Q. Well, my question is -- | 4     A. Kevin Barry. |
| 5     A. People typically use the card. | 5     Q. Kevin Barry? |
| 6     Q. -- wouldn't it be convenient. | 6     A. Uh-huh. |
| 7     A. Would it be convenient? | 7     Q. And I just want to be clear, when TD |
| 8     Q. Yes, if there's a fee attached to an | 8 bought Commerce -- |
| 9 issue date thirteen months later, wouldn't it be | 9     A. Uh-huh. |
| 10 convenient if the issue date was right there on | 10     Q. -- to your understanding, did TD |
| 11 the front of the card? | 11 legacy, I guess, did TD already have a gift card |
| 12     MR. HARVEY: Object to the form | 12 program? |
| 13 of the question. | 13     A. Yes. |
| 14     MR. FODERA: You can answer the | 14     Q. Do you know who put TD's gift card |
| 15 question. | 15 program together? |
| 16     THE WITNESS: I'm sorry, you're | 16     A. I don't. |
| 17 going to have to repeat the question again. | 17     Q. Would I be right that you had nothing |
| 18     MR. FODERA: Would you read | 18 to do with the sizing, the typing, and the font of |
| 19 back the question. | 19 the stuff on this card, you're not the right |
| 20     (The court reporter read back a | 20 person to ask about that? |
| 21 preceding portion of the proceedings as | 21     A. No, I did not have anything to do |
| 22 directed: | 22 with that. |
| 23     "Q. Yes, if there's a fee | 23     Q. Do you know who would be the right |
| 24 attached to an issue date thirteen months | 24 person to ask about that? |

| Page 131 | Page 133 |
|---|---|
| 1 later, wouldn't it be convenient if the | 1     A. That would be the product guys. |
| 2 issue date was right there on the front of | 2     Q. Goldberg. |
| 3 the card?") | 3     A. Goldman. |
| 4     THE WITNESS: Describe | 4     A. Goldman. |
| 5 convenient for me. | 5     A. Barry. |
| 6 BY MR. FODERA: | 6     Q. Suneal? |
| 7     Q. What is your understanding of the | 7     A. Suneal's really new to the game, so I |
| 8 term convenient -- | 8 don't know if he'd be appropriate. Matt |
| 9     A. Simple -- | 9 Chevalier. |
| 10     Q. -- do you have an understanding of | 10     Q. Okay. All right. Fair enough. |
| 11 it? | 11     A. I'm probably guessing here. It's |
| 12     A. -- makes it easy. | 12 relative to write Visa regulations on card design. |
| 13     Q. Right. Use that. Isn't it easier | 13 They're pretty strict. |
| 14 for the consumer if they know right there on the | 14     Q. Okay. Do you know if the bank has to |
| 15 front of the card the issue date? | 15 pay Visa any fees? |
| 16     A. I would say yes. | 16     A. I'm assuming they do, yes. They're a |
| 17     Q. Okay. Is there any reason that | 17 provider, service provider. |
| 18 you're aware of that an issue date on a sticker | 18     Q. And, again, I've got tons of |
| 19 wasn't utilized by either Commerce or TD Bank? | 19 advertising materials here. I could show you |
| 20     A. There's no reason I'm aware of, no. | 20 pictures of posters in the TD Banks, but I don't |
| 21     Q. Okay. Can you tell me, and maybe you | 21 have to because you know them, you've seen them. |
| 22 don't know, maybe you do, somebody actually | 22     A. I would assume, yes. |
| 23 thought this idea up at TD -- at Commerce Bank and | 23     Q. Who puts all that stuff together, the |
| 24 somebody put together the whole plan of let's have | 24 advertising? |

Case 1:09-cv-01062-RBK-AMD  Document 79-2  Filed 09/17/10  Page 36 of 50 PageID: 4259

MWANTEMBE et al vs. TD BANK, N.A., et al                    JAMES J. SPELKER

35  (Pages 134 to 137)

|  | Page 134 |
|---|---|
| 1 | A.  Marketing. |
| 2 | Q.  Those are people whose names you've |
| 3 | already given me or are there other people? |
| 4 | A.  Lise Moncilovich, you have. |
| 5 | Q.  Yeah. |
| 6 | A.  Allegra Sandelli would be the other |
| 7 | person. |
| 8 | Q.  Allegra Sandelli? |
| 9 | A.  Uh-huh. |
| 10 | Q.  S-A-N-D-E-L-L... |
| 11 | A.  S-A-N-D-E... |
| 12 | Q.  Oh, she's here, yeah. |
| 13 | A.  -- L-L-I. |
| 14 | Q.  And Allegra, was she -- we know that |
| 15 | she was here at Commerce.  Is she still here? |
| 16 | A.  Yes. |
| 17 | Q.  Is she still in the same position? |
| 18 | A.  Yes. |
| 19 | Q.  What is her position? |
| 20 | A.  I guess her title is director of |
| 21 | marketing advertising. |
| 22 | Q.  These cards are marketed as free, |
| 23 | correct? |
| 24 | A.  Correct. |

|  | Page 135 |
|---|---|
| 1 | Q.  What does free mean to you? |
| 2 | A.  Free to the consumer purchasing the |
| 3 | card. |
| 4 | Q.  Assuming that there's a monthly |
| 5 | service fee after the thirteenth month, do you |
| 6 | think that that could confuse a customer to say |
| 7 | that it's free? |
| 8 | MR. HARVEY:  Object to the form |
| 9 | of the question. |
| 10 | BY MR. FODERA: |
| 11 | Q.  You can answer the question.  Do you |
| 12 | think that can confuse a customer? |
| 13 | A.  It didn't confuse me as a customer. |
| 14 | It's free to get the card.  I didn't pay anything |
| 15 | as a consumer. |
| 16 | Q.  If you have a $25 card, gift card, |
| 17 | and you wait two years, how much is on that card |
| 18 | before you use it? |
| 19 | A.  I don't have a calculator here. |
| 20 | Q.  Well, at $2.50 a month how long does |
| 21 | it take to eat up the whole card, to eat up a -- |
| 22 | A.  Twelve months. |
| 23 | Q.  To eat up a $25 card, it would take |
| 24 | ten months. |

|  | Page 136 |
|---|---|
| 1 | A.  Ten months?  Yeah, yeah, yeah. |
| 2 | I'm sorry. |
| 3 | Q.  $2.50 a month, ten months is $25. |
| 4 | A.  Yes. |
| 5 | Q.  And it starts on the thirteenth |
| 6 | month.  So twenty-three months after the card is |
| 7 | purchased, a $25 card is gone. |
| 8 | A.  No value. |
| 9 | Q.  No value.  Do you think that's fair? |
| 10 | MR. HARVEY:  Object to the form |
| 11 | of that question. |
| 12 | BY MR. FODERA: |
| 13 | Q.  That a depositor comes in, gives |
| 14 | 25 bucks, if somebody takes it and puts it in |
| 15 | their drawer for thirteen -- for a year -- just |
| 16 | under two years and the card has no value, do you |
| 17 | think that's fair? |
| 18 | MR. HARVEY:  Same objection. |
| 19 | THE WITNESS:  I think -- yeah, |
| 20 | I mean it costs money to maintain the card. |
| 21 | BY MR. FODERA: |
| 22 | Q.  How much? |
| 23 | A.  I have no idea. |
| 24 | Q.  Who would? |

|  | Page 137 |
|---|---|
| 1 | A.  The product guy. |
| 2 | Q.  Goldman? |
| 3 | A.  Or Chevalier. |
| 4 | Q.  Okay.  Are you aware or do you know |
| 5 | whether or not consumers, some consumers will say, |
| 6 | "Boy, I'd like to get X," and they'll, knowing in |
| 7 | this commerce that we have now that they'll get |
| 8 | two, three, four gift cards, a couple for their |
| 9 | birthday, a couple for Christmas, you know, a |
| 10 | couple for the 4th of July, I don't know, Father's |
| 11 | Day, dads and grads, and they'll save up |
| 12 | gift cards so that they could go use all of them |
| 13 | at once for a special purchase, are you aware of |
| 14 | that in marketing at all? |
| 15 | A.  No. |
| 16 | Q.  Have you ever heard of that? |
| 17 | A.  No. |
| 18 | Q.  As the vice president of store |
| 19 | operations, are you responsible or involved in any |
| 20 | way with employee discipline? |
| 21 | A.  Indirectly. |
| 22 | Q.  What does that mean? |
| 23 | A.  Meaning people will bump things up to |
| 24 | me about situations and say, you know, |

5a189ffe-5282-43a5-be73-771a52af4ae7

Case 1:09-cv-01062-RBK-AMD Document 79-2 Filed 09/17/10 Page 37 of 50 PageID: 4260

SWAN/EMBLY - 01-62 vs. TD BANK, N.A., et al                    JONES OCTOBER

36 (Pages 138 to 141)

| Page 138 | Page 140 |
|---|---|

**Page 138**

1  historically across the organization how we
2  handled this. I don't particularly terminate the
3  person, though.
4      Q.   Maybe my question was inartfully
5  phrased. If you've got a customer service
6  representative at Branch 1234 and that customer
7  service representative is going to be terminated,
8  does that come across your desk --
9      A.   No.
10     Q.   -- at all?
11     A.   No.
12     Q.   Okay. So you would be involved in
13  termination on a policy level?
14     A.   No, that would be HR.
15     Q.   Okay.
16     A.   I would be involved if there is a
17  questionable practice and they want clarification
18  on, you know, cash handling, precedent on prior
19  terminations in a similar situation, just so that
20  we -- you know, for fairness type of situations.
21     Q.   And the flip side, what about hiring?
22     A.   I don't particularly hire people, no.
23     Q.   Not at the branch level.
24     A.   No.

**Page 140**

1  retail perspective for anything in-store that's
2  systems related.
3      Q.   Do they oversee the gift card
4  operation?
5      A.   No.
6      Q.   The systems portion of it?
7      A.   No, they don't develop. They work
8  alongside with the systems technology group to
9  say, "Well, that field should go here because it's
10  easier for the teller to use." It's design, not
11  development.
12     Q.   Oh, okay. So if somebody thought
13  that a different screen on the Card Genie was
14  necessary, it would go through that department?
15     A.   They would help in the design of it,
16  yes.
17     Q.   Are they basically IT guys?
18     A.   No, they're actually retail guys,
19  former tellers, CSRs, trainers.
20     Q.   What about on the lending end, do
21  you --
22     A.   Nothing with lending.
23     Q.   -- are you responsible for that?
24     A.   Nothing with lending.

**Page 139**

1      Q.   I mean if somebody comes in for a
2  teller job, you're not involved?
3      A.   I have nothing to do with that.
4      Q.   What about the branch manager?
5      A.   The branch manager would be involved.
6      Q.   You're involved in that?
7      A.   No, no, no, no. I'm sorry.
8      Q.   I'm sorry. I want to know what
9  you're involved in.
10     A.   No.
11     Q.   Are you involved in any hiring
12  decisions?
13     A.   My own staff.
14     Q.   Okay. How big is your staff?
15     A.   A hundred and fifty, approximately.
16     Q.   And who -- what is that comprised of?
17     A.   Regional operations officers
18  throughout the network, reconcilement and cash
19  handling department and a retail solutions and
20  service delivery department.
21     Q.   That's a mouthful.
22     A.   That is.
23     Q.   What is that?
24     A.   They outline the requirements from a

**Page 141**

1      Q.   Not even the retail?
2      A.   Not even the retail.
3      Q.   Joe Blow comes in and wants to buy a
4  car from a, you know, customer service manager,
5  you've got nothing to do with that?
6      A.   Nothing to do with that.
7          Can I just clarify something?
8      Q.   Sure. I told you in the beginning
9  you can clarify anything.
10     A.   Go back to the question regarding
11  hiring. The only thing that I am involved in is
12  that I will approve levels of store hires. So in
13  other words, you can have five tellers and six
14  CSRs and a manager and assistant manager.
15     Q.   Oh, okay.
16     A.   If they want exceptions to that, they
17  have to come through me to get an exception.
18     Q.   Would it be fair to say that the size
19  of the branch is determined by the volume that the
20  branch will have?
21     A.   And hours of operations.
22     Q.   Are you still opening new branches?
23     A.   Absolutely. Thirty-five this year.
24     Q.   Do you go to the openings?

| Page 142 | Page 144 |
|---|---|

**Page 142**

1    A.   I haven't since the integration.  In
2  the past, almost every one.
3    Q.   What do you mean since the
4  integration?  From Commerce to TD?
5    A.   Yes.  I've been working on other
6  things.
7    Q.   Okay.  What's your biggest growth
8  area geographically?
9    A.   Metro New York would still be a big
10  growth area.  Boston now is -- we just opened
11  three in Boston.  And Florida continues to be a
12  future growth area.
13    Q.   How many branches do you have in
14  Florida?
15    A.   Exact number, I don't know.  I would
16  say thirty-nine.
17    Q.   Relative to Pennsylvania.
18    A.   Small.
19    Q.   Is it concentrated in a certain area
20  of Florida?
21    A.   Yes, East Coast.
22    Q.   East Coast from Miami Beach all the
23  way up to St. Augustine or --
24    A.   No, East Coast Miami Beach to

**Page 143**

1  Palm Beach.
2    Q.   And is it mostly Broward County or is
3  it --
4    A.   It's a mix between Broward and Palm
5  and Miami-Dade.
6    Q.   And does it extend westward past
7  Alligator Alley or no?
8    A.   No.
9    Q.   No?
10    A.   West Palm, Jupiter, Fort Lauderdale,
11  Boca.
12    Q.   So are you trying to build an
13  original clientele or is it a snowbird clientele?
14    A.   It's more of a snowbird.
15  Miami would be more original.  The Palms and
16  Broward are more snowbird clientele from
17  Pennsylvania and New York.
18    Q.   What about your North Carolina
19  branches?
20    A.   We don't have any.
21    Q.   What about South Carolina?
22    A.   None.
23    Q.   What about Georgia?
24    A.   None.

**Page 144**

1    Q.   What about Virginia?
2    A.   Yes.
3    Q.   How many?
4    A.   I don't know the number exactly.
5    Q.   Ballpark.
6    A.   The Metro DC area would be about
7  forty, including Virginia, Maryland, and DC,
8  itself.
9    Q.   And as between the Philadelphia
10  market and the New York market, which is the
11  larger market?
12    MR. HARVEY:  Which is the
13  larger market for them?
14    MR. FODERA:  Yes, for retail
15  banking.
16    MR. HARVEY:  More stores?
17    MR. FODERA:  Yes.  That's his
18  area, director of store operations.
19    THE WITNESS:  You should know
20  that, right?  Can you clarify New York,
21  though?
22  BY MR. FODERA:
23    Q.   What's the New York Metro market?
24    A.   Okay.  So Philadelphia is bigger than

**Page 145**

1  New York Metro.
2    Q.   Okay.  And is the New York Metro
3  market the five-county area or do you go up to
4  Connecticut or --
5    A.   No.  Actually, in our Metro New York
6  we count North and Central Jersey as part of Metro
7  New York.
8    Q.   Everything from Cranbury north?
9    A.   Basically, yeah, like above Mercer
10  County.
11    Q.   Okay.  All right.  What about
12  Connecticut?
13    A.   Connecticut is its own market.
14    Q.   And how big is that?
15    A.   Seventy-nine stores.
16    Q.   What about Massachusetts,
17  Rhode Island?
18    A.   Rhode Island, none.  Massachusetts to
19  Boston area, I don't know the exact number of
20  stores, all new to me.
21    Q.   Boston area pick up New Hampshire in
22  the Metro Boston market?
23    A.   New Hampshire/Maine is one metro
24  market.

5a189ffe-5282-43a5-be73-771a52af4ae7

Page 146

1    Q.   Okay.  And relative to the
2  Connecticut market is the --
3    A.   It's bigger.
4    Q.   -- Boston market bigger?
5        It's bigger?
6    A.   Oh, I'm sorry.  I'll wait for you to
7  answer -- ask the question.
8    Q.   Relative to the Connecticut market is
9  the Boston market bigger or smaller?
10   A.   The Massachusetts market is bigger.
11   Q.   Okay.  You go out Western Mass,
12 Springfield?
13   A.   Yes.
14   Q.   The whole state?
15   A.   The whole state.
16   Q.   Is that the third largest market you
17 have?
18   A.   It could be the fourth relative to
19 Maine and New Hampshire.
20   Q.   If you're picking up Maine and
21 New Hampshire you mean?
22   A.   We have Maine and New Hampshire.
23 They're one metro market to us.
24   Q.   All right.

Page 147

1    A.   I would say they're equal to, maybe a
2  little bit bigger than the Metro Boston market
3  right now.
4    Q.   Philly, New York, DC, Boston?
5    A.   Uh-huh.  No.  Philly, New York,
6  Massachusetts, Maine, Boston.  I'm sorry.
7  New Hampshire, Mass' -- Maine/New Hampshire --
8  Philly, New York, Maine/New Hampshire,
9  Massachusetts, Boston.
10   Q.   Okay.
11   A.   DC is smaller.
12   Q.   Thank you for the distinction.  I
13 didn't realize -- I thought -- I was counting that
14 as one.
15       MR. HARVEY:  Counsel, we've
16 been going for a while.  Why don't we take
17 a short break.
18       MR. FODERA:  That sounds good.
19       (At this time, a recess was
20 taken.)
21 BY MR. FODERA:
22   Q.   Earlier we were talking about
23 disclosures of the fees, and we had talked about
24 in this video that there wasn't really a

Page 148

1  disclosure of the $2.50 per month fee in the
2  thirteenth month, and just in generally the
3  materials, and I recall you saying to me, "Well,
4  in the Q and A there's a disclosure in -- in the
5  materials, in the Q and A materials there's a
6  disclosure of $2.50 per month fee to the employees
7  to tell a person."  Do you recall that line of
8  questioning?
9    A.   I recall the line of questioning.
10   Q.   In the Q and A portion of the
11 training materials, would you agree with me the
12 Q and A are when customers ask you questions,
13 these are the answers you give the customers?
14 That's what a Q and A is.
15   A.   Yeah, it's prepping the employee to
16 handle the inquiries or the customer interactions
17 they may have relative to the gift card.
18   Q.   Okay.  Would you agree with me that
19 in the context of a Q and A the subject of $2.50
20 fees may have come up, but there's nothing in the
21 marketing materials that I have seen, and I'd like
22 you to confirm or deny this, there's nothing in
23 the marketing materials that affirmatively tells
24 the bank employee, tell the client -- tell the

Page 149

1  purchaser about a $2.50 per month fee?
2    A.   Marketing materials?
3    Q.   Yes.
4    A.   So it's in the disclosure.  Marketing
5  materials versus training materials?
6    Q.   Or training materials.  Let's talk
7  about training materials.  Maybe I'm just
8  inartfully phrasing it.
9    A.   So repeat the question regarding
10 training materials.
11   Q.   In the training materials that I've
12 reviewed I have not seen anything that
13 affirmatively tells the TD or Commerce Bank
14 employee, don't forget to tell the client about
15 the -- don't forget to tell the purchaser about
16 the $2.50 per month fee commencing with the
17 thirteenth month.
18   A.   It doesn't specifically say don't
19 forget to tell the customer about a $2.50 fee.
20   Q.   Okay.
21   A.   It does specifically say that you
22 must provide the disclosure and the terms and
23 conditions of the account, the gift card, which
24 contains the $2.50 fee.

| Page 150 | Page 152 |
|---|---|

**Page 150**

1    Q.   I understand that. This video that
2  we all watched that you starred in, would you
3  agree that -- and I think we have said that that
4  was pretty much an exemplar for how to sell the
5  gift cards.
6            MR. HARVEY: I object to the
7       form of the question.
8  BY MR. FODERA:
9    Q.   Do you understand the question?
10    A.   No.
11    Q.   It was used as a training tool for
12  people selling the gift cards, this is how to do
13  it.
14    A.   Yes, it was used as a knowledge base
15  for the employees about gift card and selling
16  gift cards, correct.
17    Q.   And what it is it's showing the
18  employee how to sell the gift card. True?
19    A.   It shows experiences of selling the
20  gift card; scenarios I guess is a good term.
21    Q.   Would you agree that nowhere in that
22  video, in the mock sales portion of that video is
23  the disclosure of a $2.50 per month fee?
24    A.   They did not say anything about a

**Page 152**

1  something?
2            MR. FODERA: Correct.
3            THE WITNESS: I don't recall it
4       saying that.
5  BY MR. FODERA:
6    Q.   And in the video -- and I think that
7  this -- and correct me if I'm wrong, the purchaser
8  gets a box that has the ribbon around it already
9  and it's a closed unit. The purchaser, this is
10  the way it's handed to them.
11    A.   The finished product is handled that
12  way.
13    Q.   The finished product.
14    A.   Yes, that's true.
15    Q.   Now we got to describe it for the
16  videographer (sic). So the finished product is
17  the gift card with the terms and conditions in a
18  box, the box is closed and the box has a ribbon
19  around it. That's what's handed to the purchaser.
20    A.   Yes, it's a complete package.
21    Q.   Okay.
22    A.   But the video did show them preparing
23  the box that I recall, putting the card in,
24  putting the disclosure in, closing the box.

**Page 151**

1  $2.50 fee.
2    Q.   And there's no disclosure in there
3  about, read the terms and the conditions.
4            We can take the time and read
5  or watch it.
6    A.   No.
7            No, not in the video, itself.
8    Q.   Right.
9    A.   It would be -- it would have been in
10  the training material that accompanied the video,
11  the Go Red campaign or America's Got Red, whatever
12  it was called.
13    Q.   In the video it doesn't say anything
14  about terms and conditions and telling the
15  purchaser about terms and conditions.
16    A.   Not that I recall.
17    Q.   It doesn't tell -- the video, as I
18  recall, does not tell the seller of the gift card
19  to tell the purchaser to read anything.
20            MR. HARVEY: Just to be clear,
21       you want to know whether the video tells
22       the seller to tell the customer --
23            MR. FODERA: Correct.
24            MR. HARVEY: -- to read

**Page 153**

1    Q.   And I don't mean to -- I agree.
2    A.   Okay.
3    Q.   Yeah, I agree. The video, the
4  video -- the jury's going to see the video. It's
5  there.
6    A.   Okay.
7    Q.   It is what it is. Would you agree
8  that the video doesn't say anything at all about
9  the -- about an issue date and fees accruing tied
10  to an issue date?
11    A.   I would agree with that.
12    Q.   I don't think I actually asked this,
13  but I might have: Is Vernon Hill still with the
14  bank?
15    A.   No.
16    Q.   Where is he?
17    A.   (Indicating.)
18    Q.   When did he leave?
19    A.   No.
20    Q.   No?
21    A.   Don't know where he is.
22            I want to say, guessing, I
23  think it was June of 2007.
24    Q.   Do you know if he went to another

5a189ffe-5282-43a5-be73-771a52af4ae7

| Page 154 | Page 156 |
|---|---|
| 1 bank? | 1 BY MR. FODERA: |
| 2     A.   I read in the paper he did. | 2     Q.   Have you seen this notice before? |
| 3     Q.   What bank did you read in the paper | 3     A.   No. |
| 4 that he went to? | 4     Q.   Never? |
| 5     A.   Metro Bank. | 5     A.   No. |
| 6     Q.   Where? What market? | 6     Q.   Turn to Page -- the third page of |
| 7     A.   Philadelphia. | 7 this notice. |
| 8     Q.   Okay. I asked you earlier about what | 8         MR. HARVEY: I'm going to |
| 9 documents you reviewed before you came to this | 9 object because he hadn't looked at the |
| 10 deposition. | 10 whole document when he answered your |
| 11     A.   Yes. | 11 question, for the record. |
| 12     Q.   Do you recall that? | 12         MR. FODERA: Okay. |
| 13     A.   Yes. | 13         MR. HARVEY: He was just |
| 14     Q.   Can you tell me did you speak to | 14 referring to the first page. |
| 15 anybody at TD Bank? Let me give you the ground | 15         MR. FODERA: I don't know what |
| 16 rules. I'm not entitled to know anything that you | 16 he was referring to. I don't know how you |
| 17 spoke about with your lawyer and anything that | 17 would know -- |
| 18 your lawyer said to you as long as you and your | 18         MR. HARVEY: Because I watched |
| 19 lawyer are together. Okay? | 19 him look at the first page and nothing else |
| 20     A.   Uh-huh. | 20 in answer to your question. |
| 21     Q.   And that extends to anybody employed | 21         MR. FODERA: Okay. |
| 22 by Mr. Harvey or anybody who works with Mr. Harvey | 22         MR. HARVEY: And he hadn't -- |
| 23 or anybody at the Pepper firm. But I am entitled | 23 he didn't do this. |
| 24 to know about discussions you may have had with | 24 BY MR. FODERA: |

| Page 155 | Page 157 |
|---|---|
| 1 other bank employees. So in preparation for this | 1     Q.   Why don't you look at the document |
| 2 deposition did you discuss with any other TD Bank | 2 and tell me if you've ever reviewed this document |
| 3 employee anything with regard to this deposition | 3 before. |
| 4 or preparation for it? | 4         MR. HARVEY: Or any part of it. |
| 5     A.   Other than saying I was being deposed | 5 And I would suggest that you take the time |
| 6 and telling people where I was, not detail of did | 6 to read it. |
| 7 you know this and did you know that or did you | 7 BY MR. FODERA: |
| 8 review this, no. | 8     Q.   Now having had the opportunity to |
| 9     Q.   Okay. And that's -- did you ever | 9 review the deposition notice, have you seen this |
| 10 see -- and let's just mark this as Exhibit Number-3, | 10 before? |
| 11 it's a copy of the deposition notice. | 11     A.   I believe I saw Page 3 before. |
| 12         MR. HARVEY: I would also note | 12     Q.   Okay. And you've been put forth as a |
| 13 that he told you before about talking with | 13 person in this deposition who has knowledge with |
| 14 somebody about a training video. | 14 regard to the defendants' gift card program. |
| 15         MR. FODERA: That's correct, | 15     A.   Correct. |
| 16 and he went to get the training video and | 16     Q.   Amongst other things. |
| 17 he found out that it was August of '06. | 17         MR. HARVEY: I think it's for |
| 18         THE WITNESS: But I was with | 18 counsel to identify the topics on which |
| 19 you when we did that, that's why I didn't | 19 he's going to testify about. I told you |
| 20 bring it up. | 20 this yesterday, but just to be clear, I |
| 21         (Document received and marked | 21 told you he is a witness that is being |
| 22 for identification Plaintiffs' Exhibit | 22 designated by TD Bank as one of the |
| 23 Grimmer-3, Notice of Deposition to TD Bank, | 23 people -- |
| 24 N.A., consisting of 4 pages.) | 24         MR. FODERA: As one of the |

5a189ffe-5282-43a5-be73-771a52af4ae7

## Page 158

1  people, correct.
2          MR. HARVEY: -- not the sole
3  person on topics, he has some information,
4  C, D, E, F, and G.
5          MR. FODERA: That's correct.
6  We're on the same page here.
7          MR. HARVEY: We're always on
8  the same page.
9  BY MR. FODERA:
10     Q.   I'm going to adopt your client's --
11 your attorney's statement here because we're on
12 the same page, and you've been designated at least
13 as a person with some information with regard to C
14 through F. Now, with regard to the defendants'
15 gift card --
16         MR. HARVEY: C through G.
17         MR. FODERA: C through G.
18 BY MR. FODERA:
19     Q.   With regard to the defendants'
20 gift card program -- and by defendants here, it
21 means Commerce and TD Bank.
22     A.   Uh-huh.
23     Q.   -- you discussed with me the pilot
24 program, you've discussed that period of time in

## Page 159

1  2005 up until the time you became store ops, and
2  you discussed your limited role in the gift card
3  program after 2005 when you went into store
4  operations. Have you gone over pretty much all of
5  the topics related to the gift card program? I
6  know that I could probably ask questions for seven
7  days, specific questions that you may or may not
8  have more information about. But have you covered
9  all of the topics of the gift card program that
10 you've been involved with?
11         MR. HARVEY: Object to the form
12     of the question.
13 BY MR. FODERA:
14     Q.   If you understand the question, you
15 can answer it.
16     A.   I don't understand the question, but
17 I have to clarify something.
18     Q.   Go ahead.
19     A.   So it's pilot 2004, 2005 --
20     Q.   Correct.
21     A.   -- till I took the new position.
22     Q.   Correct.
23     A.   Now repeat the question.
24     Q.   Well, I just want to make sure

## Page 160

1  that -- this is an overall question here. I want
2  to make sure that there's not a specific area of
3  the program that you were responsible or involved
4  with that I didn't ask about because I don't know
5  the area exists.
6      A.   No.
7      Q.   So you've generally discussed all
8  aspects of the gift card program? I understand
9  that there may be specific questions that I
10 haven't asked you.
11     A.   Yes.
12         MR. HARVEY: Object to the form
13     of the question. I don't know what you're
14     asking this witness. I mean you want to
15     know --
16         MR. FODERA: He answered the
17     question.
18         MR. HARVEY: Well, I object to
19     the form of that question. It's incumbent
20     upon you to ask questions about the program
21     rather than to ask him have I missed
22     anything essentially.
23         MR. FODERA: Well, there's -- I
24     don't necessarily agree with you. If he's

## Page 161

1  been designated with knowledge in a
2  specific area, I think that it's perfectly
3  proper for me to say in terms of categories
4  within your area have I covered all of the
5  categories pertaining to your knowledge.
6  It's a perfectly fine question.
7          MR. HARVEY: I disagree.
8          MR. FODERA: But that --
9  BY MR. FODERA:
10     Q.   Answer that question. Have I covered
11 all the categories of your knowledge with regard
12 to the gift card program?
13         MR. HARVEY: Object to the form
14     of the question.
15         THE WITNESS: One more time.
16 BY MR. FODERA:
17     Q.   Have I questioned -- have you given
18 me information with regard to each category of
19 knowledge that you have with regard to the
20 gift card program?
21         MR. HARVEY: Same objection.
22         THE WITNESS: It's a pretty
23     broad statement.
24 BY MR. FODERA:

Case 1:09-cv-01062-RBK-AMD   Document 79-2   Filed 09/17/10   Page 43 of 50 PageID: 4266
SWANN, et al v. TD BANK, N.A., et al                                        JAMES COLLIER

42 (Pages 162 to 165)

| Page 162 | Page 164 |
|---|---|
| 1   Q.   It is. It's meant to be broad. | 1   Q.   That impact each aspect of your |
| 2   A.   I can't be a hundred percent. | 2   responsibilities of the gift card program. Is |
| 3   Q.   Go ahead. | 3   that fair? Is that fair? |
| 4   A.   Whatever knowledge I've shared or | 4   A.   To the best of my knowledge, yes. |
| 5   based on what you asked me? Every category of | 5   Q.   Okay. I asked you if you spoke with |
| 6   gift card? That's a pretty broad statement. I | 6   anybody at TD Bank with regard to preparation, and |
| 7   don't know where else -- I don't even know where | 7   I asked you if you met with your lawyer but I |
| 8   to go with the answer. | 8   didn't ask what the substance of that was. Aside |
| 9   Q.   Of the gift card program. And let | 9   from TD Bank and your lawyer, did you speak with |
| 10   me -- let me put some meat on those bones. | 10   anybody else in preparation for this deposition? |
| 11   All right? At some point in time in the future | 11   A.   No. |
| 12   there's going to be a trial in this matter, and | 12   Q.   You told me about you gave Mr. Harvey |
| 13   this is my one opportunity to ask you questions | 13   an approximation of about twenty-five or so emails |
| 14   outside of the trial. What I want to avoid is we | 14   relating to a search that you had performed on |
| 15   walk into a trial and you get up on the stand and | 15   your computer for gift card-related emails. Do |
| 16   you say, "Oh, you know what, I was completely in | 16   you recall that testimony? |
| 17   charge of the ABC part of the gift card program | 17   A.   Yes. |
| 18   and here's what that was about," and it's | 18   Q.   Other than that specific search, were |
| 19   something that I haven't asked you about today. I | 19   you involved in the electronic discovery or in |
| 20   want to make sure that I've covered all aspects of | 20   putting together any of the emails or other |
| 21   the categories of the gift card program as far as | 21   electronic pieces of information for the -- for |
| 22   your knowledge is concerned. That's all. | 22   Mr. Harvey in this case? |
| 23   MR. HARVEY: I object. I think | 23   A.   Specifically electronic? |
| 24   you're asking that question too broadly and | 24   Q.   Well, I'm going to ask electronic and |

| Page 163 | Page 165 |
|---|---|
| 1   it's unfair. And I do think you can ask | 1   then I'm going to open it. So -- |
| 2   that question in a much more specific and | 2   A.   Not electronic that I can recall. |
| 3   narrow way to get the same information. | 3   Q.   What about other any materials? |
| 4   But the way you're asking it in my view is | 4   A.   Yes. |
| 5   not good. | 5   Q.   And what did you do in preparation of |
| 6   But you can answer the question | 6   putting together those materials? |
| 7   to the extent you can. | 7   A.   I was asked if there was other |
| 8   THE WITNESS: I don't know if I | 8   materials that wouldn't be in electronic that I |
| 9   can answer the question. | 9   had access to or that I knew were in the area, in |
| 10   BY MR. FODERA: | 10   where my area of the bank is, and there was a -- |
| 11   Q.   Well, you've had, since 2003, you had | 11   what do you call it -- a cabinet that Dan Goldman |
| 12   a variety of positions with TD Bank. Going back | 12   had left behind that had documentation about the |
| 13   before that, but the gift card program, the pilot | 13   gift card program. So I took that and sent it to |
| 14   program starts in 2003. | 14   Mr. Harvey. |
| 15   A.   Correct. | 15   Q.   Okay. And did you direct any of your |
| 16   Q.   Going forward from that. And I want | 16   employees to do any searches, any -- |
| 17   to just make sure that I have captured in my | 17   A.   No. |
| 18   questioning to you all of the aspects of the | 18   Q.   -- additional searches? |
| 19   program that you were involved with, that's really | 19   We talked about the electronic |
| 20   where I'm going with this, so that I can avoid | 20   part, but any other hard copy, I guess, searches? |
| 21   being surprised at some point in the future. | 21   A.   Just the individual that I said, |
| 22   A.   We've discussed the roles I've had at | 22   "Where's Dan's cabinet," and they had the key -- |
| 23   the bank that impact the gift card. Does that | 23   Q.   Okay. |
| 24   answer your question? | 24   A.   -- and I took it out. |

43 (Pages 166 to 169)

| Page 166 | Page 168 |
|---|---|

**Page 166**

1    Q.   Other than that?
2    A.   No.
3         Can I clarify?
4    Q.   Sure.
5    A.   The young lady that I went to and
6    asked could she get a copy of the video.
7    Q.   Okay. Let's spend a little bit of
8    time, from your perspective I'd like to know how
9    does a customer purchase a gift card and if it's
10   changed, walk me through the process.
11   A.   So a customer comes in, tells the
12   CSR, "I'd like to buy a gift card." The CSR sits
13   down with the customer and identifies the
14   customers, because we only sell to customers as a
15   general rule. They'll look up the customer's
16   information on the system to validate they are who
17   are they, obtain ID, if appropriate.
18        They would then ask the
19   customer the denomination of the card that they
20   would like to purchase. Then they would go get
21   the card, cause they're locked in the vault for
22   security reasons. Obtain, on the way back if it's
23   not in their desk, sometimes it is in their desk,
24   so the disclosure, the box, and the ribbon.

**Page 167**

1         They would then load the card
2    with the customer, and then they identify, they
3    validate for the customer, here's the card, here's
4    the number, here's the information on the card,
5    and then they would ask them would they like them
6    to fill out the greeting card for them and
7    identify here's the greeting card which includes
8    your disclosure. Or terms and conditions. I
9    don't think they say disclosure; they would say
10   terms and conditions. And then they wrap it up,
11   putting the card inside the insert, two little
12   cutouts, the card, the greeting card is placed on
13   top, the box is closed, the ribbon's attached and
14   it's handed to the customer.
15   Q.   In your experience and training is
16   the customer service representative trained to
17   open the trifold and reach inside underneath the
18   middle flap of the trifold and pull out the terms
19   and conditions and go over the terms and
20   conditions with the --
21   A.   No.
22   Q.   Okay. Is the customer service
23   representative trained at all to let the purchaser
24   know that there's something underneath this middle

**Page 168**

1    flap?
2    A.   Yes, that the terms and conditions
3    included.
4    Q.   And how is that -- what is the
5    customer service representative told with regard
6    to what they tell --
7    A.   In addition to the greeting card,
8    this contains your terms and conditions which
9    should be given to the recipient to mostly
10   register their card.
11   Q.   Well, I want to be clear here and
12   parse it out. The terms and conditions and the --
13   what do you call this, the gift card part?
14   A.   The greeting card.
15   Q.   -- the greeting card are all part of
16   the same trifold.
17   A.   Correct. Purposely.
18   Q.   And it says, for you, on the front.
19   And then you open it, and then it has the
20   gift card portion of it. And then you open it
21   again and then you have to reach in to the middle
22   flap, between the middle flap and pull out the
23   terms and conditions. We agree, do we not, that
24   the customer service representative is not trained

**Page 169**

1    to go in and pull out those terms and conditions
2    and show the customer, correct?
3    A.   Yes.
4    Q.   But the customer service
5    representative is trained to tell the purchaser
6    that this trifold contains the terms and
7    conditions?
8    A.   Yes, and important information for
9    the recipient.
10   Q.   And important information for the
11   recipient. Okay.
12        And how is it that the
13   recipient knows that the terms and conditions are
14   not just what's contained on the two ends of this
15   trifold?
16   A.   The cutout inside the -- the cutout
17   in there implies that there's something inside
18   there for the customer. The little cutout --
19   Q.   Okay.
20   A.   -- would show that there's something
21   there.
22        MR. HARVEY: I'm going to
23   object. You have it poked all the way
24   inside so you can't see it, but the terms

| Page 170 |
|---|

1  and conditions sit -- it says --
2  THE WITNESS: It usually sticks
3  out a little further than that. That's why
4  the hole's there.
5  BY MR. FODERA:
6  Q. Go ahead.
7  A. Typically like that, and it says,
8  terms.
9  Q. Okay. And is the -- is the customer
10  service representative trained --
11  MR. FODERA: Well, maybe we
12  should make a copy of this and attach it as
13  an exhibit. Do we need to? I don't think
14  that we need to. We know what we're
15  talking about with the trifold here.
16  MR. HARVEY: That's the
17  document that I presented to you as an
18  exemplar at the last -- at the deposition
19  of the plaintiff Fern Rutberg of the
20  trifold with the terms and conditions in
21  it.
22  MR. FODERA: Well, it's not
23  actually that one, but close enough.
24  BY MR. FODERA:

| Page 171 |
|---|

1  Q. Is the customer service
2  representative trained to, when they're opening up
3  this trifold or looking at the trifold and handing
4  it to the person, are they trained to make sure
5  that terms and conditions, which just fell back in
6  and can't be seen, is visible?
7  A. I can't say for sure.
8  Q. Did you see how that just fell away?
9  A. Yeah, I did.
10  Q. Describe it to me.
11  A. Describe?
12  Q. What just happened with this, with
13  the terms and conditions?
14  A. The terms went further into the
15  jacket.
16  Q. And would a consumer know to look in
17  that jacket if that's not sticking out?
18  A. I would look as a consumer.
19  Q. Would you expect every consumer to
20  look?
21  A. I can't speak for every consumer. I
22  would -- as a consumer I would look in there.
23  Q. Is it important that the purchasers
24  and the recipients are fully informed of the terms

| Page 172 |
|---|

1  and conditions attached to that card?
2  MR. HARVEY: Can I hear that
3  question back?
4  BY MR. FODERA:
5  Q. Is it important that the purchasers
6  and the recipients are fully informed of the terms
7  and conditions attached to the card?
8  MR. HARVEY: Object to the form
9  of the question.
10  THE WITNESS: That's why we
11  have terms and conditions.
12  BY MR. FODERA:
13  Q. That's not responsive to my question.
14  A. But that's the answer. I mean we --
15  Q. Is it important?
16  A. Yes, they have terms and conditions
17  and that they receive the terms and conditions,
18  absolutely, and that's why we have it included in
19  the trifold.
20  Q. Listen closely to my question. Is it
21  important that purchasers and recipients are fully
22  informed of the terms and conditions attached to a
23  card?
24  MR. HARVEY: Objection. Asked

| Page 173 |
|---|

1  and answered.
2  MR. FODERA: I disagree. It
3  wasn't answered.
4  MR. HARVEY: I think he
5  definitely just answered that question.
6  MR. FODERA: No. It wasn't
7  responsive. He answered the question. It
8  wasn't a responsive answer.
9  MR. HARVEY: Counsel, I think
10  he said -- maybe the court reporter could
11  read back the answer.
12  (The court reporter read back a
13  preceding portion of the testimony as
14  directed:
15  "A. Yes, they have terms and
16  conditions and that they receive the terms
17  and conditions, absolutely, and that's why
18  we have it included in the trifold.")
19  (Discussion held off the
20  record.)
21  BY MR. FODERA:
22  Q. Is it important that purchasers and
23  recipients are fully informed of the terms and
24  conditions?

5a189ffe-5282-43a5-be73-771a52af4ae7

## Page 174

1    A.   It's important for the purchaser and
2   the -- I'm sorry, purchaser and the recipient to
3   receive the terms and conditions, yes.
4    Q.   Is it important for them to be fully
5   informed of the terms and the conditions?
6    A.   That's the purpose of the terms and
7   conditions, so they're fully informed about the
8   gift card program and how it works.
9    Q.   Why is that important?
10    A.   Because it gives you all the
11   disclosures of how the card operates, how to
12   register your card, how to manage your card.
13    Q.   Do you think that information about
14   when and how to use the card should be provided on
15   the gift card, itself, or on a sticker or taped,
16   affixed to the card?
17       MR. HARVEY:  Object to the form
18    of the question.
19       THE WITNESS:  Can you clarify
20    when and how?  What do you mean by that?
21   BY MR. FODERA:
22    Q.   Well --
23    A.   You don't have to --
24    Q.   I'm sorry?

## Page 175

1    A.   The card is used -- I mean it's
2   activated.  There's really little you need to do
3   other than go out and spend it.  It's an active
4   card.
5    Q.   Don't you think you need to know when
6   the card is activated?
7    A.   It is activated automatically.
8    Q.   But the recipient doesn't know when
9   the card is activated.
10    A.   Why do they need to know?  It will
11   work when they go to use it.
12    Q.   Because if they wait thirteen months
13   from that date, fees attach that they're not aware
14   of.
15       MR. HARVEY:  Object to the form
16    of the question.
17       MR. FODERA:  Let me rephrase
18    the question.
19   BY MR. FODERA:
20    Q.   Because if they wait thirteen months
21   and a day, fees attach to that card.
22    A.   Which are disclosed.
23    Q.   But they can't tell from the day they
24   received that card when the thirteen months began

## Page 176

1   to run, correct?
2    A.   Not from the card.
3    Q.   Do you think that information about
4   that should be provided on the gift card, itself?
5       MR. HARVEY:  Object to the form
6    of the question.
7       THE WITNESS:  I would believe
8    that the card with the expiration date
9    would give you some inkling that you should
10    use the card.
11   BY MR. FODERA:
12    Q.   But the expiration date does not bear
13   any relationship to the issue date, does it?
14    A.   It could.
15    Q.   Explain to me how you believe it
16   could.
17    A.   Well, because if it's twelve months
18   out and it was purchased today and given out
19   tomorrow and the inventory was current, it could
20   be exactly twelve months, and thirteen months --
21   twelve month expiration would be twelve months
22   from the issue date.
23    Q.   Here's a card that I'll represent to
24   you is over a year old that was given out at

## Page 177

1   Christmas in 2008.  Can you tell how it is that
2   that has an -- assuming what I say is correct, can
3   you tell me how that is that has an expiration
4   date of 10-10?
5    A.   Not from this card, no.
6    Q.   Can tell what the issue date of that
7   card was?
8    A.   Not from the card, no.
9    Q.   Do you think if there was a sticker
10   affixed to it saying what the issue date is, you'd
11   know what the issue date was?
12    A.   Well, obviously if there was a
13   sticker that said the issue date on it, you would
14   know what the issue date was.
15    Q.   Do you think that information should
16   be provided on the card?
17       MR. HARVEY:  Object to the form
18    of the question.  You can ask -- Counsel,
19    the basis for my objection you haven't
20    asked for, but you're essentially asking
21    lay opinions of this witness.  He can
22    testify about what he saw, what he heard,
23    what he smelled, what he felt.  He's a
24    percipient witness.  He can testify about

5a189ffe-5282-43a5-be73-771a52af4ae7

| Page 178 | Page 180 |
|---|---|
| 1  information known to TD Bank as a corporate | 1  A.  True. |
| 2  designee of TD Bank, but to get him, ask | 2  Q.  And then they will take that card and |
| 3  him to testify about what -- you know, what | 3  they either have this other ancillary stuff in |
| 4  does he think is completely irrelevant and | 4  their desk or it's somewhere else.  Now, I've seen |
| 5  not a proper subject for the deposition. | 5  this stuff prepared in two different ways.  So I |
| 6  MR. FODERA:  I disagree. | 6  would like to know from you if you could show me |
| 7  You can answer the question. | 7  how this package should actually be prepared. |
| 8  THE WITNESS:  Repeat the | 8  A.  Sure. |
| 9  question. | 9  MR. HARVEY:  Can we be clear |
| 10  MR. FODERA:  Would you read | 10  that you're handing him a box -- |
| 11  back the question? | 11  MR. FODERA:  Yeah. |
| 12  (The court reporter read back a | 12  MR. HARVEY:  -- and a trifold |
| 13  preceding portion of the proceedings as | 13  with terms and conditions in it and a card |
| 14  directed: | 14  and a ribbon. |
| 15  "Q.  Do you think that | 15  MR. FODERA:  What I'm handing |
| 16  information should be provided on the | 16  him is -- |
| 17  card?") | 17  MR. HARVEY:  Just what I said. |
| 18  MR. HARVEY:  Same objection. | 18  MR. FODERA:  -- one, two, |
| 19  THE WITNESS:  I just don't see | 19  three, four, five -- one, two, three, four, |
| 20  the value in it. | 20  five, six things.  First is a card.  The |
| 21  BY MR. FODERA: | 21  second is the base of a box.  The third is |
| 22  Q.  You don't see the value in it?  I | 22  a cutout that fits in the box.  The fourth |
| 23  didn't hear what you said. | 23  is a terms and conditions.  The fifth is |
| 24  A.  I don't see the value in it. | 24  the top of the box.  And the sixth is the |

| Page 179 | Page 181 |
|---|---|
| 1  Q.  Do you think that it's important not | 1  ribbon around the box. |
| 2  to have advertisements or disclosures that are | 2  BY MR. FODERA: |
| 3  misleading to a customer about terms and | 3  Q.  How does that get put together and |
| 4  conditions? | 4  are they -- and are TD Bank employees trained to |
| 5  MR. HARVEY:  Same objection. | 5  put it together in a certain way? |
| 6  THE WITNESS:  Personally do I | 6  MR. HARVEY:  And before he does |
| 7  think it's important?  Sure. | 7  that, let me just clarify that what you |
| 8  BY MR. FODERA: | 8  called the terms and conditions is the |
| 9  Q.  Why? | 9  trifold insert with the terms and |
| 10  A.  Because you want to be honest with | 10  conditions contained inside of it. |
| 11  your customers as consumers. | 11  MR. FODERA:  I agree. |
| 12  Q.  When you say honest, do you agree | 12  BY MR. FODERA: |
| 13  that honesty also includes full disclosure? | 13  Q.  I want you to describe it orally, if |
| 14  A.  Yes. | 14  you can. |
| 15  MR. FODERA:  Let's go off the | 15  A.  So you take the box which contains |
| 16  record for a second. | 16  the cardholder -- what did you call it? |
| 17  (Discussion held off the | 17  Q.  Okay, the cardholder insert. |
| 18  record.) | 18  A.  Insert. |
| 19  BY MR. FODERA: | 19  Q.  And let me ask you about that, |
| 20  Q.  Here's what I want to know, and I | 20  because that cardholder insert, when the box comes |
| 21  don't know if you're familiar with it or not, what | 21  from the manufacturer, does it come just as you |
| 22  you've said to me is that the marketing -- I'm | 22  have it in your hand now -- |
| 23  sorry, the customer service representative will go | 23  A.  Yes. |
| 24  to the vault and get the physical card. | 24  Q.  -- with the box closed and the |

| Page 182 | Page 184 |
|---|---|
| 1  cardholder insert in there?<br>2  A.  Yes.<br>3  Q.  Okay.<br>4  A.  And this is like lower, it's flat.<br>5  The insert's flat.<br>6  MR. HARVEY:  The two notches<br>7  you mean are flat?<br>8  THE WITNESS:  Yeah.  You got to<br>9  pull them.<br>10  And then you place -- you<br>11  obviously issued the card now to the<br>12  customer and it's loaded.<br>13  BY MR. FODERA:<br>14  Q.  All right.  You've issued the card to<br>15  the customer and it's loaded.<br>16  A.  Place the card, terms and conditions,<br>17  what I call greeting card.<br>18  Q.  Trifold.<br>19  A.  Trifold goes on top.  Ribbon goes<br>20  here -- I mean lid goes on, and ribbon stretches<br>21  around the box.<br>22  Q.  And that's the completed box?<br>23  A.  Yes.<br>24  Q.  And that's the way it's handed to the | 1  some of them, I mean we've got some of the<br>2  materials here if you want to refer to them.  And<br>3  maybe there's other materials, I don't know.<br>4  A.  I can't be certain that it<br>5  specifically says that.  I want to say I thought<br>6  it was in the store huddle, like, overview guide,<br>7  but I can't -- I'm not a hundred percent sure.<br>8  Q.  What is a store huddle overview<br>9  guide?<br>10  A.  It's one of the training materials<br>11  that would have came from -- sorry, Commerce<br>12  University that's like a store huddle, tells the<br>13  store manager what steps to follow, what documents<br>14  are available.<br>15  Q.  One of these, is this what you're<br>16  talking about?  I'm just --<br>17  A.  No, that's the WAG.  That's the<br>18  policy manual.<br>19  Q.  Is this it?<br>20  A.  I'd have to look through.<br>21  Q.  I'm sorry?<br>22  A.  I'd have to look through.<br>23  Q.  We'll let you look through some of<br>24  this. |

| Page 183 | Page 185 |
|---|---|
| 1  customer --<br>2  A.  Yes.<br>3  Q.  -- the completed box?<br>4  Now, can you tell me if TD Bank<br>5  personnel are specifically told not to put the<br>6  trifold into the empty bottom of the box and then<br>7  put the cutout where the card goes on top of the<br>8  trifold?  Are they specifically trained not to do<br>9  this?<br>10  A.  They're trained what to do.  They're<br>11  trained to put the card -- the greeting card on<br>12  top of -- on top of the card.<br>13  Q.  Let's talk about that.  The TD Bank<br>14  employee is specifically trained to put the<br>15  trifold on top of the gift card that's been<br>16  affixed to the cutout in the box?<br>17  A.  Correct.  Because it makes sense.<br>18  From a recipient's perspective you want to see who<br>19  gave you and what they're giving you.<br>20  Q.  When you say they're specifically<br>21  trained where to put this trifold, is that in the<br>22  materials?  Because I can't say that I've seen it<br>23  in any materials.<br>24  And if you want to refer to | 1  A.  Can I clarify something I answered<br>2  earlier?<br>3  Q.  Sure.<br>4  A.  Cause it specifically says here that<br>5  you use -- you tell the customer about the card<br>6  and you use the gift card terms and condition<br>7  insert to guide her through the card.<br>8  Q.  Okay.<br>9  A.  So it obviously was written in<br>10  training.  I just didn't remember it.<br>11  Q.  Okay.<br>12  A.  Yeah, I don't think it's going to be<br>13  in this one, but I'll look.<br>14  MR. HARVEY:  You might want to<br>15  identify the document.<br>16  MR. FODERA:  It's not in TD73<br>17  through 84, which is Gift Card Holiday<br>18  2006.<br>19  THE WITNESS:  Not in this one.<br>20  BY MR. FODERA:<br>21  Q.  All right.  This is TD86 through<br>22  TD98, and you said what, sir?<br>23  A.  It's not specific in there.<br>24  Q.  Okay.  So it's not contained in |

48 (Pages 186 to 189)

| Page 186 | Page 188 |
|---|---|

**Page 186**

1  there.
2      A.   That's not what I was looking for.
3      Q.   Are you referencing something from
4  memory that --
5      A.   Yes.
6      Q.   Okay.  What are you referencing from
7  memory?  Because I'm not representing that I've
8  got every marketing material thing here.
9      A.   This wasn't marketing; it was
10  training.  Marketing, I consider marketing
11  external to the consumer.  Internal is training
12  material.
13          Yeah, I know I had it.
14      Q.   If you think there's a specific
15  document, do you think that you could put your
16  hands on that specific document back at TD Bank?
17      A.   Yeah.
18          MR. FODERA:  Well, I'm going to
19      follow up with a request for production for
20      that specific document.
21          MR. HARVEY:  I think we've
22      produced that document and it would be in
23      the documents that he reviewed, so if you
24      want him to take a look at documents he

**Page 188**

1  the customer if they want you to complete the
2  gift card section.  And then the next page,
3  Page 11, says -- where is it -- explain the use of
4  the card purchase, including number of balance
5  inquiry, place the gift card and the greeting card
6  brochure into the box and place the ribbon on the
7  box, hand it to the customer.
8          MR. HARVEY:  Would you please
9      identify the page number in the corner,
10      this page.
11          THE WITNESS:  Page 11.  Oh,
12      TD001234.
13  BY MR. FODERA:
14      Q.   Does that say where to place the
15  trifold in the box?
16      A.   Well, the trifold's already in the
17  box.  I'm sorry.  I'm sorry.  The holder's already
18  in.  It says place the gift card and the greeting
19  card brochure into the box and place the ribbon on
20  the box.
21      Q.   Have you --
22      A.   So with that tri' -- with the holder
23  in there, place it in, place it in, put the
24  ribbon.  It's not specifically saying that, but

**Page 187**

1  reviewed.
2          MR. FODERA:  Did he bring the
3      documents he reviewed?
4          MR. HARVEY:  No, I have
5      documents that -- copies of documents he
6      reviewed.
7          MR. FODERA:  I'd like to know.
8      I mean we don't have to spend the next
9      two hours with you looking at documents.
10      If you just want to give me the Bates
11      number of document, that's fine.  Either
12      the document exists or it doesn't exist.
13          MR. HARVEY:  I'll confer with
14      the witness after the deposition.  I'll be
15      happy to tell you that if there's such a
16      document.
17  BY MR. FODERA:
18      Q.   Okay?
19      A.   Uh-huh.
20      Q.   Did you want to look through that
21  Commerce, because that's another one?
22      A.   I'll look.
23          So this section here says that
24  you should pull out the gift card brochure and ask

**Page 189**

1  it's implying that you don't take the trifold out
2  and put -- I mean the cardholder out.  It's
3  already predone.
4      Q.   Are you aware of instances where --
5  well, let me ask you, if you had customer service
6  representatives, one or more, who were in the
7  course of their sale routinely placing the trifold
8  under the gift box -- I'm sorry, under the insert
9  in the gift box, is that something that would have
10  come to your attention in the normal course of
11  business?
12      A.   I don't know that it would come to my
13  attention unless I saw it, but I never saw it.
14      Q.   Are you aware of it occurring for
15  convenience sake, when the employees are putting
16  together a gift box, or some other reason?  I
17  don't know.
18      A.   No, you can't -- you don't prepackage
19  them because you always have to write the amount
20  in the card.  It doesn't make sense to prepackage.
21  Plus, you got to put the card in.  Cards aren't
22  preloaded.  So if you had preloaded cards, you
23  could stuff them in a box and put a little mark on
24  the box, 50 bucks.  But they're not preloaded.  So

5a189ffe-5282-43a5-be73-771a52af4ae7

49 (Pages 190 to 193)

|  | Page 190 |
|---|---|

1  it doesn't even make sense operationally to put
2  the greeting card, terms and conditions in the box
3  until you -- the last thing you got to write out.
4     Q.   You said earlier that the greeting --
5  that some of them keep them in their desks --
6     A.   Yeah.
7     Q.   -- or words to that effect.  But
8  generally at TD Bank, and at Commerce before it,
9  was there a place where the boxes were kept and a
10  place where the trifold was kept?  And we know the
11  card, itself, was kept in a vault.
12     A.   Right.  So the cards are kept in the
13  vault, and during non-holiday season the
14  greeting card and insert and the box and the
15  ribbon would be kept on the shelves in the
16  stockroom.  During the holiday season, they were
17  kept under the Christmas tree.
18     Q.   Okay.
19     A.   And -- I'm sorry.  The box was kept
20  with the ribbon on it.  The greeting card insert
21  with the trifold was kept in their drawer, the
22  CSRs' drawer.
23     Q.   You refer to this -- we've been
24  referring to this in our legalese as the trifold

|  | Page 191 |
|---|---|

1  and you refer to it as the --
2     A.   Greeting card.
3     Q.   -- greeting card.  What is the
4  nomenclature used at TD and Commerce?
5     A.   Greeting card.
6     Q.   Okay.  We briefly spoke about
7  in-store training, but can you tell me what kind
8  of frequency there was of in-store training and
9  what kind of frequency there is of in-store
10  training with regard to the gift card programs?
11     A.   Yeah, so each holiday season we would
12  relaunch the gift card training either through
13  email, you know, Coming again, here's some
14  changes, the box's green, the box's not red.  Then
15  there were store huddles, and then there would be
16  training materials attached to that, that would
17  kind of go over the Q and A process.  So annually
18  there was a bigger push relative to training
19  because we were gearing up for the holiday season.
20     Q.   What about a new employee training
21  manual or --
22     A.   Yeah, I'm not sure if it's covered in
23  CSR training.  I'd have to go back and look.
24     Q.   What about with regard to the changes

|  | Page 192 |
|---|---|

1  in the program, you said -- or when you relaunch
2  the program, you do it by email.  Do all the
3  customer service representatives have access to
4  email?
5     A.   Yes.
6     Q.   And none of the tellers sell these
7  cards?
8     A.   Not in legacy Commerce ever sold a
9  card.  Legacy Banknorth did.
10     Q.   Legacy Commerce?
11     A.   Did not sell via teller.  It was
12  always a platform experience.
13     Q.   But TD Bank sold --
14     A.   TD Banknorth did sell them at the
15  teller.  They had a different program.
16     Q.   But that hasn't happened in a couple
17  years.
18     A.   Yeah.  Yeah, I mean our systems came
19  together last year, so it's been a year or so.
20     Q.   Is it all platform sales now?  Is it
21  all customer service representatives?
22     A.   It's available at the teller for
23  overload.
24     Q.   What does that mean, overload?

|  | Page 193 |
|---|---|

1     A.   In the legacy Commerce world --
2     Q.   I'm having trouble with the
3  nomenclature.  Legacy Commerce are banks that --
4  branches that were originally Commerce Bank?
5     A.   Yes, legacy Commerce.
6     Q.   All right.
7     A.   Those store branches, they're sold at
8  the platform as a normal course of business.  If
9  December 24 you're overloaded with customers
10  trying to buy cards, the tellers can also have
11  access to sell them on their system.  It's not the
12  norm; it's the exception, just for high traffic.
13     Q.   Okay.
14     A.   Banknorth has it at both teller and
15  CSR platform because most of their stores aren't
16  staffed with many people, so they are
17  cross-trained on both sides.  So depending on
18  where they're working at the moment, a customer
19  may come in for a gift card, they can do it right
20  there at the terminal, if they want, the teller
21  terminal.
22     Q.   Okay.  So even today it depends upon
23  where the bank came from who could sell it,
24  generally?

5a189ffe-5282-43a5-be73-771a52af4ae7