EXHIBIT "C"

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHAWEZI MWANTEMBE, et al : CIVIL ACTION
                         :
        vs.              :
                         :
TD BANK, NA, et al       : 2:09-cv-00135-TJS

- - -

Thursday, April 1, 2010

- - -

Oral Deposition of LISE L.
MONCILOVICH, pursuant to Notice, taken in the
offices of Pepper Hamilton, 3000 Two Logan Square,
18th and Arch Streets, Philadelphia, Pennsylvania,
commencing at 11:21 a.m., before Francine K.
Guokas, R.P.R., Notary Public.

- - -

------------------------------------------------
            FRANCINE K. GUOKAS
            COURT REPORTING
            7 Galena Court
            Erial, NJ  08081

    (215) 726-8855        (856) 782-1640

70895bd7-fe03-4a8d-9960-235f7e6cf598

| Page 2 | Page 4 |
|---|---|

**Page 2**

1  A P P E A R A N C E S:
2  SILVERMAN & FODERA
   BY: MICHAEL P. LALLI, ESQ.
3  26th Floor
   11 Penn Center Plaza
4  1835 Market Street
   Philadelphia, Pennsylvania 19103
5
   Counsel For Plaintiffs
6
7  PEPPER HAMILTON
   BY: STEPHEN G. HARVEY, ESQ.
8  3000 Two Logan Square
   18th and Arch Streets
9  Philadelphia, Pennsylvania 19103
10 Counsel For Defendants
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**Page 4**

1  E X H I B I T S (Continued)
2
3  NO.        DESCRIPTION        PAGE
4  Plaintiffs' Exhibit Moncilovich-5    95
5  Documents Bates-stamped number TD001029 through
   TD001031, consisting of 3 pages
6
7
8
   DOCUMENT/INFORMATION REQUEST: None.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**Page 3**

1  I N D E X
2
3  WITNESS                PAGE
4  LISE L. MONCILOVICH
5  By Mr. Lalli          7
6  By Mr. Harvey         113
7
8
9
10     E X H I B I T S
11
12 NO.        DESCRIPTION        PAGE
13 Plaintiffs' Exhibit Moncilovich-1    46
14 Documents Bates-stamped number TD001194 through
   TD001197, consisting of 4 pages
15
16 Plaintiffs' Exhibit Moncilovich-2    70
17 Document Bates-stamped number TD000249, consisting
   of 1 page
18
19 Plaintiffs' Exhibit Moncilovich-3    78
20 Document Bates-stamped number TD000713, consisting
   of 1 page
21
22 Plaintiffs' Exhibit Moncilovich-4    92
23 Documents Bates-stamped number TD000263 and
   TD000264, consisting of 2 pages
24

**Page 5**

1          (It was agreed by and among
2  counsel that all objections, except as to
3  the form of the question, are reserved
4  until the time of trial.)
5          - - -
6          MR. HARVEY: Before we begin,
7  can I just make a statement about what I
8  just gave you --
9          MR. LALLI: Sure.
10         MR. HARVEY: -- just for the
11 record?
12         I just handed Mr. Lalli the
13 declaration of Lise Moncilovich with
14 exhibits, there are 59 of them. They have
15 all been produced to date with the
16 exception of tab 19, which we just found
17 out about yesterday, and it's included in
18 there and we're producing it to you right
19 now. We'll provide you a Bates-numbered
20 copy, as well.
21         I told you about this
22 declaration, that it would be coming,
23 yesterday, and this is all information that
24 we have put together and we're providing it

Case 1:09-cv-01062-RBK -AMD  Document 79-4   Filed 09/17/10  Page 4 of 31 PageID: 4288
MWANTEMBE et al vs. TD BANK, N.A., et al                    4-1-10    LISE L. MONCILOVICH

3  (Pages 6 to 9)

## Page 6

1   to you in advance of this deposition to
2   facilitate your examination of this
3   witness.  So that if you have any questions
4   about this, now is your time to ask it.  If
5   you -- I would have liked to have gotten it
6   to you last night so you would have had
7   additional time, but I had that additional
8   document that I had to get before I
9   finalized it.
10          If you would like additional
11  time to review this, we're willing to give
12  you that time and sit and, you know, let
13  you review it and start the deposition in
14  an hour or whenever today, but we'd like to
15  get the deposition done today.  So that's
16  my preliminary statement.
17          MR. LALLI:  Sure.  I don't
18  think I'm going to need more time.  I'll
19  break before we end and -- I'm not sure if
20  you want to break for lunch or...  I don't
21  think I'm going to have a lot.
22          MR. HARVEY:  Okay.
23          MR. LALLI:  So we may not need
24  to break for lunch.  But from what I've

## Page 7

1   seen so far, I don't know that I'm going to
2   need more time other than the questions I'm
3   going to ask about it.
4          - - -
5          LISE L. MONCILOVICH, having
6   been duly sworn, was examined and testified
7   as follows:
8   BY MR. LALLI:
9       Q.   Good morning, Mrs. Moncilovich.
10      A.   Good morning.
11      Q.   How are you today?
12      A.   Good, thank you.
13      Q.   We just met about two minutes ago; my
14  name is Mike Lalli.  I'm one of the attorneys for
15  the plaintiffs in this litigation.  We're here
16  today for your deposition.  Have you ever been
17  deposed before?
18      A.   No.
19      Q.   So this is your first time?
20      A.   I'm a virgin.
21      Q.   Okay.  I'm sure Mr. Harvey went over
22  this with you, but a deposition is just our
23  opportunity to ask you questions, see what you
24  know, and go through some of these documents.

## Page 8

1          You were just put under oath by
2   the court reporter.  That's the same oath that you
3   would be given in a court of law, so your
4   testimony today should be given with the same
5   effect as though it were given in a court of law.
6   Is that okay?
7       A.   Yes.
8       Q.   I'm going to go over a few ground
9   rules just to make this go a little bit more
10  smoothly.  And as I said, Mr. Harvey may have
11  already gone through these with you.  Please
12  answer all of my questions verbally; no shrugs of
13  the shoulder, or nods of the head, or uh-huhs or
14  unh-unhs, because everything is being taken down.
15  So it's much easier to take down a yes than it is
16  to take down an uh-huh.  Is that okay?
17      A.   Absolutely.
18      Q.   I'm going to ask that you wait until
19  I finish asking my question before you begin
20  answering.  That way, the court reporter has a
21  chance to take down my complete question and your
22  complete answer.  Is that okay?
23      A.   Yes.
24      Q.   And I'll give you -- I'll try to give

## Page 9

1   you the same courtesy.
2          If you don't understand a
3   question I ask, please tell me you don't
4   understand it.  I'm not good at forming sentences,
5   so if you don't understand it, let me know.  If
6   you do understand it -- if you do answer the
7   question, I'm going to assume that you heard it
8   and that you understood it and that you're
9   answering it to the best of your knowledge.  Is
10  that -- are those fair assumptions for me to make?
11      A.   Yes.
12      Q.   If you need to take a break at any
13  time, let me know.  The only caveat to that is
14  that if there's a question pending, I'm going to
15  ask you to answer the question, and then you can
16  take your break.
17          Do you have any questions about
18  those rules I just went over?
19      A.   Not so far.
20      Q.   Okay.  Can you please state your name
21  and business address for the record.
22      A.   Lise Moncilovich, at 9000 Atrium Way,
23  and that is in Mount Laurel, New Jersey.
24      Q.   And you understand you've been

## Page 10

1  designated to testify on behalf of TD Bank today?
2     A.   Correct.
3     Q.   What did you do to prepare for this
4  deposition?
5     A.   I have researched with a number of
6  coworkers, some outside vendors in order to gather
7  materials for the deposition and the booklet that
8  was put together as well as go through my own
9  files to research what I had in them from that
10  time period for the gift card program.
11     Q.   Anything else?  Other than
12  conversations --
13     A.   Other than conversations, yeah, with
14  counsel, no.
15     Q.   You said you spoke with or got
16  together with coworkers.
17     A.   Uh-huh.
18     Q.   Who were those coworkers?
19     A.   Joan Dare for newspaper advertising.
20     Q.   Can you spell the name for me,
21  please?
22     A.   D-A-R-E.
23     Q.   And it's Joan?
24     A.   Joan, J-O-A-N.

## Page 11

1     Q.   Okay.
2     A.   I had also gathered information from
3  Karen Bradley; K-A-R-E-N, B-R-A-D-L-E-Y.
4     Q.   What is Ms. Bradley's position?
5     A.   She is no longer with the bank, but
6  she worked in card production.  I'm not exactly
7  sure what her title was and to what extent, but
8  she was involved with the card program.
9     Q.   Okay.  Who else?
10     A.   I spoke with Leigh Fulda, L-E-I-G-H,
11  F-U-L-D-A, who worked, prior to the merger, with
12  TD Banknorth to go through the collateral that
13  Banknorth had presented.
14     Q.   When you say collateral, what does
15  that mean?
16     A.   Just the samples of materials that
17  they had provided for this deposition.
18     Q.   Samples of materials meaning
19  advertisements?
20     A.   It could have been signage for
21  posters, various other printed materials.
22     Q.   Okay.  Anyone else?
23     A.   Not that I can think of offhand, no.
24     Q.   Your conversation with Joan, tell me

## Page 12

1  about that conversation.  What was --
2     A.   It was very brief.  It was just for
3  her to gather information relative to what kind of
4  newspaper advertising had gone on during the --
5  for the gift card program, itself.  Since Joan was
6  our media manager for Commerce Bank, she worked
7  directly with the agency who had put the ads
8  together.  So they needed to provide that
9  information to me.
10     Q.   If I understand it correctly, you
11  just spoke with Joan and said, "Hey, I need some
12  documents, can you give them to me?"
13     A.   Uh-huh.
14     Q.   Was that the extent of it?
15     A.   Basically.
16     Q.   What about Mrs. Bradley or
17  Ms. Bradley?
18     A.   Same thing.  She was more involved
19  from the card perspective, so I approached her
20  with requesting any kind of actual proofs from
21  manufacturers of the cards.
22     Q.   And Leigh Fulda?
23     A.   Leigh is the project manager, and
24  she -- I went through her pieces that she had

## Page 13

1  supplied to make sure I understand exactly what
2  they were and could attest to them.
3     Q.   What was Leigh's position?
4     A.   She's a project manager currently.
5     Q.   What does that mean?
6     A.   She will coordinate the various
7  elements for a program.  For instance, she may
8  coordinate all the content and creative
9  development for a line of business that wants to
10  develop some promotional materials.
11     Q.   You spoke with some coworkers.  You
12  also got in touch with some outside vendors.
13     A.   Correct.
14     Q.   Okay.  Who are the outside vendors
15  you contacted?
16     A.   I had contacted Capital Printing.
17     Q.   And what is Capital Printing?
18     A.   They are the printers that produced
19  most of the gift -- greeting cards for us with the
20  terms and conditions in it.
21     Q.   When you say the greeting cards, do
22  you mean the trifold, what we've been describing
23  as a trifold --
24     A.   Right.

70895bd7-fe03-4a8d-9960-235f7e6cf598

5 (Pages 14 to 17)

| Page 14 |
|---|
| 1    Q.   -- that is included in the box? |
| 2    A.   In the box, correct. |
| 3    Q.   So Capital Printing is the company |
| 4  that TD Bank used or Commerce? |
| 5    A.   Commerce.  And TD Bank also uses |
| 6  today. |
| 7    Q.   When did Commerce start using Capital |
| 8  Printing? |
| 9    A.   He was already being used prior to my |
| 10  involvement, but relative to the gift card program |
| 11  it would have been when we first produced the |
| 12  first piece in 2004. |
| 13    Q.   So Capital Printing produced the |
| 14  trifold and the terms and conditions? |
| 15    A.   Yes, they're one and the same. |
| 16    Q.   Anything else that they produced? |
| 17    A.   Relative to the gift card program? |
| 18    Q.   Yes. |
| 19    A.   Not that I can think of offhand, |
| 20  because we would bid out work so -- not that I |
| 21  remember. |
| 22    Q.   Who did you contact at Capital |
| 23  Printing? |
| 24    A.   Our account executive, who is Jeff, |

| Page 15 |
|---|
| 1  now don't ask me to spell the last name, it's |
| 2  Augerbauer.  I think it's A-U-G-E-R-B-A-U-E-R. |
| 3  Something close to that. |
| 4    Q.   And what did your conversation with |
| 5  Mr. Augerbauer entail? |
| 6    A.   Primarily just to go into the |
| 7  previous job jackets to see if they had samples of |
| 8  pieces printed, because my files may not have had |
| 9  samples from way back then at this particular |
| 10  time, and also to gather some PDFs of the final |
| 11  file -- of the final proofs before we went to |
| 12  print for those terms and conditions and |
| 13  gift cards. |
| 14    Q.   So Capital Printing keeps... |
| 15    A.   They keep records. |
| 16    Q.   And they have -- |
| 17    A.   For the most part, yeah.  They only |
| 18  go back for so many years, but they were able to |
| 19  help. |
| 20    Q.   Do they go back to 2004? |
| 21    A.   He did have some. |
| 22    Q.   Besides Capital Printing, what other |
| 23  vendors did you speak with? |
| 24    A.   I spoke with Perfect Plastic who is a |

| Page 16 |
|---|
| 1  card manufacturer for the first hologram card that |
| 2  was produced. |
| 3    Q.   When you say the first hologram card, |
| 4  what does that mean? |
| 5    A.   It's an effect card.  The hologram |
| 6  has a very dimensional look to it, that started in |
| 7  2007, and it just is a special process, it just |
| 8  gives the card a different look. |
| 9    Q.   So you're just talking about the |
| 10  actual look of the card? |
| 11    A.   Correct. |
| 12    Q.   And did you contact Perfect Plastic |
| 13  for the same reasons you've contacted these other |
| 14  people we've been speaking of, to get documents or |
| 15  get proofs? |
| 16    A.   Yes, to get documents -- well, proofs |
| 17  in this instance. |
| 18    Q.   Who at Perfect Plastic did you speak |
| 19  with? |
| 20    A.   His name is Jim Fitzmorris.  I |
| 21  believe it's F-I-T-Z-M-O-R-R-I-S. |
| 22    Q.   And did Perfect Plastic have records |
| 23  that dated -- well, you said the first time you |
| 24  guys used them was 2007? |

| Page 17 |
|---|
| 1    A.   As far as I know, it was 2007.  I |
| 2  know they were used for this particular card, |
| 3  yeah. |
| 4    Q.   What other outside vendors did you |
| 5  speak with or contact? |
| 6    A.   That was primarily it. |
| 7    Q.   Primarily it or... |
| 8    A.   I don't recall anybody else, offhand, |
| 9  that I would have talked to. |
| 10    Q.   Okay.  Another thing you did to |
| 11  prepare was to look through your own files? |
| 12    A.   Correct. |
| 13    Q.   Tell me what that means. |
| 14    A.   Files that had been archived.  I |
| 15  would have kept files for various items that would |
| 16  have been developed throughout the years that I |
| 17  would have been involved in, so I just retrieved |
| 18  those from archives and searched through to see |
| 19  what samples I had. |
| 20    Q.   When you say they're archived files, |
| 21  do you mean they're physical boxes of files or are |
| 22  they computer files? |
| 23    A.   Physical boxes of files. |
| 24    Q.   Where are they located? |

70895bd7-fe03-4a8d-9960-235f7e6cf598

6 (Pages 18 to 21)

| Page 18 |
|---|

1  A. They were at Iron Mountain, that big
2  storage facility we use.
3        Do you use them, also?
4  Q. Yes, we do.
5  A. Everybody knows Iron Mountain.
6  Q. So you just called back from storage?
7  A. We would have had to call them back.
8  I have sort of listing of jobs by number, our own
9  job number, and I would have pulled anything that
10 was relative to the gift card program.
11 Q. Other than the actual physical files
12 you called back from Iron Mountain, did you go
13 through any of your files that are located in your
14 office?
15 A. Uh-huh, because I still have a
16 certain number of files from -- that we haven't
17 put into archive.
18 Q. And I'm speaking of physical files.
19 Is that answer the same? Not just computer.
20 A. Correct. Yes.
21 Q. And did you also go through your
22 computer files?
23 A. Uh-huh.
24        Yes.

| Page 19 |
|---|

1  Q. I should have caught you, I'm sorry.
2        It's almost like a real
3  conversation.
4  A. I know.
5  Q. When did you first hear about this
6  lawsuit?
7  A. I have to approximate that it was the
8  end of last year.
9  Q. 2009?
10 A. Yes.
11     MR. HARVEY: I'm going to point
12     out that that's almost certainly not a
13     correct answer.
14     THE WITNESS: I'm trying to
15     think of when I had gotten an email.
16     Because I pulled information starting
17     January of '09, so it would have been
18     around December, January of '09 -- I mean
19     December of '08, January of '09, yeah.
20 BY MR. LALLI:
21 Q. You got word of this lawsuit through
22 an email?
23 A. Correct.
24 Q. Who was that email from?

| Page 20 |
|---|

1  A. I don't recall.
2  Q. Do you know what the email said?
3  A. Not word for word, but other than
4  primarily that there was a lawsuit pending and to
5  maintain all files as accurately and as best as we
6  can.
7  Q. And did you follow the, I guess,
8  instruction of that email?
9  A. Uh-huh.
10 Q. You didn't --
11 A. We didn't throw anything out. We
12 didn't rip anything up.
13 Q. You didn't take all your boxes to the
14 shredder?
15 A. No. No.
16 Q. And did you produce documents to your
17 counsel in response to that email or to someone
18 else in response to that email?
19 A. When it was asked of me --
20     MR. HARVEY: I'm going to
21     object to the form of the question.
22 BY MR. LALLI:
23 Q. If you understand the question, you
24 can still answer it.

| Page 21 |
|---|

1  A. If somebody had requested
2  information, whether it was counsel or whether it
3  was somebody else within the program, I would have
4  provided that information.
5  Q. Other than speaking with your counsel
6  and the people we've already named, did you speak
7  with anyone else about this deposition?
8  A. No.
9  Q. Did you speak with anyone other than
10 your counsel about this litigation?
11 A. Relative to -- just in discussion
12 about the facts of the case or --
13 Q. Sure.
14 A. -- just having the litigation?
15 Q. Both. Any and all.
16 A. Well, I would have mentioned to
17 people that I was being deposed for this, but I
18 would not have gone into the specifics of the
19 case.
20 Q. So for this deposition you may have
21 said, "Hey, on April 1st I'm going to be at a
22 deposition?"
23 A. Yes.
24 Q. Okay. Other than this deposition --

## Page 22

1  I'm talking generally about the litigation,
2  itself --
3      A.   Uh-huh.
4      Q.   -- who did you speak with other than
5  counsel about the litigation?
6      A.   No one else.
7      Q.   No discussions with any coworkers
8  about, "Hey, you know, we're getting sued, what's
9  this all about?"
10     A.   No.
11     Q.   Or anything to that effect?
12     A.   Not that I recall, no.
13     Q.   Any conversations with friends or
14 family about it?
15     A.   Other than I was just being deposed
16 for this case?  No.
17     Q.   But nothing about the litigation,
18 itself, or the allegations that have been made
19 against TD Bank?
20     A.   No, because actually I didn't know
21 what the allegations were relative to in the
22 beginning.
23     Q.   What do you understand them to be
24 now?

## Page 23

1      A.   Relative to the fees?
2          MR. HARVEY:  I'm going to
3      object.  She can provide that information
4      if she can do it without relating whatever
5      counsel told her.
6  BY MR. LALLI:
7      Q.   What you know about the allegations
8  came from counsel.  Is that fair?
9      A.   I think that's fair.
10     Q.   You didn't read any of the pleadings
11 in this matter?
12     A.   No.
13     Q.   Okay.  And other than the documents
14 that were provided to you pursuant to your
15 requests to the coworkers and outside vendors and
16 your own files, did you review any other documents
17 in preparation for this deposition?
18     A.   No.
19     Q.   Where did you go to college?
20     A.   Eastman School of Music, part of the
21 University of Rochester.
22     Q.   Did you graduate from Eastman School
23 of Music?
24     A.   Uh-huh.

## Page 24

1          I'm sorry, yes.
2      Q.   With a degree in?
3      A.   Bachelor of music.
4      Q.   Any formal education after Eastman?
5      A.   I had taken some classes at New York
6  University and the University of Wyoming.
7      Q.   Did you obtain degrees from New York
8  University or University of Wyoming?
9      A.   No.
10     Q.   Is the bachelor of -- in music?
11     A.   Of music.
12     Q.   Is that your only degree?
13     A.   Bachelor's degree, yes.
14     Q.   Any other degrees after that?
15     A.   No.
16     Q.   When did you begin working for
17 Commerce Bank?
18     A.   I was with Commerce Bank in 1996 to
19 '97 for a year, and then returned in 2002.
20     Q.   From '97 to 2002, where were you or
21 what were you doing?
22     A.   I worked at another company, at
23 KM Lists.  And then I had taken three years off to
24 have my son.

## Page 25

1      Q.   Your stint with Commerce from '96 to
2  '97, let me focus in on that.  What was your --
3  were those dates correct or incorrect?
4      A.   '96 to '97, uh-huh.
5      Q.   What was your position with Commerce?
6      A.   I don't remember the actual title,
7  but I believe it was an advertising coordinator.
8      Q.   And as advertising coordinator, what
9  were your roles, responsibilities, duties?
10     A.   Too many.
11         Basically I would work with a
12 number of lines of business to coordinate the
13 development of promotional materials, so it could
14 range anywhere from brochures to letters to store
15 fliers, posters, could be newspaper ads, working
16 with the agency.  It was a compilation of many
17 different things.
18     Q.   When you say you would coordinate
19 these ads, were you actually creating these
20 advertisements?
21     A.   I was not designing them, no.  It
22 would have been the agency that would have handled
23 that.
24     Q.   So I guess run me through the

8 (Pages 26 to 29)

## Page 26

1  process, because I'm just not sure how it works.
2      A.  Uh-huh.
3      Q.  You get a request from someone at the
4  bank --
5      A.  Right.
6      Q.  -- saying, "We want advertisements or
7  marketing or promotional materials for this
8  project."
9      A.  The particular project.
10     Q.  Okay.  And then what do you do in
11 response to that?  And we'll just stick right now
12 with your '96 to '97.
13     A.  Okay.  As best as I can remember back
14 then, I would have asked them to provide me with
15 information that they wanted to include.
16     Q.  When you say "them," do you mean
17 the --
18     A.  Whatever line of business or internal
19 client it would have been.
20     Q.  Okay.
21     A.  So taking insurance as an example, if
22 the insurance group had come and said, "We want to
23 develop a brochure," I would have asked them what
24 kind of content, what are the key points that they

## Page 27

1  want to put into this piece, or do they have any
2  other special requests, do they want a business
3  card holder put into the piece, what is it going
4  to be used for, is it a sales tool, do they have a
5  particular size in mind.
6          So I would have gotten as many
7  specifics up front as I could, and then relayed
8  that to our agency, who then would have fine-tuned
9  it and come up with a design and layout for it.
10     Q.  So they produced that design and
11 layout, they being the advertising agency --
12     A.  Correct.
13     Q.  -- produced that design and layout to
14 you?
15     A.  Provided it back to me.
16     Q.  Okay.
17     A.  And then, in turn, I would traffic it
18 through to the person who initially requested it
19 for their review, and obviously if there were
20 edits to be made or changes to be made, we would
21 always follow through.  And it would also be
22 reviewed by my supervisor, who was -- who was it
23 at that time -- it was Linda McKenna was the
24 advertising manager, and sometimes our director of

## Page 28

1  marketing for their final approvals, as well.
2      Q.  Did you at all have a hand in the
3  approval process back then in '96 and '97?
4      A.  No.  Not final approval, no.
5      Q.  Would you ever make suggestions or
6  edits at all to any of the materials that were
7  provided back to you from the ad agency?
8      A.  I may have made suggestions to the
9  client to word something, you know, a little
10 clearer or a little simpler, but it wouldn't have
11 been made had they not approved it.
12     Q.  So then you leave Commerce and you go
13 to KM Lists.  What is KM Lists?
14     A.  They're a list company.
15     Q.  What's a list company?
16     A.  They provide lists for mailings for a
17 lot of direct marketing groups that do mass
18 mailings.
19     Q.  What was your position at KM Lists?
20     A.  Primarily I worked with gathering the
21 lists, assembling some of the work orders that
22 would come through from various clients, whether
23 it be a university or a doctor's office or whoever
24 their client list was, and process the list

## Page 29

1  through.  And process the list meaning I would
2  gather the information and then provide the list
3  back to them.
4      Q.  After leaving KM Lists, was your
5  first position back at Commerce?
6      A.  No, it was not.  I totally forgot.  I
7  was trying to remember my years.  I worked at a
8  company called CMEinfo.
9      Q.  CMEinfo?
10     A.  Correct.  And they were a medical --
11 oh, go ahead.
12     Q.  Let me ask you a question.  What was
13 the time period during which you worked at
14 KM Lists?
15     A.  That was only -- I didn't return
16 after my pregnancy, and I found out I was pregnant
17 just when I started the job, so it would have been
18 less than a year.
19     Q.  Can you tell me when you stopped, if
20 you can remember?
21     A.  I don't recall the exact date.
22     Q.  But it was sometime prior to your
23 pregnancy?
24     A.  It had to be prior to delivery, which

Case 1:09-cv-01062-RBK-AMD   Document 79-4   Filed 09/17/10   Page 10 of 31 PageID: 4294

MWANTEMBE et al vs. TD BANK, N.A., et al                    4-1-10    LISE L. MONGIOVICH

9  (Pages 30 to 33)

| Page 30 | Page 32 |
|---|---|
| 1  was in October, so it would had to have been in... | 1  tchotchkes?  The giveaways, you know, the |
| 2  Q.  October of what? | 2  specialty items that were used for either customer |
| 3  A.  '97. | 3  promotions or some internal promotion giveaway. |
| 4  Q.  Okay.  That's good enough for me. | 4  Q.  Like the little TD Bank free piggy |
| 5  A.  Okay. | 5  bank that you can -- that I've seen around my |
| 6  Q.  So then you took a few years off? | 6  office? |
| 7  A.  Yes. | 7  A.  The little TD Bank -- the coin banks? |
| 8  Q.  And then you started at CMEinfo? | 8  Q.  Yes.  Yes. |
| 9  A.  Uh-huh. | 9  A.  Yes.  I didn't work on that, but |
| 10  Q.  When did you start at CMEinfo? | 10  something along those lines. |
| 11  A.  I believe it was around 2000.  It | 11  Q.  Something along those lines. |
| 12  would be around 2000.  I don't know the exact | 12       Now, you said you investigate? |
| 13  date. | 13  A.  Well, we would research what items |
| 14  Q.  That's fine.  What is CMEinfo? | 14  are out there.  There are promotional companies |
| 15  A.  They're a medical education company. | 15  that have various items. |
| 16  They work with -- | 16  Q.  Okay. |
| 17  Q.  CME, continuing medical education? | 17  A.  We would go to T shirt companies to |
| 18  A.  Correct, there you go. | 18  see what kind of T shirts they have.  We would go |
| 19  Q.  Sorry.  My wife's a doctor; I should | 19  to bag companies and see what kind of bags they |
| 20  have known that. | 20  have.  So it would be research in the sense that |
| 21  A.  Oh, really? | 21  we would see what's available out there for a |
| 22  Q.  Yeah.  Did you just help with | 22  particular cost, particular quality, particular |
| 23  marketing with them, as well? | 23  colors. |
| 24  A.  Marketing, right.  They primarily did | 24  Q.  Other than the little tchotchkes, |

| Page 31 | Page 33 |
|---|---|
| 1  a lot of direct marketing projects since they | 1  what other projects or what other items would you |
| 2  would promote their taped classes that they | 2  have worked on as ad specialties manager? |
| 3  videotaped, say, through the Mayo Clinic and | 3  A.  That would have been primarily my |
| 4  various other established medical organizations. | 4  role since that's what it was focused on. |
| 5  Q.  Did you work for anyone in between | 5  Q.  So no advertisements, no -- |
| 6  CME and being back at Commerce? | 6  A.  No. |
| 7  A.  No. | 7  Q.  Okay.  No press releases? |
| 8  Q.  So you started back in Commerce at -- | 8  A.  No. |
| 9  in 2002? | 9  Q.  None of that stuff? |
| 10  A.  Uh-huh. | 10  A.  No. |
| 11       Yes. | 11  Q.  Okay.  How long were you the ad |
| 12  Q.  I'm just as bad as you are. | 12  specialties manager at Commerce? |
| 13       What was your position at | 13  A.  I want to -- as I recall, it was a |
| 14  Commerce in 2002? | 14  year, and then I transferred to -- still within |
| 15  A.  I started in ad specialties.  I would | 15  marketing, I took over for someone's position, |
| 16  have been an ad specialties manager I believe the | 16  they had asked me to take over the sales promotion |
| 17  title was called. | 17  manager position. |
| 18  Q.  What does an ad specialties manager | 18  Q.  So you became sales promotion manager |
| 19  do? | 19  sometime in 2003? |
| 20  A.  I would investigate and research and | 20  A.  Yes. |
| 21  develop what you call the little tchotchkes, the | 21  Q.  As sales promotion manager what were |
| 22  bags... | 22  your roles and responsibilities? |
| 23  Q.  I don't call them little tchotchkes. | 23  A.  It actually went back to more of the |
| 24  A.  You don't call them little | 24  advertising and marketing role; working with |

## Page 34

1  various lines of business, coordinating the
2  different elements to produce promotional
3  collateral again. So it was very much what I had
4  done earlier in '96.
5      Q.  How long were you the sales promotion
6  manager?
7      A.  I still am to some degree, the title
8  has just changed with the merger.
9      Q.  So your duties today --
10     A.  My duties today are more focused in
11 on print production and merchandising.
12     Q.  What is your current -- you said the
13 titles have changed?
14     A.  The titles have changed. So now I am
15 called a senior marketing communications manager.
16     Q.  Can you run me through the titles?
17 How many have there been?
18     A.  I honestly -- the only two that I
19 know of are sales promotion -- oh, ad specialties
20 was the first one.
21     Q.  Yes.
22     A.  Sales promotion manager.
23     Q.  Yes.
24     A.  And then recently it was changed to

## Page 35

1  senior marketing communications manager.
2      Q.  And your duties as senior
3  marketing -- when did you become senior marketing
4  communications?
5      A.  I don't know the exact date that the
6  titles changed. It was an HR change, so I don't
7  know exactly what date they were, but it would
8  have to be since -- it was after the merger.
9      Q.  And the merger was in '08?
10     A.  The legal day merger was June 1 of
11 '08.
12     Q.  You said your roles have changed a
13 little bit. Run me through your duties as senior
14 marketing communications manager.
15     A.  I oversee the print production and
16 the merchandising.
17     Q.  What is print production?
18     A.  Print production is anything having
19 to do with getting materials printed and produced
20 for the company relative -- marketing materials, I
21 should preface that. So I would work -- I would
22 receive files from a project manager or marketing
23 team lead, once they have gone through their
24 responsibility and their approvals, and I would

## Page 36

1  bid out a job with various vendors and award the
2  job to one vendor, and receive proofs and give
3  them instructions for delivery.
4      Q.  And you said you also work on
5  merchandising.
6      A.  Merchandising is the in-store
7  signage. So posters, door trans, which are the
8  materials that go into light boxes. It could be
9  window clings. It could be banners. Any large
10 end marketing signage.
11     Q.  Other than print production and
12 merchandising, what else?
13     A.  That's where my focus is right now.
14     Q.  I'm going to focus a little bit on
15 the gift card program, if that's okay.
16     A.  Uh-huh.
17     Q.  When did your involvement with the
18 gift card program start or when was your first
19 involvement with the gift card program at Commerce
20 or TD Bank?
21     A.  It would have been around the same
22 time that the program started for the public in
23 2004.
24     Q.  And in 2004, you were sales promotion

## Page 37

1  manager?
2      A.  Correct.
3      Q.  Relative to the gift card program, as
4  I understand it, you would get an order for
5  merchandising or print material or some sort of
6  marketing material from the bank, and you would
7  then --
8      A.  I'm not understanding.
9      Q.  I could tell by the look on your face
10 you have no idea what I'm talking about.
11         As I understand it, you're sort
12 of a liaison between the bank and the outside ad
13 agencies. Is that fair?
14     A.  To some degree, yes.
15     Q.  Okay.
16     A.  Go ahead. Are you going to finish
17 your question?
18     Q.  No, you can explain.
19     A.  The difference -- if there was an
20 item that was requested to be printed and
21 designed, I would get that information, I would
22 get as much information as I could, and very
23 similar to before, would then provide that
24 information to the ad agency. There are the times

70895bd7-fe03-4a8d-9960-235f7e6cf598

Case 1:09-cv-01062-RBK -AMD   Document 79-4   Filed 09/17/10   Page 12 of 31 PageID: 4296
MWANTEMBE et al vs. TD BANK, N.A., et al        4-1-10    LISE L. MONCRIEVICH

11 (Pages 38 to 41)

## Page 38

1  we might have used the in-house design group that
2  we had at that time, and they would come up with
3  layouts to review. So yes, a liaison would be a
4  good word for it.
5      Q.  Okay. So who -- in 2004, when the
6  gift card program began and you were the sales
7  promotions manager, who in the bank would have
8  contacted you regarding your roles around the
9  gift card program?
10     A.  I worked with Dan Goldman.
11     Q.  Anyone else?
12     A.  He was -- he had just started
13  developing the program, so he would have been the
14  only contact at that particular time to
15  initiate -- to get information from to initiate a
16  job.
17     Q.  Okay. Do you remember how you got
18  involved in the gift card program?
19     A.  That just fell under my line of
20  responsibility. It was one of the lines of
21  business that was under my umbrella.
22     Q.  I mean specifically, Dan Goldman
23  either called you or sent you an email?
24     A.  He was in the same department as I

## Page 39

1  was, we were in the same location. It would have
2  been a one-on-one meeting.
3      Q.  Do you remember -- was it a
4  one-on-one meeting?
5      A.  It may have been. I don't recall.
6      Q.  Do you remember anything about first
7  becoming aware of the gift card program and having
8  to do work on it, I guess?
9      A.  I'm not sure I understand about being
10  aware. We would have had some kind of
11  conversation, and we would have begun work on
12  developing -- the first piece, if I recall
13  correctly, was the first trifold.
14     Q.  What was your involvement with the
15  first trifold?
16     A.  I would gather the information.
17     Q.  Let me interrupt you. You would
18  gather the information from Goldman?
19     A.  Dan would provide content that he
20  would like to see within the piece as well as the
21  terms and conditions, and I would provide that to
22  in this case it was our agency.
23     Q.  Your in-house agency?
24     A.  No, our external agency.

## Page 40

1      Q.  And who was that?
2      A.  Tierney and Partners.
3      Q.  Go ahead.
4      A.  And then with that information, they
5  would come up with some kind of design and layout
6  option for Dan as well as other marketing
7  representatives to review.
8      Q.  Other than Dan, who else would review
9  these?
10     A.  Dan's supervisor was Kevin Barry.
11     Q.  Okay.
12     A.  My supervisor would have reviewed it,
13  who is Allegra Sandelli. And typically, since it
14  was a new program, our director of marketing would
15  also have reviewed it, who was John Cunningham.
16     Q.  Other than Dan Goldman, Kevin Barry,
17  Allegra Sandelli, and John Cunningham, anyone
18  else?
19     A.  Not that I recall.
20         I should say compliance most
21  likely would have seen it, but I can't guarantee
22  that that happened in the course of that
23  particular piece.
24     Q.  What's compliance?

## Page 41

1      A.  Compliance is our -- compliance is
2  our legal review?
3      Q.  What do you understand -- I'm sorry,
4  I didn't mean to interrupt.
5      A.  I guess that's the closest comparison
6  I can think of.
7      Q.  What do you understand compliance's
8  role to be?
9      A.  To review materials to make sure that
10  whatever we state is correct and acceptable and
11  permitted to be used.
12     Q.  I understand "correct," but I don't
13  understand acceptable or permitted. Do you mean
14  acceptable or permitted under the law or under
15  some sort of --
16     A.  Whatever guidelines that they would
17  follow, yes.
18     Q.  Outside guidelines, not internal?
19     A.  Correct. Correct.
20     Q.  Did you conduct any review to ensure
21  that the materials were compliant with either
22  outside guidelines or -- at any time?
23     A.  On some instances I did. For
24  instance, with our posters, when we did posters

Case 1:09-cv-01062-RBK-AMD   Document 79-4   Filed 09/17/10   Page 13 of 31 PageID: 4297
MWANTEMBE et al vs. TD BANK, N.A., et al          4-1-10          LISE L. MONCHOVICH

12  (Pages 42 to 45)

| Page 42 | Page 44 |
|---|---|

**Page 42**

1  and window cling signage, I would do that.
2      Q.   Posters and window cling signage
3  relative to the gift card program?
4      A.   Correct.
5      Q.   When was this?
6      A.   It could -- it was done over the
7  course of time when we had new creative that was
8  developed for a campaign.
9      Q.   Did you review the posters and the
10  window clings for compliance throughout the entire
11  gift card program or was it only specific ones
12  or...
13      A.   As it was -- as we were promoting the
14  campaign. It wasn't a continuous promotion
15  throughout the year. We primarily did it in the
16  spring and the holiday season.
17      Q.   But my question is for any new signs
18  or window clings, would you take the role of
19  making sure that they were compliant with the law
20  or guidelines?
21      A.   Typically, yes.
22      Q.   What law or guidelines would you
23  ensure that the signage was compliant with?
24      A.   I would only forward it on to

**Page 43**

1  compliance for their review and accept their
2  approval as being correct.
3      Q.   Okay. So you wouldn't personally --
4      A.   I would never have done it
5  personally.
6      Q.   I understand. You didn't do it
7  personally --
8      A.   No.
9      Q.   -- you would be the one who sent it
10  to compliance.
11      A.   Exactly.
12      Q.   And get their answer back.
13      A.   Exactly.
14      Q.   Okay. I'm glad I misunderstood you,
15  because that was going to make the deposition
16  a lot longer.
17      A.   I'm not a lawyer.
18      Q.   Okay. Other than Dan Goldman, Kevin
19  Barry, Allegra Sandelli, John Cunningham, and
20  compliance, anyone else who would review?
21      A.   No, not that I recall.
22      Q.   How would you -- in what format would
23  you get the information that the bank, I guess
24  being Dan Goldman, wanted in whatever you were

**Page 44**

1  going to produce?
2      A.   For the terms and conditions he
3  typically sent, obviously, an electronic document.
4      Q.   An email?
5      A.   Uh-huh.
6      Q.   What about for things other than the
7  terms and conditions?
8      A.   It would have been a discussion.
9      Q.   Do you keep records of your
10  discussions?
11      A.   No.
12      Q.   But you keep your emails?
13      A.   From back then, back in 2004? I
14  probably don't have those emails anymore. I would
15  have had -- I would have made printouts. I would
16  have probably printed some of them out so I could
17  have them in the file, which I did actually do.
18      Q.   And you produced all of those to your
19  counsel?
20      A.   Yeah.
21          MR. HARVEY:   Object to the form
22  of the question. All of what?
23          MR. LALLI:   All of these
24  printouts that we're speaking about.

**Page 45**

1          THE WITNESS:   Whatever I had
2      printed out that was in the file, I would
3      have provided.
4  BY MR. LALLI:
5      Q.   Okay. To counsel?
6      A.   Yes.
7      Q.   I did see one email from you saying,
8  what was it, "Thank god I keep everything," or
9  something to that effect.
10      A.   I keep as much as I can. It may not
11  be everything, but...
12      Q.   Okay. So the terms and conditions
13  would have come in an email. And he would just
14  send you an email saying, "This is the terms and
15  conditions I want," and it would be attached to
16  the email that you would then forward that to the
17  ad agency? Is that fair?
18      A.   That's fair enough, yeah. I can't
19  remember the exact sequence, but that would have
20  been -- because the terms were rather lengthy.
21      Q.   Would you review the terms before
22  they were sent to the ad agency?
23      A.   No.
24      Q.   Would you review the terms when they

MWANTEMBE et al vs. TD BANK, N.A., et al          4-1-10          LISE L. MONCILOVICH

13 (Pages 46 to 49)

| Page 46 |
|---|

1 were sent back to you from the ad agency?
2     A.   For proofing purposes, yes.
3     Q.   Proofing meaning editing?
4     A.   Any kind of typos, grammatical,
5 punctuation.
6     Q.   But nothing content-wise?
7     A.   No.
8         MR. LALLI:  Let me mark this as
9 Moncilovich-1.
10        (Discussion held off the
11 record.)
12        (Document received and marked
13 for identification Plaintiffs' Exhibit
14 Moncilovich-1, Documents Bates-stamped
15 number TD001194 through TD001197,
16 consisting of 4 pages.)
17 BY MR. LALLI:
18    Q.   Miss Moncilovich -- or
19 Mrs. Moncilovich, I apologize.
20    A.   Ms.. That's fine.
21    Q.   What I've put in front of you is a
22 document that's been produced to us by the bank's
23 counsel. It's Bates numbers TD001194 through
24 TD001197. Now, I understand this may not be the

| Page 47 |
|---|

1 terms and conditions that we were speaking of.
2     A.   Okay.
3     Q.   Do you know who made these edits?
4     A.   I don't.  It doesn't look like my
5 handwriting, so I honestly don't know.
6     Q.   When you said you would proof terms
7 and conditions for grammatical errors, is this the
8 sort of thing you would do?
9     A.   Correct.
10    Q.   And then you would forward this to --
11 when I say "this," the copy with your edits on it,
12 would you forward this to someone at the bank or
13 would you send it right back to the ad agency for
14 them to make corrections?
15    A.   It would depend.  If this came -- I'm
16 not sure where this came from, but...
17    Q.   And I'm not speaking specifically
18 about this document; I'm speaking generally.  You
19 said the terms and conditions you would proof for
20 edits.
21    A.   Right.  But I wouldn't send it back
22 for re-correcting until other people had seen it.
23    Q.   Other people within the bank?
24    A.   Correct.  So, in other words, I

| Page 48 |
|---|

1 wouldn't have sent it back if Dan hadn't seen it
2 and reviewed it again, since you wouldn't want to
3 make a change -- and then he makes a change, and
4 send it back; we'd want to be as concise at one
5 time as we could.
6     Q.   Other than Dan, who would review your
7 edits to terms and conditions?
8     A.   I don't recall anyone else, since Dan
9 was definitely the one personally overseeing the
10 terms and conditions.
11    Q.   So Dan was the go-to guy when it came
12 to terms and conditions?
13    A.   For most -- for the beginning of the
14 program especially, yes.  And then later on,
15 legal, as we -- when Dan had left the company,
16 then I had actually worked with legal.
17    Q.   Is legal Richard Berman?
18    A.   Yes, for his review.
19        MR. LALLI:  All right, let's
20 take a quick lunch break.
21        (At this time, a lunch recess
22 was taken.)
23 BY MR. LALLI:
24    Q.   Ms. Moncilovich, can you please -- I

| Page 49 |
|---|

1 understand that you want to add to a response that
2 you made earlier and clear something up.
3     A.   For people that I had talked to or at
4 least corresponded with relative to materials that
5 I was coordinating for this particular case, I had
6 also provided materials to Pattie Gallant from
7 TD Banknorth, who was assembling that information
8 initially.
9     Q.   You provided materials to Pattie or
10 she provided them to you?
11    A.   I provided them to Pattie.
12    Q.   And what did you provide to Pattie?
13    A.   They would have been PDFs, copies of
14 various kinds of collateral from -- it could be
15 posters, newspaper advertising, some of the
16 gift card designs that we had over the years.
17    Q.   And you did this in response to a
18 request from Pattie?
19    A.   Correct.
20    Q.   What did her -- what was the form of
21 her request?  Was it an email, a telephone call?
22    A.   I don't recall offhand.  It could
23 have been both.
24    Q.   Okay.  And it was just, "Hey, give me

| Page 50 | Page 52 |
|---|---|

**Page 50**

1 what you have," or was there anything substantive?
2    A.   If I could collect materials.
3    Q.   When did this request and then the
4 production to Pattie occur?
5    A.   It was sometime around January of
6 '09.
7    Q.   I appreciate that.
8    A.   It just makes you think. Sometimes
9 you have so many thoughts going on in your head,
10 you don't remember everything right away.
11    Q.   I completely understand.
12        When we left prior to lunch, we
13 were speaking about the terms and conditions and
14 who you would get information from and that sort
15 of thing. Now, you said in the beginning, Dan
16 Goldman was the source of the terms and
17 conditions.
18    A.   Correct.
19    Q.   Was he also the source of the
20 disclosures that were located on the back of the
21 card?
22    A.   Yes.
23    Q.   Was he also the source of the writing
24 on the actual trifold, itself?

**Page 51**

1    A.   The promotional content? The
2 promotional -- if you're referring to promotional
3 content, he would have given us some indication of
4 what he would liked to have seen, but he wouldn't
5 have been the actual copywriter unless there was
6 something specific that he wanted to incorporate
7 within that.
8    Q.   Who would have been the copywriter?
9    A.   It would have been someone from the
10 agency.
11    Q.   Someone from the outside ad agency?
12    A.   Yes.
13    Q.   You mentioned you had an internal ad
14 agency, as well, or internal --
15    A.   It was just an internal design group.
16 We have in-house designers.
17    Q.   Okay. What is the name of their
18 department?
19    A.   In-house design. I don't know if
20 there was a formal name. The design group.
21    Q.   Would you liaise between Goldman and
22 whoever and the internal design group in the same
23 ways in which you would liaise between Goldman and
24 whoever and the outside groups?

**Page 52**

1    A.   For different projects?
2    Q.   For -- how about the gift card
3 program?
4    A.   The gift card program, as I recall,
5 was mostly with the agency. We never did anything
6 in-house especially in the initial beginning that
7 I recall.
8    Q.   Do you remember if the internal
9 design group did any work at all with the
10 gift card program at any time?
11    A.   They did. They had -- there was a
12 designer that would provide design options for our
13 holiday card creative. Design.
14    Q.   Who was that?
15    A.   It could -- it may have been a few of
16 them. I know that a woman named Heather Cairns,
17 C-A-I-R-N-S, did some creative design, and I'm not
18 sure if anybody else did.
19    Q.   All right. Now, would the decision
20 be made or who makes the decision as to whether or
21 not to use an outside agency or the in-house
22 design group?
23    A.   It would have been the scope of what
24 the project would have entailed. So if it was a

**Page 53**

1 project that had a lot of legs to it where we
2 needed copywriting, we wanted a much more detailed
3 look, something that needed to be built, then we
4 would have the agency do it, since they had the
5 resources for hiring the copywriter, assembling a
6 lot of it in-house, versus our design group, which
7 is really much more production work, quick and
8 dirty. Though we have designers that can come up
9 with different creative looks for pieces, they
10 weren't an all inclusive in the sense they don't
11 place advertising; it's strictly production.
12    Q.   Who would that make that decision?
13 When I say "that decision," I mean the decision to
14 use in-house versus --
15    A.   Generally my manager, Allegra
16 Sandelli.
17    Q.   Okay. When the design group would
18 produce things, would it go through the same
19 approval process as items produced by the outside
20 agencies?
21    A.   There would still be a contact
22 person, so I -- if I were doing something with the
23 design group, yes, I would still -- they would
24 still provide it to me, and it would still be

MWANTEMBE et al vs. TD BANK, N.A., et al          4-1-10   LISE L. MONCIZOVICH

15  (Pages 54 to 57)

## Page 54

1  provided to Dan to review, and then Allegra and
2  John, as well.  Unless -- that's not to say that
3  Dan may not have gone to a designer direct to ask
4  if they could come up with some card designs.  So,
5  for instance, the holiday card, he may have gone
6  to Heather Cairns and said, "We need to start
7  coming up with some options, some looks."
8      Q.  He may have skipped you?
9      A.  He may have skipped me.
10     Q.  Okay.
11     A.  Absolutely.
12     Q.  Now, you said Dan Goldman was the
13 sort of go-to guy in the beginning at least.
14     A.  For the program --
15     Q.  For the program.
16     A.  -- he was always the go-to guy.
17     Q.  Always, from --
18     A.  As far as my experience was
19 concerned, yes.
20     Q.  When did Dan leave the company?
21     A.  I don't know the exact date that he
22 left.
23     Q.  Do you know who took over that role
24 after he left?

## Page 55

1      A.  I don't believe there was anybody who
2  took over that role.
3      Q.  After he left, who was your point
4  person for the gift card program?  When I say --
5  Let me clear that up.  When I say "your point
6  person," I mean the person who did the same things
7  that Dan did in terms of coming to you for --
8      A.  Well, the gift card program at that
9  point was more maintenance than it was new
10 development.
11     Q.  Okay.
12     A.  So when Dan had left, and I don't
13 remember the exact date, I would still have been
14 involved in reprinting -- if we needed new
15 reprints, so if there were terms and conditions, I
16 probably would have been most -- I really was the
17 point person to some degree to funnel through to
18 legal for terms and conditions review and funnel
19 through my supervisor for any creative review.
20     Q.  Where would those terms and
21 conditions come from?
22     A.  They were a pick-up of the existing
23 ones that were already in place.
24     Q.  Okay.  So they wouldn't come from any

## Page 56

1  person; you just had them because they were used
2  previously?
3      A.  They were the current ones that were
4  still in play.
5      Q.  What about changes made to the terms
6  and conditions, who would make those changes?
7      A.  It would have to have been legal if
8  there was any kind of recommended changes to be
9  made.
10     Q.  Did you have any input, any input at
11 all into the terms and conditions of the card?
12     A.  No.
13     Q.  Any input at all -- let me rephrase
14 that.  Other than you proofreading them, did you
15 have any input in the terms and conditions of the
16 cards?
17     A.  No.
18     Q.  Did you have any input in the
19 disclosures located on the back of the card?
20     A.  No.
21     Q.  Did you have any input -- and these
22 questions are encompassing at any time.  Do I need
23 to reask those questions?
24     A.  I'm not sure what mean by

## Page 57

1  encompassing.
2      Q.  When I say did you have any input, I
3  mean at any point in time did you have any input
4  in the terms and conditions of the gift cards.
5      A.  In the language that is on the back
6  of the terms and conditions?
7      Q.  In the language of the terms and
8  conditions.
9      A.  No.
10     Q.  At any point in time, did you have
11 any input in the disclosures located on the back
12 of the card?
13     A.  No.
14     Q.  At any point in time, did you have
15 any input in any of the language located on any
16 advertisements, either posters, store fliers, any
17 advertisements for gift cards?
18     A.  Not as far as determining what the
19 final language would be, no.
20     Q.  Tell me what your input would be,
21 because it seems like you qualified that a little
22 bit.
23     A.  Well, in later programs, for instance
24 when Dan was gone, there are certain key elements

## Page 58

1  and concepts that we always wanted to reiterate on
2  a poster, so it became standard, we knew what the
3  main elements would be.  I mean it was always free
4  to purchase, it was always accepted everywhere
5  Visa debit is accepted, it was available in 25 to
6  $500 denominations, it was eloquently gift boxed.
7  So they were the primary key concepts that we
8  would always pick up if we were doing, say, a
9  holiday poster, and it really didn't deviate from
10  that through the years that I can recall.
11     Q.   Who came up with those key -- points,
12  did you call them?
13     A.   Concept points, key concept points?
14     Q.   Yes.  Who came up with those?
15     A.   It would be hard to say.  It could
16  have been a collective effort of various people
17  whether it be Dan, Kevin, Allegra, John, the
18  agency.  It was most likely a collective
19  consensus.  I couldn't tell you for sure.
20     Q.   Did you have any input into coming up
21  with any of those key concept --
22     A.   Points?
23     Q.   -- points?
24     A.   No.

## Page 59

1     Q.   No.  Okay.  Did you have any input at
2  any time into what the gift card packaging was
3  going to look like?
4     A.   No.
5     Q.   Did you have any input at any time
6  into how the gift card transaction was going to
7  work in the banks, themselves?
8     A.   No.
9     Q.   And I assume you also had no input --
10  did you have any input in the training materials
11  regarding the gift card program that the bank
12  would put out?
13     A.   No.
14     Q.   So Dan's gone.  Today, who do you
15  report to with issues specific to the gift card
16  program?
17     A.   I'm not as involved with the
18  gift card program anymore since that now is
19  handled through our -- through Leigh Fulda, who
20  had project managed the -- any materials that we
21  needed for that program.  So my involvement is
22  much -- has really stepped back from the
23  gift card, itself.
24     Q.   What is your involvement today?

## Page 60

1     A.   Basically the production of the final
2  materials and fulfillment of them.
3     Q.   When you say, "Production of the
4  final materials and fulfillment of them," can you
5  just tell me what that means?
6     A.   I would get the files.  I would work
7  with the vendor to produce them, the correct
8  weight, the correct size, package them correctly,
9  get them to the branches, communicate where to
10  post them in the branches, and designate where in
11  the branch they are to go.
12     Q.   But you wouldn't have any input in
13  the content --
14     A.   No.
15     Q.   -- of any of this stuff?
16     A.   Not today, no.
17     Q.   You said Leigh Fulda is the person
18  who now sort of does that?
19     A.   She project manages the debit card,
20  which this falls under.
21     Q.   "This" being the gift card program?
22     A.   Yes.
23     Q.   When did the switch occur between you
24  and Leigh?

## Page 61

1     A.   I don't know if there was an official
2  date, but conceivably when we all converted to
3  TD Bank, which was September of '09.
4     Q.   '09?
5     A.   Are we in '10?  Yes, '09.
6     Q.   So a year after the merger?
7     A.   Yes.
8     Q.   Does Leigh report to you?
9     A.   No.
10     Q.   Who reports to you specifically
11  related to the gift card program?
12     A.   No one reports to me specifically for
13  the gift card program.  I have two print buyers
14  that report to me and a merchandising manager that
15  reports to me.
16     Q.   Who are they?
17     A.   One is Patricia Hymer, H-Y-M-E-R.
18     Q.   And what is her position?
19     A.   She is a print production specialist.
20  I believe that's the correct title.
21     Q.   And you said there were two print
22  people.  Who was the other print person?
23     A.   Nicole Fioravanti,
24  F-I-O-R-A-V-A-N-T-I, and she has the same position

70895bd7-fe03-4a8d-9960-235f7e6cf598

Case 1:09-cv-01062-RBK-AMD   Document 79-4   Filed 09/17/10   Page 18 of 31 PageID: 4302
MWANTEMBE et al vs. TD BANK, N.A., et al          4-1-10       LISE L. MONCRIEVICH

17 (Pages 62 to 65)

## Page 62

1  title.
2     Q.   And who's the other person?
3     A.   Derrick Green.  He's a merchandising
4  manager.
5     Q.   And these three people report to you
6  for --
7     A.   Production and merchandising.
8     Q.   And some of that includes the
9  gift card program?
10    A.   If we were printing relative --
11 something relative to the program, yes.
12    Q.   I want to focus on the disclosures on
13 the backs of the cards.
14    A.   Okay.
15    Q.   We've been produced or the defendants
16 have produced a number of documents in this
17 matter, and they evidence that certain changes
18 took place in the disclosures on the back of the
19 cards.  Is that a fair --
20    A.   Over the years?
21    Q.   Over the years, yeah.  Is that a fair
22 representation?
23    A.   Yes.
24    Q.   Okay.  Do you know who drafted the

## Page 63

1  initial disclosures, the disclosures that were
2  used first way back in -- with Commerce Bank?
3     A.   I do not.
4     Q.   Do you know which department those
5  disclosures would have come from?
6     A.   I do not.
7     Q.   Going forward, who would have made
8  changes to those disclosures?
9     A.   I would have received changes from
10 Dan.  Who he consulted, I couldn't verify.
11    Q.   Who do you think he would have
12 consulted?
13    A.   Legal.
14    Q.   Anyone else or any other department?
15    A.   I would only be speculating.  I have
16 no clue.
17    Q.   Okay.  Other than Dan Goldman and
18 maybe legal, who else would have been responsible
19 for changes?
20    A.   I don't know.
21    Q.   Since Dan left, have there been any
22 changes to the disclosures on the backs of the
23 cards?
24    A.   When Rich Berman had been reviewing

## Page 64

1  some of the current terms, there were slight
2  changes and modifications that were made.
3     Q.   And Rich Berman's with legal?
4     A.   Correct.
5     Q.   So as far as you know, the only
6  changes made to the disclosures came from Dan
7  Goldman and legal?
8          MR. HARVEY:  Objection.  She
9     said they were made during the time that
10    Rich Berman was reviewing it.  She didn't
11    necessarily say they came from legal.
12         MR. LALLI:  Okay.
13 BY MR. LALLI:
14    Q.   Did those changes come from legal?
15         MR. HARVEY:  I'm going to
16    object to the form of the question.  That's
17    really getting into attorney-client
18    privilege.
19         MR. LALLI:  I'm trying to stay
20    away from that.
21         MR. HARVEY:  I'm going to
22    instruct you not to answer that.
23 BY MR. LALLI:
24    Q.   Any changes to the terms and

## Page 65

1  conditions come from anyone other than Dan Goldman
2  and from the legal department that you know?
3     A.   Not that I know of, no.
4     Q.   What about changes to the terms and
5  conditions?
6     A.   It would be the same.
7     Q.   Dan Goldman and legal?
8     A.   Uh-huh.
9          Yes.
10    Q.   Do you know who formulated the
11 initial terms and conditions?
12    A.   I do not.
13    Q.   What's the purpose of the gift card
14 advertisements?
15         MR. HARVEY:  Object to the form
16    of the question.
17 BY MR. LALLI:
18    Q.   Why do you advertise for gift cards?
19    A.   So that customers know that we have a
20 product to provide to them.
21    Q.   Is one of the purposes to increase
22 the sale of gift cards?
23    A.   Well, any kind of marketing would
24 obviously be to promote a product that we have,

Case 1:09-cv-01062-RBK-AMD   Document 79-4   Filed 09/17/10   Page 19 of 31 PageID: 4303

MWANTEMBE et al vs. TD BANK, N.A.; et al          4-21-10     Lisa C. MORAGOVICH

18  (Pages 66 to 69)

| Page 66 | Page 68 |
|---|---|
| 1  and if the end result is the -- more sale of it,<br>2  then yes, I would say that would be an accurate<br>3  statement.<br>4      Q.   That would be a goal of the<br>5  advertising?<br>6      A.   Absolutely.<br>7      Q.   Is it important to avoid<br>8  advertisements that are misleading?<br>9          MR. HARVEY:  Object to the form<br>10      of the question.<br>11  BY MR. LALLI:<br>12      Q.   You can answer the question, if you<br>13  understand it.<br>14      A.   Can you be a little clearer?  Is it<br>15  important?  Is it important to whom?<br>16      Q.   Is it -- we'll start with the bank<br>17  first.  Is it important for the bank to avoid<br>18  putting out advertisements that may be misleading<br>19  to consumers?<br>20      A.   My personal opinion, it would say<br>21  yes, it's important, but I think that's more of an<br>22  opinion, then I obviously can't speak for the<br>23  bank.<br>24      Q.   Sure.  I understand that.  Why do you | 1  question?  It seemed like -- it was important to<br>2  whom?  I don't think you clarified who it was<br>3  important to.<br>4      Q.   Yeah, that was my question.  Now, do<br>5  you think it's important for consumers to be able<br>6  to understand an advertisement?<br>7          MR. HARVEY:  I'm going to<br>8      object.  You're just asking her her<br>9      personal opinions here?<br>10          MR. LALLI:  Sure.<br>11          MR. HARVEY:  I object on the<br>12      grounds it's not relevant.<br>13          Go ahead, you can answer.<br>14          THE WITNESS:  I mean, again, it<br>15      is, it's all personal opinion.<br>16          MR. LALLI:  Okay.<br>17          THE WITNESS:  Do I think it's<br>18      important that a consumer understand an ad?<br>19      It is important to them to understand the<br>20      ad.<br>21  BY MR. LALLI:<br>22      Q.   Your current position is?<br>23      A.   Senior marketing communications<br>24  manager. |

| Page 67 | Page 69 |
|---|---|
| 1  think it's important for the bank to avoid<br>2  misleading advertisements?<br>3          MR. HARVEY:  Object to the form<br>4      of the question.<br>5  BY MR. LALLI:<br>6      Q.   You can answer the question.<br>7      A.   Can you repeat it?<br>8      Q.   Sure.  You just said that in your<br>9  personal opinion it's important for the bank to<br>10  avoid advertisements that may mislead consumers.<br>11      A.   Uh-huh.<br>12      Q.   Why do you think that?<br>13      A.   Again, it's going to be something<br>14  that is speculative relative to my opinion, but<br>15  any business, whether it be the bank or not,<br>16  should obviously be as truthful in their<br>17  advertising as they can be.<br>18      Q.   And why is that?<br>19      A.   I feel it makes a fair business<br>20  practice.<br>21      Q.   I guess you misunderstood my first<br>22  question where you said for whom, the bank or<br>23  consumers.<br>24      A.   No, I -- what was your first | 1      Q.   Does the clarity -- and when I say<br>2  clarity, I mean -- I don't know what I mean.  The<br>3  understandability of an ad, does that come into<br>4  play at all for you?<br>5      A.   In my position?<br>6      Q.   Yes.<br>7      A.   No.<br>8      Q.   Whose position or who would make<br>9  those determinations as to whether or not an<br>10  advertisement is understandable or clear to the<br>11  consumers?  And I'll start with when the gift card<br>12  program began, and then going forward, if that<br>13  person changed, let me know.<br>14      A.   I don't think -- again, my view is<br>15  that it wouldn't necessarily be any one person; it<br>16  would have to be a group, a collective group,<br>17  including other marketing representatives from the<br>18  director of marketing, you know, to my manager, to<br>19  the product group which in this case would have<br>20  been Dan and Kevin, to make sure that they're<br>21  communicating the information correctly.<br>22          MR. LALLI:  I think it's easier<br>23      if I just go to one of the ads that I have<br>24      a question about.  This will be |

Case 1:09-cv-01062-RBK-AMD   Document 79-4   Filed 09/17/10   Page 20 of 31 PageID: 4304
MWANTEMBE et al vs. TD BANK, N.A., et al          4-1-10          LISE L. MONCILOVICH

19  (Pages 70 to 73)

| Page 70 | Page 72 |
|---|---|
| 1    Moncilovich-2. | 1    A.   Uh-huh. |
| 2         (Document received and marked | 2    Q.   And then below that it says, The |
| 3    for identification Plaintiffs' Exhibit | 3    Commerce Bank Visa Gift Card.  Right? |
| 4    Moncilovich-2, Document Bates-stamped | 4    A.   Yes. |
| 5    number TD000249, consisting of 1 page.) | 5    Q.   And then there are three bullet |
| 6         (Discussion held off the | 6    points to the left, and the first is, FREE, in all |
| 7    record.) | 7    capitals, and it's bold and there's an exclamation |
| 8    BY MR. LALLI: | 8    point after it; is that correct? |
| 9    Q.   What has just been marked as | 9    A.   Yes. |
| 10   Moncilovich-2 is a document produced to us by your | 10   Q.   Can you tell me who decided to use |
| 11   counsel.  It's Bates-stamp TD000249.  Have you | 11   the word free in this advertisement? |
| 12   ever seen this document -- or not this particular | 12   A.   I don't know who made the final |
| 13   document but what this document represents? | 13   decision.  The reference was always free to |
| 14   A.   Yes. | 14   purchase, and obviously, again, it goes back to |
| 15   Q.   Tell me what it is. | 15   the key concepts, there are certain elements we |
| 16   A.   This is a poster that was used for a | 16   always wanted to communicate, and depending on the |
| 17   spring campaign. | 17   medium that we would use, some words would live |
| 18   Q.   And I'm not going to ask you when, | 18   greater than other words would live. |
| 19   but you provided a declaration -- | 19        This obviously was an element |
| 20   A.   I did.  I mean I would have to take a | 20   that they wanted to communicate on this particular |
| 21   look. | 21   piece, because a poster is a very -- it's a |
| 22   Q.   Sure. | 22   walk-by kind of signage, so they want to get an |
| 23   A.   I believe it was around 2005. | 23   immediate attention grabber. |
| 24        Yep, 2005. | 24   Q.   So when you say it's a walk-by kind |

| Page 71 | Page 73 |
|---|---|
| 1    Q.   And this was a poster, you said? | 1    of signage, what you mean by that is a person will |
| 2    A.   Yes. | 2    walk in, see the sign and then walk past it? |
| 3    Q.   Where would this poster have been | 3    A.   Depending on where it's located in |
| 4    placed? | 4    the store, they would walk right past -- they |
| 5    A.   This would have been placed in-store | 5    could walk right past it if they were going to the |
| 6    in one of the merchandising fixtures that would | 6    teller line or if they were going to the customer |
| 7    have been in the store. | 7    service area. |
| 8    Q.   Did you -- do you remember this? | 8    Q.   So sort of like a quick hitter -- |
| 9    A.   Uh-huh. | 9    A.   It's a quick hit. |
| 10        Yes. | 10   Q.   -- type thing like that? |
| 11   Q.   Did you have a hand in this -- I | 11   A.   Yeah. |
| 12   understand you didn't create the document, but did | 12   Q.   I don't think you answered my |
| 13   you have a hand in requesting it from the ad | 13   question.  Maybe your answer was, "I don't know." |
| 14   agency and then funneling it back through and | 14   A.   Who made that final decision?  I |
| 15   getting approval from -- | 15   wouldn't be able to tell you who made the final |
| 16   A.   Requesting that they come up with a | 16   decision.  It would have been approved, again, |
| 17   design for our spring campaign to include the | 17   through a number of people that would have seen |
| 18   introduction, these were new cards at that | 18   this. |
| 19   particular time, new designs that were part of the | 19   Q.   Dan Goldman? |
| 20   greeting card lineup, so I would have requested | 20   A.   Dan would have seen it.  Allegra |
| 21   they incorporate this and develop a poster for use | 21   Sandelli would have seen it.  And I can't verify, |
| 22   for in-store purposes. | 22   but my -- you know, typically John Cunningham |
| 23   Q.   If you look at the top, it says, | 23   would have seen it, as well. |
| 24   Perfect For Any Occasion, in pretty bold print. | 24   Q.   And you would have seen it? |

70895bd7-fe03-4a8d-9960-235f7e6cf598

Case 1:09-cv-01062-RBK -AMD   Document 79-4   Filed 09/17/10   Page 21 of 31 PageID: 4305
MWANTEMBE et al vs. TD BANK, N.A., et al          4-1-10    LISE L. MONCHOUROU

20  (Pages 74 to 77)

| Page 74 | Page 76 |
|---|---|
| 1   A.   I would have seen it, absolutely.<br>2   Q.   But you don't have any approval<br>3  authority or anything like that.<br>4   A.   No.<br>5   Q.   And you didn't come up with the idea<br>6  to use free in all bold?<br>7   A.   No.<br>8   Q.   Were there any discussions that you<br>9  can recall -- when I say discussions, I'm going to<br>10 use that as broadly as I can.<br>11   A.   Okay.<br>12   Q.   That means in-person discussions,<br>13 telephone discussions, email exchanges, regarding<br>14 the use of the word free and whether or not<br>15 that's -- well, let me just -- regarding the use<br>16 of the free, do you remember any discussions about<br>17 that?<br>18   A.   Specifically for the use of that<br>19 word?<br>20   Q.   Or generally for the use of that<br>21 word.<br>22        MR. HARVEY:  In as far as it<br>23    relates to gift cards?<br>24        MR. LALLI:  Yes. | 1  present for the discussion?<br>2   A.   At some discussion.  And, again, I'm<br>3  using it in a more of a broad term --<br>4   Q.   That's fine.<br>5   A.   -- because I can't isolate it to a<br>6  particular incident or a particular day.<br>7   Q.   I completely understand that.<br>8   A.   Okay.<br>9   Q.   What do you remember about these<br>10 types of broad discussions about the use of the<br>11 word free in gift card advertising?<br>12   A.   Nothing that really stood out as<br>13 memorable.  It was the concept.  Again, it goes<br>14 back to the initial concept, key points that we<br>15 wanted to promote, which was free to purchase, 25<br>16 to $500, wherever Visa debit is accepted.<br>17   Q.   Okay.  Now, you said a key point was<br>18 free to purchase.  This doesn't say free to<br>19 purchase.<br>20   A.   It emphasizes -- depending on --<br>21 again, depending on the medium, it emphasize' --<br>22 we emphasize certain key words.  This particular<br>23 piece is what I call a walk-by kind of piece where<br>24 we want an immediate attention grabber. |

| Page 75 | Page 77 |
|---|---|
| 1        THE WITNESS:  Not focusing in<br>2    just on that, that being an element to<br>3    incorporate, I vaguely remember a<br>4    discussion, but it's not something that I<br>5    can say definitely happened for this<br>6    particular piece or any other particular<br>7    piece.<br>8  BY MR. LALLI:<br>9   Q.   What would that -- tell me what you<br>10 remember from that discussion or -- first, who was<br>11 part -- who took part in this discussion?<br>12   A.   It would have been a collective<br>13 group.  Again, it was -- it would have been John.<br>14   Q.   John Cunningham?<br>15   A.   Uh-huh.  Allegra.  Dan.  But whoever<br>16 came up with the final decision of what -- how it<br>17 came, I couldn't tell you.<br>18   Q.   Do you know -- I assume you were also<br>19 part of this discussion.<br>20   A.   Part of it as far as providing input?<br>21   Q.   Sure.<br>22   A.   No.  I wouldn't have provided any<br>23 input.  I may have been sitting in the room.<br>24   Q.   That was my next question.  You were | 1   Q.   Okay.<br>2   A.   So the "free" is in the bullet, and<br>3  then, no purchase fee, is in the disclaimer line.<br>4   Q.   Okay.  And the disclaimer line is way<br>5  at the bottom.<br>6   A.   Uh-huh.<br>7   Q.   It's in the smallest print on the<br>8  poster.  You would agree with me there, right?<br>9   A.   Right.  Even if you see it -- this is<br>10 obviously much more scaled down than you'll see in<br>11 actuality.<br>12   Q.   Sure.  But, regardless, even blown<br>13 up, it's still going to be the smallest print --<br>14   A.   Type size, it will be the smaller of<br>15 the type sizes.<br>16   Q.   The smallest of the type sizes.<br>17   A.   Uh-huh.<br>18   Q.   Correct?<br>19   A.   Yes.<br>20   Q.   Okay.  And you said this is a quick<br>21 hitter type sign, right?<br>22   A.   Uh-huh.<br>23        Yes.<br>24        (Document received and marked |

| Page 78 | Page 80 |
|---|---|

**Page 78**

1  for identification Plaintiffs' Exhibit
2  Moncilovich-3, Document Bates-stamped
3  number TD000713, consisting of 1 page.)
4  BY MR. LALLI:
5      Q.   What's just been marked as
6  Moncilovich-3 is a document that was produced by
7  the bank's counsel.  It's Bates-stamped TD000713.
8  Do you recognize this document?
9      A.   Yes.
10     Q.   Tell me what this document is.
11     A.   This is, if I'm not mistaken, this is
12 the poster for the latest holiday season, for the
13 2009 holiday season.
14     Q.   Feel free to --
15     A.   Can I refer to the declaration?
16     Q.   Sure, you can.  Feel free to refer to
17 the declaration.
18     A.   Thank you.
19          There it is, yeah, poster for
20 2009.
21     Q.   And is this the same type of poster
22 that would be seen in a bank branch that was
23 marked as Exhibit-2?
24     A.   Yes.

**Page 79**

1      Q.   Same size, basically?
2      A.   Size may have varied depending on the
3  fixture that it was going in, and size may also
4  vary in the New England footprint, since they have
5  different fixtures than the Commerce legacy
6  footprint.
7      Q.   Is this a walk-by sign?
8      A.   Same kind of treatment, yes.
9      Q.   Quick hit?
10     A.   (Indicating.)
11          Yes.
12     Q.   Okay, you nodded your head.
13     A.   Yes.
14     Q.   Now, if you look at this sign, it
15 doesn't say free; is that right?
16     A.   Correct.
17     Q.   And instead, in the bottom right
18 there's sort of a ribbon and it says, no purchase
19 fee; is that correct?
20     A.   Yes.
21     Q.   Tell me why.
22     A.   I can't answer that.  I wasn't
23 involved in the design of this particular piece,
24 so I have no input as to why some of the elements

**Page 80**

1  that were chosen for this were chosen.
2      Q.   Who would know why?
3          MR. HARVEY:  Object to the form
4  of the question.
5          THE WITNESS:  Yeah, I can
6  only -- I can only deduce that Leigh Fulda
7  who was the project manager for this
8  particular piece would have better answers.
9  Or clearer answers.
10 BY MR. LALLI:
11     Q.   At what office is Leigh Fulda?
12     A.   In Maine, West Falmouth.
13     Q.   Is it fair to say that you had no
14 input at all -- or I don't even want to say input,
15 because we know that; you had no connection with
16 this, you didn't -- did you ever see this before
17 it went out?
18     A.   I would have seen it before it was
19 sent to the vendor for production, and that's
20 about it.
21     Q.   Okay.  But you don't know why the
22 switch was made from free to no purchase fee?
23     A.   No.
24     Q.   Do you remember any discussions about

**Page 81**

1  making the switch from free to no purchase fee?
2      A.   No.
3      Q.   In your mind -- you said free means
4  no purchase fee, right?  When we go back --
5      A.   It was always the connection.
6      Q.   If we go back to Exhibit-2, the free
7  means no purchase fee?
8      A.   Yes.
9      Q.   In your mind, between Exhibit-2 and
10 Exhibit-3, which is the more clear to the customer
11 about that aspect of the gift card?
12     A.   Well, that's being speculative, I
13 think.
14          MR. HARVEY:  Objection to the
15 form of the question.
16 BY MR. LALLI:
17     Q.   Assume you're a customer for me.
18     A.   If I'm a customer, I'm going to see
19 the one that obviously has less words, and key
20 points that are pronounced on the piece to get my
21 attention.
22     Q.   Okay.  So in your estimation -- and
23 you say that with your marketing experience?
24     A.   I'm saying that --

70895bd7-fe03-4a8d-9960-235f7e6cf598

Case 1:09-cv-01062-RBK -AMD   Document 79-4   Filed 09/17/10   Page 23 of 31 PageID: 4307
MWANTEMBE et al vs. TD BANK, N.A., et al          4-1-10    LISE L. MONCZEWSKI

22  (Pages 82 to 85)

## Page 82

1          MR. HARVEY: Object to the form
2    of the -- I'm sorry, is that a question?
3          MR. LALLI: Yes.
4          MR. HARVEY: Object to the form
5    of the question.
6    BY MR. LALLI:
7      Q.   You can answer the question.
8      A.   Can you repeat the question?
9      Q.   Sure. You said as a customer you're
10   going to see the one with the -- I forget the
11   exact wording, but it sounded like that was coming
12   from some sort of education or experience in
13   marketing. Is that fair?
14         MR. HARVEY: Object to the form
15   of the question. You asked her her
16   experience as a customer what she would
17   expect.
18         MR. LALLI: I understand that.
19   And from her answer I gathered that it came
20   from not just as a customer but from your
21   position or experience or education or
22   something regarding marketing. It just
23   sounded --
24         THE WITNESS: Meaning I'm

## Page 83

1    giving -- I'm talking marketing terms?
2          MR. LALLI: It just struck me
3    as a very -- you know.
4          THE WITNESS: Well, you're --
5          MR. HARVEY: Object to the form
6    of the question. There's no question
7    pending right now. Do you have a question?
8          MR. LALLI: Can you read back
9    her previous answer to me, please.
10         (The court reporter read back a
11   preceding portion of the testimony as
12   directed:
13         "Q.   Assume you're a customer
14   for me.
15         "A.   If I'm a customer, I'm
16   going to see the one that obviously has
17   less words, and key points that are
18   pronounced on the piece to get my
19   attention.")
20   BY MR. LALLI:
21     Q.   Now, that response, why do you think
22   that? That is the broadest way I can ask it.
23         MR. HARVEY: Object to the form
24   of the question.

## Page 84

1    BY MR. LALLI:
2      Q.   Why do you think that the ones with
3    the less words, and key points will get the
4    customer's attention?
5      A.   Well, you're asking me to speculate
6    in many ways. I can give you my personal opinion,
7    again, to say if I'm driving on a street, if I'm
8    driving down a road and I see a billboard, I'm
9    going to see the one word that is the largest on
10   that board and probably will not notice anything
11   else. So the same concept goes for this piece,
12   I'm going to see what attracts my attention first.
13   That's how -- that's what I would pay attention
14   to. That doesn't necessarily mean someone else is
15   going to do that, obviously.
16     Q.   I understand that. And in design and
17   in marketing, are the people coming up with these
18   advertisements aware of that concept that you just
19   expressed?
20         MR. LALLI: Object to the form
21   of the question. You're asking her to
22   testify about the awareness of undefined
23   people who came up with these
24   advertisements?

## Page 85

1          MR. LALLI: I'm asking her to
2    testify about general concepts in marketing
3    and advertising.
4          MR. HARVEY: I don't think you
5    are. I object to the form of the question
6    and this whole line of questioning.
7          THE WITNESS: Yeah, I think
8    you're -- you're trying to make a
9    generalized statement that isn't
10   necessarily relative to this particular
11   piece. Do marketing people tend to
12   simplify and extract the most prominent
13   words? I think they do. I think that's
14   the goal of marketing is to grab somebody's
15   attention.
16         So the qualifiers that would
17   grab somebody's attention would be
18   something that they would pick up on. But
19   obviously anything that is done still has
20   to be prequalified for what it's relative
21   to, meaning in this case if it's free, it
22   is free to purchase and we still have to
23   have that information on this piece. So
24   we're not doing it randomly, we're doing it

| Page 86 |
|---|

1     with a purpose.
2 BY MR. LALLI:
3     Q. And, again, if free means no purchase
4 fee, you don't know -- do you know why it just
5 doesn't say no purchase fee on Exhibit-2?
6     A. I really don't. That would -- I
7 can't give you answers as to what the final
8 decision was.
9     Q. But it would have been made by the
10 group of people that we spoke about previously,
11 Dan Goldman and John?
12     A. It would have been a collective
13 decision.
14     Q. Of those people?
15     A. Uh-huh.
16     Q. Anyone else that we haven't
17 mentioned?
18     A. Not that I know of.
19     Q. The packaging, when I say the
20 packaging of the card, I mean everything that the
21 customer gets, the gift box, the ribbon, the terms
22 and conditions, the trifold, and the card, itself,
23 it's clear that the issue date of the card is not
24 included on any of that -- any of those materials.

| Page 87 |
|---|

1 Do you agree with that?
2     A. Issue date -- I'm not quite sure I
3 understand what you mean by issue date.
4     Q. The date on which the customer
5 purchases the gift card.
6     A. Not on those materials, no.
7     Q. And it's not provided by the customer
8 service representative in terms of a receipt
9 that's also attached to the card or anything like
10 that, right?
11     A. I don't know that.
12     Q. Do you know of any discussions as to
13 whether or not to include, some way to include the
14 issue date of the card on the materials?
15     A. Not that I'm aware of.
16     Q. If those discussions took place,
17 would you be aware of them? Would you have been
18 one of the people who would have been involved in
19 them?
20     MR. HARVEY: Object to the form
21 of the question.
22     THE WITNESS: Are you
23 talking --
24     MR. HARVEY: If discussions

| Page 88 |
|---|

1 took place that she's not aware of --
2     MR. LALLI: You can object --
3     MR. HARVEY: I know, but that's
4 just over the top.
5     MR. LALLI: I started this off
6 by saying I'm not the best wordsmith.
7     MR. HARVEY: Okay.
8     MR. LALLI: Let me try to
9 reformulate my question.
10 BY MR. LALLI:
11     Q. Having the issue date somewhere in
12 the materials of the card would constitute a
13 change to the actual materials, the print
14 materials, the terms and conditions, the trifold,
15 correct?
16     A. Possibly. It would depend on to what
17 extent it was going to affect any of those
18 materials.
19     Q. Okay. And changes to those materials
20 while you were leading this gift card program in
21 your role, you would have -- they would have come
22 to you, you would have seen changes to the
23 materials, correct?
24     MR. HARVEY: Object to the form

| Page 89 |
|---|

1 of the question.
2 BY MR. LALLI:
3     Q. Do you understand the question?
4     A. Well, I wasn't leading the program,
5 so I just want to make sure I make that clear.
6     Q. Yes.
7     A. Changes to -- print materials that
8 would have required changes, if it was relative to
9 the greeting card insert, terms and conditions,
10 would have come through me.
11     Q. Okay.
12     A. I would have seen the changes in
13 order to effect the changes.
14     Q. Okay. Were you part of -- when I say
15 "part of," either with input or just being
16 present, discussions about changes, any changes to
17 the print materials that go along with the card?
18     A. I'm not quite sure I understand.
19 Changes relative to anything in particular?
20     Q. Anything at all that goes with the
21 card to the customer, and I'm talking about the
22 trifold greeting card, the terms and conditions.
23     A. My only involvement with the
24 packaging for that particular piece was the

70895bd7-fe03-4a8d-9960-235f7e6cf598

24 (Pages 90 to 93)

| Page 90 |
|---|

1  greeting card insert that went into the piece.
2      Q.   Okay.
3      A.   Or into the box.
4      Q.   So were you -- I guess I could just
5  ask it broadly.  If there were a change to the
6  trifold, the greeting card -- okay? -- and the
7  change was we're going to add a line, there was
8  lines, to, from, value, and message, we're going
9  to add a line that says, issue date -- are you
10  following me?
11      A.   Uh-huh.
12      Q.   -- if that change were to be made,
13  would that have come to you?
14      A.   It would have come to me, yes.
15      Q.   Would the discussion to make that
16  change involve you?  And by "involve," I mean
17  either you're adding input or you're just brought
18  into the room.
19             MR. HARVEY:  Object to the form
20  of the question.
21             But you can answer it, if you
22  understand it.
23             THE WITNESS:  No, I wouldn't
24  have been involved in that.

| Page 91 |
|---|

1  BY MR. LALLI:
2      Q.   Okay.  Who would be involved?  Would
3  it have been Dan Goldman, would it have been the
4  same people, same group of people we've been
5  speaking about today?
6      A.   Possibly, but I couldn't -- I really
7  don't know.
8      Q.   When we talked about terms and
9  conditions and disclosures, the only people who
10  you recalled who had made changes was either
11  Goldman or legal.
12      A.   Correct.
13      Q.   What about changes to the actual
14  greeting card, itself, where did those changes
15  come from?
16      A.   When changes were made?
17      Q.   Yes.
18      A.   Are you asking me to speculate if
19  changes were made?
20      Q.   No, no, no.  I'm sorry.  When
21  changes --
22      A.   When changes were made?
23      Q.   Yes.
24      A.   It would have been through Dan.  Dan

| Page 92 |
|---|

1  would have said, "Look, I'd like to change this
2  word or put in this question."  It primarily -- it
3  would have been started through Dan.
4      Q.   But you don't recall any discussions
5  about including the issue date either on -- in any
6  materials, you know, included with the card,
7  itself?
8      A.   No.
9             MR. LALLI:  We're going to mark
10  this as Moncilovich-4.
11             (Document received and marked
12  for identification Plaintiffs' Exhibit
13  Moncilovich-4, Documents Bates-stamped
14  number TD000263 and TD000264, consisting of
15  2 pages.)
16             MR. HARVEY:  Mike, one other
17  thing I meant to mention to you is that we
18  had told that we have the originals of some
19  of these materials that we're looking at
20  here, particularly trifolds and the inserts
21  in them, and you're free to -- this would
22  be the right witness to ask questions about
23  those.  I don't have them in the room.  I
24  can go get them if you want to do that.

| Page 93 |
|---|

1             MR. LALLI:  Okay.
2             MR. HARVEY:  So just let me
3  know.  If you'd like that, I can get those
4  and you can examine them and she can
5  explain to you how they work.  And they've
6  all been produced; these are just the
7  originals instead of copies.
8             MR. LALLI:  Okay.  I'm going to
9  ask that you do that.
10             MR. HARVEY:  Okay.  At the
11  break, I'll go get them.
12  BY MR. LALLI:
13      Q.   This has been marked as Exhibit
14  Moncilovich-4, and it a document that's been
15  produced, it's Bates-stamped TD000263 to 264.  Do
16  you recognize this document?
17      A.   I had not seen it before having to
18  gather materials for this particular case.
19      Q.   So the first time you saw it was when
20  you did your search, you were --
21      A.   When I had gotten -- when the agency
22  had provided this to Joan, and Joan had provided
23  it to me.  So you didn't have any input into
24      Q.   So you didn't have any input into

| Page 94 | Page 96 |
|---|---|
| 1  this at all? | 1      THE WITNESS:  Oh, I'm sorry. |
| 2      A.  No. | 2      Yes, I believe so. |
| 3      Q.  And it never crossed your desk when | 3  BY MR. LALLI: |
| 4  it was used in 2006? | 4      Q.  What is Beth Hogan's... |
| 5      A.  No. | 5      A.  You know, I don't know if this was |
| 6      Q.  Okay.  Then I'm not going to ask you | 6  one that I actually -- I'm not sure if this is one |
| 7  any questions about it. | 7  that I actually provided or someone from Banknorth |
| 8          To your knowledge, have there | 8  provided. |
| 9  been any customer complaints regarding the | 9      Q.  That's fine.  What is Beth Hogan's |
| 10  gift card advertisements? | 10  role?  What's her position? |
| 11      A.  Not to my direct knowledge, no. | 11      A.  She is a planner, marketing planner. |
| 12      Q.  When you say, "Not to my direct | 12      Q.  What does that mean? |
| 13  knowledge," what does that mean? | 13      A.  I couldn't give you a good definition |
| 14      A.  Not to my knowledge. | 14  of what that means other than they plan campaigns |
| 15      Q.  Would complaints about the | 15  and programs for their particular line of product. |
| 16  advertising come to you? | 16  In this case the debit card was Beth's line of |
| 17      A.  No. | 17  product. |
| 18      Q.  Who would they go to? | 18      Q.  Is part of being a marketing planner |
| 19      A.  I really don't know.  They may come | 19  having input into the actual... |
| 20  through our call center, who may redirect them to | 20      A.  I don't know. |
| 21  somebody else, but that's pure speculation. | 21      Q.  You don't know? |
| 22      Q.  Have you ever received, either | 22      A.  Yeah. |
| 23  through the customer directly or through anyone at | 23      Q.  If you look, it looks like you sent |
| 24  TD Bank customer, complaints about any of the work | 24  an email on July 16, 2008, to Beth.  The subject |

| Page 95 | Page 97 |
|---|---|
| 1  you've done? | 1  is:  Re: forward:  Gift card terms and conditions |
| 2      A.  No, not that I recall. | 2  pricing change September '08.doc.  Do you see |
| 3          (Document received and marked | 3  that? |
| 4      for identification Plaintiffs' Exhibit | 4      A.  Yes. |
| 5      Moncilovich-5, Documents Bates-stamped | 5      Q.  Do you have an independent |
| 6      number TD001029 through TD001031, | 6  recollection of this email? |
| 7      consisting of 3 pages.) | 7      A.  Independent meaning? |
| 8  BY MR. LALLI: | 8      Q.  Do you remember sending this email? |
| 9      Q.  What's been marked as Moncilovich-5 | 9      A.  I do. |
| 10  is an email that was -- or an email string that | 10      Q.  Okay.  Tell me about it. |
| 11  was produced to us.  It's Bates stamped TD001029 | 11      A.  This was prior to Commerce Bank doing |
| 12  through 1031. | 12  a rebrand to TD Bank before November of 2008, and |
| 13      A.  Uh-huh. | 13  I was working on finalizing the new design for the |
| 14      Q.  Do you recognize this email string? | 14  smaller trifold into the new green box, and |
| 15      A.  Yes. | 15  TD Banknorth was also going to be doing the same |
| 16      Q.  Is this one of the emails that was | 16  designed piece just logo'ed with TD Banknorth and |
| 17  produced by you to counsel? | 17  a few other changes, and one of the -- two other |
| 18      A.  This was -- my involvement in this | 18  copy points that might have been slightly |
| 19  string looks like it wasn't until I was asking a | 19  different than our card would have been, and also |
| 20  specific question of Beth Hogan, who is the debit | 20  their terms and conditions were different than our |
| 21  card plan planner for TD Banknorth. | 21  terms and conditions.  And my question to her in |
| 22          MR. HARVEY:  Ms. Moncilovich, I | 22  just proofreading her terms and conditions that |
| 23      think his question was was this one of the | 23  she had provided was why they noted the State of |
| 24      documents you produced to counsel. | 24  Maine as being the governing charter and not |

Case 1:09-cv-01062-RBK-AMD Document 79-4 Filed 09/17/10 Page 27 of 31 PageID: 4311
MWANTEMBE et al vs. TD BANK, N.A., et al          4-1-10     LISE L. MONCILOVICH

26 (Pages 98 to 101)

| Page 98 | Page 100 |
|---|---|

| | |
|---|---|
| 1  Delaware, which is what TD Bank had been under was | 1  break. |
| 2  Delaware, and that was my only question. | 2          MR. HARVEY:  Okay. |
| 3          MR. HARVEY:  May I point out to | 3          MR. LALLI:  Get the trifolds, |
| 4  the witness, in case she's not aware, the | 4  and I'll have a few questions, not much. |
| 5  word, redacted, there at the bottom of | 5          (At this time, a recess was |
| 6  Page 1029 and at the top of the Page 1029 | 6  taken.) |
| 7  means that there was additional information | 7          MR. HARVEY:  I'm not going to |
| 8  here that has been obliterated so the | 8  identify everything in here, but we've got |
| 9  plaintiffs couldn't see it, and it was | 9  a card and a series of greeting card |
| 10 obliterated, or redacted as we say, based | 10 inserts, and then some I believe these are |
| 11 on -- because there was something in there | 11 card carriers, and I'll keep them together |
| 12 that revealed an attorney-client privileged | 12 through this litigation.  These all came |
| 13 information. | 13 from Ms. Moncilovich, I believe, and we'll |
| 14          THE WITNESS:  Okay. | 14 just hang onto them in case anybody ever |
| 15          MR. HARVEY:  And you | 15 needs to refer to one of these originals. |
| 16 shouldn't -- you should not disclose -- | 16          Ms. Moncilovich can identify |
| 17          THE WITNESS:  Right. | 17 with these documents where they are and |
| 18          MR. HARVEY:  -- anything | 18 which of these -- with the Bates numbers on |
| 19 relating to communications with attorneys. | 19 them.  If you have any questions or you |
| 20 So I'm just cautioning you on that and | 20 want to see in particular about how the |
| 21 clarifying. | 21 greeting card inserts worked before we |
| 22          THE WITNESS:  Okay. | 22 had -- before TD Bank had the smaller |
| 23 BY MR. LALLI: | 23 insert, greeting card that it uses today, |
| 24      Q.   The only issue, really, for this | 24 Commerce Bank had the larger greeting |

| Page 99 | Page 101 |
|---|---|

| | |
|---|---|
| 1  email was that the terms and conditions had Maine? | 1  cards, feel free to inspect and examine and |
| 2      A.   TD Banknorth cited Maine, ours sited | 2  ask the witness questions about them. |
| 3  Delaware, and I wanted to confirm if that was | 3          MR. LALLI:  Okay, thanks. |
| 4  correct or incorrect. | 4  BY MR. LALLI: |
| 5      Q.   Okay.  And it looks like a few other | 5      Q.   Before I get to this, let me just ask |
| 6  people were included on this email string.  One is | 6  about this declaration that you provided prior to |
| 7  Karen Mayo. | 7  today's deposition.  Why did you create this?  It |
| 8      A.   Uh-huh. | 8  seems like it was a lot of work. |
| 9      Q.   Who's Karen Mayo? | 9          MR. HARVEY:  Obviously it was |
| 10     A.   Karen worked -- she worked for | 10 created at the request of counsel. |
| 11 TD Banknorth, and today works for TD Bank in the | 11          THE WITNESS:  Right. |
| 12 product group.  I don't know her specific title. | 12          MR. HARVEY:  So I don't think |
| 13     Q.   Do you know why she would have been | 13 she can answer that question. |
| 14 copied on this email? | 14          MR. LALLI:  Okay. |
| 15     A.   She -- I believe she works with the | 15          THE WITNESS:  Yeah. |
| 16 debit product, that's why she most likely would | 16 BY MR. LALLI: |
| 17 have been copied on this. | 17     Q.   And this was created through the -- |
| 18     Q.   Another person copied is Pattie | 18 you going out and asking coworkers and outside |
| 19 Gallant.  We spoke about her previously. | 19 vendors for documents and -- |
| 20     A.   Uh-huh. | 20     A.   Personal files. |
| 21     Q.   Those are the only questions I have | 21     Q.   -- personal files, which we spoke |
| 22 about that. | 22 about before, right? |
| 23     A.   Okay. | 23     A.   Yes. |
| 24          MR. LALLI:  Let me take a | 24     Q.   And all of the information here is |

70895bd7-fe03-4a8d-9960-235f7e6cf598

Case 1:09-cv-01062-RBK-AMD   Document 79-4   Filed 09/17/10   Page 28 of 31 PageID: 4312

MWANTEMBE et al vs. TD BANK, N.A., et al                    4/1/10   LISE J. MONGIOVECH

27  (Pages 102 to 105)

| Page 102 | Page 104 |
|---|---|
| 1  true and accurate to the best of your knowledge?<br>2      A.   Yes.<br>3      Q.   That's all I have.<br>4           Now I'm holding one of the<br>5  greeting cards that was used by Commerce Bank.<br>6  There's a sticky on it that says December '04.<br>7  And it's a trifold, and there's a pull-out for<br>8  terms and conditions.  Is that fair and accurate?<br>9      A.   Yes.<br>10      Q.   My first question is who creates the<br>11  actual greeting card, itself, not the terms and<br>12  conditions.<br>13      A.   The design of it?<br>14      Q.   No, no, no.  Who actually produces<br>15  the greeting card?<br>16      A.   Prints it?<br>17      Q.   Yes.<br>18      A.   It would have been a printer that<br>19  would have printed it.  In this case it was<br>20  Capital Printing.<br>21      Q.   Who prints the terms and conditions?<br>22      A.   The same vendor since it's all done<br>23  at the same time.<br>24      Q.   How, if you know, how are the | 1  printer, the greeting card is closed, and they're<br>2  packaged complete with the terms and conditions<br>3  inside in packages of twenty-five --<br>4      A.   Yes.<br>5      Q.   -- shrink-wrapped, and then sent out<br>6  to a central depository?<br>7      A.   Yes.<br>8      Q.   Okay.  Just to be clear, the terms<br>9  and conditions aren't packaged separate and<br>10  apart --<br>11      A.   No.<br>12      Q.   -- from the gift card?<br>13      A.   No.<br>14      Q.   Okay.  And that's true for --<br>15      A.   All of them.<br>16      Q.   -- all of them?<br>17          Yes?<br>18      A.   Yes.<br>19      Q.   Do you know why the terms and<br>20  conditions are in a pouch?<br>21      A.   That was just the way the design was<br>22  finalized and approved by everybody.  There were a<br>23  certain amount of content information that we<br>24  wanted to include, and the agency had developed a |

| Page 103 | Page 105 |
|---|---|
| 1  greeting cards and the terms and conditions -- and<br>2  I'm not just speaking specifically to this one,<br>3  but --<br>4      A.   Any of them.<br>5      Q.   -- any of them, how are they sent<br>6  from the printer to banks?<br>7      A.   That terms and conditions piece is<br>8  collated into that card before it gets<br>9  shrink-wrapped in groups of twenty-five is how we<br>10  produce them, so it is already assembled, and that<br>11  gets shipped to our warehouse facility, which is<br>12  Standard Register, and then when banks requisition<br>13  supplies or if we were to do a distribution, it<br>14  would come in the preshrunk packs of twenty-five,<br>15  so they are all together.<br>16      Q.   When you say the terms and conditions<br>17  are collated with the...<br>18      A.   They're collated into that piece.<br>19      Q.   -- into the piece, do you mean that<br>20  they are --<br>21      A.   When you just took it out of the<br>22  pocket, yes.<br>23      Q.   You mean they are placed, the terms<br>24  and conditions are placed in the pocket by the | 1  layout and that was the suggested one that was<br>2  approved.<br>3      Q.   The agency being the outside agency?<br>4      A.   Tierney, yes.<br>5      Q.   And it was approved by the people we<br>6  spoke of before?<br>7      A.   Yeah.<br>8      Q.   Dan Goldman?<br>9      A.   Dan, Allegra, John reviewed that.<br>10  Those are the only ones that I know of.<br>11      Q.   For the printing company to produce<br>12  something like this -- I'm sorry, let me back up.<br>13  For the design outfit to design something like<br>14  this, what needed to be provided to them?<br>15      A.   We would provide -- well, obviously<br>16  the document for the terms and conditions.<br>17      Q.   Okay.<br>18      A.   And any specific information that Dan<br>19  would have wanted to include, and he wanted to<br>20  include, for example, the frequently asked<br>21  questions, he wanted to include the phone number<br>22  and the -- let me just check.  The URL I think is<br>23  on here, as well.  That was a later one.  This was<br>24  the phone number one.  At the time we must not |

Case 1:09-cv-01062-RBK-AMD   Document 79-4   Filed 09/17/10   Page 29 of 31   PageID: 4313
MWANTEMBE et al vs. TD BANK, N.A., et al                    4-1-10        LISE D. MONCRIEFF/CIH

28 (Pages 106 to 109)

| Page 106 | Page 108 |
|---|---|

**Page 106**

1  have had a URL.
2  Q.  Okay.
3  A.  So obviously the phone number to
4  register. He would have provided bits of
5  information that said here's what I'd like to
6  include. The agency -- I would have sent that
7  information to the agency, also include a panel
8  for a message to be put, and taking all of that
9  together, came up with an option that would
10  accommodate all of those needs.
11  Q.  Would Dan have decided that the terms
12  and conditions should be in a pouch?
13  A.  I don't think so. I think that was
14  just the nature of the design. I mean it happened
15  to work out that way, since, one, you want to keep
16  it as contained as we can, obviously to -- it
17  would have been difficult to put those terms and
18  conditions anywhere else on this piece. We don't
19  want to make it -- it would have not been
20  something we want to make too cumbersome, we
21  wouldn't want it extended even longer, because
22  obviously that doesn't make for a packaged,
23  completed look. So this was obviously a nice
24  compromise.

**Page 108**

1  it?
2  A.  No.
3  Q.  Okay. This particular one, the
4  larger Commerce gift card greeting card, was this
5  placed in a box, a gift packaged box?
6  A.  It would have been placed -- when a
7  customer purchased a card, the card would have
8  gone in the greeting box, and they would have
9  taken a greeting card and also placed that in the
10  box on top of it, and then closed the box and
11  placed the ribbon on it.
12  Q.  So at some point in time, the boxes
13  were bigger than they are today, the gift boxes?
14  A.  That was a large red box, the
15  Commerce boxes were red boxes that fit that size.
16  Q.  And then at some point --
17  A.  They went to the smaller, yeah.
18  Q.  -- they went to the smaller boxes.
19  Now I'm holding what Steve
20  described as or you described as card carriers?
21  A.  Yes.
22  Q.  What's a card carrier?
23  A.  These would have been used for
24  mail order cards, and a card would have been

**Page 107**

1  Q.  Okay. So it may have -- to your
2  understanding, did that idea come from the ad
3  agency?
4  A.  I believe so.
5  Q.  And then it looks like that idea,
6  meaning the terms and conditions, slid inside a
7  pouch --
8  A.  It stayed with everything.
9  Q.  -- it looks like it was followed
10  through -- let me finish. I'm sorry.
11  A.  I'm sorry.
12  Q.  It looks like it was followed through
13  to present day; is that correct?
14  A.  Yes.
15  Q.  Do you have any reason to believe
16  that the banks, when they receive these packaged
17  greeting cards, would pull out the terms and
18  conditions, store them separately from the
19  greeting cards?
20  A.  Do I have any reason to believe that
21  they -- why they would do that?
22  Q.  Or that they would do that.
23  A.  No.
24  Q.  That doesn't make much sense, does

**Page 109**

1  attached here, and then sent through the mail.
2  Q.  Using like that gum, sticky gum
3  stuff?
4  A.  Right.
5  Q.  And is this the only -- what else
6  would have been sent in the mail to the customer
7  besides this page with the card stuck onto it?
8  A.  That, I don't know. I don't believe
9  there was anything else, but I don't want to
10  speculate on that.
11  Q.  It would have just been a single
12  card?
13  A.  I believe so.
14  MR. HARVEY: Just to be clear,
15  Mike, when you were referring to those card
16  carriers, the terms and conditions are on
17  the back of those card carriers.
18  MR. LALLI: Yes.
19  BY MR. LALLI:
20  Q.  Did Commerce or TD Bank at any time
21  use a greeting card that didn't have the pouched
22  terms and conditions?
23  A.  Commerce never did, and in my
24  experience so far with TD Bank, they have the same

70895bd7-fe03-4a8d-9960-235f7e6cf598

## Page 110

1  pouch, as well, and never have they had anything
2  else as far as -- that's as far as TD Bank. I
3  can't speak for TD Banknorth.
4       Q.   Sure. Any discussions that a
5  consumer may not see the terms and conditions?
6       A.   Discussions with?
7       Q.   Anyone.
8       A.   Anybody? Not to my knowledge.
9       Q.   That was never a worry?
10      A.   No.
11      Q.   Let me just go through my notes.
12              Just to I guess clarify and
13  finalize your role with the gift card program and
14  these materials --
15      A.   Okay.
16      Q.   -- other than the proofreading edits
17  you would have made to the terms and conditions --
18  which we talked about.
19      A.   Yes.
20      Q.   -- have you ever made any changes or
21  suggested any changes to any of the materials?
22      A.   To any of the disclosure materials or
23  the terms and conditions materials specifically?
24      Q.   We'll start with the terms and

## Page 111

1  conditions first. Other than the proofreading
2  edits, have you ever suggested any changes?
3       A.   No.
4       Q.   Regarding the disclosures located on
5  the back of the card, have you ever suggested any
6  changes other than that email with the Maine?
7       A.   That email with the Maine was
8  relative to the terms and conditions, not relative
9  to that.
10      Q.   Okay. I apologize for that. So --
11      A.   No.
12      Q.   No, you never suggested any changes
13  to the disclosures located on the back of the
14  card?
15      A.   No.
16      Q.   Have you ever suggested any changes
17  to the form of the -- the form or the content
18  located on the greeting card, the trifold?
19      A.   It would only have been language or
20  grammatical changes, it wouldn't have been
21  anything relative to the specific content.
22      Q.   When you say language, do you mean
23  grammar or do you mean --
24      A.   It could have been grammar so the

## Page 112

1  sentence is structured correctly.
2       Q.   Okay. What else?
3       A.   Punctuation. It would not have been
4  anything that was specific to the operation or
5  process of the program.
6       Q.   So not really the content of it; just
7  the wording?
8       A.   Exactly.
9       Q.   Okay. Have you ever made or
10  suggested any changes to any of the poster
11  advertisements?
12      A.   No.
13      Q.   Any of the -- I'll make it broader.
14  Any advertisements, really, to gift cards?
15      A.   No.
16      Q.   Never suggested a change?
17      A.   No. Not content change, if that's
18  what you're referring to.
19      Q.   Okay.
20      A.   Is that what you're referring to?
21      Q.   Well, what changes other than content
22  would you have made?
23      A.   Again, it would be more grammatical
24  and punctuational than anything else.

## Page 113

1           MR. LALLI: Okay. Those are
2   all the questions I have for you.
3           MR. HARVEY: Mike, you didn't
4   show her the deposition notice. This
5   witness was produced today under the
6   corporate designee notice of deposition in
7   the two lawsuits, the Mann and the
8   Mwantembe lawsuits to testify about
9   advertising and marketing and all the
10  materials that are covered by her
11  declaration and all the things that were
12  provided to the customers, terms and
13  conditions, backs of cards, et cetera.
14          MR. LALLI: I understand that
15  she was brought here to testify on topics
16  G, L, and maybe I.
17          MR. HARVEY: I need to look at
18  it again. It was all the topics I -- it
19  was all the things that are covered in her
20  declaration.
21          MR. LALLI: That's fair.
22          MR. HARVEY: I just have a
23  couple questions for the witness.
24  BY MR. HARVEY:

70895bd7-fe03-4a8d-9960-235f7e6cf598

Case 1:09-cv-01062-RBK-AMD Document 79-4 Filed 09/17/10 Page 31 of 31 PageID: 4315

MWANTEMBE et al vs. TD BANK, N.A., et al          4-1-10          LISE L. MONCILOVICH

30 (Pages 114 to 117)

| Page 114 | Page 116 |
|---|---|

**Page 114**

1    Q.    Would you please turn to the -- your
2   declaration. And I note that you just finalized
3   this this morning, but it occurred to me there's
4   something that's just slightly unclear in
5   paragraph 4A. If you would read paragraph 4A,
6   just read it to yourself, please.
7    A.    Okay.
8        Okay.
9    Q.    So if I understand this correctly,
10   what you're saying is that this card, the one that
11   you've referred to here by Bates number is the
12   very first plastic that Commerce Bank ever used?
13    A.    Yes.
14    Q.    And it didn't -- you call it the
15   generic card in that it doesn't have a holiday
16   scene or something like that, right?
17    A.    Correct.
18    Q.    And whenever you have a card that
19   doesn't have a holiday scene on it, you refer to
20   that as the generic card.
21    A.    Yes.
22    Q.    And generic cards generally means
23   that they're not used in the November to January
24   holiday season.

**Page 116**

5        I, LISE L. MONCILOVICH, have read the
6   aforegoing transcript of my deposition
7   given on Thursday, April 1, 2010,
8   consisting of 115 pages, and it is true,
9   correct, and complete to the best of my
10   knowledge, recollection, and belief, except
11   for the list of corrections, if any,
12   attached on a separate sheet herewith.

17              LISE L. MONCILOVICH

22              Witness

**Page 115**

1    A.    The generic card could be used during
2   the holiday season as well as the holiday card.
3    Q.    I see. But you put out a specific
4   holiday card.
5    A.    Yes, we do.
6    Q.    Okay. Now, in holiday season 2004,
7   however, isn't it correct that this generic card
8   was the card that was used for holiday season
9   2004?
10    A.    Yes.
11    Q.    So that was just a little unclear in
12   paragraph 4A, so we've clarified that now.
13   Thank you.
14    A.    Right.
15              ---
16       (DEPOSITION CONCLUDED)
17       (1:52 p.m.)
18              ---

**Page 117**

1              C E R T I F I C A T E
4        I, FRANCINE K. GUOKAS, RPR, and
5   Notary Public for the Commonwealth of
6   Pennsylvania, do hereby certify that the
7   proceedings, evidence, and objections noted are
8   contained fully and accurately in the notes taken
9   by me of the preceding deposition and that this
10   copy is a correct transcript of the same.
12        I further certify that I am not an
13   attorney or counsel of any of the parties; nor a
14   relative or employee of any attorney or counsel
15   connected with the action, nor financially
16   interested in the outcome of the same.
18              FRANCINE K. GUOKAS, RPR
19              Notary Public

21   NOTE: The certification appended hereto does not
22   apply to any reproduction of same unless under the
       direct control and/or supervision of the
23   certifying court reporter.