EXHIBIT "E"



# THE **NORTON** GROUP

P.O. Box 2400
Princeton, NJ 08543
Tel: (609) 409-4490

www.thenortongroup.net
E-Mail: tng3@att.net
Fax: (609) 409-4491

Leonard V. Fodera, Esq.
Silverman & Fodera, P. C.
1835 Market St. Ste 2600
Philadelphia, PA 19103
Tel: 215-561-2100
Fax: 215-561-0190

June 11, 2010

**Re: Gift Card Litigation**

## Introduction

My name is Tomas J. Norton. I am principal of The Norton Group, a
Banking Consulting firm which provides a broad range of management
consulting, including, quality control, lending quality control, financial
administration, processing operations, secured lending, etc. In addition, we have
provided litigation support for clients inside and outside the banking industry
including the submission of expert reports and testimony.

I personally have been a regulator. I have an extensive background in
bank regulation and management including ten years with the Banking
Department of the State of New Jersey and Chief Executive Positions in several
banking institutions. I've been a member The Lending Committees in Regional
Banks both in New Jersey and New York. I am a Certified Fraud Examiner (since
1993).  My curriculum vitae is annexed hereto as Exhibit A.

1

I have prepared expert reports in approximately 150 cases and I have personally appeared as an expert witness in approximately 35 cases in Federal and Local Courts in New Jersey, New York, Pennsylvania and North Carolina. The list of cases I have participated in, over the past several years is annexed hereto as Exhibit B.

Counsel for the Plaintiff, Leonard V. Fodera, Esq., has requested that I independently review the following material and determine whether the disclosures provided by the Defendants to both the Gift Card Purchaser and the ultimate Recipient were adequate and/or within the industry standards. I reviewed the following materials:

1. An exemplar of what is handed to a purchaser of a Gift Card from Defendant.

2. Declaration of Lise Moncilovich, Senior Marketing Communications Manager for TD Bank, NA, including 59 tabbed exhibits consisting of gift card plastics, terms and conditions, Greeting Cards, card carriers and marketing materials used by Defendant in Pennsylvania and New Jersey.

3. TD Bank Gift Card Study Guide 2009, Bate-stamped TD000022-TD000035; (training material on selling Gift Cards for TD Bank employees)

4. Commerce Bank, "America's Got Red," Training Manual, Bate Stamped TD001224-TD001249.

In the course of my work on this matter, I have depended on my knowledge and long experience in the banking industry over 40 years, as well as my independent research on the subject matter.

## Background

- The Commerce Bank, over a 35 year period beginning in 1973, grew from a one office location in southern New Jersey to a 450 office behemoth with total assets of over 50 billion dollars in 2008 when it was merged in to the TD Bank in March of 2008.

- Much of the Bank's success was attributed to an aggressive marketing campaigns and the dedicated philosophy to retail banking. (the strategic location of branch offices).

- Among the merchandising services offered to its customers was a reputed free Gift Card offer that began in the year 2004.

- These Gift Cards were the successor to gift checks which had been offered by the financial services industry for over the past 50 years where in turn the customer would purchase a bank check for a certain amount. The check in many instances would bear the overlay of a significant holiday and/or occasion (anniversary, birthday, etc.).

- Change in consumer preferences to credit and debit cards and with the technology available it was a natural expansion to provide Gift Cards to the consumer/Bank customer.

- In January 2005, shortly after the debut of the Commerce Bank Visa Gift Cards, the Bank's founder and Chairman of the Board, Vernon W. Hill

noted, "I am pleased to announce that we have changed the terms of the gift card to extend its best feature, that it's free. We have eliminated all conversion, expiration, reissue and other fees from the Commerce Bank Visa Gift Card there by liberating gift card users from unnecessary and inconvenient fees." (emphasis added)

- In the 5 ½ years since making that statement, Commerce Bank and its successor TD Bank has continually marketed its Visa Gift Cards as free, both through its advertising campaigns and public pronouncements in the news media.

- During the intervening five year period  the fine print on the Card agreement (Terms) has gone through several changes, and continues to provide for certain fees included dormancy fees among others while continuing to propound the mantra of No Hassles, No Fees.

- These Cards are subject to the following fees:

| | | |
|---|---|---|
| Replacement Card | $10.00 | Lost, stolen or damaged cards. |
| Conversion | $15.00 | Cardholder can opt to convert the Card to cash or check or deposit the balance into a Commerce account. |
| Service Fees | $2.50 | There is a monthly service charge for the Card that begins on the first day of the month immediately following the 365th day after the date your Card was purchased. |

- The disclosures on the Gift Card itself and the material accompanying the Card have gone through several changes. Resulting in the purported final incarnation that was submitted by the Defendant as an Exemplar in a

4

green box which included a blank greeting card and a plastic card
containing the TD Bank logo and the word gift on it. The Card appears to
be vintage of August 2009 (08/09).

- Hidden in a compartment of the Gift Card greeting card is a four sided
  card (3x4) titled "Terms" having approximately 170 <u>lines in very fine print</u>.

**Terms (see insert- actual size)**

- "The administration fee (for the Card) is a monthly fee and begins with the
  <u>purchase date</u>; it is waived for the first 12 months.

- The administration fee will reduce the card balance and may consume the
  balance before the "Good Thru" date on the Card."

- This statement contradicts the various advertisements and
  pronouncements and other marketing ploys by the Commerce/TD Bank in
  alluding to "Free" which they have trumpeted in news releases and
  advertising since the inception of the Gift Card Program.

- The consumer/purchaser is introduced to the Gift Cards through a
  marketing program that was initiated by the Bank, news releases and in-
  house advertising, all designed to promote the product (Bank Gift Cards).
  Thus drawn in the consumer/purchaser meets with a Bank representative.

- In view of the conflicting terms stated in the agreement when purchasing
  the subject Gift Cards and the method on which they are delivered
  <u>extremely small print hidden in a pocket of an insert, which is designed to</u>
  <u>be abandoned immediately upon opening since the purpose of the</u>
  wrapping is to deliver a plastic card for continuing use as a monetary

4

1

**TD Bank Visa® Gift Card Agreement — Effective September 2009**

Texas

2

3

5(a)

## TD Bank Visa® Gift Card Agreement

5 (b)

instrument. There is no doubt that the average consumer/recipient discards the wrapping material and goes about their business with little or no thought to the contractual obligation the Bank has thrusted upon the purchaser of the Gift Card.

- These terms and conditions represent a non-negotiable agreement that is offered to the consumer on a "take it or leave it" basis.

- In those versions of the terms and conditions that do disclose the monthly service fee, the disclosure itself is the same size and type font as the provisions of the terms and conditions around it.  The disclosure related to fees is not bolded, or set off in any way from the provisions around it.

- The Bank personnel after inquiring as to the amount of the Card requested and method of payment, give the completely finished product, a boxed Gift Card to the consumer/purchaser without allowing the consumer/purchaser to see any of the terms of the transaction and without any further explanation of the transaction. The Bank training materials instruct the Bank personnel to simply inform the purchaser that terms and conditions govern the Card, without any specific reference to alerting the purchaser about the fees.

- During the same period the world's largest provider of prepaid financial instruments (American Express) has initiated similar Cards at a fixed fee when purchased and no other fees throughout the life of the Card.

- Our research shows that neither the public pronouncements nor the advertising and other media channels the Defendant Commerce/TD Bank

6

used, never provided the transparency regarding the charging of fees noted in the schedule earlier in clarifying its "free" message when in fact fees are charged for a variety of services on the Gift Cards.

- Notwithstanding their minimal efforts to change the presentment of the material in the Gift Card package[1]:
  - o Concerning the monthly $2.50 inactivity fee
  - o The other fees noted earlier
- Taken in its totality the Defendant Bank's representations from the outset of the Gift Card Program to the present and its presentment of the final product to its customer have been fraught with lack of transparency in its relationship to the "Purchasers" of its Gift Cards.

**In Summary**

The "Free Gift Cards" do not meet the test of proper disclosure of the terms of the agreement by:

a. Using extremely "fine print" (without prominent display type)

b. Hiding the terms in an inconspicuous pouch in the greeting card that accompanies the Gift Card.

c. Taking unfair advantage of the Customer/Recipient of the Cards since there is virtually no transparency regarding the fee structure in the material provided with the Gift Cards.

---

[1] Including TD000114 & TD000115 which can be described as a "stream of consciousness" like paragraph of the terms of the agreement in extremely small print without the required emphasis on the consumer duties.

It is my opinion that the actions of Commerce/TD Bank in its efforts to gain a competitive advantage on other competing financial institutions, has been unconscionable in its promotion of the pre-gift wrapped Commerce/TD Bank Visa Gift Card and violate the concept of good faith and fair dealing.

Tomas J. Norton, CFE

EXHIBIT "F"



# DESIGN SCIENCE

924 Cherry Street, First Floor
Philadelphia PA 19107-2405
T: 215.627.4122
F: 215.627.4335
E: info@dscience.com
www.dscience.com

June 10, 2010

Leonard V. Fodera, Esquire
Silverman & Fodera
1835 Market St., Suite 2600
Philadelphia, PA 19103

**Re: TD Bank Litigation**

Dear Mr. Fodera:

The purpose of this letter is to report my analysis of certain human factors issues associated with the gift cards sold by TD Bank and Commerce Bank, prior to its acquisition by TD Bank. In preparation for my report, I reviewed, inter alia, the following materials:

1. Class Action Complaint.

2. An exemplar gift card, including its packaging and greeting- card insert.

3. Declaration of Lise Moncilovich, with exhibits.

4. Commerce Bank press release regarding gift cards, dated 12/7/04.

5. Commerce Bank, "America's Got Red," employee training manual regarding gift cards.

6. TD Bank Gift Card Study Guide.

I understand that Commerce Bank began selling gift cards in 2004, a practice continued by TD Bank, which acquired Commerce Bank in 2008. One consistent characteristic of the gift cards is that the banks collect a monthly fee, a so-called *dormancy fee*, from the remaining balance of the cards, beginning typically 12 months after they are sold[1].

The question that you have asked me to address is whether or not the information provided to the purchaser and to the recipient by Commerce

USER
RESEARCH

HUMAN
F⟋ ⟋RS
ANALYSIS

INTERACTION
DESIGN

---

[1] At one point, this monthly *dormancy fee* was collected beginning six months after the card was purchased.



Bank and by TD Bank was/is sufficient to make it reasonably likely that the purchasers and the recipients would be alerted to the presence of the dormancy fees. The results of my analysis are presented below, after a brief discussion of my field of expertise, human factors.

## Human factors

The discipline of human factors involves the study of human capabilities, limitations, and tendencies and the application of this type of information to the design of the things that humans use, including information such as instructions and warnings. Human factors professionals study, among other things, how people use instructions and other forms of information and how information can be effectively provided in different contexts.

Understanding such issues requires specialized knowledge that is beyond that of the typical layperson.

The discipline of human factors has been accepted as important at least since World War II, when the military recognized the need for knowledge about the *users* of systems, in addition to more traditional engineering considerations, in order to develop systems that were adequately safe and easy to use.

Today, human factors is explicitly recognized by the National Safety Council, the U.S. Food and Drug Administration, all branches of the U.S. Military, and many other agencies and organizations, as the basis of reliable and important technical information regarding how to design products, systems, and information to be usable. The field has a professional organization, the Human Factors and Ergonomics Society, a body of technical information, as published in professional journals, monographs, and conference proceedings, and scientific/engineering methodologies that are applied to solving various classes of problems.

My own background (I have a Ph.D. in Experimental Psychology) is typical of members of the Human Factors and Ergonomics Society. Psychology is the most common source of the information about human beings that is applied to problem solving in the discipline of Human Factors.

In analyzing the effectiveness of the information in question, I have applied a methodology that is widely used by human factors professionals. I have carefully examined the facts, in light of basic facts and principles of human factors. In doing so, I have relied upon my education (in fact, my



major areas of specialization in graduate school were visual perception and the psychology of language) and my 26 years of experience in the field, during which I have designed and tested many instructions and other text-based materials.

## Expectations

The first question, from a human factors perspective, is whether or not people would naturally expect the dormancy fees. In fact, the fees that Commerce Bank and TD Bank automatically collected were unlikely to be expected. Based upon the "time value" of money principal, one would normally expect that money loaned *to a bank* would increase in value over time. However, in this case, the card's value goes *down* the longer it is held. It follows that it is counter-intuitive that what is, in effect, a loan to the bank will generate fees *from the lender to the borrower* that increase the longer the bank holds the money (which it, no doubt, obtains interest from). This is clearly at odds with the pattern with which anyone who has borrowed money would be familiar.

Thus, without receiving adequate information on the subject, the typical person would not expect the dormancy fees. The question, then, is whether or not the information provided was adequate to alert purchasers and recipients to the presence of these fees.

## Information provided to the purchasers

I have carefully reviewed the information provided to the purchaser of the gift cards, and I note that purchasers were provided absolutely no information about the fees, and, in fact, they were provided with misleading information. This conclusion is based upon my understanding that a typical purchaser would first see a reference to the gift cards via marketing/advertising materials or hear about them in some other way, then buy the card from a bank employee, or, alternatively, fill out an order form. Thus, the information-conveying vehicles regarding cards included:

1. The posters and related advertising materials.

2. The order forms.

3. The messages that they received from bank employees.



The posters, advertising, etc. that I have seen all either referred to the cards as "free" or having "no purchase fee", or both. It was normal and reasonable to conclude from the use of such terms that there were no fees. There was no reference whatsoever to the dormancy fees in these materials.

Likewise, the order forms contained no reference to the fees.

I have reviewed the employee training materials that instructed employees in how to present the cards and that provided step-by-step instructions regarding how to sell them. There were no references to the dormancy fees. Bank employees are simply instructed to inform purchasers that the cards are governed by terms and conditions, but, for reasons stated below, the terms and conditions are also inadequate as they relate to the dormancy fees. Unless a potential purchaser directly asked a customer service representative if this dormancy fee existed, the purchaser would not be given that information.

In sum, there was no reason for purchasers to expect the fees and no information provided to purchasers to alert them to the presence of the fees.

## Information provided to the recipients

The recipients received the cards themselves and some combination of the following materials that contained references to the fees:

1. Terms of conditions

2. Card carriers with "FAQs".

3. Greeting cards that contained terms and conditions.

None of these materials provided information about the dormancy fees likely to come to the attention of the recipients. Let me discuss each of them in turn.

## The cards

The reference to the fees on the cards themselves, first of all, did not even appear on the cards sold from 2004 to 2007. When it did appear, it was


"buried" in the fine print on the back. Evidence indicates that people are unlikely to read even things like assembly instructions until they need them—until they are in an "information-seeking" mode. Also, the likelihood of text being read is related to how conspicuous it is made by color, point size, graphics, etc. (cf., Wogalter, et al., *Warnings and Risk Communication*, 1999) . There was simply no reason for people to pay any attention to this fine print on the back of the card. In other words, people have to have a reason to seek information before they are likely to notice it, something that is simply not true of the recipient of a gift card vis a vis the fine print on the back of the card.

There are a number of methods for making messages conspicuous, such as the use of contrasting color, larger point-size type, use of specialized headline words, like "NOTE", use of graphic illustrations, and/or outlining of a message in a separate box. Since the message in question contained none of these devices, it was highly unlikely that many people would ever read it.

Finally, the message was located at the same position as the reverse of the card numbers, making it harder to read.

I note that, in contrast to the reference to the fees, virtually every other message on the cards, front and back, was more conspicuous—from the bank logo, to the message regarding how to check the balance, to the message regarding the need for a signature.

## The terms and conditions

During 2005, the reference to the dormancy fee was not in the terms and conditions governing the cards. I am aware that Commerce Bank did not charge any fees on gift cards during some timeframe within 2005.

At times when the dormancy fee was in place, and the disclosure related to it was included in the cards' terms and conditions, it was buried in line after line of opaque "legalese". Terms and conditions presented in tiny text are the sorts of things that few people read.

With the cards produced some of the years (e.g., 2006-2008), the text was not even separated into paragraphs, further decreasing the likelihood that it would be read.



## Card carriers

The card carriers did not introduce any reference to fees until 2009, when a fifth "FAQ" was added at the bottom of the list. In order to be effective, the recipient would have to pull the carrier out in the first place, then read through the FAQs when there was no particular reason to be searching for information.

Indeed, I am confident that it was not true to refer to the question of whether or not there were dormancy fees ("Is there a monthly administration fee?") as an FAQ or "frequently asked question" because I would be shocked to find that such a question was ever asked at all, let alone asked frequently.

## Greeting cards

I understand that, when a card is purchased at one of the defendants' branches, the card is packaged in a gift box. When a recipient opens the box, a folded greeting card is the first thing that the recipient sees. Under the folded greeting card is the gift card itself.

These greeting cards open up and include a place for the purchaser to fill in information about the card, i.e. its value, who the purchaser is, and who the recipient is. Within the folded greeting card is a pouch in which the terms and conditions of the cards sit. Not only do the terms and condition suffer the flaws I discussed above, but the manner in which the terms and conditions are presented to the recipients is flawed.

A recipient should not have to "search" for terms and conditions which govern a gift card. The banks at issue packaged the terms and conditions inside a gift box, within a greeting card that must be opened, and inside a pouch within the greeting card.

In sum, none of the materials presented to recipients alert them to the fact that dormancy fees would be charged. Recipients would also have no way of knowing when the card was purchased, which was the "start date" for the onset of the dormancy fee. They also would not know how much value was left on the card at any given time, since this required calling a number or logging onto a website, both also mentioned in the fine print on the back of the card.



Wilcox—TD Bank Litigation Report | June 10, 2010| Page **7**

## Conclusion

My opinion, to a reasonable degree of professional certainty, is that Commerce Bank and TD Bank failed to provide information adequate to have a reasonable chance of alerting purchasers and recipients to the presence of dormancy fees—either on the cards themselves or in any of the other materials provided.

Indeed, the banks knew or should have known that their customers would not know about these fees, given:

- The counter-intuitive nature of the fees.

- The inaccurate references in their promotional materials to "free" and "no purchase fee".

- The failure to include a direct instruction to bank employees to advise purchasers to inform the recipients of the cards that a dormancy fee is automatically collected on the card after a certain time period.

- The failure to provide the purchase date of the card in the materials designed to reach the recipient of the gift card.

- The fact that the fees are often automatically collected prior to the expiration date located on the front of the card.

- The failure to apply well known and documented methods for improving the conspicuity of the relevant information.

Regarding this last, the banks presented the relevant information in such a way that it was unlikely to be noticed, something that those who created the materials knew or should have known to be the case.

Sincerely,

Stephen B. Wilcox, Ph.D.
Principal

EXHIBIT "G"

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CASE NO. 2:09-cv-00135-TJS

CHAWEZI MWANTEMBE, MARGARET
MUNTHALI and FERN RUTBERG on
behalf of themselves and
all others similarly situated,
    Plaintiffs,
    vs.
TD BANK, N.A., et al.
    Defendants.


        Oral deposition of BRADLEY
MANN, taken at Silverman & Fodera,
P.C., 1835 Market Street, 26th Floor,
Philadelphia, Pennsylvania, on
Monday, March 15, 2010, commencing at
approximately 2:24 p.m., before
JANICE D. BURNESS, a Registered
Professional Reporter, Certified
Court Reporter, and Notary Public,
pursuant to notice.

ORAL DEPOSITION OF BRADLEY MANN, 7/13/2010

2 (Pages 2 to 5)

| Page 2 |
| --- |

1   APPEARANCES:
2   MICHAEL P. LALLI, ESQUIRE
    mlalli@civilrights.com
3   SILVERMAN & FODERA, P.C.
    1835 Market Street, 26th Floor
4   Philadelphia, Pennsylvania  19103
    215-561-2100
5   Appearing on behalf of Plaintiffs
6
    MICHAEL BERMAN, ESQUIRE
7   michael@meberman.com
    310 Riverside Boulevard
8   Suite 31
    Long Beach, New York  11561
9   516-320-9076
    Appearing on behalf of Plaintiffs
10
11  BARAK A. BASSMAN, ESQUIRE
    bassmanb@pepperlaw.com
12  STEPHEN G. HARVEY, ESQUIRE
    harveys@pepperlaw.com
13  PEPPER HAMILTON, LLP
    3000 Two Logan Square
14  18th & Arch Streets
    Philadelphia, Pennsylvania  19103
15  215-981-4000
    Appearing on behalf of Defendants
16
17
       EXAMINATION INDEX
18
19  BRADLEY MANN
    BY MR. BASSMAN . . . .   3
20  BY MR. LALLI . . . . .   86
21
22
23
24

| Page 3 |
| --- |

1       BRADLEY MANN, having been
2   duly sworn, was examined and
3   testifies as follows:
4           EXAMINATION
5   BY MR. BASSMAN:
6       Q.  Good afternoon, Mr. Mann.
7       A.  Good afternoon.
8       Q.  My name is Barak Bassman.
9   I'm an attorney for TD Bank in this
10  case, and we met just a minute ago.
11      I want to go over just a
12  couple of things before we get
13  started substantively that will make
14  this afternoon go a little more
15  quickly and smoothly.
16      MR. LALLI:  Before you get
17  into that, Barak, I just wanted to --
18  it's usual stipulations, other than
19  we are going to have him read and
20  sign.
21      MR. BASSMAN:  That's fine.
22  BY MR. BASSMAN:
23      Q.  First, as you can see, the
24  court reporter is writing down

| Page 4 |
| --- |

1   everything that we are saying, so
2   I'll need you to answer all of my
3   questions verbally.
4       Sometimes in conversation
5   people respond with shrugs, nods,
6   gestures, um-hums.  Here everything
7   will have to be verbal.
8       Is that okay?
9       A.  Yes.
10      Q.  Also, at any time if you
11  don't understand a question that I
12  ask you, please let me know, and I'll
13  rephrase.  If you answer my question,
14  I'm going to assume you understand
15  it.
16      Is that okay?
17      A.  Yes.
18      Q.  If at any time you need to
19  take a break, let me know.  I'll try
20  to wrap up my questioning as fast as
21  I can to get you out to a break.
22  Feel free to take breaks whenever you
23  feel like you need them.
24      You are not a prisoner

| Page 5 |
| --- |

1   here, you are not being interrogated
2   by the CIA at a block site.
3       Sometimes witnesses think
4   that if they don't take breaks and
5   try to be martyrs, it will get done
6   faster.  You won't.
7       The process takes the time
8   it takes.  So I'd really encourage
9   you if you feel at any time you need
10  to take a break, just let me know.
11      A.  Thank you.
12      Q.  A question I need to ask
13  you, and nothing personal:  Are you
14  under the influence of drugs or
15  alcohol right now?
16      A.  No.
17      Q.  Are you on any medications
18  that could affect your ability to
19  remember events?
20      A.  No.
21      Q.  What did you do to prepare
22  for today's deposition?
23      A.  I met with my attorney
24  previous to coming in this room.

## Page 6

1    Q.  Other than talking to your
2 attorney, did you do anything else to
3 prepare?
4    A.  No.
5    Q.  By the way, could you, just
6 for the record, state your full legal
7 name and your address.
8    A.  Bradley Mann, 26 Mayberry
9 Avenue, Monroe Township, New Jersey
10 08831.
11    Q.  Do you have a middle name,
12 Mr. Mann?
13    A.  Craig, C-R-A-I-G.
14    Q.  Do you ever go by any
15 nicknames or aliases, like Brad or
16 something like that?
17    A.  Brad.
18    Q.  And how long have you been
19 at your current address?
20    A.  Approximately five years.
21    Q.  When did you graduate from
22 high school?
23    A.  1986.
24    Q.  What high school?

## Page 7

1    A.  Wantagh High School.
2    Q.  Where is that?
3    A.  New York.
4    Q.  Is that in Long Island?
5    A.  Yes.
6    Q.  Do you have any education
7 after high school?
8    A.  Yes.
9    Q.  Can you describe that?
10    A.  I have a bachelor of
11 science degree from the State
12 University of New York at Albany.
13    Q.  And what was your major?
14    A.  Accounting.
15    Q.  And what year did you
16 graduate?
17    A.  1989.
18    Q.  After graduating from SUNY
19 Albany, any further education?
20    A.  I finished approximately
21 one year of an MBA program.
22    Q.  Where was the program?
23    A.  I obtained classes at --
24 originally at Hofstra University, and

## Page 8

1 then I relocated and I attended
2 additional classes at Farleigh
3 Dickinson University.
4    Q.  I take it from your last
5 answer at some point you moved from
6 Long Island to New Jersey?
7    A.  Yes.
8    Q.  Do you recall when that
9 was?
10    A.  Sometime around the year
11 2000.
12    Q.  In your MBA program did you
13 have any particular concentration or
14 major?
15    A.  I didn't go far enough to
16 have a concentration at that point.
17    Q.  Any other formal education
18 after college?
19    A.  No.
20    Q.  What was your first job
21 after you graduated from SUNY Albany?
22    A.  I worked as an auditor for
23 the -- I'll give you the initials --
24 ILGWU, which stands for the

## Page 9

1 International Ladies' Garment
2 Workers' Union.
3    Q.  Is that what's now Unite?
4    A.  I believe that's their
5 slogan.  I don't know if that's their
6 name.
7    Q.  How long were you with the
8 ILGWU?
9    A.  Approximately one year.
10    Q.  And where did you go from
11 there?
12    A.  I went to what at the time
13 was called Republic National Bank.
14    Q.  And how long were you at
15 Republic National Bank?
16    A.  Well, it later changed its
17 name, but the time I was -- it became
18 HSBC.  But at that entity I was there
19 approximately nine years.
20    Q.  And can you walk me through
21 what positions you had at that bank?
22    A.  I was -- when I first --
23 about approximately three years I
24 worked as a credit analyst for

c037b7cf-7bb0-43c0-8208-3f414fbe4f7b

| Page 10 | Page 12 |
|---|---|
| 1 domestic credit specializing in | 1 president in the project management |
| 2 middle market companies. | 2 group, would be the correct title. |
| 3     For about approximately | 3    Q. And what did the project |
| 4 another three years I worked in -- as | 4 management group do? |
| 5 an operations analyst in the | 5    A. We helped to facilitate |
| 6 operations area of the bank. | 6 special projects on behalf of the |
| 7     And approximately the next | 7 finance unit of the company. |
| 8 three years I worked in trading | 8    Q. Do you recall any |
| 9 operations on the foreign exchange | 9 particular examples of the kinds of |
| 10 desk. | 10 projects you worked on? |
| 11    Q. When you were an operations | 11    A. Sure. One of the projects |
| 12 analyst, could you describe in a | 12 was implementation of new mortgage |
| 13 little more detail what you did? | 13 products. |
| 14    A. We acted as sort of an | 14     We had to interface with |
| 15 internal control function, and we | 15 the various subsidiaries to make sure |
| 16 would go and review different | 16 that their systems were able to |
| 17 segments within the organization to | 17 compute the projects -- products, |
| 18 see if they met controls, and also | 18 excuse me. |
| 19 looked into the profitability | 19    Q. And while you were at |
| 20 analysis for each group. | 20 Chase, did you do any work on gift |
| 21    Q. In your nine years at | 21 cards? |
| 22 Republic, which turned into HSBC, did | 22    A. No, not that I can recall. |
| 23 you have any involvement with the | 23    Q. Did any of your work at |
| 24 retail banking side of the | 24 Chase involve credit cards? |

| Page 11 | Page 13 |
|---|---|
| 1 organization? | 1    A. Other than interfacing with |
| 2    A. Not in any significant | 2 a unit that -- in Delaware that I |
| 3 capacity. | 3 believe issued credit cards, I |
| 4    Q. And when you worked as a | 4 specifically -- I did not deal with |
| 5 trading analyst, you said you were | 5 credit cards myself. |
| 6 involved in foreign currency trading? | 6    Q. What was the nature of the |
| 7    A. Yes, foreign currency | 7 interface that you had with the |
| 8 option specialist. | 8 credit card unit in Delaware? |
| 9    Q. Were you actually a | 9    A. The organization was doing |
| 10 trader? | 10 a restructuring, and they were trying |
| 11    A. No. I worked in the back | 11 to change the legal entity structure, |
| 12 office. | 12 ownership of the entity. And we |
| 13    Q. After you left HSBC, where | 13 worked with the finance and legal |
| 14 did you go? | 14 departments in effecting that legal |
| 15    A. I went to what was then | 15 change. |
| 16 called Chase Manhattan Mortgage | 16    Q. Did your responsibilities |
| 17 Corp., which later became JPMorgan | 17 at Chase ever involve debit cards? |
| 18 Chase. | 18    A. No. |
| 19    Q. And how long were you with | 19    Q. After you left Chase, where |
| 20 that institution? | 20 did you go to work? |
| 21    A. Approximately four to five | 21    A. I left Chase due to |
| 22 years. | 22 disability. |
| 23    Q. And what did you do there? | 23    Q. Have you been on disability |
| 24    A. I was an assistant vice | 24 ever since you left Chase? |

c037b7cf-7bb0-43c0-8208-3f414fbe4f7b

Case 1:09-cv-01062-RBK-AMD Document 79-6 Filed 09/17/10 Page 25 of 43 PageID: 4365
ORAL DEPOSITION OF BRADLEY MANN, 7/13/2010

5 (Pages 14 to 17)

## Page 14

1    A.  Yes.
2    Q.  Besides yourself, have any
3  of your family members ever worked in
4  the banking sector?
5    A.  No, not to my knowledge.
6    Q.  Are there any newspapers
7  that you read regularly?
8    A.  No.
9    Q.  Any websites you check
10  regularly for news?
11    A.  Yes.
12    Q.  What sites?
13    A.  New York
14  Times.com, MSNBC.com, Fox News, Fox
15  Business News.
16    MR. LALLI:  Both sides of
17  the aisle, huh?
18    THE WITNESS:  Yes.
19  BY MR. BASSMAN:
20    Q.  Truly fair and balanced.
21    A.  Absolutely.
22    MR. LALLI:  I think Fern
23  was Fox and Chawezi was MSNBC, right?
24    MR. BASSMAN:  No, Chawezi

## Page 15

1  was a CNN junkie, in her words.
2    THE WITNESS:  I like to
3  keep my options open.
4  BY MR. BASSMAN:
5    Q.  How often do you check
6  these websites?
7    A.  Either daily or every other
8  day.
9    Q.  The New York Times site, do
10  you have a subscription to the site?
11    A.  No.
12    Q.  Does not having a
13  subscription restrict what you can
14  see there?
15    A.  I don't know, because I
16  haven't had a subscription to compare
17  it to.
18    Q.  Any other websites that you
19  check regularly for news?
20    A.  Not that I can recall at
21  the moment.
22    Q.  Do you read any magazines
23  regularly?
24    A.  Yes.

## Page 16

1    Q.  What magazines?
2    A.  Popular Mechanics, Popular
3  Science, Field and Stream.
4    There may be a few more
5  personal interests like that, but I
6  don't recall at the moment if I have
7  current subscriptions to them.
8    Q.  Do you read any business or
9  news magazines?
10    A.  I used to have a
11  subscription to Newsweek, which
12  lapsed about six months ago.
13    Q.  Any others?
14    A.  Any other what?
15    Q.  Business or news magazines.
16    A.  No.
17    Q.  Any TV news programs you
18  watch regularly?
19    A.  I wouldn't say regularly.
20    I watch the standard four
21  or five cable business shows, you
22  know, but I wouldn't say I'm a
23  regular viewer of any single one.
24    Q.  What are the standard four

## Page 17

1  or five cable business shows?
2    A.  Fox News, MSNBC, CNN.  I
3  don't have a particular preference.
4  If I'm in the mood for the news, I
5  put on whichever one doesn't have the
6  most commercials at the moment.
7    Q.  CNBC?
8    A.  Yes.
9    Q.  Are you a member of any
10  consumer rights organizations?
11    A.  Not to my knowledge.
12    What would qualify as a
13  consumer rights organization?
14    Q.  I'll rephrase the
15  question.
16    Have you donated any money
17  in the last ten years to any
18  organization whose mission includes
19  fighting consumer fraud?
20    MR. LALLI:  Objection.
21    You can answer if you can.
22    THE WITNESS:  I don't -- I
23  wouldn't know of any organization
24  that I've donated money to that does

c037b7cf-7bb0-43c0-8208-3f414fbe4f7b

6 (Pages 18 to 21)

## Page 18

1  fight consumer fraud.
2  BY MR. BASSMAN:
3      Q.  Have you ever been involved
4  as a plaintiff or a defendant in a
5  lawsuit before this one?
6      A.  Yes.
7      Q.  How many prior lawsuits?
8      A.  One.
9      Q.  When was that?
10     A.  The incident occurred in
11 1998.  I don't know when the lawsuit,
12 you would call, began.  I imagine
13 shortly after that.
14     Q.  What was the subject matter
15 of the lawsuit?
16     A.  Personal injury lawsuit to
17 my wife.
18     Q.  You were a co-plaintiff?
19     A.  I believe so.
20     Q.  Any other lawsuits?
21     A.  No.
22     Q.  And, again, this is another
23 question I have to ask, so don't take
24 this personally.

## Page 19

1      Have you ever been
2  convicted of a crime?
3      A.  No.
4      Q.  Have you ever bought a gift
5  card from a bank?
6      A.  Yes.
7      Q.  Which banks?
8      A.  TD Bank.
9      Q.  When you say "TD," are you
10 Commerce as TD or just TD
11 itself?
12     A.  I have only purchased from
13 TD.
14     Q.  Is TD Bank where you
15 maintain your checking and savings
16 accounts?
17     A.  I have a checking account
18 at TD Bank, as well as at Capital One
19 Bank.
20     Q.  And on how many occasions
21 have you purchased gift cards?
22     A.  Approximately two
23 occasions.
24     Q.  When was the first

## Page 20

1  occasion?
2      A.  Sometime in 19 -- in
3  probably May of 1998, I believe.
4      Q.  May of '98?
5      A.  I'm sorry, 2008.  I'm
6  sorry.  I was thinking of my job
7  history.
8      Q.  So one was May 2008.
9          And do you recall when the
10 other time was?
11     A.  It was sometime late in
12 2008, near the holidays.
13     Q.  So around December of 2008?
14     A.  I would say that would be
15 accurate, approximately.
16     Q.  In May 2008, how many gift
17 cards did you buy?
18     A.  My wife and I collected
19 money on behalf of the teachers in
20 our children's Hebrew school, and we
21 went to -- we went to purchase -- we
22 weren't account holders then, so we
23 went with a friend who was an account
24 holder.

## Page 21

1      Q.  And when you say you went
2  with a friend who was an account
3  holder, were the gift cards actually
4  purchased by the friend?
5      A.  Yes.
6      Q.  What was that friend's
7  name?
8      A.  Dori Daus.
9      Q.  Can you spell that?
10     A.  D-O-R-I D-A-U-S.
11     Q.  And do you know what town
12 she lives in?
13     A.  Monroe, New Jersey.
14     Q.  And how many gift cards did
15 you buy with Ms. Daus in May of 2008?
16     A.  I believe there were five.
17     Q.  And these were for gifts to
18 five separate Hebrew school teachers?
19     A.  Yes.
20     Q.  And the May was for the end
21 of the school year?
22     A.  Yes.
23     Q.  And how many parents
24 contributed to these gift card

c037b7cf-7bb0-43c0-8208-3f414fbe4f7b

Case 1:09-cv-01062-RBK-AMD Document 79-6 Filed 09/17/10 Page 27 of 43 PageID: 4367
ORAL DEPOSITION OF BRADLEY MANN, 05/26/10

7 (Pages 22 to 25)

## Page 22

1  purchases in May of '08?
2      A.  I would -- I would -- it
3  would be a total estimate, I would
4  say approximately 30 to 40.
5          My wife was the one who did
6  all the collecting of the money and
7  really took care of it.
8      Q.  So I take it your wife was
9  tasked by the parents' association
10  with calling up all the parents in
11  the Hebrew school, getting the fund
12  together, and then going to the bank?
13      A.  Yes.  She's the youth
14  advisor for the synagogue, so she was
15  the one that really did it.  I just
16  happened to go with her that day.
17      Q.  What's your wife's name?
18      A.  Robynn Mann.
19      Q.  Robynn with an I or a Y?
20      A.  It's spelled R-O-B-Y-N-N.
21      Q.  I would have never have
22  guessed the two Ns.
23      A.  No, it's quite unusual,
24  especially with the last name of two

## Page 23

1  Ns.
2      Q.  And do you recall what the
3  denominations of these gift cards
4  were?
5      A.  No.  I know they weren't
6  for a lot of money, but I don't
7  remember the exact amount.
8      Q.  Were they all the same
9  amount?
10      A.  I don't recall.  The two of
11  them really took care of everything,
12  you know, and I was just kind of
13  there because we were running
14  errands.  And, you know, I was just
15  there, but they took care of
16  everything.
17      Q.  And you said you don't
18  recall the exact amount of the card
19  denominations.
20          Were each of those cards
21  under $100?
22      A.  Yes.  Typically, in the
23  past the gift cards were about $25
24  that we had purchased from other

## Page 24

1  places like Barnes & Noble and things
2  like that.  So I would imagine they
3  were something in that approximate
4  amount.
5      Q.  And I take it from your
6  previous testimony you don't know
7  exactly how many parents contributed,
8  but were each set of parents asked to
9  contribute an equal amount?
10      A.  Typically, that's how they
11  did it, but I wasn't involved in that
12  part of it.
13      Q.  Do you recall how much they
14  contributed?
15      A.  No.
16      Q.  More than $100?
17      A.  Less.
18      Q.  Less than $50?
19      A.  Probably.
20      Q.  Less than $25?
21      A.  I would guess -- I'm
22  sorry.  Less than 25, could you
23  explain that?  Per child?  Per
24  total?

## Page 25

1      Q.  Sure.  Just to clarify, I'm
2  just trying to figure out of the
3  amount of money that was raised, the
4  pot that was raised to buy the five
5  gift cards, how much did you
6  personally contribute into that pot?
7      A.  I would estimate they
8  probably asked somewhere around $5
9  per child that you have in the
10  school.  So we have four children, so
11  I guess around $20.
12      Q.  Four children.  Mazel tov.
13      A.  Thank you.
14      Q.  And who came up with the
15  idea of buying TD Bank gift cards for
16  the five Hebrew school teachers?
17      A.  I don't know.
18      Q.  Did you suggest this?
19      A.  No.
20      Q.  And I take it you weren't
21  the one who made the decision to
22  spend the money on TD Bank gift cards
23  as opposed to any other kind of gift?
24      A.  That's right.

c037b7cf-7bb0-43c0-8208-3f414fbe4f7b

Case 1:09-cv-01062-RBK-AMD   Document 79-6   Filed 09/17/10   Page 28 of 43 PageID: 4368
ORAL DEPOSITION OF BRADLEY MANN, 07/29/2010

8 (Pages 26 to 29)

| Page 26 | Page 28 |
|---|---|
| 1     Q.  In May of '08, did you<br>2  physically go to the branch when the<br>3  gift cards were bought?<br>4     A.  Yes.<br>5     Q.  And which branch was that?<br>6     A.  East Brunswick, New Jersey.<br>7     Q.  Is that branch on Ryders<br>8  Lane?<br>9     A.  Yes.  Ryders and Route 18.<br>10  I believe it's Ryders Lane.  I would<br>11  have called it Route 18, but I<br>12  believe it's Ryders.<br>13     Q.  And did you speak to a<br>14  customer service representative?<br>15     A.  No, I didn't speak with<br>16  anyone.  My wife and her friend<br>17  handled the transaction.<br>18     Q.  Did you hear that<br>19  discussion between your wife and her<br>20  friend and the customer service<br>21  representative?<br>22     A.  No.<br>23     Q.  Did either your wife or her<br>24  friend tell you anything about their | 1     Are you sure it was May,<br>2  but you are not sure when in May?  Or<br>3  was it around May, it could have been<br>4  June?<br>5     A.  It may have been May or it<br>6  may have been June.  I couldn't say<br>7  for sure.<br>8     Q.  And were you present when<br>9  the gift cards were given to the<br>10  recipients?<br>11     A.  No.<br>12     Q.  Do you know how much time<br>13  elapsed between when the gift cards<br>14  were bought and when they were given<br>15  as gifts?<br>16     A.  No.<br>17     Q.  Did you see the packaging<br>18  they were given in when they were<br>19  presented as gifts?<br>20     A.  Can you clarify that?<br>21     Q.  Sure.  Even if you weren't<br>22  there when the gifts were actually<br>23  given, did you see what they were<br>24  wrapped in?  Wrapping paper?  Boxes? |
| **Page 27** | **Page 29** |
| 1  discussion with the customer service<br>2  representative?<br>3     A.  No.<br>4     Q.  Did you see the packaging<br>5  that the gift cards came in after<br>6  they were purchased in May of '08?<br>7     A.  No.<br>8     Q.  Just to pin down the<br>9  date -- and I understand these dates<br>10  are a little while ago so there might<br>11  be some fuzziness.<br>12     Are you sure that these<br>13  gift cards were purchased in May of<br>14  '08 as opposed to maybe June of '08?<br>15     MR. LALLI:  Objection, only<br>16  that he testified it was<br>17  approximately May.<br>18     If you can answer more<br>19  specifically.<br>20  BY MR. BASSMAN:<br>21     Q.  Actually, just to clarify,<br>22  I just want -- when you say<br>23  approximately May, I just want to<br>24  see. | 1     A.  From the bank or from the<br>2  present that was given to the<br>3  teachers?<br>4     Q.  Actually both, if you<br>5  know.<br>6     A.  I didn't see what came from<br>7  the bank.<br>8     I believe when they<br>9  presented to the teachers, they had a<br>10  ceremony at the synagogue where they<br>11  gave them presents.  At the end of<br>12  the year at one of the services they<br>13  are usually given presents.<br>14     And I think they were in<br>15  like a gift bag, you know, from like<br>16  the Dollar Store, that type of thing.<br>17     Q.  And by the way, what's the<br>18  name of the synagogue?<br>19     A.  Congregation Etzchaim.<br>20     Q.  The gift giving ceremony,<br>21  that was on a Saturday morning<br>22  service?<br>23     A.  I don't recall.  It could<br>24  have been during one of the holidays |

c037b7cf-7bb0-43c0-8208-3f414fbe4f7b

| Page 30 | Page 32 |
|---|---|
| 1  as well.  So I don't recall which<br>2  service it would have happened in.<br>3     Q.  Could it have been a Friday<br>4  night service?<br>5       MR. LALLI:  Objection.<br>6       THE WITNESS:  Like I said,<br>7  I don't recall.<br>8  BY MR. BASSMAN:<br>9     Q.  Were you at that service<br>10  when the gifts were given in 2008?<br>11     A.  I believe so.<br>12     Q.  Ms. Daus, the friend who<br>13  had the account at TD Bank, had she<br>14  ever worked in the banking industry,<br>15  to the best of your knowledge?<br>16     A.  To the best of my<br>17  knowledge, no.<br>18     Q.  And the second time you<br>19  bought gift cards I think you said<br>20  was late 2008?<br>21     A.  Yes.<br>22     Q.  How many gift cards did you<br>23  buy then?<br>24     A.  Approximately three.  I | 1  would be a good opportunity to buy<br>2  them.<br>3     Q.  When you say you saw the<br>4  sign in the window that said no fee,<br>5  do you recall anything else that was<br>6  said on that sign?<br>7     A.  I don't recall the exact<br>8  wording.  It was a large green sign,<br>9  about three, four feet tall, probably<br>10  by about two feet wide.<br>11      And I think it said the<br>12  wording of free gift cards, inquire<br>13  within, or something to that effect.<br>14  I don't remember the exact wording on<br>15  it.<br>16     Q.  Was your wife with you on<br>17  this trip to the bank?<br>18     A.  No.<br>19     Q.  Did you go by yourself?<br>20     A.  My son was with me.<br>21     Q.  How old's your son?<br>22     A.  He is 11 currently, so that<br>23  would have made him about nine.<br>24     Q.  Before you saw this sign in |

| Page 31 | Page 33 |
|---|---|
| 1  believe it was three.<br>2     Q.  Could it have been two?<br>3     A.  Possible.  I believe it was<br>4  two or three.<br>5     Q.  And did you buy these cards<br>6  yourself?<br>7     A.  Yes.<br>8     Q.  Did you buy the cards at<br>9  the same TD Bank branch in East<br>10  Brunswick?<br>11     A.  Yes.<br>12     Q.  Why were you buying gift<br>13  cards in late 2008?<br>14     A.  My wife likes to buy -- she<br>15  likes to buy gifts, always likes to<br>16  shop early for people.  And we --<br>17  when we were there, we saw there was<br>18  a sign on the window about no-fee<br>19  gift cards.<br>20      And my thought would be<br>21  since we had discussed -- we were<br>22  thinking about giving gift cards this<br>23  year for people's -- relatives'<br>24  birthdays and whatnot, I thought it | 1  the window that said free gift cards,<br>2  had you seen any advertising for TD<br>3  Bank gift cards?<br>4     A.  I believe in a newspaper,<br>5  yes.<br>6     Q.  Do you recall what<br>7  newspaper?<br>8     A.  No.<br>9     Q.  Do you recall when this<br>10  was?<br>11     A.  No.<br>12     Q.  Do you recall the substance<br>13  of the ad?<br>14     A.  No.  I don't recall the<br>15  exact wording, no.<br>16     Q.  Do you recall any of the<br>17  wording?<br>18     A.  Yes.<br>19     Q.  What do you recall?<br>20     A.  It discussed free gift<br>21  cards as well, similar to the sign on<br>22  the window.  Yes, that's what I<br>23  recall.<br>24     Q.  And do you recall, you |

Case 1:09-cv-01062-RBK-AMD Document 79-6 Filed 09/17/10 Page 30 of 43 PageID: 4370
ORAL DEPOSITION OF BRADLEY MANN, 5/28/2010

10 (Pages 34 to 37)

| Page 34 | Page 36 |
|---|---|
| 1 know, roughly, how close in time it<br>2 was between when you saw the<br>3 newspaper ad and when you went in<br>4 late 2008 to buy two or three gift<br>5 cards?<br>6    A. Probably in the preceding<br>7 few weeks.<br>8    Q. Any other TD Bank gift card<br>9 advertisements that you have seen?<br>10      MR. LALLI: Just in banks<br>11 or newspapers?<br>12 BY MR. BASSMAN:<br>13    Q. Anywhere. Anywhere.<br>14 Internet, billboards, TV, newspapers,<br>15 signs, anything.<br>16    A. Yes.<br>17    Q. What are they?<br>18    A. I don't know if I could<br>19 quantify all of them. I mean,<br>20 there's been commercials on TV.<br>21 There's been commercials on the<br>22 radio, I believe.<br>23      Are you asking the nature<br>24 of the advertisements? | 1 multiple newspaper ads about free<br>2 gift cards?<br>3    A. Yes.<br>4    Q. Did you ever read any TD<br>5 Bank press releases?<br>6    A. No.<br>7    Q. Have you ever visited the<br>8 TD Bank website?<br>9    A. Yes.<br>10    Q. When you visited the TD<br>11 Bank website, did you ever look for<br>12 information about gift cards on the<br>13 website?<br>14    A. No.<br>15    Q. Did you ever see any<br>16 Internet advertising for TD Bank gift<br>17 cards?<br>18    A. Not that I can recall.<br>19    Q. Do you remember seeing any<br>20 billboards advertising TD Bank gift<br>21 cards?<br>22    A. Not specifically.<br>23    Q. Any signs advertising TD<br>24 Bank gift cards other than the one |

| Page 35 | Page 37 |
|---|---|
| 1    Q. Well, start with the<br>2 nature. TV, radio.<br>3    A. Just general advertisements<br>4 about convenient banking and things<br>5 of that nature.<br>6    Q. Outside of the one sign you<br>7 mentioned in the branch and the<br>8 newspaper ad, were any of those TD<br>9 Bank ads, again, in any medium<br>10 specifically about gift cards?<br>11    A. I believe so. I believe I<br>12 saw the same ads repeated again about<br>13 free gift cards.<br>14    Q. You saw ads on TV about<br>15 free gift cards?<br>16    A. I believe in the newspaper.<br>17    Q. Did you see any TV ads<br>18 about free gift cards?<br>19    A. I don't recall if I did or<br>20 did not.<br>21    Q. What about radio ads?<br>22    A. It's possible. I don't<br>23 recall.<br>24    Q. You might have seen | 1 you mentioned you saw in the window<br>2 of the East Brunswick branch?<br>3    A. I've seen -- yes, I've seen<br>4 it on other TD Bank branches.<br>5    Q. Same sign?<br>6    A. Same or similar.<br>7    Q. I take it you saw these<br>8 passing them on the road or walking<br>9 by?<br>10    A. Yes.<br>11    Q. Did the no-fee sign make a<br>12 difference to you in your decision in<br>13 late 2008 to buy gift cards from TD<br>14 Bank?<br>15    A. Yes.<br>16    Q. How so?<br>17      MR. LALLI: I'm going to<br>18 object, only because he testified --<br>19 I think he testified no fee as well<br>20 as free.<br>21      MR. BASSMAN: Okay. Just<br>22 that sign is all I was driving at.<br>23 BY MR. BASSMAN:<br>24    Q. Did that sign make a |

Case 1:09-cv-01062-RBK-AMD Document 79-6 Filed 09/17/10 Page 31 of 43 PageID: 4371
ORAL DEPOSITION OF BRADLEY MANN, 07/15/2010

11 (Pages 38 to 41)

Page 38

1  difference to you?
2       Let me rephrase that
3  question.
4       Did that sign that said
5  free, no fee in the bank branch
6  influence your decision to buy gift
7  cards from TD Bank in late 2008?
8    A.  Yes.
9    Q.  How so?
10   A.  Previously, we had
11 purchased American Express or Visa
12 gift cards from places like Rite Aid,
13 and there's an additional fee at the
14 cash register of approximately 4.95
15 or 5.95 that they add on to the face
16 value of the card.
17      And being that we were
18 watching our money, it was to our
19 best advantage not to have to pay an
20 additional fee to purchase the cards.
21   Q.  And when you bought gift
22 cards from TD Bank in late 2008, were
23 you charged a purchase fee?
24   A.  No.

Page 39

1       THE WITNESS:  Can I ask if
2  we can take a break when it's
3  possible?
4       MR. BASSMAN:  Right now is
5  fine.
6       Off the record.
7       (Recess.)
8  BY MR. BASSMAN:
9    Q.  Mr. Mann, I just want to
10 circle back to a couple of things we
11 were talking about before the break.
12      You mentioned that you have
13 been at your current address in
14 Monroe for about five years?
15   A.  Yes.
16   Q.  Where did you live for the
17 five years before that?
18   A.  Manalapan, New Jersey.
19   Q.  And what was the street
20 address?
21   A.  Two addresses during the
22 last five years.  The first was 175
23 Pine Brook Road, Manalapan.  And the
24 other was 35 Winthrop Drive,

Page 40

1  Manalapan.
2    Q.  And Dori Daus, is that her
3  full name, or is Dori short for
4  something?
5    A.  I believe it's short for
6  something, but I don't know for
7  sure.  I mean, I don't know what it
8  is.  I know it's short for something.
9    Q.  And do you know what her
10 street address is?
11   A.  I know she lives on
12 Monmouth Road.  Monmouth Road.  I
13 don't know the house number.
14   Q.  And the sign that you saw
15 in late 2008 in the TD Bank branch,
16 did that say free on it, no fee on
17 it, or both?
18   A.  I don't recall my -- I'm
19 sorry.  I don't recall.
20   Q.  When you bought gift cards
21 in late 2008, did you buy them from a
22 customer service representative at
23 the bank?
24   A.  Is customer service

Page 41

1  representative the person that I
2  would typically call a platform
3  person?
4    Q.  Yeah.  What I mean by
5  customer service representative is
6  not the teller, but the people that
7  sit to the side by the desks at the
8  bank branch.
9    A.  Okay.  Yes, that's who I
10 purchased it from.
11   Q.  And did you talk to the
12 customer service representative at
13 all about your gift card purchase?
14   A.  Sure, I had to ask them --
15 yes, is my answer.
16   Q.  Tell me everything you can
17 recall about that conversation.
18   A.  I mentioned to them that we
19 were interested in -- we saw the sign
20 in the window and are interested in
21 purchasing a few gift cards.  And,
22 you know, do we purchase it from this
23 person, and they said yes.
24      And they asked, you know,

c037b7cf-7bb0-43c0-8208-3f414fbe4f7b

12 (Pages 42 to 45)

| Page 42 | Page 44 |
|---|---|
| 1 the denominations, how many we<br>2 wanted. And it was pretty much a<br>3 straightforward transaction. There's<br>4 nothing -- yeah, that's my answer.<br>5    Q. Do you recall anything else<br>6 that was said in that conversation<br>7 either by you or by the customer<br>8 service rep?<br>9    A. I remember asking if like<br>10 the sign said that they are free,<br>11 no-fee cards, because, you know, I<br>12 wanted to get my full money's worth.<br>13 And they said yes.<br>14    Q. Anything else you remember<br>15 about the conversation?<br>16    A. Not specifically, no.<br>17    Q. Was it a man or a woman who<br>18 you met with?<br>19    A. A man.<br>20    Q. Do you recall his name?<br>21    A. No.<br>22    Q. Do you recall roughly what<br>23 time of day you were in the branch to<br>24 buy the cards? | 1    Q. Whom did she give them to?<br>2    A. That I don't specifically<br>3 recall.<br>4    Q. Did you ever hear from your<br>5 wife or anyone else that there was<br>6 any problem using the gift cards that<br>7 you bought in late 2008?<br>8    A. No.<br>9    Q. By the way, by late 2008<br>10 had you set up a checking account at<br>11 TD Bank?<br>12    A. Yes.<br>13    Q. And do you recall<br>14 approximately what time you<br>15 established an account at TD Bank?<br>16    A. Approximately the same time<br>17 period as when the cards were<br>18 purchased.<br>19    Q. Did you set up the account<br>20 in order to purchase the cards?<br>21    A. No.<br>22    Q. When you purchased the<br>23 cards, did they come in a box?<br>24    A. I believe so. There was |

| Page 43 | Page 45 |
|---|---|
| 1    A. Middle of the day.<br>2    Q. And after you bought these<br>3 gift cards in late 2008, did you have<br>4 any further communication in any way<br>5 with the bank about these gift<br>6 cards?<br>7    And by that I mean e-mail,<br>8 phone call, in person discussion, any<br>9 type of communication.<br>10    A. Not that I can recall.<br>11    Q. Did you ever call any bank<br>12 customer service lines in connection<br>13 with the gift cards you purchased?<br>14    A. No.<br>15    Q. To whom did you give the<br>16 gift cards that you bought in late<br>17 2008?<br>18    A. I didn't give them to<br>19 anyone. My wife had taken -- I gave<br>20 them to my wife, I guess would be the<br>21 answer.<br>22    Q. And did your wife in turn<br>23 give them to anybody else?<br>24    A. Yes. | 1 some packaging around them, and I<br>2 think it was a small box.<br>3    Q. And was it one card -- each<br>4 card had its own separate box?<br>5    A. I don't recall.<br>6    Q. Do you recall if the boxes<br>7 had ribbons on them?<br>8    A. No, I don't recall if it<br>9 did or did not have a ribbon.<br>10    Q. Was there any material<br>11 besides the physical gift card itself<br>12 in the box or packaging?<br>13    MR. LALLI: When you say<br>14 "material," do you mean cardboard or<br>15 do you mean --<br>16    MR. BASSMAN: Written<br>17 materials.<br>18    THE WITNESS: At the time<br>19 of purchase I didn't notice that.<br>20 BY MR. BASSMAN:<br>21    Q. Did you notice it later?<br>22    A. Yes.<br>23    Q. When?<br>24    A. Approximately a week or two |

| Page 46 | Page 48 |
|---|---|
| 1 later. | 1        Actually, just to go back, |
| 2    Q.  And how did you come to | 2 at the birthday party, do you recall |
| 3 notice the additional materials? | 3 who told you about gift card fees? |
| 4    A.  We were at a birthday party | 4    A.  It was one of the parents |
| 5 for one of my children's friends, and | 5 from my son's Cub Scout Troop. |
| 6 it was at their home.  And the | 6    Q.  And what was the person's |
| 7 parents were sitting around talking, | 7 name? |
| 8 and the subject of, you know, current | 8    A.  I don't even think I know |
| 9 events and whatnot came up. | 9 their name.  It was one of the |
| 10        And someone was talking | 10 parents who I don't know their name. |
| 11 about they had heard that there were | 11    Q.  Okay.  And after you came |
| 12 gift cards that were incurring all of | 12 home and you read the material about |
| 13 these sorts of fees. | 13 dormancy fees, did you call up any of |
| 14        And through that discussion | 14 the Hebrew school teachers to whom |
| 15 we had mentioned that I had just | 15 gift cards were given in May -- |
| 16 purchased these gift cards, and we | 16 around May of 2008 and inform them |
| 17 were so excited because they were | 17 that there could be dormancy fees |
| 18 free, no-fee gift cards. | 18 charged to their cards? |
| 19        And a person was saying, | 19    A.  No. |
| 20 Well, they said on the news you have | 20    Q.  Did you talk to your wife |
| 21 to check everything that comes with | 21 about whether anyone should contact |
| 22 it.  And I kind of had a little bit | 22 those teachers and tell them that |
| 23 of a discussion with them saying, No, | 23 there could be dormancy fees charged |
| 24 we checked everything. | 24 to their cards? |

| Page 47 | Page 49 |
|---|---|
| 1        So at their insistence, | 1    A.  I told her that there -- |
| 2 when we got home, we had pulled apart | 2 what I learned in the conversation. |
| 3 the packaging, and I believe there | 3 I didn't discuss whether we should |
| 4 was some additional papers.  Either | 4 call the Hebrew school teachers or |
| 5 it was behind the gift cards or | 5 not. |
| 6 somewhere in the packaging there was | 6    Q.  And at the time that you |
| 7 some additional information in there. | 7 found out about the dormancy fees, |
| 8    Q.  And what did you learn from | 8 had your wife given any of the cards |
| 9 reading that additional information? | 9 that you bought in late 2008 away to |
| 10    A.  If I remember correctly, it | 10 anyone? |
| 11 discussed after a certain period of | 11    A.  I don't recall the exact |
| 12 time, several months, I don't | 12 timing.  She may have. |
| 13 remember the number, that there was | 13    Q.  Were you at all concerned |
| 14 some type of dormancy-type fee per | 14 that the people to whom she might |
| 15 month that was charged if the card | 15 have given a gift card wouldn't know |
| 16 wasn't fully used or had a balance | 16 about these dormancy fees? |
| 17 still on it. | 17        MR. LALLI:  Objection. |
| 18    Q.  And what did you do with | 18        You can answer. |
| 19 that information that you learned | 19        THE WITNESS:  Can you |
| 20 about the dormancy fees? | 20 explain what you mean by concerned? |
| 21    A.  I don't understand the | 21 BY MR. BASSMAN: |
| 22 question. | 22    Q.  Sure.  Were you worried |
| 23    Q.  Sure.  Let me ask you | 23 that your wife may have just given a |
| 24 something slightly different. | 24 gift card to someone who wouldn't |

c037b7cf-7bb0-43c0-8208-3f414fbe4f7b

| Page 50 | Page 52 |
|---|---|
| 1  know that if they didn't spend the | 1  A.  Not specifically, no. |
| 2  card quickly enough they could incur | 2  Q.  Do you have credit cards? |
| 3  fees? | 3  A.  Yes. |
| 4  MR. LALLI:  Same objection. | 4  Q.  Have you ever seen terms |
| 5  THE WITNESS:  Yeah, I don't | 5  and conditions for those credit |
| 6  -- I don't recall specifically. | 6  cards? |
| 7  BY MR. BASSMAN: | 7  A.  Most likely I would have. |
| 8  Q.  Do you recall either you or | 8  Q.  Based on -- I believe you |
| 9  your wife making any attempt to | 9  testified you had about 15 years of |
| 10  inform any recipient of any gift card | 10  experience in the banking industry; |
| 11  that you bought about potential | 11  is that right? |
| 12  dormancy fees? | 12  A.  Yes. |
| 13  A.  No. | 13  Q.  Based upon your 15 years of |
| 14  Q.  By the way, are you sure | 14  experience in the banking industry, |
| 15  that all the gift cards that you | 15  do you understand generally that |
| 16  bought in late 2008 were, in fact, | 16  cards issued by banks generally come |
| 17  given away to people? | 17  with terms and conditions? |
| 18  A.  I'm not sure if they all | 18  MR. LALLI:  Objection. |
| 19  were or not. | 19  You can answer. |
| 20  Q.  You mentioned that after | 20  THE WITNESS:  Okay. |
| 21  the birthday party, you went and | 21  Could you repeat the |
| 22  looked at the packaging that came | 22  question, please? |
| 23  with the card. | 23  MR. BASSMAN:  Could you |
| 24  Did you look at the card | 24  read it back? |

| Page 51 | Page 53 |
|---|---|
| 1  itself? | 1  (The court reporter read |
| 2  A.  I must have.  I think there | 2  back the following: |
| 3  was one card in the packaging still, | 3  "Q.  Based upon your 15 |
| 4  so I must have looked at that card. | 4  years of experience in the banking |
| 5  Q.  Do you recall reading both | 5  industry, do you understand generally |
| 6  the front and the back of the card? | 6  that cards issued by banks generally |
| 7  A.  Not specifically.  I may | 7  come with terms and conditions?") |
| 8  have flipped the card over.  I | 8  THE WITNESS:  I don't |
| 9  couldn't tell you specifically what | 9  understand my experience in the |
| 10  it said or not. | 10  banking industry.  I had nothing to |
| 11  Q.  Do you recall if the | 11  do with consumer banking, so I don't |
| 12  information about dormancy fees you | 12  see how the question relates to this |
| 13  saw was on the card itself or in the | 13  instance. |
| 14  materials that came in the package, | 14  BY MR. BASSMAN: |
| 15  the other materials? | 15  Q.  Would you ever buy a gift |
| 16  A.  My recollection is it was | 16  card again from TD Bank? |
| 17  in the other materials. | 17  A.  I couldn't speculate at the |
| 18  Q.  By the way, at the time | 18  moment. |
| 19  that you purchased these cards in | 19  Q.  Do you have any current |
| 20  late 2008, did you understand that | 20  plans to buy another gift card from |
| 21  the cards would be governed by a set | 21  TD Bank? |
| 22  of terms and conditions? | 22  A.  I don't have any current |
| 23  A.  No. | 23  plans, no. |
| 24  Q.  Did you think about it? | 24  Q.  By the way, have you ever |

| Page 54 | Page 56 |
|---|---|
| 1 received a bank gift card yourself? | 1    A.  I prefer not to say.  It's |
| 2    A.  No. | 2 not relevant to this. |
| 3    Q.  After you learned about the | 3    Q.  Whatever this Facebook page |
| 4 dormancy fees when you opened the | 4 is or whoever it's maintained for, |
| 5 package up, did you contact legal | 5 was there ever anything posted on it |
| 6 counsel? | 6 about dormancy fees for gift cards? |
| 7    A.  Your question is after -- I | 7    A.  No. |
| 8 mean, immediately after or -- | 8    Q.  Outside of that Facebook |
| 9    Q.  Immediately after is my | 9 page, do you have a page on any other |
| 10 question. | 10 social networking site? |
| 11    A.  No, not immediately after. | 11    A.  No. |
| 12    Q.  At some point thereafter | 12    Q.  Have you made any attempts |
| 13 did you contact counsel? | 13 to recruit any other plaintiffs in |
| 14    A.  Yes. | 14 this case? |
| 15    Q.  And was that Mr. Berman? | 15       MR. LALLI:  Objection. |
| 16    A.  Yes. | 16       THE WITNESS:  I don't know |
| 17    Q.  How did you know | 17 what you mean by "recruit." |
| 18 Mr. Berman? | 18       Could you explain that? |
| 19    A.  Mr. Berman and I grew up in | 19 BY MR. BASSMAN: |
| 20 the same neighborhood -- he actually | 20    Q.  I'll ask a broader |
| 21 lived down the street -- since I was | 21 question. |
| 22 a child. | 22       Leaving out your attorneys, |
| 23    Q.  And do you recall how much | 23 have you spoken to anyone about this |
| 24 time elapsed from when you found out | 24 lawsuit? |

| Page 55 | Page 57 |
|---|---|
| 1 about the dormancy fees and you first | 1    A.  Yes. |
| 2 contacted Mr. Berman? | 2    Q.  Who have you spoken to |
| 3    A.  I would say in the | 3 about this lawsuit? |
| 4 neighborhood of a few weeks. | 4    A.  My wife. |
| 5    Q.  Did you make any attempt to | 5    Q.  Anyone else? |
| 6 complain to TD Bank about the | 6    A.  No. |
| 7 dormancy fees? | 7    Q.  Did you ask your wife to |
| 8    A.  No. | 8 join the lawsuit as a plaintiff? |
| 9    Q.  Did you try to complain to | 9    A.  No. |
| 10 any government agency about TD Bank's | 10    Q.  Do you believe that TD Bank |
| 11 dormancy fees? | 11 misled you? |
| 12    A.  No. | 12       MR. LALLI:  Objection. |
| 13    Q.  Did you post anything on | 13       But you can answer the |
| 14 the Internet about TD Bank's dormancy | 14 question. |
| 15 fees? | 15       THE WITNESS:  Could you |
| 16    A.  No. | 16 explain that, by "misled"?  I don't |
| 17    Q.  Do you have a Facebook | 17 -- |
| 18 page? | 18 BY MR. LALLI: |
| 19    A.  Not -- I maintain a | 19    Q.  Sure. |
| 20 Facebook page, but it's not for | 20    A.  Could you clarify that? |
| 21 myself, so I think the answer would | 21    Q.  Let me ask a more specific |
| 22 be no. | 22 question. |
| 23    Q.  Who do you maintain it | 23       In connection with selling |
| 24 for? | 24 you gift cards, do you think that TD |

c037b7cf-7bb0-43c0-8208-3f414fbe4f7b

| Page 58 | Page 60 |
|---|---|

**Page 58**

1  Bank engaged in any conduct to
2  deceive you?
3          MR. LALLI:  Objection.
4          THE WITNESS:  No.
5  BY MR. BASSMAN:
6     Q.  Do you think TD Bank has
7  done anything that has harmed you
8  personally?
9          MR. LALLI:  Objection.
10         THE WITNESS:  Can you
11  explain harm?  I don't understand
12  what exactly you are asking.
13  BY MR. BASSMAN:
14    Q.  Sure.  I'll break it down.
15         In connection with its gift
16  card program, has TD Bank done
17  anything that caused you financial
18  loss?  And by "you," I mean you
19  personally.
20    A.  No.
21    Q.  In connection with its gift
22  card program, has TD Bank done
23  anything that's caused you emotional
24  distress?

**Page 60**

1     A.  Thank you.
2     Q.  I take it you didn't seek
3  any medical treatment for any
4  emotional distress caused by TD Bank?
5     A.  I don't mean to split
6  hairs.  Your question has a double
7  negative, I believe.
8     Q.  Sure.  Let me ask you a
9  little straighter.
10        In order to treat the
11  emotional distress you just
12  described, did you ever see a doctor?
13    A.  No.
14    Q.  Did you ever take any
15  medication to treat that emotional
16  distress?
17    A.  No.
18    Q.  Did you ever see a
19  therapist to treat that emotional
20  distress?
21    A.  No.
22    Q.  If you were to win this
23  case, what relief would you like the
24  court to order for you?

| Page 59 | Page 61 |
|---|---|

**Page 59**

1     A.  Yes.
2     Q.  What did TD Bank do to
3  cause you emotional distress?
4     A.  Well, I purchased gift
5  cards which I later learned would
6  incur fees that I wasn't aware of.
7         And being that my wife had
8  given these as gifts, it's
9  embarrassing that if someone were to
10  use them and they don't get the full
11  value of what we purchased, it's
12  embarrassing and upsetting.
13    Q.  Did you ever learn that any
14  of the recipients of the gift cards
15  that you bought were unable to use
16  the full value of their cards?
17    A.  No, I never learned that.
18        MR. LALLI:  Are you okay,
19  Brad?
20        THE WITNESS:  Yes, I'm
21  okay.
22  BY MR. BASSMAN:
23    Q.  Okay.  If at any point you
24  need another break, feel free.

**Page 61**

1         MR. LALLI:  Objection.
2         THE WITNESS:  Can you
3  explain that further?
4  BY MR. BASSMAN:
5     Q.  Sure.  Let me try to break
6  that one down a little more.
7         In this case are you asking
8  the court to award you personally
9  money damages?
10    A.  I'm asking the court to
11  award a class of people who have been
12  injured, not only for myself.
13    Q.  Would you be one of the
14  people who you think should be
15  awarded money damages?
16    A.  I'm not an attorney to
17  speculate.  I don't know if a person
18  would be eligible for damages or not.
19    Q.  Would you like the courts
20  to order a refund of any fees that
21  were charged on gift cards that you
22  purchased?
23    A.  Yes.
24    Q.  And would you prefer for

Page 62

1   that refund to go to you or to the
2   recipient of the card?
3           MR. LALLI:  Objection.
4           THE WITNESS:  I would
5   assume the recipients.
6   BY MR. BASSMAN:
7       Q.   Do you want the court to
8   order TD Bank to change any of its
9   conduct?
10          MR. LALLI:  Objection.
11          THE WITNESS:  Yes.
12  BY MR. BASSMAN:
13      Q.   And what changes would you
14  like the court to order?
15      A.   I would like to have a more
16  clear disclosure of any and all fees
17  or any other wording -- any other
18  type of costs that would be incurred
19  by purchasing or maintaining --
20  having a card, a gift card.
21          THE WITNESS:  Could I ask
22  that we take a break?
23          MR. BASSMAN:  Sure.  Off
24  the record.

Page 63

1           (Recess.)
2   BY MR. BASSMAN:
3       Q.   Mr. Mann, is your wife
4   currently employed?
5       A.   No.
6       Q.   Has she previously been
7   employed?
8       A.   Yes.
9       Q.   Just generally, what was
10  her job?
11      A.   She worked for the same
12  bank that I had worked previously,
13  for Republic National Bank.  We met
14  when she worked in the credit
15  department there.
16      Q.   And did she ever work in
17  retail banking?
18      A.   Not to my knowledge.
19      Q.   After you opened the
20  package and saw the information about
21  the dormancy fees, did you discuss
22  what you learned with your wife?
23      A.   I believe so, yes.
24      Q.   Do you recall if you

Page 64

1   discussed it with her in one
2   conversation or multiple
3   conversations?
4       A.   It probably was two or
5   three times we had discussed it.
6   There was -- we discussed what we
7   learned and what our friend told us
8   at the party that I mentioned
9   previously.
10      Q.   Anything else you remember
11  about those conversations?
12      A.   No, not specifically.
13      Q.   Was your wife surprised at
14  what you had to tell her about the
15  dormancy fees?
16          MR. LALLI:  Objection.
17          THE WITNESS:  Yes, she was.
18  BY MR. BASSMAN:
19      Q.   Was she upset?
20          MR. LALLI:  Objection.
21          THE WITNESS:  Yes, I would
22  say upset.
23  BY MR. BASSMAN:
24      Q.   Did she tell you she wanted

Page 65

1   to contact the people that she gave
2   the cards to tell them about this?
3       A.   No.
4       Q.   By the way, the gift cards
5   that you bought in late 2008, do you
6   know if those cards were ever used?
7           MR. LALLI:  Objection.
8           THE WITNESS:  I don't know
9   if they were used or if they were not
10  used.
11  BY MR. BASSMAN:
12      Q.   Would you be surprised if
13  the bank's records showed that they
14  were never used to make a purchase?
15          MR. LALLI:  Objection.
16          THE WITNESS:  No, I
17  wouldn't be surprised.
18  BY MR. BASSMAN:
19      Q.   Why wouldn't that surprise
20  you if they were given away as gifts?
21      A.   There aren't many things
22  that surprise me anymore.
23      Q.   When you met with the
24  customer service representative to

c037b7cf-7bb0-43c0-8208-3f414fbe4f7b

Case 1:09-cv-01062-RBK-AMD   Document 79-6   Filed 09/17/10   Page 38 of 43 PageID: 4378
ORAL DEPOSITION OF BRADLEY MANN, 08/13/2010

18 (Pages 66 to 69)

| Page 66 | Page 68 |
|---|---|
| 1 buy these gift cards in late 2008, | 1    Q.  Acknowledge at the time of |
| 2 did the customer service | 2 purchase? |
| 3 representative mention that there | 3    A.  Sure. |
| 4 were terms and conditions that govern | 4    Q.  Any other changes to the |
| 5 the cards? | 5 disclosure practices of the bank with |
| 6    A.  Not that I recall. | 6 regard to gift card fees that you |
| 7    Q.  And when you say "Not that | 7 would like to see put in place? |
| 8 I recall," is it possible that he may | 8      MR. LALLI:  Objection. |
| 9 have and you just don't remember one | 9      THE WITNESS:  Sure.  I mean |
| 10 way or the other right now? | 10 the signage is very -- was extremely |
| 11      MR. LALLI:  Objection. | 11 not clear, so the sign should be much |
| 12      THE WITNESS:  Could you | 12 clearer. |
| 13 repeat the question? | 13 BY MR. BASSMAN: |
| 14      MR. BASSMAN:  Can you read | 14    Q.  Anything else? |
| 15 it back? | 15      MR. LALLI:  Objection. |
| 16      (The court reporter read | 16      THE WITNESS:  Sitting here |
| 17 back the following: | 17 at the moment, I don't have those |
| 18      "Q.  And when you say | 18 specific answers. |
| 19 "Not that I recall," is it possible | 19 BY MR. BASSMAN: |
| 20 that he may have and you just don't | 20    Q.  Why did you contact |
| 21 remember one way or the other right | 21 Mr. Berman after finding out about |
| 22 now?") | 22 the dormancy fees? |
| 23      THE WITNESS:  I don't think | 23      And to be clear, I don't |
| 24 there was any mention of terms and | 24 want to know anything that you two |

| Page 67 | Page 69 |
|---|---|
| 1 conditions. | 1 said after you contacted him.  I'm |
| 2 BY MR. BASSMAN: | 2 just asking what led you to call him |
| 3    Q.  But you don't recall all | 3 up. |
| 4 the exact words that were said in | 4    A.  Well, I knew Michael was an |
| 5 that conversation sitting here a | 5 attorney. |
| 6 couple years later? | 6      And when I spoke with my |
| 7    A.  That's correct. | 7 wife she said, Why don't you -- she |
| 8    Q.  You mentioned earlier that | 8 suggested that I talk to him and see |
| 9 you would like the court to order TD | 9 if he has any ideas about, you know, |
| 10 Bank to have better disclosures of | 10 what could be done.  And so I reached |
| 11 fees charged in connection with gift | 11 out and gave Michael a call and -- |
| 12 cards. | 12    Q.  And I don't want to know |
| 13      What better disclosures do | 13 what you two discussed.  That's |
| 14 you think there should be? | 14 privileged. |
| 15      MR. LALLI:  Objection. | 15    A.  Okay. |
| 16      THE WITNESS:  I don't know | 16    Q.  By the way, have you ever |
| 17 if I could speculate on how you do | 17 spoken to an individual named Angelo |
| 18 it, but you should have the customer | 18 Capizzi? |
| 19 somehow acknowledge exactly if there | 19    A.  No, not to my knowledge.  I |
| 20 is additional terms and conditions; | 20 don't know that name. |
| 21 acknowledge -- as you use the term | 21    Q.  Have you ever spoken to a |
| 22 terms and conditions, acknowledge | 22 woman named Maggie or Margaret |
| 23 what they are. | 23 Munthali? |
| 24 BY MR. BASSMAN: | 24    A.  I don't know that name |

c037b7cf-7bb0-43c0-8208-3f414fbe4f7b

Case 1:09-cv-01062-RBK-AMD Document 79-6 Filed 09/17/10 Page 39 of 43 PageID: 4379
ORAL DEPOSITION OF BRADLEY MANN, 7/29/2010

19 (Pages 70 to 73)

| Page 70 | | Page 72 | |
|---|---|---|---|
| 1 | either, no. | 1 | advertisements, on the Internet, |
| 2 | Q. Fern Rutberg? | 2 | anything -- about the costs that TD |
| 3 | A. No. | 3 | Bank incurs to maintain gift cards? |
| 4 | Q. Chawezi Mwantembe? | 4 | A. No. |
| 5 | A. No. | 5 | Q. Same question, but this |
| 6 | MR. LALLI: Or Bertha. | 6 | time the costs incurred to replace a |
| 7 | BY MR. BASSMAN: | 7 | gift card. |
| 8 | Q. Or Bertha Mwantembe? | 8 | A. Is the question the costs |
| 9 | A. No. | 9 | that TD Bank incurs? |
| 10 | Q. How about Sandra Elmoznino? | 10 | Q. Yes, the costs to TD Bank. |
| 11 | A. No. | 11 | A. No, I have never seen |
| 12 | Q. You mentioned earlier that | 12 | anything like that. |
| 13 | your Complaint asks for you to be | 13 | MR. BASSMAN: Off the |
| 14 | appointed as a representative of a | 14 | record. |
| 15 | class of purchasers of gift cards. | 15 | (Recess.) |
| 16 | Do you recall that? | 16 | BY MR. BASSMAN: |
| 17 | A. Yes, I do. | 17 | Q. Mr. Mann, do you know where |
| 18 | Q. What do you understand your | 18 | the gift cards you bought in late |
| 19 | obligations to be as a representative | 19 | 2008 are today? |
| 20 | of a class? | 20 | A. No. |
| 21 | A. To look out for the | 21 | Q. Do you still have |
| 22 | interests of other people who may | 22 | possession of any of them? |
| 23 | have been wronged by this incident. | 23 | A. Not that I know of. I |
| 24 | Q. Have you ever read any | 24 | don't believe so. |

| Page 71 | | Page 73 | |
|---|---|---|---|
| 1 | documents issued by any governmental | 1 | Q. If you wanted to find out |
| 2 | agency or authority about gift cards? | 2 | where they are today, what would you |
| 3 | A. No, not that I can recall. | 3 | do? |
| 4 | Q. Have you ever read any | 4 | A. I have like a file box |
| 5 | articles in a publication called the | 5 | where I keep my TD Bank records, so |
| 6 | E-commerce Times? | 6 | if there's -- if I wanted to look at |
| 7 | A. No. | 7 | anything related to TD Bank, I would |
| 8 | Q. As far as you know -- and, | 8 | look in that file box. |
| 9 | again, just to the best of your | 9 | Q. Have you consulted that |
| 10 | knowledge -- did any of the gift | 10 | file box at all in connection with |
| 11 | cards that you bought need to be | 11 | this case? |
| 12 | replaced? | 12 | A. No. |
| 13 | MR. LALLI: Objection. | 13 | Q. Did you search that file |
| 14 | THE WITNESS: Can you | 14 | box to see if you had any documents |
| 15 | explain "replaced"? | 15 | relating to your gift card purchases? |
| 16 | BY MR. BASSMAN: | 16 | A. I believe a few months back |
| 17 | Q. Sure. The card was lost or | 17 | I looked through it, yes. |
| 18 | stolen and a replacement card needed | 18 | Q. And did you find any |
| 19 | to be ordered for it. | 19 | documents relating to your gift card |
| 20 | A. I don't know if that | 20 | purchases there? |
| 21 | happened or not. | 21 | A. I think there's a receipt |
| 22 | Q. Did you ever see any | 22 | of the transaction because it was |
| 23 | representations from TD Bank in any | 23 | drawn from my account. So I believe |
| 24 | form -- oral, written in | 24 | that was in there. |

c037b7cf-7bb0-43c0-8208-3f414fbe4f7b

| Page 74 | Page 76 |
|---|---|
| 1    Q.  Do you still have a copy of | 1    Q.  What is it? |
| 2  that receipt? | 2    A.  Faith. |
| 3    A.  I believe so. | 3    Q.  F-A-I-T-H? |
| 4         MR. BASSMAN:  Has that been | 4    A.  I believe so, but I'm not |
| 5  produced to us? | 5  positive of the spelling.  It's |
| 6         MR. LALLI:  I don't believe | 6  definitely Faith.  I'm not sure if |
| 7  so, but I'll -- | 7  it's F-A-Y-T-H or F-A-I-T-H. |
| 8         MR. BASSMAN:  If you could | 8    Q.  And does she go by her |
| 9  look into that. | 9  maiden name or your last name? |
| 10         MR. LALLI:  Sure. | 10    A.  My last name, Mann. |
| 11  BY MR. BASSMAN: | 11    Q.  And has she gone by Mann |
| 12    Q.  Could you ask your wife | 12  for the last ten years? |
| 13  where the gift cards are now? | 13    A.  Yes. |
| 14    A.  Yes. | 14    Q.  One of the things I wanted |
| 15    Q.  Do you think she would be | 15  to ask you about -- and I apologize I |
| 16  able to at least identify who the | 16  ended up not bringing extra copies. |
| 17  recipients of the gift cards were? | 17         The interrogatory responses |
| 18         MR. LALLI:  Objection. | 18  we received from your attorneys |
| 19         THE WITNESS:  I don't know. | 19  mention the gift card purchases for |
| 20  BY MR. BASSMAN: | 20  the Etzchaim Hebrew School teachers, |
| 21    Q.  But you are pretty positive | 21  but listed a date as 2007 instead of |
| 22  that the cards were, in fact, given | 22  2008. |
| 23  away to someone besides her? | 23         And I just wanted to |
| 24    A.  That was the intention. | 24  confirm that the Hebrew school |

| Page 75 | Page 77 |
|---|---|
| 1    Q.  And, again, I'm not trying | 1  teacher purchase was in 2007.  I mean |
| 2  to trip you up, I just want to be | 2  in 2008, excuse me. |
| 3  clear. | 3         Confirm the year they |
| 4         In all honesty, you don't | 4  happened. |
| 5  know either way whether your wife, in | 5    A.  It was during the prior |
| 6  fact, really did give them away or | 6  school year.  And I believe they were |
| 7  just threw them in a drawer? | 7  for end of the year gifts, that would |
| 8         MR. LALLI:  Objection, it's | 8  make it 2008.  So I believe 2008 was |
| 9  been asked and answered. | 9  correct. |
| 10         But you can answer again. | 10    Q.  And, again, just to -- I |
| 11         THE WITNESS:  Yeah, I'm not | 11  know we discussed this a little |
| 12  aware of -- like I said, if -- I'm | 12  earlier but I just want to nail it |
| 13  not aware if they have been given out | 13  down. |
| 14  or not.  Possibly my wife would know, | 14         As far as you know, neither |
| 15  but I don't think that she -- you | 15  you nor your wife made any attempt |
| 16  know, I can ask. | 16  whatsoever to inform any of the |
| 17         BY MR. BASSMAN: | 17  recipients of the gift cards you |
| 18    Q.  One of the things I wanted | 18  purchased that there could be fees in |
| 19  to ask you about -- oh, your wife's | 19  connection with them? |
| 20  name, by the way, it was I remember | 20         MR. LALLI:  Objection. |
| 21  Robynn with a Y and the two Ns. | 21         THE WITNESS:  Yes, that's |
| 22         Does she have a middle | 22  what I previously said. |
| 23  name? | 23  BY MR. BASSMAN: |
| 24    A.  Yes. | 24    Q.  Were you at all worried |

c037b7cf-7bb0-43c0-8208-3f414fbe4f7b

| Page 78 |
|---|

1    that the gift card recipients would
2    find out about the fees some other
3    way and be upset with you?
4         MR. LALLI: Objection.
5         THE WITNESS: Could you
6    explain "worried"? I don't know if I
7    worried about it.
8    BY MR. BASSMAN:
9         Q. Was it something you
10   thought about?
11        A. Yes.
12        Q. And if it was something you
13   thought about, the possibility that a
14   gift card recipient could find out
15   about these fees and be upset with
16   you, why didn't you try to forestall
17   that by telling them about the fees
18   ahead of time?
19        A. Well, I'm not sure what you
20   mean by "ahead of time."
21        If I wasn't -- to this day
22   I didn't investigate and find out who
23   my wife had given them to and
24   whatnot, so I'm not sure even ahead

| Page 79 |
|---|

1    of time we knew they were used or not
2    used.
3         Q. Did you ever ask your wife
4    who she gave the gift cards to?
5         A. No.
6         Q. Did she ever volunteer the
7    information to you?
8         A. No.
9         MR. BASSMAN: Steve, I was
10   wondering if you could describe the
11   exemplar on the record.
12        MR. HARVEY: Yes. I
13   just -- we have an exemplar of a gift
14   card box here.
15        I don't know that this gift
16   card box was in use in the last part
17   of 2008. You may be able to testify
18   about whether you saw it or not.
19        But I do believe there was
20   a box, and the box works generally
21   the same way. It might have been a
22   different size, I don't know.
23        But it had inside what we
24   the lawyers call a tri-fold that

| Page 80 |
|---|

1    looks -- it is a document that opens
2    up with three panels. And inside the
3    center panel there is a little space
4    for a document, it's called terms in
5    this one.
6         And it sits on top of a
7    gift card holder in which the card
8    is, so it's -- when you open up
9    the -- when you take the elasticized
10   ribbon off and you take the top off,
11   and you find the tri-fold. And then
12   underneath the tri-fold is the gift
13   card and the bottom of the box.
14        MR. LALLI: That's fair.
15   BY MR. BASSMAN:
16        Q. I show you the box,
17   Mr. Mann.
18        And my first question is,
19   just look at the exterior of the
20   box.
21        Does this look similar to
22   the packaging in which the gift cards
23   you bought in late 2008 came in?
24        A. Yes.

| Page 81 |
|---|

1         Q. And if you open up the box,
2    on top you see there's the document
3    that Mr. Harvey just described as a
4    tri-fold.
5         Do you recall seeing a
6    document like that that came with the
7    gift cards that you bought in late
8    2008?
9         A. I don't remember
10   specifically whether it was a
11   tri-fold or -- there was some
12   documentation. I don't remember
13   specifically if it looked like this
14   or where it was located.
15        I seem to remember there
16   was something behind -- when I took
17   out the gift card, there was
18   something behind it. Whether it was
19   a tri-fold or not, I don't recall.
20        Q. Okay. So you do remember,
21   I guess, the ordering of the
22   packaging as being you open the box,
23   there was a card, and the other
24   materials that you described where

Page 82

1    you saw -- you read about the
2    dormancy fees were physically
3    underneath the card.
4         MR. LALLI:  When you say
5    "the card," do you mean the gift
6    card?
7         MR. BASSMAN:  Yeah, the
8    gift card itself.  Physically
9    underneath the gift card.
10        THE WITNESS:  Yes, that's
11   what I remember.
12   BY MR. BASSMAN:
13     Q.  If you could pass that back
14   to me.
15        If you look at the back of
16   the gift card in the exemplar, which
17   I just handed back to you, do you see
18   some writing on it?
19     A.  Yes.
20     Q.  Do you recall if the gift
21   cards that you bought in May of 2008
22   had writing on the back of them?
23     A.  I believe they had writing
24   on the back, yes.

Page 83

1      Q.  Did you read that writing
2    on the back of the cards?
3         MR. LALLI:  Objection.  I
4    think we have been through this
5    already.
6         But you can answer.
7         THE WITNESS:  Was the
8    question did I read the writing on
9    the back of the card?
10   BY MR. BASSMAN:
11     Q.  Yeah.
12     A.  At what time?  At any time
13   when I purchased it?
14     Q.  At any time.
15     A.  Yes, I did read it.  At
16   some time I did, yes.
17     Q.  If you look on the back of
18   the card in the exemplar box that I
19   just handed you, there is a mention
20   on the back of that card of a monthly
21   maintenance fee of $2.50 that kicks
22   in at a certain point.  If you take a
23   look back there.
24     A.  Um-hum.

Page 84

1      Q.  Yes?
2      A.  I'm sorry.  What was the
3    question?
4      Q.  Sure.  I'm just asking if
5    you see the language.
6      A.  I couldn't possibly read
7    that without my reading glasses on.
8         MR. LALLI:  You can read it
9    for the record.
10        MR. BASSMAN:  I'll read it
11   for the record.
12        MR. LALLI:  But this is an
13   exemplar.
14        We don't know if this is
15   the same card that was used, right?
16        MR. BASSMAN:  Right, we
17   don't.  I'm just reading what's on
18   the back of the exemplar that
19   Mr. Harvey described earlier.
20        MR. LALLI:  Sure.
21   BY MR. BASSMAN:
22     Q.  And the back of this card
23   has, among other verbiage, the
24   following:  A monthly service fee of

Page 85

1    $2.50 will be deducted from your
2    balance starting on the first day of
3    the month immediately following the
4    365th day of the date your card was
5    purchased.  You can request a
6    reissued card following the active
7    through date.
8         And my question for you,
9    Mr. Mann, is do you recall any
10   language like that being physically
11   on any of the gift cards that you
12   bought in late 2008?
13     A.  No, I don't recall it.
14     Q.  Okay.  Do you know if your
15   wife has discussed gift card fees
16   with anyone besides you?
17        MR. LALLI:  Objection.
18        THE WITNESS:  No, I don't
19   know if she did.
20   BY MR. BASSMAN:
21     Q.  Did your wife ever speak to
22   Mr. Berman about gift cards and gift
23   card fees?
24        MR. LALLI:  Objection.

Page 86

1        THE WITNESS:  Not that I
2    know of.
3        MR. BASSMAN:  Off the
4    record.
5        (Recess.)
6        MR. BASSMAN:  Mr. Mann, the
7    good news is I don't have any further
8    questions for you.  So unless your
9    counsel has questions for you, you
10   are free to eat cheese steaks.
11       MR. LALLI:  I've just got
12   one, and you've already testified to
13   it.
14          EXAMINATION
15   BY MR. LALLI:
16    Q.   As a class rep, do you
17   promise to fairly and adequately
18   protect the interests of all the
19   other class members?
20    A.   Yes, I do.
21       MR. LALLI:  We're done.
22       (The deposition concluded
23   at 4:17 p.m.)
24

Page 87

1        WITNESS CERTIFICATION
2
3
4        I hereby certify that I
5    have read the foregoing transcript of
6    my deposition testimony, and that my
7    answers to the questions propounded,
8    with the attached corrections or
9    changes, if any, are true and
10   correct.
11
12
13
14
15   DATE          BRADLEY MANN
16
17
18
19   PRINTED NAME
20
21
22
23
24