NOT FOR PUBLICATION                                           (Doc. No. 46)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

_____
                                        :
BRADLEY MANN, et al.,                   :
                                        :
        Plaintiffs,                     :
                                        :
                                        :        Civil No. 09-1062 (RBK/AMD)
        v.                              :
                                        :            **OPINION**
TD BANK, N.A., et al.,                  :
                                        :
        Defendants.                     :
_____    :


**KUGLER**, United States District Judge:

Before the Court is Plaintiffs' motion for class certification pursuant to Federal Rule of

Civil Procedure 23 (Doc. No. 46).  Plaintiffs claim that Defendants TD Bank, N.A. ("TD Bank")

and Commerce Bank, N.A. ("Commerce") failed to adequately disclose to consumers that their

prepaid VISA gift cards are subject to a $2.50 monthly "dormancy fee" beginning one year after

a card's date of purchase.  They also claim that Defendants mislead consumers by advertizing

their cards as "free" despite imposing the dormancy fee.  Plaintiffs assert class claims for

violation of the New Jersey Consumer Fraud Act ("NJCFA"), breach of contract, and unjust

enrichment.  They define the putative class as "all New Jersey persons or entities who purchased

or received . . . gift cards on which dormancy fees were assessed . . . ."  (Pl. Br. at 16).

The Court denies Plaintiffs' motion for class certification.  To succeed on any of

Plaintiffs' three causes of action, Plaintiffs must prove that class members held their cards at a

time when Defendants actually assessed fees to those cards.  Although Defendants' records

identify people who purchased cards that incurred dormancy fees, gift-card recipients are not

required to register their cards.  Thus, there is no systematic way to determine who actually held cards at a time when those cards incurred dormancy fees.  In other words, there is no feasible way to determine class membership.  The Court would have to hear anecdotal evidence from each prospective class member and determine whether he or she could be credibly linked to a card at a time when the card incurred a dormancy fee.  Consequently, Plaintiffs' putative class fails Rule 23(b)'s predominance and superiority requirements.  The named Plaintiffs also fail to qualify as adequate and typical class representatives under Rule 23(a) because none of them have proven, by a preponderance of the evidence, that they themselves held cards at a time when those cards incurred dormancy fees.  Plaintiffs' putative class does not satisfy the requirements for certification.

## I.     FACTUAL BACKGROUND

### A.  Defendants' Gift Card Program

Defendants issue credit-card size gift cards.  The cards are embossed with the VISA logo. Holders of the gift cards can use them to make purchases anywhere that VISA cards are accepted.  All cards display a "Good-Thru" date on the front of the card, and come with a separate document that explains applicable terms and conditions.  Commerce began to issue the cards in 2004.  In May 2008, TD Bank succeeded Commerce by merger.  After May 2008, TD Bank continued to issue the same or similar gift cards.

Defendants have never charged a purchase-price for the gift cards.  Customers can obtain them simply by selecting the amount of credit they would like to place on the card, and giving Defendants that amount.  In exchange, Defendants issue a gift card credited with the full amount they received from the customer.  The cards are, however, subject to certain fees and charges, which Defendants assess against the credit placed on each card.  At issue in this case is the so-

called "dormancy fee." A card begins to incur monthly dormancy fees if it is inactive for a certain period. The monthly fee on most of Defendants' cards was $2.50 beginning in the thirteenth month after the date the card was purchased.[1]

Defendants maintain a registration and tracking system regarding gift cards.[2] Because gifts cards can be purchased only by bank account holders, Defendants can identify purchasers of specific cards. Defendants can also track the transactions on a card, including the dates and amounts of purchases and fees, by reference to either a card purchaser's name or the VISA number on the card. However, a card can be used by anyone who has possession of the card, and, in fact, Defendants designed the cards with the intent that purchasers would give them away to unidentified recipients. Recipients can choose to register their card upon recipient, but they do not need to do so in order to use their cards.[3] Thus, there are no consolidated records showing if and when card-purchasers gave their cards away or to whom they gave the cards. Consequently, there is no systematic way to identify who actually held cards when those cards incurred dormancy fees. To make that determination, the Court would have to entertain anecdotal evidence from individual purchasers and recipients regarding when they gifted or obtained their cards.[4]

---

[1] There were at least three exceptions to the general terms of the dormancy fee during the relevant period. First, Commerce did not charge a dormancy fee for cards sold between January and November 2005. Second, for a short period after the merger that created TD Bank, former branches of another predecessor of TD Bank sold TD Bank cards with a $3.50 monthly dormancy fee that began in the seventh month after the date of purchase. Third, for cards sold in November and December of 2004, a monthly fee of $2.50 was to be charged after the Good-Thru date, rather than thirteen months after the date of purchase. Defendants claim that they did not charge any fees on those cards until July 20, 2006.

[2] This system is operated by a third-party vendor. Defendants claim that although they can retrieve basic information regarding gift cards, certain complex parameter searches are subject to special fees by the vendor.

[3] Defendants do not have any information about how many or what percentage of their gift cards are registered, and Plaintiffs do not submit any such information.

[4] Even then, the Court could only use Defendants' records to determine whether a recipient actually held a card at a time when it incurred dormancy fees if the recipient knows the card's fourteen-digit VISA number, knows the name

All cards issued by Defendants came in a gift box.  Inside the gift box is a folded greeting card.  The greeting card includes blank spaces for the purchaser to fill in information such as who the card is from, the recipient, and the card's value.  None of the greeting cards included a space for the date of issuance.  The printed terms and conditions are in a pouch within the folded greeting card.  They appear on a four-inch by three-inch card.  The terms and conditions did not address the dormancy fee until after 2005.  After 2005, the dormancy fees provision was generic and did not convey each card's issuance date.  The gift card itself was packaged beneath the greeting card in a paper card-carrier.  From 2009, the card-carrier included a list of frequently asked questions, one of which read:  "Is there a monthly administration fee?  After 12 months, a fee of $2.50 per month will be deducted from the card balance."  Defendants maintain a website and toll-free number that recipients can access to obtain their card's purchase date.

Plaintiffs complain that the cards' packaging and documentation do not adequately disclose the dormancy fee's existence or terms.  Specifically, Plaintiffs contend:  (1) that Defendants failed to conspicuously disclose to consumers the existence and terms of the dormancy fee; and (2) the Defendants' disclosures are substantively deficient because neither the cards nor the accompanying documentation convey the date the card was issued, i.e., the operative date for determining when Defendants will begin to assess the fee.[5]

---

of the account-holder who purchased the card, or registered the card upon recipient.  Without that additional information there is no way to determine whether putative recipient-plaintiffs actually held a card at a time when it incurred fees.

[5] In support of their claims, Plaintiffs submit expert reports from Tomas J. Norton and Michael Eric Berman.  Plaintiffs offer Norton as a banking industry expert with specialized knowledge regarding industry disclosure standards.  Norton concluded that the card's packaging was insufficiently conspicuous regarding the dormancy fee because:  (1) the terms and conditions are hidden in a pocket within the folded greeting card; (2) the terms and conditions appear as 170 lines of small print on a small card; and (3) the dormancy fee provisions are not conspicuous relative to the other terms.  Plaintiffs offer Berman as an expert in "human factors" associated with advertising and consumer disclosures.  Berman concludes, for many of the same reasons given by Norton, that the disclosures would not have alerted the typical consumer to the dormancy fee.  Berman also concludes that Defendants failed to take adequate steps to ensure that recipients of gift cards, who are the intended end-users, are notified of the card's purchase date.

### B.  Defendants' Advertising Campaign

Defendants aggressively marketed their gift cards.  Plaintiffs claim that this marketing was deceptive.  They point to four of Defendants' in-store posters.  The first poster says:  "FREE Gift Cards" and shows a picture of a gift card.  Two of the posters say, among other things, "The Perfect Gift! FREE!"  The last poster lists three of the cards' features, including that they are "FREE".  All four posters include, in small print at the bottom, "[Bank] account required.  No purchase fee."[6]

Defendants respond that the word "free" was expressly qualified and intended to convey only that, unlike other banks, Defendants do not charge an up-front purchase fee for their gift cards.  Defendants also claim that Plaintiffs' argument rests on a few isolated in-store posters and that Defendants' advertising campaign as a whole was not deceptive.  For example, Defendants note that their newspaper advertisements never used the word "free" without qualification, but instead stated "no purchase fee" or "free to purchase."  Defendants also note that although Commerce issued a press release in January 2005 stating that its cards had "no fees," the then-existing terms and conditions did not impose any fees.  Defendants' training materials include an exhortation that customer service representatives explain the dormancy fee to customers and impress upon customers the importance of reviewing the terms and conditions.  Defendants further claim that they have always encouraged customers to register their gift cards and that registration informs a customer of the card's purchase date.

---

[6] Both of Plaintiffs' experts conclude that Defendants' advertising materials are misleading because they fail to adequately apprise consumers of the dormancy fee.

### C. Named Plaintiffs

There are three named Plaintiffs.  Each Plaintiff seeks to be a class representative.

### 1. Angelo Capizzi

Capizzi is a Pennsylvania resident.[7]  Capizzi admits that he did not purchase any gift cards from Defendants within New Jersey.  He contends, however, that between 2004 and 2008 he received various gift cards in New Jersey from individuals who purchased the cards in New Jersey.[8]  Capizzi does not recall experiencing any trouble making purchases with any of the cards, nor does he recall whether Defendants ever assessed any dormancy fees against any of his cards.  Capizzi did not register any of the cards and he does not know the card numbers.  Thus, there is no way to determine whether Defendants ever assessed any dormancy fees against any of Capizzi's cards.[9]  Capizzi remembers the in-store posters describing the cards as "No-fee, no-cost gift cards."  (Capizzi Dep. at 27:13).

### 2. Bradley Mann

Mann has lived in New Jersey since at least 2005.  On November 22, 2008, he purchased two $25 gift cards from a TD Bank branch in East Brunswick, New Jersey.  Mann testified that he gave both cards to his wife so that she could use them for holiday or birthday gifts.  His wife testified that she gave the cards as gifts but does not remember who she gave them to.  Her testimony is not clear regarding when she gave them away, but her testimony suggests that she gave them away during the 2008 holiday season before either card would have incurred any

---

[7] He has lived in Pennsylvania since 2001.  He is registered to vote in Pennsylvania and holds a Pennsylvania driver's license.  His family owns a beach house in New Jersey, but he is not the owner of record.

[8] Capizzi holds an account with TD Bank and he purchased two cards from TD Bank in Pennsylvania.  Plaintiffs assert that these cards are irrelevant to Capizzi's claims in this action because his claims are based entirely upon his receipt of cards as gifts within New Jersey.

[9] Capizzi identifies only one of the people that gave him cards in New Jersey, Harry Smith.  Neither Plaintiffs nor Defendants present any evidence regarding cards purchased by Mr. Smith.

dormancy fees.  Defendants' records show that neither card was registered and no purchases were ever made with either card.  As of May 27, 2010, Defendants had assessed $15 in fees against each card.  Before purchasing the two cards, Mann remembers seeing the in-store posters advertising the cards as well as newspaper advertisements.

### 3.  Nikunj Bulsara

Bulsara is a New Jersey resident.  He holds two cards that his father gave to him as gifts. Bulsara kept the cards and Defendants were therefore able to trace the activity on the cards.  The Defendants' records confirm that Bulsara's father, Thakor Bulsara, purchased both cards on December 18, 2007 from a TD Bank branch in Edison, New Jersey.  Each card was initially credited with $25.

Bulsara claims that his father gave him one of the cards as a birthday gift on October 19, 2009.  Defendants' records show that this card was never used and that its value was fully depleted by dormancy fees on October 1, 2009 – before Bulsara received it from his father. Bulsara does not recall when his father gave him the second card.  Defendants' records show that the second card was used three times in December 2008 to buy items totaling $10.46.  The card was not used thereafter, and its remaining balance of $14.56 was depleted by dormancy fees as of June 1, 2009.  Both cards contained a disclosure stating that the bank would assess a dormancy fee on the thirteenth month after the card's purchase.  Neither card contained a statement regarding the card's actual purchase date.  Bulsara did not purchase any cards himself. He remembers seeing Defendants' in-store posters advertising the cards.

## II.    THE PUTATIVE CLASS AND ITS CAUSES OF ACTION

Plaintiffs move to certify the following class:  "All New Jersey persons and entities who purchased or received Commerce Bank, N.A. or TD Bank N.A. gift cards on which dormancy

fees were assessed from 2004 to the present." (Pl. Br. at 16). In their reply brief, Plaintiffs suggest two subclasses. The first subclass would include "gift card recipients on whose cards defendants assessed fees." (Pl. Reply Br. at 22). "The second subclass would consist of gift card purchasers who, for whatever reason, never gifted their cards, or whose recipients have assigned their rights back to this claim." (Id.).

Plaintiffs assert three causes of action on behalf of the putative class: (1) violations of the NJCFA; (2) breach of contract; and (3) unjust enrichment. Because class certification requires the Court to forecast evidentiary issues associated with class adjudication of Plaintiffs' claims, In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 311 (3d Cir. 2008), it is necessary to first identify exactly what Plaintiffs have to prove for each of their claims. The Court therefore discusses the legal elements for Plaintiffs' claims before analyzing whether those claims are appropriate for class adjudication in this case.

### A. Plaintiffs' NJCFA Claim

The NJCFA "provides relief to consumers from 'fraudulent practices in the market place.'" Lee v. Carter-Reed Co., L.L.C., No. A-38, 2010 N.J. LEXIS 951, at *39-42 (N.J. Sept. 30, 2010) (quoting Furst v. Einstein Moomjy, Inc., 860 A.2d 435, 441-42 (N.J. 2004)). "Because it is 'remedial legislation,' the [NJ]CFA is 'construe[d] liberally to accomplish its broad purpose of safeguarding the public.'" Id. at *42 (quoting Furst, 860 A.2d at 435). To succeed on a NJCFA claim, a plaintiff must prove: (1) unlawful conduct by the defendant; (2) an ascertainable loss by the plaintiff; and (3) a causal relationship between the unlawful conduct and the ascertainable loss. Bosland v. Warnock Dodge, Inc., 964 A.2d 741, 749 (N.J. 2009). An unlawful practice under the NJCFA is "any unconscionable commercial practice, deception, fraud, false pretense, false promise, [or] misrepresentation . . . in connection with the sale or

advertisement of any merchandise." N.J.S.A. 56:8-2. Merchandise includes "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." N.J.S.A. 56:8-1.

The first element of Plaintiffs' NJCFA claim is not in dispute. The NJCFA clearly applies to deceptive advertising and misleading disclosures regarding gift cards. However, the parties contest exactly what Plaintiffs must prove regarding the NJCFA's ascertainable-loss and causation elements. Defendants claim that Plaintiffs must prove that they incurred dormancy fees because of the allegedly misleading disclosures and not some other cause. For example, a cardholder may have incurred dormancy fees because he or she lost or purposefully discarded the card, not because he or she was unaware of the fees. Plaintiffs respond that the NJCFA does not require them to prove that they relied on Defendants' misrepresentations. Plaintiffs also suggest that if Defendants assessed a dormancy fee against a card, both the card's purchaser and subsequent recipients suffered an ascertainable loss simply by virtue of holding a card that is subject to Defendants' misleading disclosures.

For the reasons discussed below, the Court finds that to establish ascertainable loss under the NJCFA, Plaintiffs must prove that a card incurred a dormancy fee at a time when the purchaser or recipient actually held the card. Regarding causation, the Court finds that Plaintiffs are entitled to a class-wide causal presumption regarding their theory that Defendants' gift-card packaging was defective, but they are not entitled to a class-wide causal presumption regarding their misleading advertising theory. To establish causation on their misleading advertising theory, Plaintiffs must prove that individual cardholders actually encountered the allegedly misleading advertising.

1.  **Ascertainable Loss under the NJCFA**

Under the NJCFA, "[a]n ascertainable loss is a loss that is 'quantifiable or measurable'; it is not 'hypothetical or illusory.'"  Lee, 2010 N.J. LEXIS 951, at \*39-42 (quoting Thiedemann v. Mercedes-Benz USA, LLC, 872 A.2d 783, 792-93 (N.J. 2005)).  Mere inconvenience to a consumer is not enough to demonstrate ascertainable loss, and New Jersey courts have long recognized that "non-economic damages are not recoverable under the [NJ]CFA."  Cole v. Laughrey Funeral Home, 869 A.2d 457, 463 (N.J. Sup. Ct. App. Div. 2005); see Perkins v. DaimlerChrystler Corp., 890 A.2d 997, 1002-03 (N.J. Sup. Ct. App. Div. 2006) (discussing consumer inconvenience as insufficient for proving ascertainable loss) (citing Thiedemann, 872 A.2d at 793).

There are at least three recognized theories of ascertainable loss that may apply to Plaintiffs' NJCFA claim.  In cases involving product misrepresentation, "either out-of-pocket loss or a demonstration of loss in value will suffice to meet the ascertainable loss hurdle . . . ."  Thiedemann, 872 A.2d at 792.  The "out-of-pocket" theory may include the purchase price of a misrepresented product if the purchasers did not receive a refund and the seller's misrepresentations rendered the product essentially worthless.  See Lee, 2010 N.J. LEXIS 951, at \*51-52.  A "loss-in-value" theory is based on the quantifiable difference in value between the merchandise as advertized and the merchandise as delivered.  Thiedemann, 872 A.2d at 792 (stating that an expert may employ a "market conditions" approach to product value to determine ascertainable loss).  Under the third theory, an "ascertainable loss" can include a nominal overcharge for which the plaintiffs have not made a "pre-suit demand for a refund."  Bosland, 964 A.2d at 751.

Under any theory of ascertainable loss, the plaintiff bears the burden of proving that the loss is "real" and "capable of calculation." Thiedemann, 872 A.2d at 793. The plaintiff "must proffer evidence" sufficient to "demonstrate a cognizable and calculable claim of loss due to the alleged [NJ]CFA violation." Id. Significantly, even under New Jersey's liberal class certification rule, which may favor certification more readily than Federal Rule of Civil Procedure 23, all class members in a NJCFA class action for money damages must suffer their own individual "ascertainable loss."[10] Lee, 2010 N.J. LEXIS 951, at *51-52 (stating that each NJCFA class member must demonstrate ascertainable loss by showing that they remitted a non-refunded purchase price for a product that was essentially "worthless" because disclosures thoroughly misrepresented the product); see United Consumer Fin. Serv. Co. v. Carbo, 982 A.2d 7, 16 (N.J. Sup. Ct. App. Div. 2009) (noting that New Jersey has "liberal rules governing class actions").

Applying those principles to this case, the Court finds that only the third theory of ascertainable loss is applicable to Plaintiffs' NJCFA claim. First, Plaintiffs cannot pursue a purchase-price theory of ascertainable loss. Plaintiffs concede that Defendants' never charged a purchase price for their cards. Moreover, the money that customers gave to Defendants in exchange for a gift card cannot be characterized as a "purchase price" within the meaning of the NJCFA. Unlike paying a purchase price in exchange for a product that is essentially "worthless"

---

[10] Plaintiffs cite Laufer v. U. S. Life Ins. Co., 896 A.2d 1101 (N.J. Sup. Ct. App. Div. 2006), for the proposition that only class representatives need to suffer an ascertainable loss. Laufer is inapposite. The court in Laufer expressly limited its holding to class actions where the plaintiffs sought only injunctive relief on behalf of class representatives. Id. at 1104. The court held that the named plaintiff could pursue injunctive relief on behalf of the class without showing that each class member had suffered an ascertainable loss. Id. at 1111. Plaintiffs in this case do not seek injunctive relief. They seek money damages. As such, the New Jersey Supreme Court's recent holding in Lee is dispositive. There, the plaintiffs sought money damages on behalf of a class of product purchasers. Lee, 2010 N.J. LEXIS 951, at * 10-12. Like Plaintiffs in this case, the Lee plaintiffs alleged that the product's packaging and advertising were inaccurate. Id. at *49-51. The Court held that those purchasers who paid for the product and did not receive a refund suffered an ascertainable loss and qualified as class members. Id. at 51. Lee affirms the basic principle that each class member must suffer an ascertainable loss in order to join a class of plaintiffs seeking money damages for alleged NJCFA violations.

because of the seller's misrepresentations, see Lee, 2010 N.J. LEXIS 951, *51-52 (holding that drug was essentially "worthless" because it did not perform the functions  advertized), gift-card purchasers do not lose a purchase price when they obtain gift cards.  They give Defendants a sum of money and receive a gift card credited with that same amount.  Even if Defendants' misrepresented the dormancy fee's existence and terms, simply obtaining a card from Defendants that is credited with the same amount given to Defendants does not give rise to an ascertainable loss under the NJCFA because Plaintiffs did not lose any portion of the remitted amount.  They received the full amount in the form of a prepaid debit card.  Thus, the initial act of obtaining a card does not, in and of itself, give rise to an ascertainable loss.

Second, Plaintiffs have not presented evidence sufficient to sustain a loss-of-value theory of ascertainable loss.  Card purchasers could conceivably argue that even though they did not lose a purchase price when they obtained their gift cards, they suffered a loss in value because they thought that they were purchasing a gift card unencumbered by dormancy fees, but, in reality, Defendants issued them a card subject to dormancy fees.  See Theidemann, 872 A.2d at 792-93 (stating that purchasers may characterize their ascertainable loss as the difference in value between the product as advertized and the product as delivered).  However, if the Court were to accept a loss-in-value theory in this case, Plaintiffs bear the burden of presenting evidence proving that the alleged loss-in-value is real and quantifiable.   See Hoffman v. Asseenontv.Com, Inc., 962 A.2d 532, 538 (N.J. Sup. Ct. App. Div. 2009).  Simply asserting that a seller harmed consumers by tricking them into purchasing misrepresented products is insufficient to satisfy the NJCFA's ascertainable-loss requirement.  Id. at 538-40.   Plaintiffs must provide some evidence of the quantity and nature of the alleged loss-in-value; otherwise the purported loss is not "real" and "capable of calculation."  Theidemann, 872 A.2d at 792-93.

Plaintiffs have submitted no such evidence.  There is no evidence in the record quantifying the difference in value between the product that purchasers allegedly thought they were receiving, i.e., a gift card unencumbered by any dormancy fees,[11] and the product that Defendants actually issued, i.e., a gift card that incurred a $2.50 monthly fee beginning on the thirteenth month after purchase.[12]  Thus, on the evidence currently before the Court, Plaintiffs cannot sustain a loss-in-value theory of ascertainable loss.

Because cardholders did not pay a purchase price for their cards, and because Plaintiffs submit no evidence to sustain a loss-in-value theory of ascertainable loss, Plaintiffs' only cognizable theory of ascertainable loss relates to Defendants' assessment of dormancy fees.  Plaintiffs can demonstrate ascertainable loss under the NJCFA by proving that Defendants assessed dormancy fees on particular cards.  However, because under this theory the ascertainable loss is the actual assessment of dormancy fees, only the person holding the card at the time of the fee suffers the loss.  Plaintiffs have presented no evidence and no viable legal theory for the proposition that Defendants' assessment of dormancy fees causes a "real" and "measurable" loss to anyone who ever held the subject card.  That is, on the record before the Court, the Court finds no basis to conclude that a card-purchaser suffers an ascertainable loss if he or she gives a card to a recipient before the card incurs any fees.  Similarly, a card-recipient does not suffer an ascertainable loss unless the card incurred fees at a time when the recipient

---

[11] It is unclear from the evidence what exactly Plaintiffs allege that purchasers thought they were receiving when they obtained a gift card.  Plaintiffs clearly assert that the dormancy fees were not adequately disclosed.  Plaintiffs concede, however, that every card contained a "Good Thru" date on the front of the card.  Thus, it seems untenable for Plaintiffs to claim that purchasers believed the cards were valid for an indefinite duration.  Based on the evidence, a reasonable interpretation of Plaintiffs' theory is that purchasers believed that their cards would not incur any fees or penalties before the Good Thru date.

[12] The Court makes no ruling as to whether this sort of valuation is possible to the requisite degree of legal certainty. Indeed, such a valuation in this case would be complex because it would have to account for the fact that gift cards were issued in various denominations.  Presumably, the difference in value between a $500-card with no dormancy fee and a $500-card encumbered by a monthly dormancy fee is greater than the difference in value between two $25-cards subject to the same conditions.

actually held the card.  To satisfy the NJCFA's ascertainable loss requirement, Plaintiffs must show that cardholders actually held one of Defendants' cards at a time when that particular card incurred dormancy fees.

### 2.   Causation under the NJCFA

To prove causation under the NJCFA, a plaintiff must "demonstrate that [they] suffered an ascertainable loss 'as a result of' the unlawful practice." Lee, 2010 N.J. LEXIS 951, at *41-42 (quoting N.J.S.A. 56:8-19).   "Causation under the [NJ]CFA is not the equivalent of reliance." Id. at *41-42 (citing Int'l Union of Operating Eng'r Local No. 68 Welfare Fund v. Merck & Co., 929 A.2d 1076, 1086 (N.J. 2007).  Consumers do not need to establish that they actually relied on the unlawful practice.  See Gennari v. Weichert Co. Realtors, 691 A.2d 350, 366 (N.J. 1997) (citing N.J.A.S. 56:8-2).  They merely need to establish a "causal nexus" between the unlawful practice and the ascertainable loss.  Id.

Regarding misleading product packaging, New Jersey law recognizes a rebuttable presumption that there is a causal relationship between defective product packaging and a purchaser's loss.  See Elias v. Ungar's Food Prod., Inc., 252 F.R.D. 233 (D.N.J. 2008); Varacallo v. Mass. Mut. Life Ins. Co., 752 A.2d 807, 817 (N.J. Sup. Ct. App. Div. 2000) (finding that prima facie evidence of NJCFA's causal nexus requirement is satisfied in class action if the purchaser of a product "was shown" the allegedly misleading material before making a purchase).  The New Jersey Supreme Court recently extended that presumption beyond product packaging to include "entire marketing schemes" if "all the representations about the product are baseless." Lee, 2010 N.J. LEXIS 951, at *50 (emphasis added) ("When all the representations about the product are baseless, a trier of fact may infer the causal relationship between the unlawful practice – the multiple deceptions – and the ascertainable losses").

14

This distinction between advertising and product packaging is sound and applicable in this case.  All purchasers are necessarily exposed to product packaging.  It is therefore reasonable to require a defendant to rebut the presumption that purchasers' losses were caused, to some degree, by misleading packaging.  However, not all purchasers are necessarily exposed to all statements made in an advertising campaign.  If an advertising campaign includes only some misstatements in some advertisements, it is not fair to defendants to presume that all purchasers' losses were caused by those misrepresentations because some purchasers may never have encountered the misrepresentations.

In this case, Plaintiffs submit evidence in support of their allegation that Defendants' product packaging was misleading.  Plaintiffs are therefore entitled to the causal presumption that the allegedly misleading product packaging caused any ascertainable losses suffered by cardholders.  This is significant because, unless Defendants present evidence sufficient to rebut the causal presumption, Plaintiffs may establish causation under the NJCFA by proving only that purchasers actually purchased cards with standard packaging.[13]

Regarding advertising, however, Plaintiffs identify only a few specific in-store posters that allegedly contain misstatements.  Plaintiffs do not contend, nor does the evidence suggest, that "all representations" about the cards were "baseless."  See Lee, 2010 N.J. LEXIS 951, at *50.  For example, as Defendants correctly note, none of their newspaper advertisements contained the statements that Plaintiffs allege are misleading.  Thus, Plaintiffs are not entitled to a causal presumption regarding their NJCFA advertising claim.  Plaintiffs must show that individual purchasers or recipients actually encountered the specific posters that Plaintiffs claim are misleading.

---

[13] As discussed below, that showing may be susceptible to class-wide proof.

## B.  Plaintiffs' Breach-of-Contract Claim

Plaintiffs' breach-of-contract claim involves three steps.  First, Plaintiffs claim that the terms providing for assessment of dormancy fees are unconscionable and therefore unenforceable.  Second, Plaintiffs claim that because the dormancy fee provision is unenforceable, Defendants breached the contract by assessing the dormancy fees.  Third, Plaintiffs claim that both purchasers and recipients may assert breach-of-contract claims because purchasers are the original parties to the gift-card contract and recipients are "third party beneficiaries" of that contract.

A breach-of-contract claim under New Jersey law requires proof of three elements:  "a valid contract, defective performance by the defendant, and resulting damages."  Coyle v. Englander's, 488 A.2d 1083, 1088 (N.J. Sup. Ct. App. Div. 1985).  Courts may refuse to enforce contract terms that are unconscionable; especially terms included in contracts of adhesion between parties of unequal bargaining power.  Muhammad v. Cnty. Bank of Rehoboth Beach, Del., 912 A.2d 88, 96 (N.J. 2006).  In determining whether provisions in a contract of adhesion are unenforceable, New Jersey courts balance four factors:  "[(1)] the subject matter of the contract, [(2)] the parties' relative bargaining positions, [(3)] the degree of economic compulsion motivating the 'adhering' party, and [(4)] the public interests affected by the contract."[14] Rudbart v. N. Jersey Dist. Water Supply Co., 605 A.2d 681, 687 (N.J. 1992); see also Carter v. Exxon Co. USA, 177 F.3d 197, 207 (3d Cir. 1999) (listing "the bargaining power of the parties, the conspicuousness of the putative unfair term, and the oppressiveness and unreasonableness of the term" as relevant factors).

---

[14] The parties do not dispute that the gift cards were presented to customers on a take-it-or-leave-it basis, and, therefore, are contracts of adhesion under New Jersey law.  See Muhammad, 912 A.2d at 96.

Plaintiffs are correct that Defendants' gift cards give rise to contractual obligations. However, from the perspective of contract law, the gift cards in this case are most closely analogous to bearer financial instruments. See PrivaCash, Inc. v. Am. Express Co., No. 09-391, 2010 U.S. Dist. LEXIS 107093 (W.D. Wis. Oct. 4, 2010) (making this comparison). Ownership and the right to enforce a bearer instrument follow possession of the instrument itself. See N.J.S.A. 12A:3-201 (describing bearer instruments); Bank of N.Y. v. Raftogianis, No. F-7356-09, 2010 N.J. Super. Unpub. LEXIS 2316, *7-8 (N.J. Sup. Cut. Ch. Div. June 29, 2010) (holding that a change in possession of a bearer instrument "transfers" the instrument and gives "the person receiving the instrument the right to enforce it") (citing Corporacion Venezolana de Fomento v. Vintero Sales Corp., 452 F. Supp. 1108, 1117 (S.D.N.Y. 1978)). The gift cards in this case are a promise by the bank to make payment pursuant to stated terms on behalf of the cardholder; regardless of whether that is the purchaser, recipient, or other authorized card-user.[15] Consequently, only the authorized possessor of a card owns the credit on the card, and purchasers who give their cards away relinquish their ownership in the card's remaining credit. Cf. Raftogianis, 2010 N.J. Super. Unpub. LEXIS 2316, *7-8 (holding that bearer instruments can be "both transferred and negotiated by delivery alone."). Thus, if the bank breaches the terms and conditions by assessing unauthorized fees against the card, the cardholder at the time of that breach is the only party with a cognizable contract claim because he or she is the only party who suffers damages. See Coyle, 488 A.2d at 1088 (holding that damages are an essential element of a breach-of-contract claim).

---

[15] The terms and conditions distributed by Commence with its cards between November 2004 and November 2005 state that the terms apply only between Commerce and "the person who has received the Commerce Bank VISA Gift Card." (Decl. of Lise Moncilovich, Exs. 13-14). Commerce's terms and conditions from November 2005 until May 2008 state that they apply between Commence and: "(a) the person to whom we issue the Card; (b) the person receiving the Card; and, (c) the person using the Card." (Decl. of Lise Moncilovich, Exs. 15-16).
The terms and conditions distributed by TD Bank with its cards between June 2008 and the present apply between TD Bank and: "(a) the person to whom we issue the Card; (b) the person receiving the Card; and, (c) the person using the Card." (Decl. of Lise Moncilovich, Exs. 17-20).

Plaintiffs cannot sustain their breach-of-contract claim by simply asserting in conclusory terms that all purchasers and recipients of cards that incurred dormancy fees have viable contract claims.  This would lead to the untenable result that any person who held a card at any point in time could claim a right to recover dormancy fees deducted from the card at a time when that person did not own the credit on the card.  Because the credit on the card belongs exclusively to the cardholder, only the cardholder sustains damages when Defendants assess unauthorized fees.  Thus, to succeed on their breach-of-contract claim, Plaintiffs must prove, in addition to other necessary elements, that the person asserting the claim is also the person who held the card when Defendants assessed dormancy fees.

## C.  Plaintiffs' Unjust-Enrichment Claim

As an alternative to their breach-of-contract claim, Plaintiffs assert a quasi-contract claim for unjust enrichment.  See Caputo v. Nice-Pak Prod., Inc., 693 A.2d 494, 497 (N.J. Sup. Ct. App. Div. 1997) (holding that plaintiffs may plead breach of contract and unjust enrichment in the alternative).  Plaintiffs' claim is that Defendants unjustly obtained dormancy fees by selling gift cards with misleading disclosures and through false advertising.

"To establish unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust."  VRG Corp. v. GKN Realty Corp., 641 A.2d 519, 526 (N.J. 1994).  Although courts have applied the doctrine of unjust enrichment in myriad contexts, "a common thread runs throughout its application where liability has been successfully asserted, namely, that the plaintiff expected remuneration from the defendant, or if the true facts were known to plaintiff, he would have expected remuneration from defendant, at the time the benefit was conferred."  Callano v. Oakwood Park Homes Corp., 219 A.2d 332, 334-35 (N.J. Sup. Ct. App. Div. 1966).  Thus, to succeed on an unjust-enrichment

claim, a plaintiff must prove, among other things, that they conferred a tangible benefit on the

defendant with the expectation that the defendant would pay for that benefit.  Id.

   As noted above, gift-card credit belongs to the cardholder.  If a bank unjustly

appropriates a portion of that credit by assessing an unauthorized fee, the cardholder is the party

that conferred a benefit on Defendants.  Consequently, only cardholders that incurred dormancy

fees while they held their cards can assert unjust-enrichment claims.  In addition to proving other

essential elements of unjust enrichment, Plaintiffs must prove that the person asserting the claim

actually held the card when Defendants assessed the dormancy fees.

## III.   STANDARD FOR CLASS CERTIFICATION

### A.  Rule 23's Explicit Requirements

   In order to qualify for class certification under Rule 23, a plaintiff must satisfy the four

elements set out in Rule 23(a) and the requirements of one of the three subsections in Rule 23(b).

See In re Constar Int'l Inc. Sec. Litig., 585 F.3d 774, 776 (3d Cir. 2009).  Rule 23(a) provides

that class certification may be proper if:

> (1) the class is so numerous that joinder of all members is
> impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical
> of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the
> interests of the class.

Plaintiffs seek certification pursuant to subsection (3) of Rule 23(b), which provides that

certification is proper if:

> [T]he court finds that the questions of law or fact common to class
> members predominate over any questions affecting only individual
> members, and that a class action is superior to other available
> methods for fairly and efficiently adjudicating the controversy.
> The matters pertinent to these findings include:

> (A) the class members' interests in individually controlling the
> prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the
> controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation
> of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

A plaintiff bears the burden of demonstrating that Rule 23's requirements are met by a preponderance of the evidence, and the district court "must make whatever factual and legal inquiries are necessary and must consider all relevant evidence and arguments presented by the parties." In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 306. Thus, a district court should certify a class "only if the court is 'satisfied, after a rigorous analysis, that the prerequisites of Rule 23[] have been satisfied.'" Beck v. Maximus, Inc., 457 F.3d 291, 297 (3d Cir. 2006) (quoting Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 161 (1982)).

All of the class certification requirements are intended to serve as "guideposts for determining whether maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 626 n.20 (1997) (citations and internal quotation marks omitted).

## B. Implicit Requirements for Class Certification

In addition to Rule 23's explicit requirements, there are also implicit requirements for class certification. "Class certification presupposes the existence of an actual 'class.'" White v. Williams, 208 F.R.D. 123, 129 (D.N.J. 2002) (quoting In re Sch. Asbestos Litig., 56 F.3d 515, 519 (3d Cir. 1995)). A "proposed class must be sufficiently identifiable without being overly broad." Id. It may not be "amorphous, vague, or indeterminate" and it must be "administratively feasible to determine whether a given individual is a member of the class." Id. (quoting Mueller

20

v. CBS, Inc., 200 F.R.D. 227, 233 (W.D. Pa. 2001)); see Allen-Wright v. Allstate Ins. Co., 2008

U.S. Dist. LEXIS 103272, *6-7 (E.D. Pa. Dec. 17, 2008) (identifying problems with a class

definition that required case-by-case factual determination); Forman v. Data Transfer, Inc., 164

F.R.D. 400, 403 (E.D. Pa. 1995) (same).  A putative class is not appropriate for certification if

class membership would "require fact-intensive mini-trials."  Solo v. Bausch & Lomb Inc., No.

06-2716, 2009 U.S. Dist. LEXIS 115029, at *14 (D.S.C. Sept. 25, 2009) (citing Cuming v. S.C.

Lottery Comm'n, No. 05-3608, 2008 U.S. Dist. LEXIS 26917, at *1 (D.S.C. Mar. 28, 2008)).

**IV.     ANALYSIS OF CLASS CERTIFICATION REQUIREMENTS**

   **A.  Plaintiffs' Proposed Class Fails to Satisfy the Implicit Requirements for Class
        Certification**

       Plaintiffs' putative class runs afoul of the implicit requirement that a class be reasonably

ascertainable.  See White, 208 F.R.D. at 129.  As noted above, a court should not certify a class

if determining class membership will "require fact-intensive mini-trials."  Solo, 2009 U.S. Dist.

LEXIS 115029,  at * 14 (citing Cumming, 2008 U.S. Dist. LEXIS 26917, at *1).  Certification is

also inappropriate if the proposed class "definition would require a putative plaintiff to establish

the merits of his or her claim before being included in the class."  White, 208 F.R.D. at 129.

       In Cumming, the plaintiffs sought to certify a class based on whether the class members

purchased a lottery ticket that offered a chance to win certain prizes that, at the time of purchase,

were no longer available.  2008 U.S. Dist. LEXIS 26917, at *8.  The court declined certification

because "to determine which [persons have] standing to sue, the court would have to conduct

potentially thousands of individualized inquiries to determine whether the ticket had been

purchased after the [advertised] prize had been awarded. . . .  This is exactly the type of

'extensive factual inquiry' that courts have held to be too administratively burdensome to

warrant class certification."  Id. at *9 (quoting Loeb Indus. v. Sumitomo Corp., 196 F.R.D. 348

(W.D. Wis. 2000); Sanneman v. Chrysler Corp., 191 F.R.D. 441 (E.D. Pa. 2000)).

    In this case, Plaintiffs' proposed class includes:  "All New Jersey persons and entities

who purchased or received [Defendants'] gift cards on which dormancy fees were assessed from

2004 to the present."  (Pl. Br. at 16).  This definition implies two cardholder subclasses:

purchaser cardholders and recipient cardholders.  Like the proposed class in Cumming,

Plaintiffs' proposed class is defective because it is over inclusive and too indeterminate.

    First, Plaintiffs' proposed class is too indeterminate because it would require individual

hearings to establish who qualifies as a class member.  Although Defendants can produce records

identifying purchasers of cards that incurred dormancy fees, recipients are not required to

register their cards.  Thus, although the Defendants can produce a list of all cards that incurred

dormancy fees, there is no systematic means for determining who ultimately received those cards

or when purchasers gave their cards away.  The Court would have to conduct fact-finding

hearings to evaluate anecdotal evidence from each putative plaintiff and then determine whether

individual plaintiffs could be credibly linked to one of the cards on Defendants' list at a time

when the card incurred a dormancy fee.  This would require just the sort of individualized mini-

trials that the court rejected in Cumming.  See Cumming, 2008 U.S. Dist. LEXIS 26917, at *8.

    Second, Plaintiffs' proposed class definition is over inclusive because it ignores legal

complications associated with class membership.  As discussed above, an essential element of all

three causes of action (violations of the NJCFA, breach of contract, and unjust enrichment) is

that each putative plaintiff suffer an injury – specifically, that each plaintiff held a card when it

incurred a dormancy fee.  Plaintiffs' proposed class does not account for this necessary

distinction.  It defines the class as including all purchasers and recipients who held a card that

incurred a dormancy fee at any point in time.  That definition is over-inclusive.  A purchaser may have given a card to a recipient before the card incurred any dormancy fees.  In that case, the purchaser would not have a claim because he or she was never assed a dormancy fee while holding the card.  Plaintiffs' putative class fails because it includes cardholders that have no legal right to recovery.

In their reply brief, Plaintiffs attempt to cure these defects by suggesting that the Court certify two subclasses.  The first subclass would include "gift card recipients on whose cards defendants assessed fees."  (Pl. Reply Br. at 22).  "The second subclass would consist of gift card purchasers who, for whatever reason, never gifted their cards, or whose recipients have assigned their rights back to this claim."  (Id.).  This augmented taxonomy does not fix the problems discussed above.  In order to determine whether a person falls into one of the putative subclasses, the Court would have to conduct the same case-by-case factual inquiry.  A prospective purchaser-plaintiff would have to show that he or she did not gift the card to anyone or, if they did give the card away, that the recipient transferred relevant rights back to the purchaser.  Similarly, all prospective recipient-plaintiffs would have to present evidence sufficient for the Court to link them to a particular card identified in Defendants' records as well as evidence of the time of the gift so that the Court could determine whether Defendants assessed dormancy fees while the recipient, rather than the purchaser, held the card.[16]

These problems with Plaintiffs' proposed class definitions are more than theoretical possibilities.  The facts sounding two of the named Plaintiffs illustrate their reality.  Capizzi

---

[16] Plaintiffs themselves appear to appreciate the difficulties inherent in this factual inquiry.  Bulsara testified:
> And just for the record, I would like to stipulate that it's kind of hard for somebody to recall gift cards being given because of time frames being involved.  The normal person, I mean, if it's a question of two years ago or three years ago or five years ago, it is kind of hard to basically remember have you received a gift card.  That kind of thing, just for the record.

(Bulsara Dep. at 80:8-17).

claims to have received two cards from persons who purchased them from a TD Bank branch in New Jersey.  He does not recall whether Defendants ever assessed any dormancy fees on the cards.  He did not keep the cards and he does not remember or have any record of the card numbers.  The only evidence that Capizzi offers that could link his cards to Defendants' records is that a man named "Harry Smith" gave him one of the two cards.  Neither Plaintiffs nor Defendants presented the Court with evidence regarding cards purchased by Mr. Smith.  Thus, even after months of fact discovery, including deposition testimony, there is still minimal evidence proving that Capizzi himself actually qualifies as a class member because there is no evidence connecting him to any cards that incurred dormancy fees.

Mann illustrates similar factual problems regarding prospective purchaser-plaintiffs. Defendants' records show that Mann purchased two $25 cards in November 2008.  Mann's wife testified that she gave those cards as gifts, but she does not recall who she gave them to.  Her testimony suggests that she gave them away sometime during the 2008 holiday season. Defendants' records show that both cards began to incur fees in December 2009.  If Mann's wife gave the cards away during the 2008 holiday season, they would not have incurred any dormancy fees while Mann or his wife held them.  In that case, Mann would not have suffered a cognizable injury and the unknown recipients would be the proper plaintiffs.  As with Capizzi, it has taken months of discovery and the depositions of Mann and his wife to develop a factual record regarding whether Mann is a proper purchaser-plaintiff in this action.

In defining their class, Plaintiffs must do more than assert that everyone who ever held one of the Defendants' cards that incurred dormancy fees is entitled to recover those fees.  That proposed class is too factually indeterminate because there is no systematic way for the Court to determine membership.  It is also too legally imprecise because it includes cardholders that do

not have legal claims against Defendants.  In the Court's view, those defects alone warrant denial

of class certification.  <u>See</u> <u>Solo</u>, 2009 U.S. Dist. LEXIS 115029, at *14 (denying class

certification because determining class membership would "require fact-intensive mini-trials.");

<u>White</u>, 208 F.R.D. at 129 (denying class certification because determining class membership

would require trials regarding legal merits of putative class members' claims).

However, for sake of completeness, the Court also addresses Defendants' opposition to

class certification based on Rule 23's explicit certification requirements.  Defendants do not deny

that Plaintiffs satisfy Rule 23(a)'s numerosity and commonality requirements.  Rather,

Defendants claim that Plaintiffs fail to establish typicality and adequacy under Rule 23(a) and

predominance and superiority under Rule 23(b).  The Court addresses each of those challenged

elements in turn.

## B.  Typicality under Rule 23(a)

Typically requires that "the claims or defenses of the representative parties are typical of

the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  It requires the court to compare

the attributes of the proposed class representatives with those of the putative class.  <u>In re</u>

<u>Schering Plough Corp. ERISA Litig.</u>, 589 F.3d 585, 597 (3d Cir. 2009).  In that regard, the Third

Circuit has identified three necessary comparative analyses:  (1) "the similarity of the legal

theory and legal claims"; (2) "the similarity of the individual circumstances on which those

theories and claims are based"; and (3) "and the extent to which the proposed representative may

face significant unique or atypical defenses to her claims."  <u>Id.</u> at 597-98.   Those comparative

analyses are designed to ensure "that the class representatives are sufficiently similar to the rest

of the class – in terms of their legal claims, factual circumstances, and stake in the litigation – so

that certifying those individuals to represent the class will be fair to the rest of the proposed

class."  Id.  The core concern is that the class representatives' interests sufficiently align with the interests of the class as a whole.  Id. at 599.

Regarding the first comparison, the "similarity between the claims or defenses of the representative and those of the class does not have to be perfect."  Id. at 598 (citing Baby Neal for & by Kanter v. Casey, 43 F.3d 48, 56 (3d Cir. 1994); Hassine v. Jeffes, 846 F.2d 169, 177-78 (3d Cir. 1988)).  The representative plaintiffs' claims must merely be "typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class."  Beck, 457 F.3d at 295-96.  Similarly, the second comparison ensures that factual particularities do not undermine the named plaintiffs' interests in fairly representing the class.  In re Schering Plough Corp. ERISA Litig., 589 F.3d at 598.  Factual differences do not render a representative atypical "if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members."  Hoxworth v. Blinder & Co., 980 F.2d 912, 923 (3d Cir. 1992).  The third comparison requires that the court reject a representative if "the representative is subject to a unique defense that is likely to become a major focus of the litigation."  Beck, 457 F.3d at 301.

None of the named plaintiffs satisfy Rule 23(a)'s typicality requirement because none of them can establish by a preponderance of the evidence that they themselves qualify as class members.

### 1.  Angelo Capizzi

Plaintiffs offer Capizzi as a representative only of the recipient-plaintiff subclass. Plaintiffs define that subclass as "gift card recipients on whose cards [D]efendants assessed fees."  Capizzi is not typical of that subclass because the facts suggest that he does not even qualify as a member.  Capizzi recalls receiving two cards that he believes were purchased at New

Jersey branches of TD Bank or Commerce.  However, he does not recall whether those cards

ever incurred any dormancy fees.  He no longer has the cards and he does not recall or have

record of the card numbers, which makes it impossible for Defendants to identify Capizzi's cards

in their records.  This means that there is no way to determine whether Capizzi depleted the cards

before incurring any dormancy fees.  To qualify as a recipient-plaintiff and a representative of

that subclass, Capizzi must prove by a preponderance of the evidence that he held a card while it

incurred dormancy fees.  On the record before the Court, Capizzi cannot prove that necessary

fact.  Capizzi is not a typical recipient-plaintiff.

### 2. Bradley Mann

Mann claims that he purchased two cards from TD Bank in New Brunswick, New Jersey.

He does not claim that he received any cards as gifts.  Mann can therefore serve only as a

representative of the purchaser-plaintiff subclass.  Like Capizzi, however, the facts before the

Court do not prove by a preponderance of the evidence that Mann qualifies for that subclass.  He

purchased the two gifts cards on November 22, 2008.  Both he and his wife testified that she

gave the cards away as gifts, but neither of them remembers who received them.  Ms. Mann's

testimony suggests that she gave them away during the 2008 holiday season.  There is no

evidence to suggest that she gave them away at any later date.  According to Defendants'

records, both cards began to incur dormancy fees beginning in December 2009.  Thus, Mann

gave his cards away before the cards incurred any fees.  There is no evidence suggesting that the

recipients assigned their rights to the cards back to Mann.  Plaintiffs cannot prove by a

preponderance of the evidence that Mann is a member of the purchaser-plaintiff subclass – let

alone a typical member of that subclass.[17]

---

[17] Defendants argue that Capizzi and Mann are not typical representatives because they are subject to a unique
defense.  Defendants claim that there is circumstantial evidence that Capizzi and Mann obtained their gift cards

### 3.  Nikuju Bulsara

Bulsara also fails to qualify as a typical class representative.   He claims that his father gave him two $25 cards as gifts.  He did not purchase any cards himself.  He can therefore qualify only as a representative of the recipient-plaintiff subclass.  His father purchased both cards in December 2007 and gave Bulsara one of the cards on October 19, 2009.  Bulsara still has this card, and Defendants' records show that it was fully depleted by dormancy fees on October 1, 2009.  Thus, the first card does not qualify Bulsara as a class member because he did not hold the card while it incurred dormancy fees.  Bulsara does not recall when his father gave him the second card.  However, he claims that he did not check the balance on the second card until after he discovered that the first card was fully depleted in October 2009.  According to Bulsara, when he checked the balance on the second card, approximately sixty percent of the card's value had been depleted by fees.

Bulsara kept the second card.  Defendants' records reveal that Bulsara's father purchased the card on December 18, 2007, the same day that he purchased the first card.  The records also reveal that, because purchases on the card reduced its balance, dormancy fees fully depleted the card's remaining value on June 1, 2009.   Thus, according to Defendants' records, it is not possible that Bulsara checked the balance on the second card sometime after October 2009 and learned that the card still retained 40% of its value.  In fact, the card was fully depleted by June 2009.  Because Bulsara did not register the second card, there is no record of when his father gave it to him.

---

solely for purposes of participating in this law suit.  If Defendants can show that Capizzi and Mann knowingly incurred dormancy fees for the purpose of participating in this case and not because Defendants' disclosures were defective, they may be able to rebut the causal presumption under the NJCFA that Capizzi and Mann's alleged losses were caused by Defendants' alleged deception. This defense would surely be atypical of the putative class. However, because the Court finds that neither Capizzi nor Mann actually suffered an ascertainable loss under the NJCFA, it need not address this theory.

On these facts, Bulsara cannot show by a preponderance of the evidence that he actually held the second card while it incurred dormancy fees. The Court would have to speculate, without any supporting evidence, that Bulsara received the second card sometime before June 1, 2009, when it was fully depleted by dormancy fees. The Court finds that there is insufficient evidence to conclude that the second card qualifies Bulsara as a member of the recipient-plaintiff subclass. As such, he is not a typical representative of that subclass.

### C. Adequacy under Rule 23(a)

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." It "has two components designed to ensure that absentees' interests are fully pursued." Georgine v. Amchem Prod., Inc., 83 F.3d 610, 630 (3d Cir. 1996), aff'd, Amchem Prod. v. Windsor, 521 U.S. 591 (1997). First, it "seeks to uncover conflicts of interest between named parties and the class they seek to represent." In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 532 (3d Cir. 2004). This inquiry overlaps with the typicality requirement and "certain questions – like whether a unique defense should defeat class certification – are relevant under both." In re Schering Plough Corp. ERISA Litig., 589 F.3d at 602. Second, adequacy "tests the qualifications of the counsel to represent that class." In re Warfarin Sodium Antitrust Litig., 391 F.3d at 532. Rule 23(g)(1) provides a list of factors for the court to consider when approving class counsel:

> (i) the work counsel has done in identifying or investigating
> potential claims in the action;
> (ii) counsel's experience in handling class actions, other complex
> litigation, and the types of claims asserted in the action;
> (iii) counsel's knowledge of the applicable law; and
> (iv) the resources that counsel will commit to representing the
> class; [and]
> any other matter pertinent to counsel's ability to fairly and
> adequately represent the interests of the class

Plaintiffs' counsel submits evidence of their ability to adequately prosecute this case. The Court finds no reason to doubt counsel's ability to fairly, zealously, and competently pursue the interests of the class they seek to certify.  However, the named Plaintiffs are not adequate class representatives.  Indeed, as discussed above, there is insufficient evidence to conclude that any of the named Plaintiffs qualify as members of any putative class or subclass – let alone qualify as <u>adequate</u> representatives of a class.

### D.  Predominance under Rule 23(b)(3)

"Predominance 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'"  <u>In re Hydrogen Peroxide Antitrust Litig.</u>, 552 F.3d at 311-12 (quoting <u>Amchem</u>, 521 U.S. at 623).  Predominance is "far more demanding" than the commonality requirement of Rule 23(a), which requires only a single common claim.  <u>Id.</u> at 311. The court must find that "issues common to the class . . . predominate over individual issues."  <u>In re The Prudential Ins. Co. of Am. Sales Practices Litig.</u>, 148 F.3d 283, 313-14 (3d Cir. 1998). To determine whether an issue is common or individual, a court must examine the "nature of the evidence that will suffice to resolve" the issue.  <u>In re Hydrogen Peroxide Antitrust Litig.</u>, 552 F.3d at 311 (quoting <u>Blades v. Monsanto Co.</u>, 400 F.3d 562, 566 (8th Cir. 2005)).  This requires the court to "formulate some prediction as to how specific issues will play out."  <u>Id.</u> (quoting <u>In re New Motor Vehicles Can. Exp. Antitrust Litig.</u>, 522 F.3d 6, 20 (1st Cir. 2008)).  "If proof of essential elements of the cause of action requires individual treatment, then class certification is unsuitable."  <u>Id.</u> (quoting <u>Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 259 F.3d 154, 172 (3d Cir. 2001)).   The Court therefore reviews the three causes of action at issue in this case "through the prism" of the predominance requirement.  <u>Id.</u> (quoting <u>Newton</u>, 259 F.3d at 181).

### 1.  Plaintiffs' New Jersey Consumer Fraud Act Claim

The Court finds that individual issues are likely to predominate adjudication of Plaintiffs' NJCFA claims because proof of "ascertainable loss" will inescapably involve individualized factual issues. [18]  As explained above, to establish ascertainable loss under the NJCFA Plaintiffs must prove that each class member incurred a dormancy fee at a time when the member actually held the card.  That factual inquiry is not amenable to class-wide proof.  There is no systematic means for determining which class members held cards when dormancy fees were actually assessed because recipients did not have to register their cards upon receipt.  Thus, this Court will have to entertain anecdotal evidence from each class member to determine whether he or she can be credibly linked to a card that was assessed dormancy fees at a time when the fees were incurred.  The Court does not see any feasible alternative to this case-by-case inquiry, and class adjudication is therefore inappropriate in this case.[19]

---

[18] The Court rejects Defendants' argument that individual issues will predominate adjudication of causation regarding Plaintiffs' misleading product packaging claim, but accepts that argument regarding Plaintiffs' misleading advertising claim.  As discussed above, New Jersey law includes a rebuttable presumption that there is a causal relationship between defective product packaging and a purchaser's loss in paying for a misrepresented product.  See Elias v. Ungar's Food Prods., Inc., 252 F.R.D. 233 (D.N.J. 2008).  Defendants have not presented sufficient evidence to rebut that presumption.  Thus, the Court finds no reason to conclude that individual issues would predominate adjudication of causation regarding Plaintiffs' claim that misleading gift card packaging caused any ascertainable losses.  However, because individual issues will predominate adjudication of "ascertainable loss," certification of Plaintiffs' product packaging NJCFA claim is nevertheless denied.

   Regarding Plaintiffs' NJCFA advertising claim, New Jersey law recognizes a causal presumption only if "all representations" in the advertising campaign are "baseless."  Lee, 2010 N.J. LEXIS 951, at *50 (emphasis added).  As stated above, Plaintiffs do not contend, nor does the evidence suggest, that "all representations about the product [were] baseless."  Id.  Plaintiffs are not entitled to a causal presumption regarding their NJCFA advertising claim.  Plaintiffs must therefore prove that individual class members actually encountered the allegedly misleading posters.  Consequently, the Court finds that individual issues are likely to predominate adjudication of causation regarding Plaintiffs' NJCFA advertising claim because the Court would have to determine which class members actually encountered the allegedly misleading posters.

[19] The Court also notes that adjudication of the timing surrounding the transfer of gift cards is likely to be contentious.  To qualify as a class member, each putative purchaser-plaintiff and recipient-plaintiff must show that they, rather than their corresponding purchaser or recipient, held a card while it incurred dormancy fees.  This creates a potential conflict of interest between some recipients and purchasers because their respective rights of recovery may be mutually exclusive.  The Court would have to adjudicate these conflicting claims to class membership between competing cardholders.

### 2. Plaintiffs' Breach-of-Contract Claim

The fatal flaw with all of Plaintiffs' claims is that there is no feasible means for determining which class members suffered actionable injuries and which did not. This problem persists regarding Plaintiffs' breach-of-contract claim. Only class members who held cards when Defendants assessed dormancy fees have breach-of-contract claims. Again, this means that Plaintiffs will have to prove that class members asserting breach-of-contract claims actually held their cards at a time when Defendants assessed dormancy fees. There is no feasible mechanism for Plaintiffs to prove those facts on a class-wide basis. The Court would have to hear anecdotal evidence from myriad prospective class members to determine when they received or gifted their cards and determine whether each member can be credibly linked to a particular card during a time when that card incurred dormancy fees. The Court finds that individual issues would predominate its adjudication of Plaintiffs' breach-of-contract claim.[20]

### 3. Plaintiffs' Unjust-Enrichment Claim

Plaintiffs' unjust-enrichment claim is unsuitable for class adjudication for the same reasons that their NJCFA and breach-of-contract claims are unsuitable. An unjust enrichment claim requires that the plaintiff confer a benefit on the defendant. Callano, 219 A.2d at 334-35. Even if the Court accepts that Defendants' disclosures and advertising were unlawful, Defendants' did not obtain a benefit until they assessed the dormancy fee. When Defendants assessed the dormancy fees, they were enriched at the expense of whoever held the card at that point in time. Only that cardholder has a viable unjust-enrichment claim against Defendants. This means that each class member will have to demonstrate that they held a card when it was

---

[20] Class adjudication of this claim is inappropriate even if the Court applies Plaintiffs' two proposed subclasses. The two proposed subclasses have the effect of defining the putative class as those cardholders, either purchasers or recipients, whose cards incurred dormancy fees while they held the cards. Although this augmented class definition centers on the legally relevant criteria for class membership, it does not cure the inescapable factual difficulties associated with determining who falls into the respective subclasses.

assessed a dormancy fee.  As noted above, there is no systematic way for determining who the proper plaintiffs are.  The Court would have to conduct case-by-case factual hearings to determine whether each class member actually held the subject card when Defendants assessed the fees.  Individual issues will therefore predominate Plaintiffs' unjust-enrichment claim.

### E.  Superiority under Rule 23(b)(3)

Rule 23(b)(3) requires that a class action be superior to other forms of litigation.  This includes the requirement that the putative class action be manageable.  See Newton, 259 F.3d at 192.  Manageability "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit."  Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 164 (1974); see Danvers Motor Co. v. Ford Motor Co., 543 F.3d 141, 149 (3d Cir. 2008).  This includes whether the court can feasibly ascertain class members.  See Cumming, 2008 U.S. Dist. LEXIS 26917, at *1; In re Phenylpropanolamine Products Liab. Litig., 214 F.R.D. 614 (W.D. Wash. 2003) (conducting analysis of whether class members are reasonably ascertainable under Rule 23(b)(3)'s manageability requirement).  Certification is inappropriate where determining class membership would create "serious administrative burdens that are incongruous with the efficiencies expected in a class action."  Sanneman v. Chrysler Corp., 191 F.R.D. 441, 446 (E.D. Pa. 2000).  A court should not certify a class if determining class membership will "require fact-intensive mini-trials."  Solo, 2009 U.S. Dist. LEXIS 115029, at *14 (citing Cumming, 2008 U.S. Dist. LEXIS 26917, at *1).

This case presents significant manageability concerns.  As discussed throughout this Opinion, there is no systematic way to identify class members because not all purchasers or recipients have valid claims against Defendants.  The Court would have to conduct "fact-intensive mini-trials" to determine whether prospective class members actually held cards at a

time when Defendants assessed a dormancy fee.  This represents an unmanageable endeavor and weighs against class certification.

Plaintiffs suggest that manageability concerns regarding damages should not preclude certification of the proposed class regarding liability.  However, the issue here is not unmanageability regarding the appropriate distribution of damages to class members, which is nonetheless a real concern.  The issue is the unmanageability of determining class membership in the first instance because not all putative class members suffered redressable injuries.  There is no feasible way to identify, on a class-wide basis, those cardholders with legally cognizable claims against Defendants.

Plaintiffs nevertheless emphasize that "[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights."  Amchem Prods., 521 U.S. at 617 (quoting Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir. 1997)).  "A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor."  Id.  Plaintiffs argue that the nominal value of individual claims in this case does not create adequate incentives for solo litigation and that class certification is necessary to ensure that Defendants do not escape liability for their deceptive practices.  However, this argument alone is insufficient to justify class certification.  The Court must consider whether, from a practical perspective, the proposed class is suitable for class adjudication.  The Court cannot certify a class simply because the plaintiffs hold nominal claims and present evidence of deceptive practices by the defendants.  Rule 23 imposes more stringent requirements that are designed to ensure that class actions are manageable and that the due process rights of absentee plaintiffs are respected.  See Newton, 259 F.3d at 182 ("The Rule

34

23(a) class inquiries (numerosity, commonality, typicality, and adequacy of representation) constitute a multipart attempt to safeguard the due process rights of absentees.").  As discussed at length above, there are significant practical obstacles to fairly adjudicating Plaintiffs' proposed class claims.  This Court is bound by Rule 23's certification requirements, and Plaintiff's proposed class does not satisfy those requirements.

## V.     CONCLUSION

For the reasons discussed above, Plaintiffs' motion for class certification is denied.  An appropriate Order shall follow.

Dated: <u>10/20/10</u>                                                    <u> /s/ Robert B. Kugler         </u>
                                                                          Robert B. Kugler
                                                                          United States District Judge